IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CIVIL NO. 10-1581

PETER BROWNSTEIN,                    :
                                     :
          Plaintiff,                 :   TRANSCRIPT OF PROCEEDINGS
                                     :
          -vs-                       :
                                     :          TRIAL
TINA LINDSAY and E-TECH,             :
                                     :
          Defendants.                :
                                     :
- - - - - - - - - - - - - - - - - -

                              Trenton, New Jersey
                              February 14, 2012


          B E F O R E:

               THE HONORABLE JOEL A. PISANO
               UNITED STATES DISTRICT COURT JUDGE
                    and a JURY


          A P P E A R A N C E S:

          MC DANIEL LAW FIRM
          BY:  JAY R. MC DANIEL, ESQ.,
               BONNIE PARK, ESQ.,
          For the Plaintiff.

          KIRSCH, GARTENBERG, HOWARD
          BY:  JESSE KLAPROTH, ESQ.,
          For the Defendants.


          Pursuant to Section 753 Title 28 United States
          Code, the following transcript is certified to be
          an accurate record as taken stenographically in the
          above-entitled proceedings.


                    _____
                    S/Joanne M. Caruso, CSR, CRR
                       Official Court Reporter
                          (908)334-2472

| WITNESS | DIRECT |
|---|---|
| PETER BROWNSTEIN | |
| By Mr. McDaniel | 90 |

1                    February 14, 2012

2          (The following takes place out of the presence of

3      the jury.)

4          THE COURT:  Good morning.

5          Everybody is prompt and ready to go.  We have

6  preliminary issues to resolve and we'll see where we're going.

7          First of all, Mr. McDaniel.

8          MR. MC DANIEL:  My partner, Miss Park and Mr.

9  Brownstein.

10          MR. KLAPROTH:  This is Tina Lindsay, my client.

11          Back here is Zach Wilhoit, CEO E-Tech.

12          THE COURT:  I have been through all of the papers

13  that you've sent in and who is this gentleman?

14          MR. MC DANIEL:  Sorry, your Honor.  That's Magiano,

15  he's a technician, Vince Magiano.

16          THE COURT:  Miss Park, your first name is Bonnie?

17          MS. PARK:  Yes.

18          THE COURT:  We have a couple of issues.  First of

19  all, there are two legal issues that need to be resolved.

20  There's some sort of in limine motion, which has to do with

21  the admissibility of some settlement agreements in prior

22  litigation, and there's also an issue about whether or not the

23  defense can call certain people as witnesses, even though they

24  were never disclosed in discovery, right?

25          MR. KLAPROTH:  Right.

1          THE COURT:  So let's take that one first.

2          Mr. Klaproth, you've got a motion here that's couched

3     in terms of appealing portions of the final pretrial order

4     which precludes some witnesses.

5          If you take a look at the final pretrial order,

6     you'll see that the magistrate judge has, indeed, precluded a

7     couple of witnesses.  This appears on page 26 of the final

8     pretrial order.

9          Who is it that you want to call?  We've got Mr.

10    Wilhoit, who is precluded and who are the other people, Mr.

11    Klaproth?

12         MR. KLAPROTH:  John Hosfield, who is a programmer

13    with Ethnic Technologies; Joanne Nicholson, who is another

14    programmer with Ethnic Technology; David Reinken, who is  a

15    programmer with Ethnic Technology and I see the magistrate

16    judge will not be called for Allan Lawrence, but he's another

17    person we would call, a programmer.

18         THE COURT:  I have Hosfield, Lawrence, Nicholson and

19    Reinken are programmers?

20         MR. KLAPROTH:  Yes.

21         THE COURT:  What's the objection?

22         First of all, why were they precluded?  Was there an

23    objection, Mr. McDaniel?

24         MR. MC DANIEL:  There was.

25         THE COURT:  What was it?

1          MR. MC DANIEL:  Two-fold.  One, they weren't

2    disclosed in the Rule 26 disclosures and we haven't had an

3    opportunity to depose them.

4          Secondarily is that at this juncture their testimony

5    is not relevant.  These are employees who came after the

6    events that are at issue in this case.  In fact, several years

7    later.

8          The point of their testimony appears to be to conduct

9    an analysis of some sort of the programs that were then in

10   existence when they came some years later and they're going to

11   testify -- I think the idea is that they would testify that

12   they're not novel, that they're simple, easy whatever.

13         THE COURT:  It sounds like expert testimony.

14         MR. MC DANIEL:  It is expert testimony in the first

15   instance.  In the second instance --

16         THE COURT:  Hold it.

17         Let's get back to business.  Wait a minute.

18         In reading the summary of their testimony, Mr.

19   Klaproth, first of all, they look like expert witnesses to me.

20   Indeed, you represent Mr. Hosfield as an expert witness.

21         MR. KLAPROTH:  Yes, your Honor.  That's actually the

22   purpose of our motion was to ensure that we could call them

23   not for the summaries that are listed here in the pretrial

24   order, because the magistrate basically ruled that their

25   testimony would be opinion testimony, it's not really relevant

1  at the trial.

2       Our motion is to reserve the right to call them as

3  rebuttal witnesses, just on the very specific issue of

4  credibility as to the plaintiff, on certain issues.

5       THE COURT:  That's also the basis for Mr. Wilhoit's

6  testimony?

7       MR. KLAPROTH:  Mr. Wilhoit's testimony will be that

8  he had a conversation with the plaintiff prior to being

9  retained as CEO.  At that conversation it was discussed that

10 there were copyrights, it was understood by the people in the

11 meeting that these copyrights were owned by Tina Lindsay and

12 by Ethnic Technologies.

13      So the way I anticipated it working is asking Mr.

14 Brownstein whether or not he had that conversation or was

15 present for those conversations.  If he says no, then I would

16 call Mr. Wilhoit and ask him the same question, were you

17 present for those conversations, was that discussed.

18      THE COURT:  Do I have it right that Mr. Wilhoit was

19 never disclosed in Rule 26 as a defense witness?

20      MR. KLAPROTH:  That's correct.

21      THE COURT:  How do you get it in?

22      MR. KLAPROTH:  On the small issue of rebuttal.

23      THE COURT:  But here's what I'm not getting: You

24 mentioned this before and we haven't had it on the record, but

25 we've had this conversation before and in your papers, you

1 characterize -- let's talk about Mr. Wilhoit.  You

2 characterize him as a rebuttal witness, but what we have here

3 is a case, Mr. Brownstein is making claim for authorship of a

4 copyright and the defense in the case is, among other things,

5 the statute of limitations.

6        Now, Mr. Wilhoit is being offered as a witness on the

7 question of the statute of limitations.  Did you have this

8 conversation and if so, when?  And under case law, is this

9 information which should have given to Mr. Brownstein such

10 knowledge of the circumstances that he was aware of the fact

11 that this claim should be asserted?

12        This isn't rebuttal.  This is simply a defense.  You

13 know, rebuttal is generally something that a plaintiff would

14 offer in order to rebut something that comes in in the defense

15 case.  So Mr. Wilhoit is certainly not a rebuttal witness,

16 he's a defense witness and I understand the basis for your

17 proffer, but that's pretty fundamental and he should have been

18 disclosed and if he wasn't disclosed, there's prejudice to the

19 other side because they didn't take his deposition and may not

20 be prepared to meet the testimony.

21        So, Mr. McDaniel, if you object to it, I'm going to

22 sustain it.  On the other hand, if you want some other sort of

23 remedy, if you want to take his deposition or something, we

24 can do it that way.

25        MR. MC DANIEL:  I would just object to it.

1    THE COURT:  He wasn't disclosed and there's not good

2    reason to reverse the magistrate judge's decision.

3    I don't understand something else also.

4    You say, Mr. Klaproth, in your papers that there's

5    something in Rule 26 that let's you not disclose a rebuttal

6    witness?  Where is that?

7    MR. KLAPROTH:  Rule 26 provides that witnesses or

8    actually impeachment evidence does not need to be disclosed.

9    THE COURT:  Where is that?  You cited --

10    MR. KLAPROTH:  It's 26(a)(1), subpart (a)(2).  It

11    lists what should be disclosed, a copy or description by

12    category and location of all documents and tangible things

13    that the disclosing party has in its possession, custody and

14    control may be used to support its claims or defenses unless

15    the use would be solely for impeachment.

16    THE COURT:  Yes, but Rule 26(a)(1) talks about

17    initial disclosure obligations, not about general discovery

18    obligations.  Other parts of Rule 26 are the fundamental parts

19    of the rule which talk about parties' obligations to provide

20    discovery during the course of litigation.

21    Rule 26(a)(1) talks about initial disclosures, what

22    you've got to come up with in the beginning.

23    I don't think there's any such provision in the rules

24    to support you on Mr. Wilhoit, so he is precluded.

25    What do we do about these others folks?  You know,

1  you say they're expert witnesses, but even more fundamental

2  than that, Mr. McDaniel seems to be right about relevance.

3  We're not talking here about whether or not Miss Lindsay's

4  work was copyrightable.

5         What we're talking about here is whether or not

6  Brownstein is a co-author, so what's the relevance of the

7  similarity of something one way or the other, and similarity

8  of what?

9         MR. KLAPROTH:  Well, in order to be a joint work,

10  which would have one or more authors, it needs to be

11  inseparable and interdependent.  Mr. Brownstein will testify

12  that her copyright, his programs were independent and

13  inseparable.  The programmers would say, no, they're capable

14  of being separated, other programs can utilize her system, so

15  that would be the relevance.

16         THE COURT:  Is that part of the defense here?

17         MR. KLAPROTH:  Absolutely.  I mean, part of the

18  elements of the plaintiff's case is he needs to show it's a

19  joint work, he needs to show that the authors shared an intent

20  to be co-authors and that the contribution of Mr. Brownstein,

21  if any, was copyrightable in and of itself.  Those are the

22  elements for co-author claim.

23         THE COURT:  How are you going -- how do you intend --

24  how did you intend to defend against that?

25         MR. KLAPROTH:  We intend to defend against that by

1   showing, number one, through Tina Lindsay's testimony, that

2   her system exists independently of any computer programs.

3   Computer programs you can utilize any miriad number of

4   computer programs in different languages, languages that

5   plaintiff can't even program in, to implement her system.

6           THE COURT:  All of these witnesses, Hosfield,

7   Lawrence, Nicholson and Reinken in the pretrial order are

8   offered as expert witnesses.  What was the objection to them,

9   Mr. McDaniel?

10          MR. MC DANIEL:  Well, one, I got no expert

11  disclosure.  I never saw a report, I don't know what they

12  relied on, I don't know anything about the scope of their

13  testimony.

14          THE COURT:  Is that true, Mr. Klaproth?

15          MR. KLAPROTH:  They were not disclosed in Rule 26.

16          THE COURT:  Then they're out, that's it, end of

17  story.

18          If you want to call people to give expert opinion

19  testimony, you've got to comply with the rules.  If you didn't

20  give notice, didn't produce reports, didn't submit the basis

21  for any opinions, then you can't call them.  That's

22  fundamental.  They're out.

23          What are we trying?

24          MR. KLAPROTH:  We have the other issue, the

25  settlement agreements.

1           THE COURT:  Oh, I'm sorry, the settlement agreements.

2           The settlement agreement is in connection with the

3    prior litigation.

4           MR. MC DANIEL:  And actually, there are two

5    settlement agreements, Judge.  I guess I'll speak first

6    because I think mine was the genesis of this, at least the

7    first one.

8           1998, there was a settlement agreement in this LSDI

9    litigation.  Now, it's being offered, as I understand it,

10   because in the settlement agreement, it says Tina Lindsay --

11   the parties acknowledge and agree that Tina Lindsay has

12   obtained -- do you have a copy of it?  Obtained a

13   registration, such and such number and has obtained a

14   registration, such and such number.  There are two different

15   paragraphs.

16          My objection is that fundamentally that document was

17   executed and prepared for a purpose that has nothing to do

18   with this case.  My client is going to testify that he had

19   knowledge of the filing of the copyright registration that

20   they're referring to so it's redundant.  He's going to testify

21   to that.

22          The second thing is that this is a long document and

23   it contains a bunch of ambiguous provisions.  I see us going

24   down this whole line of examination about what the parties

25   intended.

1          THE COURT:  What's the portion -- we're looking at

2    the settlement agreement of September 18, 1998?

3          MR. MC DANIEL:  That's correct, Judge.

4          THE COURT:  This is between List Service Direct, Inc.

5    And Raskin on the one part and Lindsay, TAP, Nelson, Consumer

6    Marketing Research, Brownstein and Ethnic Technologies and all

7    of those folks have signed this.

8          MR. MC DANIEL:  Right.  So you have paragraphs three

9    and four.

10          THE COURT:  Okay.

11          MR. MC DANIEL:  So you also have, however, you have

12    other paragraphs that contradict -- paragraph 18 says that

13    Lindsay, Nelson, Brownstein, ET, TAP and CMR represent that

14    they are the sole owners of the copyrights and publications

15    identified in paragraphs two, three, four and five.  I think

16    that --

17          THE COURT:  Hold it.

18          Are the copyrights the same copyrights that are in

19    this litigation?  Yes?

20          MR. MC DANIEL:  Well, they are.

21          THE COURT:  Okay.

22          MR. MC DANIEL:  In part, let's put it that way.

23          THE COURT:  Okay.

24          MR. MC DANIEL:  They include the works that are at

25    issue in this litigation.  So my point is that it's a

1    settlement agreement.  As a general proposition, settlement

2    agreements, you know, should not come in because they're not

3    intended to be evidence.

4         Now, in this case it's probably being offered for

5    notice.  However, as to the notice, it's redundant to the

6    testimony that I think is uncontroverted and I think that

7    there's a great deal of likelihood of prejudice to the jury

8    because unless we conduct extensive examination about the

9    settlement agreement itself, what the parties were doing, what

10   the deal was, what they intended, how long they had a chance

11   to look at it, what these other provisions mean, it's

12   confusing.

13        The jury's going to be in there with this document

14   trying to figure out what it means.  I don't think that on the

15   whole, given the fact that it's cumulative and given the fact

16   that it's a settlement document and given the fact that it's

17   ambiguous in various phases, that on the whole it should stay

18   out under a 403 analysis.

19        THE COURT:  403?

20        MR. MC DANIEL:  I think that its probative value is

21   nominal because Mr. Brownstein is going to testify as to the

22   essential point they want to offer.

23        THE COURT:  There was some briefing about whether

24   it's excludable under Rule 408.

25        MR. MC DANIEL:  I think it's also a settlement

1    document.  It's a settlement document -- the let me put it

2    this way:  The policy considerations that guide us in Rule 408

3    determinations are applicable here.  I think it falls within

4    the scope of Rule 408.

5           I can see he has a fairly good argument it's not

6    offered for the truth of the matter asserted, as to an

7    admission of liability because it really doesn't fit in the

8    circumstances, and so maybe if it was crystal clear and wasn't

9    going to confuse the jury, I might feel a little bit

10   differently about it, but given the fact that it is a

11   settlement document, it's kind of something that we should

12   look at carefully and the fact that it's cumulative, very low

13   probative value and is certain to confuse the jury, I think it

14   should stay out.

15           THE COURT:  Well, let's discuss a couple of things

16   first.

17           Rule 408, in my view, does not apply to the situation

18   because Rule 408 keeps out of a case offers to compromise or

19   statements made in connection with the negotiation of a

20   potential settlement of the case that's before the Court and

21   the language in Rule 408 is clear.  In Rule 408 (a)(1) and

22   (a)(2), it speaks in terms of the communications in connection

23   with "the claim", so I don't think it's a Rule 408 problem.  I

24   think Mr. Klaproth is right about that.

25           Under Rule 403, however, you may have a point, but

1   I'm curious to know why some instruction to the jury can't
2   take care of any confusion that you say will come out of this.
3   The fact of the matter is, it's not hearsay.  It's a contract.
4   Mr. Brownstein signed it and it is historical fact that
5   whatever the legal dispute was between Brownstein and Lindsay,
6   because at that point they appear to have been on the same
7   team, whatever the legal dispute was at the time was
8   negotiated as a business event and that he signed this
9   document.
10          Now, what's important from the document is whether or
11  not it gives credence one way or the other --
12          MR. MC DANIEL:  Right.
13          THE COURT:  -- to his knowledge of Lindsay's now
14  claim that she's the sole author or that it somehow undermines
15  Lindsay's now argument that she's the sole author.
16          It would seem to me if there are provisions in the
17  contract that can be argued on that point, those provisions --
18  those limited provisions in the contract are relevant.
19          MR. MC DANIEL:  I think with the curative instruction
20  that the issue could resolve it.
21          THE COURT:  What do you think?
22          MR. MC DANIEL:  If I can get a curative instruction,
23  I'll be prepared to withdraw the objection.
24          MR. KLAPROTH:  I don't know what the curative
25  instruction would do.  If there is a part of this document

1   that somehow negates those two paragraphs, then that's

2   something that he can bring up through his client or he can

3   argue.  He can point out a different provision.

4          THE COURT:  I agree with you.  I'm thinking along the

5   lines of something to the jury as if to say, look, this is a

6   lengthy document.  It says it's a settlement agreement and

7   you're instructed that there was a lawsuit -- there was a

8   litigation between some parties in 1998, and it was negotiated

9   by the parties and settled by terms of this contract and

10  what's important about this contract is whether or not it's

11  probative of Brownstein's knowledge or lack of knowledge about

12  Lindsay's now claim that she's the sole author, something like

13  that.  I leave it to you to draft.

14         MR. KLAPROTH:  Yeah, that's fine.

15         THE COURT:  First of all, I don't think it's

16  prejudicial one way or the other.  It's not hearsay.  It's not

17  being offered for the substance of the settlement of that

18  litigation and it is probative of an issue in this case.

19         MR. KLAPROTH:  Yeah, I'd be fine with that

20  instruction.

21         THE COURT:  Work on something and we'll talk to the

22  jury about it.

23         What about the other contract?  The other document,

24  is entitled "Settlement Agreement, May 25, 2010, Between

25  Ethnic Technologies, TAP, Nelson, Lindsay, Wilhoit and

1  Brownstein."

2        What is this all about?

3        MR. MC DANIEL:  I'm not sure why it's being offered.

4        THE COURT:  Mr. Klaproth, is this the agreement that

5  resulted in the settlement of everything between Brownstein

6  and Lindsay, except for this case?

7        MR. KLAPROTH:  Absolutely, your Honor.

8        THE COURT:  How is it relevant to this?

9        MR. KLAPROTH:  Well, it's relevant because it shows

10  how his employment at E-Tech ended, which is part of this

11  story.  I think without this, the potential is that the jury

12  could, may infer that he's not there any more because he was

13  let go or laid off and that they could confuse the two.

14        I think that an instruction here would be perfect,

15  too, just to explain that there was a state court settlement,

16  Brownstein's shares were brought out and it has nothing to do

17  with this case.

18        THE COURT:  Well, it is also historical fact that

19  there's been -- there have been other issues litigated by

20  these parties and it's also historical fact that these parties

21  agreed to segregate the discreet claim being tried in this

22  case from everything else.  Why can't we just tell the jury

23  that that happened, here's the settlement agreement, you're

24  not to draw any inferences one way or another about anything,

25  other than the fact that the parties have segregated this

1   dispute over the copyright and that's what you're here to

2   decide, but this gives you a perspective, something like that.

3   You can write it.

4         MR. MC DANIEL:  I have no problem if they get an

5   instruction that says there was a prior litigation, we can

6   characterize it and so forth.  I don't want them to see the

7   agreement because I don't think they should know what Mr.

8   Brownstein received for his compensation for his sale of the

9   shares of TAP.  I think they could draw an inference from that

10  that's unacceptable.

11        THE COURT:  What about a stipulation, Mr. Klaproth?

12  Just a simple stipulation that there was prior litigation,

13  that everything in it was settled, which is why Mr. Brownstein

14  is no longer in business with Miss Lindsay?

15        MR. KLAPROTH:  I think as long as the jury knows that

16  his shares were purchased and that's not part of this case.

17        THE COURT:  Fine.

18        MR. KLAPROTH:  Yes.

19        THE COURT:  I think that's the right way to do it.

20        MR. MC DANIEL:  I agree.

21        THE COURT:  You fellows can work on the language.

22        Is there anything else we need to do before we get

23  the jury?

24        MR. MC DANIEL:  I guess -- we've agreed, each of us,

25  to allow the other to use some PowerPoints.  I was going to

1    use some in my opening, Jesse wants to use them, he may as

2    well.  Then preliminary statement of the case, which we had

3    some changes to.

4            MR. KLAPROTH:  Yes, I got your changes.

5            THE COURT:  May I, your Honor?

6            MR. MC DANIEL:  Sure.

7            THE COURT:  Have you agreed on it?

8            MR. MC DANIEL:  There's some changes to it.

9            This is -- most of the changes -- you know what,

10   there is one other issue that we haven't talked about and that

11   is the equitable claims that are in this case.  Neither the

12   Court or adversaries talked about constructive trust or

13   equitable estoppel.

14           I assume the jury is going to consider those issues.

15           THE COURT: Is going to what?

16           MR. MC DANIEL:  Is going to consider those issues.

17   The Court's not going to take that issue back.  There's an

18   equitable claim for constructive trust and there is an

19   equitable estoppel claim which I think both sides were

20   asserting.

21           There is no per se right to jury trial of those

22   equitable claims, but nobody's made a motion and the Court has

23   brought it up, so the jury's going to get that issue?

24           MR. KLAPROTH:  No, I think that the replevin claim is

25   an equitable claim.  I think that to the extent that the jury

1  makes a determination on it, that should be advisory.  I think

2  the same thing with equitable estoppel.

3       To the extent that that claim is there which we said

4  was not pled as a claim, and doesn't find its way into the

5  pretrial order, but to the extent there's any equitable

6  claims, I have no problem with the jury deciding them but I

7  think ultimately it's the Court's province to make the

8  decision.

9       THE COURT:  The way I envision this, these equitable

10  claims, this replevin and the claims for the imposition of a

11  trust really only come into play in the event the jury finds

12  that the action was not barred by the statute of

13  limitations --

14       MR. KLAPROTH:  This is true.

15       THE COURT:  -- if, in fact, the action is not barred

16  by the statute of limitations, then the only question is

17  whether or not whatever Mr. Brownstein did, is or should be

18  properly includable in the copyright and those are issues that

19  the jury will decide, and if the jury finds in favor of

20  Brownstein on those issues, then I think as a matter of law

21  the Court would enter a judgment on those equitable claims.

22       MR. MC DANIEL:  Agreed.

23       THE COURT:  That would mean that Brownstein wins and

24  he would be entitled, it would seem to me --

25       MR. MC DANIEL:  Agreed.

1          THE COURT:  -- to these equitable remedies.

2          MR. MC DANIEL:  I bring it up just so we're clear and

3    there aren't objections.

4          THE COURT:  So what we're trying to the jury, so

5    we're all clear on this, is whether or not Mr. Brownstein had

6    knowledge or should have had knowledge prior to three years

7    before the lawsuit was filed --

8          MR. MC DANIEL:  On the statute of limitations.

9          THE COURT:  -- as to Miss Lindsay's claims that he

10   was not a co-author?

11         MR. MC DANIEL:  That's correct.

12         THE COURT:  And whether or not Mr. Brownstein had

13   knowledge or should have had knowledge more than six years

14   before he made a claim for the return of these computer

15   programs, this replevin claim.

16         MR. MC DANIEL:  I agree.

17         However, in both cases, the injury fact date is an

18   important consideration.

19         THE COURT:  The what?

20         MR. MC DANIEL:  The date of injury in fact.  Our

21   point is injury in fact does not occur until 2010, so they

22   have -- in order to establish their statute of limitations

23   defense, the first thing they have to do is show injury in

24   fact that occurred more than three years before.

25         THE COURT:  Yes.

1          MR. MC DANIEL:  Then they have to go back.  I think,

2    Judge, in terms -- this comes up in the statement of the case.

3    The first thing that the jury has to do is decide what is the

4    work, what's the copyrightable thing that we're arguing about?

5    There's a difference between the parties about what that is.

6          Our position is that the work is this ethnic

7    determination system that was named ultimately called the LCID

8    and that that work was fixed in a standard usable form

9    including software during 1994.

10          The issue of the subsequent events -- and that's the

11    whole issue of what did Peter contribute, what did Tina

12    contribute, what's the nature of the thing.

13          Then we have the issues of later filings and other

14    actions that would have occurred, but that's one of the issues

15    that I have with the statement of the case because I think

16    it's important that we not confuse registration with fixing.

17    The fixing of a copyright occurs or the existence of

18    copyrights arise at the moment of the fixing of a creative

19    work.

20          Registration is another process.  It can provide

21    notice, it can provide remedies, but the registration is not

22    the work.  So I had some changes along those lines.

23          MR. KLAPROTH:  I mean, I think, first of all, that's

24    their factual contention that's why it shouldn't be in the

25    statement of the case.

1          Second of all, if the registrations aren't the issue,

2     then what should he have been added as co-author of?  If there

3     was a common law copyright, which is what I take it to mean

4     that Mr. McDaniel is arguing, I don't understand how he could

5     be made a co-author, because there's nothing to register.  So

6     from our position, the issue is the registrations, the 1996

7     registrations, so I don't think we should get into this in the

8     statement of the case at least, this 1994 copyrighted work or

9     versus 1996 registration.  We can call it the copyrighted

10    work.  I mean, that's sort of encompasses the whole thing.

11          MR. MC DANIEL:  Well, you know --

12          THE COURT:  The way I looked at this was to simplify

13    it, because there's a lot about copyright law that we really

14    don't need to put to this jury.  It seems to me that the

15    fundamental issues for the jury to decide, first of all, is

16    Brownstein a co-author?  If so, if Brownstein is a co-author,

17    did he fail to assert his claim to the copyrighted work in a

18    timely fashion?

19          MR. MC DANIEL:  I agree.

20          THE COURT:  Those are the two fundamental issues.

21    Now, he bears the burden of proof on the co-authorship.

22          MR. MC DANIEL:  Exactly.

23          THE COURT:  Who bears the burden of proof on the

24    statute of the limitations?

25          MR. MC DANIEL:  The defendant.

1          MR. KLAPROTH:  The defendant.

2          THE COURT:  It's an affirmative defense.  So we've

3   got to tell the jury that you have to prove that your client

4   is a co-author and he has to prove that -- by the way, if the

5   jury finds he's not a co-author, then the case is over.

6          MR. KLAPROTH:  Correct.

7          MR. MC DANIEL:  Then we're done.

8          THE COURT:  On the other hand, if they do find he's a

9   co-author, the defense bears the burden of proving that he

10  failed to assert his interests in a timely fashion.

11         MR. MC DANIEL:  And my essential concern is that

12  because we view this -- I would disagree with my adversary on

13  the issue of common law copyright, there's just no such

14  creature.  I'm talking about what the statute says.

15         My concern is that if the Court refers to this as an

16  issue over the copyrighted work with reference to the

17  copyright -- the deposit copies which are here, then I'm

18  arguing back later contrary to something that the Court has

19  already said and I think I would be prejudiced by that.

20         So I think it's important to stick with the idea of

21  the work, at least at this stage.  It doesn't prejudice my

22  adversary.  I think his essential argument is that the

23  copyrights were notice and he may say that the work was not

24  fixed in 1994, it was fixed in 1998, or whatever other year,

25  but the question of the fixing of the work is a statutory one

1    and it is distinct from the registration of the work.

2         So I'm concerned that the jury not hear from the

3    Court at the outset referring to the work as that work which

4    was registered.

5         THE COURT:  Here's what I intend to tell the jury.  I

6    intend to tell the jury that in this case, Peter Brownstein,

7    the plaintiff, claims that he is the co-author of a

8    copyrighted work that is subject to two copyright

9    registrations by Tina Lindsay, the defendant.

10        Tina Lindsay denies that Peter Brownstein is a

11   co-author of the work and further claims that his failure to

12   bring this lawsuit in a timely fashion prevents him now from

13   recovering.

14        There are two fundamental issues for the jury to

15   determine.  One, is the plaintiff a co-author of the

16   copyrighted work and he bears the burden of proof by

17   preponderance of the evidence that he is.  If so, the second

18   issue for the jury to determine is whether the defense can

19   show by a preponderance of the evidence that Mr. Brownstein

20   failed to assert his interest as a co-author in the

21   copyrighted work in a timely fashion, which will be described

22   in final instructions, i.e., there's a statute of limitations

23   defense.

24        There's also a claim that Mr. Brownstein makes for

25   the return of certain computer programs and it is also the

1  defenses' position that he has failed to assert that claim

2  within a timely fashion.

3         I'm going to leave to you in your arguments all of

4  the factual assertions that you make in support of those

5  positions.

6         MR. MC DANIEL:  I think that gives them a good

7  chapter overview and it doesn't prejudice anyone.

8         THE COURT:  As we try the case, we can find out what

9  we really have to include in a final instruction and what we

10 can leave out.

11        MR. KLAPROTH:  Sounds good.

12        MR. MC DANIEL:  That sounds good to me.

13        THE COURT:  Let's get the jury panel.  We have 25

14 people.  We have a questionnaire that we're going to put them

15 through.

16        I have included in the questions of voir dire three

17 of the questions submitted by you, Mr. McDaniel, but not the

18 others.  I didn't get any voir dire from the defense.

19        Does anybody have any objections?

20        MR. KLAPROTH:  I have no objections to the ones he

21 submitted.

22        THE COURT:  That's what they're going to get.

23        MR. MC DANIEL:  Do you put them in the box or

24 question them?

25        THE COURT:  We put them in order.  We're going to

1   have 16 people, one through 16 in the box and then 17 through

2   25 in the row.  We hear from all of them and then if there are

3   supplemental questions, we put them to them, find out if

4   there's any reason why they can't serve.  Then we will excuse

5   them, we'll take challenges for cause or by consent and then

6   peremptory challenges.

7           MR. MC DANIEL:  Thank you.

8           THE COURT:  You get three each.

9           MR. MC DANIEL:  Three each.

10          THE COURT:  We're going to have seven trial jurors

11  and in the federal rules, the jury needs to be unanimous.

12          Now, before we ask them to come up the elevator, I

13  ask Mr. Brownstein, Miss Lindsay, this is a business dispute.

14  As business people, you have resolved other business disputes

15  by reaching settlements.

16          I've attempted to meet with your lawyers in

17  connection with reaching a settlement here.  They tell me that

18  you're not interested in that.  This is, I'm not going to say

19  it's your last chance because we sometimes settle cases in the

20  middle of a trial, but I always think that business people are

21  better equipped to make their own resolutions than courts and

22  jury's.

23          You have a right to a jury trial and we're prepared

24  to start it this morning.  If you want to have a minute to

25  talk to one another, I'll give it to you.

1          MR. KLAPROTH:  No on our end.

2          THE COURT:  Okay.  Off we go.

3          (Recess.)

4          (The following takes place in the presence of the

5     jury.)

6          THE CLERK:   All rise.

7          THE COURT:  Thank you, good morning.

8          Have a seat.

9          I'm Judge Pisano.  I'm a United States District Judge

10    and I'm going to be presiding over the case you have been

11    called in here for.

12          At the outset -- I take it, by the way, you have been

13    appropriately greeted by our clerk staff and everybody here in

14    the court.  I hope they've made you feel comfortable and

15    welcomed you.  I also trust you had the benefit of the

16    orientation video and that you have a general sense of what

17    you're going to be doing here.

18          Before we go any further, I want to tell you that I

19    understand and everybody in the courthouse understands that

20    you folks probably would rather be somewhere else this

21    morning.  We understand that service on jury's is a burden to

22    our citizens, it interferes with your business lives, your

23    personal lives, whatever else you want to be doing.

24          It is also, however, one of the most fundamental ways

25    that we exercise our citizenship in this country.  It's very

1    important that you folks have responded to the summons.  It's

2    an obligation that we all have.  As a matter of fact, I'm

3    going to Monmouth County myself on jury duty in two weeks.

4    It's an obligation all of us have, but we do appreciate the

5    fact that it's a sacrifice.

6          We'll try to make this experience for you, if you

7    are, indeed, selected to sit on this case, one that is

8    something that you would be proud to have done.  We try to

9    make it interesting, we'll try to keep the case going, we'll

10   try not to have you sitting in the jury room without too much

11   action and, again, we want you to leave here at the end of the

12   case thinking that you have been rewarded.  We do appreciate

13   the fact it's a sacrifice to you and that you've come in here

14   today.

15         Now, I'm going to tell you something very basic about

16   the case and then we're going to engage in the jury selection

17   process.  You have been given some questionnaires, I take it?

18   At the outset, let me explain to you that what we call this is

19   voir dire.  That's what the jury selection process is called.

20   I tell you that as a matter of law and as a matter of fact,

21   this is a selection process.  The lawyers representing the

22   parties are entitled to use their judgment and discretion in

23   selecting who are going to be ultimately chosen to sit on the

24   jury.

25         In order to do that, we need to get certain

1 information about you so that the lawyers can make intelligent

2 decisions as to whether they want to select you to sit on this

3 jury or not.

4        None of what we're asking you is intended to be

5 overly personal, certainly isn't intended to pry into your

6 personal lives, but it is something that the lawyers are

7 entitled to have and we appreciate your candor and cooperation

8 in this regard.

9        At the outset, let me tell you something very, very

10 general about the case because you're probably wanting to know

11 what it is that you're going to be sitting on here.  I'm going

12 to tell you that this is a civil case.  It is not a criminal

13 case.

14        It's a civil case and the name of the case is Peter

15 Brownstein, who is the plaintiff, and this is Mr. Brownstein

16 sitting behind counsel table, is the plaintiff and he's

17 bringing a claim against two defendants; one of the

18 defendant's is Tina Lindsay sitting here at counsel table and

19 also against a company by the name of Ethnic Technologies,

20 LLC.

21        It is a claim that can generally be described as

22 concerning a copyright and a copyright is something which

23 presents federal court jurisdiction and that's why you're here

24 in the United States District Court.  Generally speaking, it

25 is a civil case.

1          Mr. Brownstein is making a claim, first of all, that

2  he is the co-author to a copyrightable work which has the form

3  of being in a computer program.  He is also making a demand

4  for the return of certain computer programs and he's making

5  these claims against Miss Lindsay.

6          On the other hand, Miss Lindsay and Ethnic

7  Technologies, LLC denies that Mr. Brownstein is a co-author of

8  any copyright.  They also deny that he has the right to demand

9  the return of any computer programs and as an affirmative

10 defense, they also contend that Mr. Brownstein has failed to

11 assert any interest that he might have in these materials

12 within the time required by the law for a claim to be brought.

13 In other words, it's a statute of limitations defense.

14         I'll be giving some more particular instructions on

15 all of these as we get into the case, but I don't want you to

16 sit here in a complete vacuum and not understand what it is

17 that the case is about.  Essentially it's a dispute over the

18 rights to a copyright, the copyright has to do with some

19 computer programs and I'll leave to the attorneys and the

20 witnesses in the case particular arguments as to the facts of

21 the case.

22         I want to introduce some of the other folks who are

23 here.  Mr. Brownstein is represented by lawyers, Jay McDaniel

24 and Bonnie Park.

25         MR. MC DANIEL:  Good morning.

1          THE COURT:  The gentleman in the back is Vince Magio.

2     He is a technician and might be operating the computers with

3     some of the exhibits on the screen.

4          Miss Lindsay and Ethnic Technologies are represented

5     by Jesse Klaproth.  He is here and also with Miss Lindsay is

6     Mr. Zach Wilhoit, who is involved in the business of Ethnic

7     Technologies.

8          Are there other witnesses or people whose names may

9     be mentioned, Mr. McDaniel, Mr. Klaproth?

10          MR. MC DANIEL:  I think the only other people whose

11     names may come up woulb be Ginger Nelson, who is one of the

12     owners of Ethnic Technologies and Tom and Micah Raskin, what

13     is that name?

14          MR. MC DANIEL:  Thomas and Micah Raskin.  They were

15     owners of the prior business that both the parties worked out.

16          THE COURT:  Mr. Klaproth, anybody else?

17          MR. KLAPROTH:  The business that he just referred to

18     is LSDI, so that's another business name that's going to come

19     up.

20          THE COURT:  We give you those, folks, do any of you

21     think you know any of the people that have been introduced to

22     you, any of the lawyers, any of the folks whose names have

23     been mentioned?  Do any of you think you know me or anybody

24     else in the court, Mr. Murphy here, Joanne, our court reporter

25     par excellence, Charlie, crack security officer.  Does anyone

1 think you know anybody or do you think you know anything about

2 this case?  No, okay.

3          Well, then with that, we're going to go into the jury

4 selection.  I also want to give you an idea about the trial

5 because one of the things we're going to be asking you is,

6 first of all, is there any reason why you can't be a fair and

7 impartial juror and secondly, is there any reason why you

8 can't serve on the case.

9          I want to tell you that as things go, this is

10 estimated to be a brief trial and according to counsel,

11 everyone expects that this case can be tried and concluded

12 before the end of this week.

13          Now, I tell you that that's an estimate, don't hold

14 me to that if you find yourself here next Tuesday because we

15 don't have the ability to predict exactly how long witness'

16 testimony will be, the schedule of witnesses, whether I get

17 involved in an emergent matter, but I represent to you that we

18 fully expect the case to be concluded by the end of the week

19 and we'll do our best to keep it moving for you.

20          That being said, all of you folks have been given a

21 questionnaire which has 13 questions on the first page and

22 then three questions on the second page.  What I'd like to do

23 is to give everybody a chance to get to know each other and

24 one at a time I'd ask you to stand up and in a clear voice

25 just go down the questions and give us the answers.

1          Dan's going to give you a microphone.  Please try to

2   keep your voice up.

3          (Jury selection not transcribed.)

4          THE COURT:  All right.

5          MR. KLAPROTH:  Jury is acceptable.

6          MR. MC DANIEL:  Jury is acceptable.

7          THE COURT:  All right.

8          Now, before they come back, they've got some time and

9   we need a break.  In terms of preliminary instructions, are

10  you folks together on what you handed up to me?

11         MR. MC DANIEL:  I think we need to go through that

12  between us.

13         THE COURT:  Take a look at it because I would intend

14  to read the part of this document that's pages -- the part of

15  page two that begins "Preliminary jury instructions" and read

16  through page three.

17         MR. KLAPROTH:  Yeah, I mean I have some comments on

18  that changes to the document.

19         MR. MC DANIEL:  Maybe we can work it out.

20         THE COURT:  If you can work it out, that's great.  If

21  you can't, tell me.

22         MR. KLAPROTH:  It's worth five minutes.

23         THE COURT:  We'll take five minutes.  We'll take a

24  short break, we'll have the jury back in, we'll excuse those

25  who we do not use and have the other seven go into the jury

1  room and get acquainted and then work this out and have them

2  back in and get started.

3          THE CLERK:  All rise.

4          (Recess.)

5          THE COURT:  Have a seat.

6          How did you make out?

7          MR. KLAPROTH:  We actually made some progress.

8          THE COURT:  I'll tell you what, let's do what I

9  suggested.  We'll send the seven in, get together on our own

10 matters and when we have them back, we'll give the preliminary

11 instructions, go right to opening.

12         THE COURT:  Okay.

13         (The following takes place in the presence of the

14 jury.)

15         THE COURT:  All right.  Are we all here?

16         Have a seat, everybody.

17         Is anybody missing?

18         Thanks for your cooperation.

19         All right.  The attorneys have gone through the

20 selection process and what I'm going to do is excuse 18 of you

21 and ask seven of you to stay.  Now, those of you who are being

22 excused should not take this personally.  This is not meant in

23 any way, as I told you, to be personal, but the lawyers are

24 entitled to use their discretion in selecting the jurors and

25 if I do excuse you, please understand that we do so with

1  thanks and appreciation for the fact that you've come in here
2  today.  I know this has been, again, a sacrifice.
3      Now, I don't know if anybody else is trying a case
4  today.  If I excuse you, the good news is you're excused from
5  this case.  The bad news is you have to go back to the jury
6  department because they may need you.  I don't know if anybody
7  else is trying a case today.
8      You'll probably be excused and your obligations will
9  be satisfied.
10     In any event, with the thanks of the Court and the
11 parties, everybody is excused except for ** miss instead of
12 fan, miss /KHRAOUFP /KHAOE, Mr. Occurs see, miss company
13 /KWEUPB, Miss Lynch, miss zone meal I don't and Miss McBride.
14 You seven folks should stay, everybody else is excused with
15 the thanks of the Court.
16     Miss McBride?
17     MS. MC BRIDE:  You said it wouldn't be done before
18 the end of the week?
19     THE COURT: Relax.  If we're still going on Thursday,
20 we'll accommodate you for the weekend.
21     Gather ranks, get a little closer here.  Miss
22 McBride, why don't you stay in the second row and just move
23 over.  Miss Lynch, stay right where you are, you'll see the
24 witnesses better because the screen is in the way.
25     Welcome.  What we're going to do is this:  I'm going

1   to have a series of instructions for you that I'm working out

2   now in final form.  It will take another five minutes or so to

3   be complete on the language.  What I'm going to do is give you

4   a chance to go into the jury room and get acclimated to your

5   surroundings, get to know one another, take a break and we'll

6   have you back here.

7          I'm going to give you some preliminary instructions

8   in a little more detail about the case and about how the trial

9   is going to be run and then depending on where we are, we'll

10  move into the opening statements of counsel.

11         Now, we know, Miss McBride, we know you have

12  scheduling problems.  The lawyers have discussed it with me.

13  In the event the case is still going on Thursday afternoon,

14  we're going to accommodate you, we'll break early enough on

15  Thursday for you to get to where you have to go and because

16  Monday is a holiday, we'll also take Friday off also from the

17  case, also accommodating you and you folks can go to work and

18  do whatever you need to do.

19         MS. MC BRIDE:  It takes me two hours to get home.

20         THE COURT:  Don't worry about it.  Where do you live,

21  Sea Bright?

22         THE JUROR:  Sea Bright.

23         THE COURT:  It takes you two hours?

24         THE JUROR:  The traffic is very bad.  My husband does

25  it everyday from Philadelphia.  I know for a fact it's two

1   hours and I can't get there at 5 p.m.  I can't be there at

2   5:05.

3           THE COURT:  Calm down, it's okay.

4           The jury room is in the corner.  Dan, will take you

5   them there and we'll have you back here in a few minutes.

6           (Jury is excused and the following takes place out of

7   the presence of the jury.)

8           MR. MC DANIEL:  We were at the issue, your Honor, of

9   question of equitable estoppel.

10          MR. KLAPROTH:  This is page three.  We're at the last

11  paragraph where it starts, "In response to defendants' claim."

12          THE COURT:  I don't even have that.  I have the

13  document that Mr. McDaniel handed up.

14          MR. MC DANIEL:  It's actually --

15          MR. KLAPROTH:  I'm sorry, it should be there.  Right

16  above replevin claim, the underlying portion.  I guess it's

17  the last sentence, "In response to the defendants' claim,

18  statute of limitations."

19          THE COURT:  Right.

20          MR. KLAPROTH:  So my argument with that is, is that

21  this is the equitable estoppel part.  I don't necessarily know

22  that equitable estoppel is a claim.  If it is, it wasn't pled,

23  but if it's an equitable defense, it's something for the Court

24  to decide.

25          I think it's almost like an excuse if we -- if the

1  jury determines that plaintiff was on notice or should have
2  known of this claim before the statute of limitations, I think
3  that should be for the Court to decide whether he basically
4  has an excuse under equitable estoppel for the failure to
5  bring the claim.
6          I don't know if it's something that the jury needs to
7  be told.
8          MR. MC DANIEL:  I don't disagree with that.
9          THE COURT:  I agree with you.  I think that sentence
10  comes out.  I want to be as general about this as possible.
11  This isn't the time for detailed instructions.
12          MR. MC DANIEL:  No, no.
13          What about these couple of changes?
14          MR. KLAPROTH:  With the replevin claim, the first
15  change, "are the lawful property of plaintiff," that's fine.
16          The computer programs, he crossed out "wrongly."  The
17  word from the case law is "wrongfully held" and that's
18  actually an element of the claim, so I would object to taking
19  out "wrongfully held."
20          For the third part --
21          MR. MC DANIEL:  That comes out.
22          MR. KLAPROTH:  The language -- this is another
23  element.  You have crossed out "plaintiff has the right to the
24  exclusive possession of the programs."  That's an element,
25  exclusive possession is an element of replevin.

1          MR. MC DANIEL:  I don't know that --

2          THE COURT:  I don't know what you're talking about.

3  I don't have anything like that.

4          MR. KLAPROTH:  This is on page four.

5          THE COURT:  I'm not getting to page four.

6          MR. MC DANIEL:  Then we're finished.

7          THE COURT:  I'm going to read -- step up here so we

8  don't confuse this any further.

9          (Discussion held off the record.)

10          THE COURT:  Let's get the jury.

11          THE CLERK:   All rise.

12          (The following takes place in the presence of the

13  jury.)

14          THE COURT:  Always stay in the same seats that you

15  were in.  You'll get into a routine and it will be fine.

16          Have a seat.

17          Miss Lynch, you're better off if you move over to the

18  right.  We want you to be able to see the witness without

19  being obstructed by the screen.

20          Can everybody see the witness stand from where you

21  are?  Okay.

22          Well, I'm going to give you some preliminary

23  instructions and then we'll take a break for lunch and then

24  we'll come back and begin the actual trial.

25          First thing we're going to do is swear you in as

1  jurors.

2          (Jury of seven sworn at 11:50 a.m.)

3          THE COURT:  All right.

4          You may notice when you walk into the courtroom, that

5  everybody is going to rise for you.   That's because you folks

6  are going to be treated as judges.

7          I want to explain to you our respective roles in the

8  trial of this case.  I, of course, am the presiding judge and

9  I will be presiding over the case and seeing to it that the

10 case is tried in accordance with our rules of evidence, in an

11 orderly fashion and I will rule on any issues of law which may

12 arise.

13         You, on the other hand, are called judges of the

14 facts.  So while I have the responsibility to manage the trial

15 and to rule on any legal issues and to give you legal

16 instructions that you're to follow, you are the sole deciders

17 of the facts in the case and you're going to be treated as

18 judges.

19         It will be your duty to find from the evidence what

20 the facts are and you and you alone are going to be the judges

21 of the facts.  You'll then have to apply to those facts the

22 law as I will give it to you and I instruct you that you must

23 follow my legal instructions whether you think they're

24 accurate or not.

25         I tell you at the outset that while I do have a

1  responsibility to preside over the case and to resolve any

2  legal issues that might arise, nothing that I say or do during

3  the course of this trial should indicate to you in any way

4  what I think your fact decisions ought to be, because that is

5  entirely within your province and not mine.

6        Now, what you're going to do in order to decide the

7  fact issues is, among other things, you're going to consider

8  the evidence in the case.  I'm going to give you some

9  instructions about evidence now.  The evidence from which you

10  will find the facts will consist of a number of different

11  forms.  It will come in the testimony of witnesses, it may

12  come in the nature of exhibits or documents and it may exist

13  in the form of anything that the lawyers agree or stipulate

14  to.  I may also instruct that you must consider something as

15  evidence, but those are the basic forms that you'll get it in.

16  Most commonly it will come to you from the witness' testimony

17  here in court, from exhibits or documents that are received

18  into evidence and from that evidence, you will make your

19  determinations of facts.

20        Now, there are certain things, on the other hand,

21  that are not evidence and you're not to consider them as

22  evidence.  The first thing is that statements or arguments or

23  questions by lawyers are not evidence.  Right after lunch, for

24  example, you're going to hear opening statements from counsel.

25  The opening statements will be what the lawyers suggest to you

1   the evidence will show, but what they say, in and of itself,

2   is not to be considered by you as evidence, it's argument.

3   Statements, arguments or questions by lawyers should not be

4   taken by you as evidence in the case.

5          Similarly, there may be some objections made when a

6   question is put to a witness.  I tell you that the objections

7   that might be made to a question are not to be considered by

8   you as evidence.

9          Now, let me explain the nature of a trial.  It is an

10  adversarial process.  That is to say, the parties have

11  interests that they are going to put forward for you to

12  decide.  The lawyers representing the respective parties have

13  an obligation to their clients to use tactics, strategy and

14  also to use their judgment so that if something is coming in

15  or is offered by the other side that is properly not evidence,

16  not subject to our rules of evidence, then the lawyer has a

17  duty to raise an objection.

18         That will create a legal issue which I have to decide

19  and this will happen right in front of you.  I'm telling you

20  that any argument or any objection that a lawyer makes is not

21  considered by you as evidence and, frankly, any ruling that I

22  make on it is not evidence, but you must follow my ruling.

23  So, for example, if there is a witness on the stand and a

24  question is put to the witness and one of the lawyers makes an

25  objection to the question, I will have to decide whether the

1   witness should answer the question or not.  If I overrule the

2   objection, it means the witness may give an answer and you

3   should consider the answer as the evidence in the case.  If I

4   sustain the objection, then the witness will not give the

5   answer and you should disregard the fact that the objection

6   was made in the first place.

7           So the question, the objection, the argument or

8   colloquy from the lawyers is not evidence.  What is evidence

9   is the testimony of the witness.

10          Also what is not evidence is anything that you may

11  have seen or heard outside the confines of this courtroom.

12  Now, you come into the court with a wealth of common

13  experience, human experience, common sense and you certainly

14  don't leave that at the door.  We want you to bring your

15  intelligence and independent thought in with you when you come

16  here but we don't want you to decide this case based upon,

17  first of all, any preconceived notion that you might have

18  because you don't know anything about the case, and we

19  certainly don't want your decision-making process to be

20  influenced by anything that you hear or see outside the

21  courtroom.

22          This is generally in a case where I instruct the jury

23  not to read newspaper articles or listen to the news about any

24  reports of the case.  This being a civil case, it's highly

25  doubtful that there will be anything written about it, that

1   there will be any media coverage of it so we don't have to

2   worry about that.  On the other hand, I would rather you

3   didn't come into contact with anything that touches upon the

4   subject matter of the case.  So if, in your travels, you're

5   reading an article or book or something comes on television

6   which in any way makes you think about this case, please don't

7   let it influence your thinking.  It's as simple as that.

8          It may also be that something comes into the record

9   and in hindsight I decide that it shouldn't have, so I may

10  give you an instruction, although we try not to do this, I may

11  give you an instruction to disregard something that came in or

12  strike something from the record.  If that occurs, I'll give

13  you a specific instruction.  Generally it doesn't happen but

14  if it does, you'll know about it.  Okay.  Those are the things

15  that are not evidence.

16         A little bit more about evidence.  There are,

17  generally speaking, two different types of evidence.  We call

18  it direct evidence or circumstantial evidence.  Direct

19  evidence is just that, it is the direct proof of a fact.  It

20  can be from the testimony of an eye witness to an incident,

21  someone who participated in a transaction, it can be a

22  photograph, it can be a document which proves a fact directly.

23  You certainly will have the benefit of using direct evidence

24  in the case.

25         Circumstantial evidence, however, sounds more

1  complicated than it is.  It is merely the proof of a fact from

2  which you may infer that another fact exists.  You're going to

3  draw an inference, you're going to use your common sense and

4  from the direct proof of some facts or circumstance, you will

5  make an inference that something else must be true.

6      Very common example that I like to use is the story

7  of Robinson Crusoe marooned on a desert island.  He thinks

8  he's all by himself, all alone and one day he goes to the

9  beach and sees a footprint.  Okay.  He has direct evidence of

10 the footprint, from which he draws the inference that somebody

11 else must be on the island.  It's as simple as that and I

12 promise at the end of the case I'll give you even a more trite

13 example of circumstantial evidence, but that's all there is to

14 it.  Use your common sense and draw inferences if you think

15 that the direct evidence leads you to do that.

16     One other thing that's very important in terms of

17 your making fact issues in the case is you're going to hear

18 the witnesses and you're going to see the evidence.  It is

19 entirely up to you to determine the credibility of witnesses.

20 That is to say, which witnesses you find believable, which

21 witnesses do not convince you that their testimony is

22 satisfying.  The credibility of witnesses is something that's

23 very important and integral to any juror's performance.  You

24 will hear the witnesses and it will be entirely up to you to

25 determine their credibility or believability and I'll give you

1  some detailed instructions as to some guidelines that you can

2  use in doing that at the end of the case.

3      Now, I told you something very general about the case

4  earlier.  I'm going to give you a more specific instruction,

5  but it is still a pretty general summary of the law that

6  applies in this case.  What I'm telling you now is not

7  evidence.  This is a preliminary instruction just to give you

8  an idea of what you can anticipate hearing about during the

9  course of this trial.  I will be giving you very detailed

10 instructions that will be binding upon you at the end of the

11 case.

12     As I told you earlier, Mr. Brownstein, the plaintiff,

13 claims that he is the co-author of a copyrighted work created

14 and which is the subject of two copyright registrations by

15 Tina Lindsay, the defendant.  This is a lawsuit over the issue

16 of whether or not Mr. Brownstein has a claim of ownership to

17 these copyrighted works.

18     There is also a claim that some computer programs

19 which exist are something that he has an interest to as well

20 and that he has demanded the return of.

21     Now, Miss Lindsay and the defense, the other

22 defendant, the business entity that she is principal of, deny

23 that Mr. Brownstein is a co-author of the copyrighted work and

24 they also claim that he has failed to bring this lawsuit

25 within the period of time set by the copyright law.  In other

1     words, that his claim is barred by what we call the statute of

2     limitations, which on a copyright claim is three years.

3            As to the return of the computer program claim, the

4     defendants deny that he is entitled to the return of those

5     computer programs and further, that he has failed to bring

6     this lawsuit within the statute of limitations for a claim for

7     the return of this property, which in that instance would be

8     six years.  I'll be getting into this in a minute.

9            You should also understand that this is a trial of

10    what we call liability only.  You're going to be deciding the

11    preliminary issue in the dispute between the parties which is

12    to say does Mr. Brownstein have a claim or not.  You don't

13    need to go any further than that in terms of value or damages,

14    we're not trying that aspect of this dispute.  Okay.

15           Now, as to the co-authorship claim, I'm going to give

16    you a preliminary instruction as follows:  That in order to be

17    declared the co-author of the work, Mr. Brownstein, the

18    plaintiff, must show that the work is a joint work.  That

19    means that it was prepared by more than one author, with the

20    intention that their contributions be merged into inseparable

21    and interdependent parts of a unitary whole and secondly, that

22    the plaintiff's contribution, if any, was independently

23    created and possessed some minimal degree of creativity so

24    that it could have been copyrighted even without Miss

25    Lindsay's work.

1    Now, the defendants, as I've told you, have raised in
2    addition to a dispute as to whether or not Mr. Brownstein has
3    a claim of co-authorship in and of itself, they have also
4    raised what we call the statute of limitations as a defense.
5    Under the Federal Copyright Act, a claim seeking co-authorship
6    of a copyrighted work must be brought within three years.
7    Plaintiff claims, first, that his claim arose in
8    2010, and that even if it did come earlier than 2010, he did
9    not know that his co-authorship was in dispute until February
10   of 2010.  The defendants must show that the plaintiff's claim
11   arose before March 22nd, 2007, which is three years before the
12   lawsuit was filed, or that a reasonable person in Mr.
13   Brownstein's position should have discovered, with the
14   exercise of due diligence, that his status as a co-author was
15   disputed.
16   Those are the issues as to the claim of co-authorship
17   of the copyright claim and you can see how, in order to decide
18   those fact issues, you're going to need some evidence, you're
19   going to need the testimony of the witnesses and everybody
20   else that the parties will show you, but those are the issues
21   as to the co-authorship claim.
22   Now, as to the claim for the return of some computer
23   programs which you may hear referred to by the lawyers as a
24   replevin claim, that's a legal phrase that you don't need to
25   worry about it, but you may hear that word.  In order for you

1   to find that Mr. Brownstein is entitled to the computer

2   programs that he claims to have authored prior to the year

3   2000, he must show, first, that the computer programs are, in

4   fact, his property and second, that the computer programs are

5   being wrongfully withheld by the defendants in a way from him

6   exercising his rights as owned.

7         Now, as to this return claim or replevin claim, the

8   defendants dispute his claim as to the computer programs and

9   they also have asserted separate statute of limitations

10   defense as to that part of this case.  I advise you that under

11   New Jersey law, a claim such as Mr. Brownstein's seeking the

12   return of goods that is being held by another must be brought

13   within six years.  Mr. Brownstein claims that the programs

14   were not wrongfully held by the defendants until May of 2010.

15         On this case, on this statute of limitations as to

16   the return of the programs claim, the defendants have the

17   burden of showing that a reasonable person in Mr. Brownstein's

18   position should have discovered, with the exercise of due

19   diligence, that his rights were being interfered with

20   regarding the programs that he claims a right to possess more

21   than six years before he brought this lawsuit.

22         So you get an idea of what's going to be tried here.

23   It's going to be the claims that Mr. Brownstein has to

24   co-authorship of the copyrighted work and to the return of

25   some computer programs.  The defense is going to be that he

1  does not have a legitimate claim to co-authorship or to the

2  return of the programs and in the event that he does, he

3  didn't bring the case soon enough and is, therefore, barred

4  from to recovery.  Those are the issues that you're going to

5  have to decide.

6          Now, I'm going to tell you something about burden of

7  proof.  This is a civil case so the party that bears the

8  burden of proof on any issue must bear the burden of proof by

9  what we call preponderance of the evidence.  Now, you may have

10  heard in the criminal law context of burden of proof beyond

11  reasonable doubt.  That applies to criminal cases only and it

12  is far more stringent.

13          The burden of proof in this civil case is by

14  preponderance of the evidence.  What that means is that the

15  person who bears the burden of proof has to produce evidence

16  which, when considered in light of all the facts, would lead

17  you to believe that what that party claims is more likely true

18  than not.  To put it differently, if you were to put the

19  evidence on the scales, balance scales of justice, the person

20  who bears the burden of proof on any particular issue would

21  have to tilt the scales in its favor.  If the party carrying

22  the burden does tip the scales in its favor, it can be said

23  that that party has carried his or her burden of proof.

24          If the party bearing the burden of proof fails to

25  tilt the scales in his or her favor, then he or she has failed

1 to carry the burden of proof.  I'll be giving you some more

2 particular instructions about that as we go through here.

3          In this particular case, you have to be mindful that

4 there are different burdens of proof and I advise you that Mr.

5 Brownstein bears the burden of proof by preponderance of the

6 evidence, A, that he has a claim to co-authorship of the

7 copyrighted work, and secondly, that he has a claim to the

8 return of the computer programs.  He bears the burden of proof

9 by preponderance of the evidence on those fundamental issues

10 of the claims.

11          Because the defense is asserting a defense by the

12 statute of limitations, the defense bears the burden of proof

13 on that issue.  So it will be up to the defense to convince

14 you by preponderance of the evidence that Mr. Brownstein has

15 failed to bring his claims in a timely fashion.  All right.

16          Everybody reasonably clear on that?

17          Now, a little bit about your conduct as jurors and

18 then I'll tell you a little bit about how we do business here.

19 First of all, during the course of this case, I'm instructing

20 you that you are not to discuss this case with anyone or

21 permit anyone to discuss it with you.  Now, that means you

22 shouldn't even discuss the case with each other, at least

23 until such time as I give you my final legal instructions,

24 you've heard the closing arguments of counsel and I instruct

25 you to retire for your deliberations.  Then you'll have an

1  obligation to discuss the case with each other, but until

2  then, don't discuss the case with each other.

3          Also don't discuss it with anyone else.  When you go

4  home and someone asks you what's this all about, tell them

5  that it's a federal civil case, it's got to do with a

6  copyright, it's got to do with some computer programs and

7  beyond that, I can't talk about it.  The judge told me I can't

8  talk about it. It's as simple as that.  We just don't want to

9  have you influenced by all of the expert opinions that you get

10 from bringing your friends and family into the case.  Put it

11 on me, don't discuss it with anyone.  Don't permit anyone to

12 discuss it with you.  I don't think that will happen, but if

13 anybody tries to insinuate themselves with you, don't talk to

14 them and let us know.

15         Don't have any contact with anybody involved in the

16 case.  Now, you're going to be walking in and out of the

17 courthouse, you may bump into one of the parties, one of the

18 witnesses, whoever it might be, one of the lawyers.  Do not

19 speak to anyone involved in the case.  They will not speak to

20 you because they know they're not supposed to, so don't take

21 it personally if you run into one of the lawyers in an

22 elevator and the lawyer doesn't say good morning or turns his

23 back on you.  That's what they're supposed to do.  Don't have

24 any contact with anybody.

25         As I said before, try not to come into contact with

1   any information that touches upon anything that's involved in

2   the case.  Also do not conduct any independent research, don't

3   go on the computer, don't go on the internet, don't look

4   anything up.  Everything that you need to decide this case

5   will be given you here in the courtroom and that is the entire

6   source of your knowledge in making your fact decisions.

7           Lastly, it's very important that you keep an open

8   mind until the end of the case.  Don't begin forming an

9   opinion as to what you think the outcome of this case ought to

10  be until you've heard all of the evidence, you've had my legal

11  instructions and you've had the final arguments of counsel.

12  Just please keep an open mind.

13          Now, this is not going to be a long case so I would

14  prefer that you not take notes.  I do have the authority to

15  permit you to take notes, but because it's only going to be a

16  short case, I would rather not have you distracted by note

17  taking.  Pay close attention, as I'm sure you will, and you'll

18  be able to follow this without any difficulty.  I don't expect

19  there to be any overly technical material that would require

20  note taking.

21          That's about it.  In terms of schedule, we'll try to

22  get started as early as possible in the morning.  I know some

23  of you come a distance, so try to get here as close to nine

24  o'clock as you can.  When everybody is fully together, we will

25  start.  If it takes a few minutes more, if you get stuck in

1   traffic, we have people that come a distance, but whenever

2   we're all assembled is when I want to get started in this

3   case.

4          We're going to go probably until about 10:30, 11:00,

5   we'll take a short break.  We will go until a logical time for

6   a short lunch break and I mean short, no more than 30 minutes.

7   Then I want to have you back here so we can continue working

8   and my goal is usually to get everybody back on the road home

9   before 4:00.  If we follow this schedule, short breaks, we'll

10  get plenty of work done and it's important to me that you get

11  back on the road before traffic, before dark without any

12  headaches or problems.

13         Make sure you bring something to eat because with the

14  short lunch break, there really isn't anywhere you can go

15  around here to get anything edible and have it within 30

16  minutes.  So you see there are facilities in the jury room,

17  there's a refrigerator, whatever you need.  Bring something to

18  snack on and to eat and we'll try to keep you working as best

19  we can.

20         If you have any emergency, if anything happens, any

21  problems arise, please let us know.  Dan will take your

22  numbers and he'll give you a phone number that you can call if

23  you have any problems.  Please let us know immediately as soon

24  as there is anything untoward which occurs.  We want to

25  accommodate you, we want to make you comfortable and keep you

1  working and keep you interested and I'm sure you would

2  appreciate that as well.

3         Okay.  Any questions about any of this?

4         No.  All right.

5         Well, it's 12:15 so let's take a short lunch break.

6  I'll give you a little more time because you don't have

7  anything with you.

8         Dan will give you some advice as to what to do about

9  lunch and we'd like you to be back here ready to go by 1:00

10  and we'll have opening statements from counsel, followed by

11  evidence to be adduced on behalf of Mr. Brownstein.

12         When the plaintiff's case is concluded, we'll then

13  have any evidence that the defense chooses to introduce.

14  Following the taking of all the testimony and receipt of the

15  all the evidence, I will give my closing legal instructions

16  and you'll then have the benefit of closing arguments from

17  counsel and then begin deliberating.  That's the schedule.

18         Any questions?  Great.

19         You can go into the jury room, Dan will take care of

20  you and we'll receive you back here around 1:00.

21         THE CLERK:  All rise.

22         (Jury is excused and the following takes place out of

23  the presence of the jury.)

24         THE COURT:  Any exceptions to the preliminary

25  instruction?

1          MR. MC DANIEL:  Not from the plaintiff.

2          MR. KLAPROTH:  None.

3          THE COURT:  Good.  Take a rest and we'll see you back

4  here at one.

5          (Luncheon recess.)

6          A F T E R N O O N   S E S   I O N

7          (The following takes place out of the presence of the

8  jury.)

9          THE COURT:  Are we all here and ready?

10          MR. MC DANIEL:  My technician went to get water.  I

11  don't need him right away.

12          THE COURT:  Ready, Dan?

13          THE CLERK:  Ready.

14          THE COURT:  Let's go.

15          THE CLERK:  All rise.

16          (The following takes place in the presence of the

17  jury.)

18          THE COURT:  There is one more coming.

19          Close up the ranks, it might be easier.  Take a seat,

20  folks.

21          We're ready to proceed and the first order of

22  business is to have the opening statements by counsel.

23          Mr. McDaniel, go ahead.

24          MR. MC DANIEL:  Your Honor, ladies and gentlemen,

25  good morning or good afternoon, I should say.

1        Let me join with the Judge, thank you so much for

2   your service.  I know all of you were hoping you weren't going

3   to be one of the names that got asked to stay. It's important,

4   it's important to my client, it's important that he had a

5   forum in which to have his grievance heard.

6        You can't look at the facts of this case without

7   looking at the relationship between the two parties.  Mr.

8   Brownstein, my client, my privilege to represent him today and

9   Miss Lindsay have known each other for almost 25 years.  For

10  most of those 25 years, they were the best of friends.

11       In fact, the evidence will show you that it was Peter

12  Brownstein who got Tina Lindsay a job when she was at the end

13  of her rope, when she needed work, when she was out of money.

14  It was Peter Brownstein who promoted Tina Lindsay in the

15  workplace, it was Peter Brownstein who fought for her, to keep

16  her job during layoffs.  It never mattered to Peter if he got

17  the credit.  He was happy to promote Tina.  Why?  Because she

18  was his best friend in the world.

19       You're going to hear, Peter didn't have children, he

20  doesn't have a wife, he had a business, he had his computer

21  programs and that was what mattered to him and so during the

22  that 24-year period, he's going to tell you he never once

23  doubted that she could be trusted.

24       It turned out in the end that that trust was

25  misplaced.  In 1996, without Peter's knowledge, Miss Lindsay

 1   took his work and registered with the United States Copyright

 2   Office under her name and that's why we're here today.

 3          You have to begin looking at this case to understand

 4   a little bit about what the work is.  You're going to hear a

 5   lot about the work during the case and I'll ask a lot of

 6   questions about it.  The work in this case is a system and

 7   it's a system that's used in something called the list

 8   industry.

 9          Now, the list industry is a subindustry of direct

10   marketing, people who send you all that stuff in the mail.

11   What the list industry does is it processes names and address

12   lists together with a whole lot of other information.  You can

13   have a list of names and addresses that will have, in addition

14   to the names and addresses, it will have where people live,

15   obviously, but how much their house cost, what their

16   profession is, all sorts of information and that's how the

17   direct marketing industry finds people to market directly to.

18          The list industry provides services for them.  They

19   can take a list and often these lists can be hundreds of

20   thousands -- hundreds of millions of names and massage them,

21   work with them.  Take a list of names and from the customer's

22   huge hundred-million-name list, for example, create a list of

23   people who have incomes over $50,000, people who live in a

24   certain type of house.

25          Now, the issue that's -- the kinds of lists that

1  we're looking at in this case are lists that determine

2  ethnicity, race, religion, where people are from, ethnicity,

3  Scottish, Turkish, Irish, whatever.  The process is called

4  ethnic encoding.

5          Ethnic encoding is something that occurs -- it's a

6  process in which a customer will have a list, it may be

7  100,000 names, it could be 100 million names and what they

8  want to do is to identify the ethnic characteristics of the

9  people on the list, so they encode the list.  The encoding

10 process, they'll identify people according to their names and

11 their zip codes, what their particular ethnicity is.  It can

12 be African American, Scottish, Turkish, also with religion,

13 Protestant, Catholic, Buddhist.

14         The list industry is a big industry.  Ethnic encoding

15 is a good business and the product, the work that's at issue

16 in this case is a product that was created by Peter Brownstein

17 and Tina Lindsay in order to encode lists of names and

18 addresses.

19         The work on the product began in late 1993, early

20 1994.  At the time there was some ethnic encoding that was

21 done within the list industry.  It was done in a few different

22 ways but it was generally not particularly accurate and not

23 well accepted.  One of the ways that you could ethnically

24 encode a list of names and addresses was to buy the list of

25 names and addresses from some kind of an association.  If you

1  bought a name and address list from the university alumni

2  association, you had a pretty good idea that the people on the

3  list were college-educated.

4        There was also a process at the time in which lists

5  of names and addresses would be compared with known last names

6  and the last names would have ethnic characteristics.

7  McDaniel, for example, it might tag that as being Scott or

8  Irish.  That however was considered to be very inaccurate and

9  its accuracy rates were about 50 percent so you were wrong as

10  much as you were right.

11        The other thing that occurred at the time, we'll

12  explain to you, is that names could be encoded by census data.

13  Census data was essentially the name would be compared with

14  where the zip code sat in particular sets and whether or not

15  that was a white or non-white area.  So very simply, the list

16  industry at the time would look, would take the names and

17  addresses and it assumed if you came from a certain census,

18  that everybody in there was African American or everybody was

19  Asian.  Again, not very accurate.

20        In late 1993, Tina Lindsay had an idea.  The idea was

21  -- basically there were four aspects to it.  The first aspect

22  of the idea was she made some observations that first names

23  are actually a better identifier of ethnic characteristics

24  than last names.

25        The second thing she noticed was that letters that

1  are at the end of last names, prefixes and suffixes are also a

2  better identifier than the whole name.  It eliminates

3  misspellings and so, for example, certain letter combinations,

4  two or three letter combinations that sit at the end of a last

5  name are a good indicator of the ethnicity of that person.

6        She also had the idea that if you did those things in

7  series with what the industry was already doing, you could

8  build a better mousetrap, you could have a better ethnic

9  encoding system.  So the idea was you would code first names,

10 then you would code prefixes and suffixes of last names, then

11 you would encode last names and then you would do your

12 geocode.  This was her idea.

13       She came to Peter, her friend, and at the time the

14 idea was literally on the back of an envelope.  They sat in a

15 conference room where they worked together in a place called

16 Future Perspective Clients, Inc. where Peter had gotten Tina a

17 job and they went over this idea.  Now, it was just an idea,

18 it was a concept.

19       In order to determine whether or not there was any

20 validity to that idea, it was going to be necessary that

21 someone develop programs, someone develop a system because the

22 list industry works from computers.  It deals with millions of

23 names and addresses.  It deals with millions of rules -- I

24 should say millions of names and addresses and literally

25 hundreds of thousands of different names and matches and

1  decisions that have to be made.

2      They came up with this idea and Peter was

3  enthusiastic about it.  The two of them started to work

4  together on this project.  Peter, he will testify, and the

5  evidence will show, set up a sign on in the computer system in

6  this company, Future Perspective Clients, Inc. where they were

7  working together.  Miss Lindsay began to do research.  She

8  copied names from lists of olympic teams, she looked in the

9  phone book, she read the newspapers, conducted this research

10  and she would type her research, her names that she had copied

11  out of other sources into the computer system and they were

12  loosely organized according to some codes she had set up.

13      In order to make that idea into a product that could

14  be sold, it had to be converted into a format that a computer

15  could use.  A list of a hundred names, 500,000 names in the

16  list industry is not going to be a product, a product requires

17  the use of computers.

18      Peter, meanwhile, set about writing some programs so

19  that they could see if this concept, this idea and this

20  research that she had done actually had any applicability so

21  that they could see if they could make a product.  The

22  evidence will show you that they talked about how to develop

23  this, whether they could build a business, whether they could

24  have something for themselves out of it.

25      The first thing, the evidence will show, that had to

1   be done was that the text file, the research in which Miss

2   Lindsay was typing her addresses, her names and her rules,

3   that had to be converted into something that a computer could

4   read because a simple text file, which is like typing it into

5   a word processor, isn't something that a computer could use.

6          The very first thing that had to happen, is that that

7   information had to be converted into a format that a computer

8   could use, that it could look at and read.  And so the first

9   thing that happened was that Peter prepared a program and the

10  program took the text file that Miss Lindsay had been typing

11  and it converted it into something that you'll hear testimony

12  about called the record file.

13         The record file is the research expressed in a format

14  that a computer can look at and use.

15         Once that had occurred, and let me just -- you'll

16  hear more testimony about this, but the computers are

17  obviously very precise things.  They have to know exactly

18  where to look for data.  They need to know where is the first

19  name, where is the last name, where is the code for Catholic,

20  for example.  So he designed this data format and the evidence

21  will show that it's really the first expression of the system.

22         The next thing that had to happen was that you had to

23  build a program that would take the list that was now

24  expressed in this record, this data, the record file and start

25  to process it against lists of names and addresses that you

1   would get from a customer.  And the evidence will show that

2   there was a million-name record file that they were working

3   with.  And so Peter wrote a program initially that would take

4   every name and apply from the test record, the million-name

5   record and apply it against the rules, one at a time.  Did it

6   match a first name, did it match one of the prefixes for the

7   last name, did it match the entire last name and then it would

8   look at where the name was located, would it indicate that it

9   was a non-white person.

10          That didn't work.  It was too slow, it wasn't

11  effective, they were never going to have a product out of it.

12          So what he did then was that he took that work, he

13  actually broke it into a series of programs and we'll have a

14  chance to go through what those programs were.  The programs

15  were held together by an overarching organization called the

16  job control language, JCL for short.  So he wrote a number of

17  these programs that would orchestrate this process and the

18  process required the programs, the series of programs to look

19  at the customer list, to look at the record file and to make

20  decisions about each of the names as they were going through

21  it.

22          It's a little technical and we're going to have to

23  spend some time going through what some of the programs do,

24  but at the end of the day I think the evidence will show you

25  that it's a computerized system.

1          Can we have slide six, please?

2          Now, this is just a summary which I prepared to help

3    us in our discussion, but it sets out what the evidence will

4    show you are the basic steps of this software and this system.

5          Now, you notice at the top that it says the LCID.

6    Let me just clarify a couple of terms here because there will

7    be some things that may be a little bit confusing.

8          The type of product that they were working on is an

9    ethnic determination system.  That's the generic name for the

10   program, the system that was going to make ethnic -- do ethnic

11   predictions, make ethnic determinations about a list.

12         LCID stands for the Lindsay Cultural Identification

13   system.  The LCID is the product.  Product is an ethnic

14   determination system so when I refer to the LCID, I'm

15   referring to the product that's at issue in this case, the

16   thing that the two of them put together.

17         So the first thing that it has to do, as you notice,

18   convert the human rules to computerized record file.  Another

19   thing that the LCID has to do in order to be an effective

20   product, in order to work and do its job, is it has to extract

21   and convert customer data.  The record files, the customer

22   files that come in are huge and they can be in all sorts of

23   different formats so it has to take out the pieces that it

24   needs in order so that it can comply in the system and make

25   the decisions that the program makes.

1          It does first name ethnic coding.  It looks at the

2    first names and tries to determine if there's a match.  If

3    there's a match between a first name, it actually sends that

4    off to another place as matched.  So, for example, if I recall

5    correctly, Adrian is a first name match for Scottish.  I could

6    be wrong about that, but there are certain first names that

7    are good indicators.

8          The next thing is it goes and compares suffixes and

9    prefixes, starts with a five-letter code, four-letter code and

10   a three-letter code and two-letter code and it goes to the

11   beginning of the word and goes through each of those

12   calculations, each of those comparisons.

13         It then looks at all of the last names to see if

14   there's a whole name match.

15         Then finally what it does, the system does is it

16   takes the names and it looks at the names that have been coded

17   and if those names are of a type that existed in the United

18   States prior to the abolition of slavery, it will then look to

19   see if those names can be found in a non-white area and it

20   will infer from that, that the people who have those names and

21   live in the non-white area are African American.

22         Finally, what the system has to do in order to be

23   effective, it has to match that data back up top to the

24   customer file.  These were all computerized processes that had

25   to be taken from Tina's idea and converted into an expression

1   of a system, of a product that will work, that could be sold.

2          Go to slide seven, please.

3          This is just another representation of it, but you

4   can see how it -- how the program is working its way through.

5   Beginning with the subset, which is extracting the data and

6   each of the -- it has to sort the data and it has to apply the

7   first names, has to sort it again, has to apply the last

8   names, sorts one more time and applies the prefixes and suffix

9   and we'll have a chance to go through this in more detail when

10  Mr. Brownstein testifies, but as you can see, it's not an

11  overly complex system but it's not a simple system either, and

12  there are steps and each one of these steps were handled with

13  the computer.

14         Now, they began this process in 1994.  Through 1994,

15  they developed the ideas, the systems, the idea, the concepts

16  of the steps that they would follow, Peter developed the

17  programs.  They achieved a stable version of the system, the

18  research and all of the programs in 1994.

19         At that point, they were still employed by this

20  company Future Perspective Clients, Inc.  They were doing all

21  this work on their own time.  They were working at nights,

22  they were working weekends, management didn't know they were

23  working on this.

24         Peter went to the management at Future Perspective

25  Clients and said, Tina has a great idea.  This is something

1 that could really push ethnic processing up into a new level.

2 FPCI's management, the father and son named Tom and Micah

3 Raskin were not interested.  They didn't think Peter had the

4 ability, they didn't think Tina had the ability.

5 So it sat for a few more months and then Tina

6 approached management, Future Perspective Clients, Inc. with

7 the same proposal, got the same result.  The one thing that

8 the evidence will show is that they had at this point, the

9 Raskin's had a general idea of what the project was ongoing

10 and they gave permission for Tina to continue to use the

11 computer system to type in research.

12 Fast forward just a little bit to the middle of 1995.

13 FPCI hires a woman named Loretta Pogio.  She had worked with

14 both Tina and Peter at another company even before FPCI called

15 CMR, Consumers Marketing Research.  CMR will come back into

16 the story later, but she was generally recognized as something

17 of an expert in ethnic encoding to the extent that it existed

18 and so she was presented with the program, with the LCID at

19 this point, which was now a product that they wanted to sell.

20 She liked it.  She thought it was a good product,

21 that it had commercial viability and Loretta Pogio went to

22 management.  Now, when Loretta Pogio recommended to management

23 the LCID, they looked at in a different light.  They saw that

24 maybe there was something there and that began, the evidence

25 will show, a period of a lot of tension that existed between

1    Peter Brownstein, Tina Lindsay and the management at FPCI.

2           Loretta Pogio actually began to try and sell the

3    product and in the early part of 1996, she got a client Axciom

4    Corporation, which you'll hear evidence about Axciom.  It was

5    a huge provider of data.  Axciom was interested, they were

6    interested in a site license.

7           Meanwhile, because of the tension level that was

8    going on, Peter and Tina decided they better register the

9    copyright.  So they took what was then in existence in 1996,

10   and they printed out Tina's portion of the work.  That

11   included a description of the system, that included most of

12   the research that she'd done, it did not include the programs.

13          Why?  It was a decision that the two of them made.

14   You'll hear evidence, at least from Peter Brownstein's

15   perspective, Tina said it wasn't the right time.  Tina said

16   you need to be protected.  You really don't want the Raskin's

17   to know that you're the guy that's writing this software, and

18   so they made this registration.

19          They did this in late -- in early 1996.  In May of

20   1996, they run the Axciom job, the test and it goes very well.

21   They actually prepare a site license for it.  Unfortunately,

22   it doesn't close and they continue to work on the program

23   throughout this time.

24          As the years drawn to a close, the two of them are

25   beginning to get very concerned about whether or not Future

1 Perspective Clients, Inc. is going to come after them, going

2 to try and claim ownership of the work because they did it

3 while they were employed but working outside their general

4 duties.

5          There had been other circumstances that had gone on

6 and this is just part of the acronyms in the case, bear with

7 us for a second, but Future Perspective Clients, Inc. was

8 having big financial problems.  They actually walked away from

9 the business and continued operation under the name of another

10 company called LSDI, List Services Direct, Inc. and you'll

11 hear about litigation with LSDI in a short while.

12          The long and short of it is that there was a second

13 registration that was done.  And what happened was that Peter

14 Brownstein was asked by Tina Lindsay would he print out the

15 programs.  They had decided there was going to be a

16 registration.  Peter printed them out, he gave them to Tina.

17 Tina registered the programs in her own name.  She never told

18 Peter she was registering them in her own name.  Peter had a

19 sense that he knew that his programs were going to be

20 included, but he didn't know that his partner was going to

21 claim credit for the work that he did.

22          There was -- subsequently, the situation with LSDI

23 broke into a lawsuit.  In 1997, Tina Lindsay left, Peter left

24 a few days after, this is in late June of '97.  There was

25 another contract that was being negotiated.  Actually they

1   landed a contract with a company called Hard-Hanks, again the

2   product was being sold.  Tina Lindsay was promised that she

3   would receive a commission, there was no commission, they were

4   behind in the paychecks, LSDI owed both of them a lot of

5   money, they walked.

6          There was a lawsuit then between LSDI, Tina

7   initially, later Peter and another company, which I'm going to

8   get to in just a second, but the product -- the point that I'm

9   trying to make here is that this product as it was, was

10  complete and was being marketed.

11         Now, the other thing that happened during this time

12  period was that in June of 1996, Peter and Tina formed a

13  company called TAP Systems and the purpose of TAP Systems was

14  that they were going to take this product that they put

15  together both themselves and they were going to market it.

16  They were going to go out there and sell this thing and try

17  and make money off of it.  It was a commercial product.

18         There was a short period of time after Tina and Peter

19  now operating as TAP left LSDI and they operated

20  independently.  They took with them a copy of the research,

21  they took a copy of the programs and they went to a service

22  bureau, a place where you could get computer time.  One of the

23  things I forgot to mention was that these are all -- in this

24  era, these are all made for computers so they literally take

25  the tapes and they go to another service bureau and they

1  actually get one client which they use the product to service

2  during that time period.

3         They then -- the story goes back to the place where

4  they used to work a number of years earlier, Consumers

5  Marketing Research.  Consumers Marketing Research also is in

6  the list business and there's a person there by the name of

7  Ginger Nelson who is now in control of that business.  And

8  what they decided to do was they decided to form a joint

9  venture between TAP and Consumers Marketing Research.  TAP was

10  going to take what it had, which they called at that time the

11  TAP system, the LCID we talked about earlier, the stuff that

12  Peter took on a tape out of LSDI, took it over to another

13  place and they ran a job with it.

14         CMR had its own kind of last name product and the

15  idea behind this business was they were going to combine the

16  two and form a new company called E-Tech, Ethnic Technologies

17  and they were going to have this system that was going to be a

18  combination of the two processes.  A lot of this is outside

19  the scope of the case, but so you see kind of where it goes.

20         Meanwhile, LSDI is after everybody.  LSDI has filed a

21  lawsuit initially against Tina and TAP.  They then add Peter,

22  Ginger Nelson and CMR as defendants as well and that case goes

23  on until late 1998.  Ultimately that case gets settled and the

24  terms of the settlement were that LSDI, which still had a copy

25  of the program, gets to keep what they've got, whatever shape

1    it was in and they can use it or not as they want.

2          TAP, CMR and this new company, E-Tech, they get to go

3    on and develop the product, and they did.  And it was

4    successful, it was really successful.  At the time it

5    represented a quantum advancement over the state of the

6    industry.  Within a relatively short while, they started to

7    get clients and for the next, I guess it would be the next 12

8    years, everyday -- I shouldn't say everyday, but Peter and

9    Tina went to work at E-Tech and they developed this program

10   and they made refinements to it and arrangements and there

11   were new versions and ultimately it was translated into some

12   other languages and they had site licenses and they had

13   customers and nobody ever said a word about the fact that

14   Peter was not supposed to be the co-author.

15         Peter had no idea, it never -- the evidence will show

16   he had no idea.  It never occurred to him that he was working

17   on something that Tina Lindsay says he doesn't own.  It never

18   occurred to him that there was any dispute about the fact that

19   he was the co-author of this system.  It never occurred to him

20   that anyone would question for a second that you could have an

21   LCID, ethnic encoding system separate and apart from a

22   computer program because it works in computers.

23         The evidence will show E-Tech is a software company

24   primarily, most of their revenue comes from the licensing of

25   software.

1       Now, we're here today, obviously something didn't go

2   the way everyone had planned.  This relationship did come to

3   an end.  In 2010, there was another lawsuit and it concerned

4   control of the company and the details aren't really germane

5   to this, but the long and the short of it was that they were

6   in litigation over control of the company.

7       During that litigation, Tina Lindsay testified that

8   she had registered Peter's software programs under her name as

9   the LCID, as the program.  That was the first time Peter knew

10  that he had been betrayed.  He had no idea before that point.

11      There was a demand made that the certificate be

12  amended to reflect its actual authors.  That demand was

13  rejected.  This lawsuit was filed within a month.

14      The evidence is going to show that from the very

15  beginning of this, you could not separate the LCID, the

16  product, the idea, the research from a system that could apply

17  it.  Peter Brownstein wrote that system.  Now, it doesn't

18  matter -- withdrawn.

19      He wrote that system.  Other people could have

20  written the system, Peter Brownstein wrote the system.  What

21  Tina said in those years when she was in different

22  circumstances, when it suited her interest, was that the

23  ethnic research that she had done was inextricably bound to

24  the computer programs.  She did that on a couple of occasions.

25  She did that first when they were preparing the license for

1  that company Axciom that I mentioned earlier.  That license

2  says it's LCID, it's research and it is inextricably

3  intertwined with its computer programs.

4        The second time that she did that was when they left

5  FPCI.  The Hard-Hanks was kind of out there and Tina Lindsay,

6  on her own and without telling Peter, executed something

7  called an assignment, in which she purported to transfer

8  everything that was in the LCID, including Peter's programs,

9  to TAP.  The evidence will show you that she never bothered to

10  tell Peter about that.

11        The evidence will also show that in that document

12  that bears Tina Lindsay's signature, it says the computer

13  programs and the rules are inextricably intertwined.

14        The evidence is going to show in this case that the

15  only thing that ever mattered to these two was a product.

16  It's very interesting to be able to pick names out of the

17  telephone book.  The research has value as research, but they

18  were in business.  They were trying to make a product.  This

19  product has never, during the time period that's in issue in

20  this case, it never operated with anything, other than Peter

21  Brownstein's software.

22        I would suggest to you that at the conclusion of this

23  case, you're going to see that quite clearly, quite obviously,

24  Peter Brownstein wrote program, he wrote a number of programs,

25  he wrote job control language, he put the system, he gave

1  expression to the idea that allowed it to become a product;

2  that he did that, that that work is a work that's protected by

3  the copyright laws of the United States of America.

4         The second thing you're going to see is that it was

5  always the intention, always the intention between these two

6  people that that be a product that would utilize both the

7  research and programs.  I suggest to you that there is no

8  sufficient evidence to argue or to convince you that there's a

9  valid statute of limitations claim.  This is Peter didn't

10 know.  He didn't know and he couldn't have known unless

11 somebody told him.  He went to work everyday, day in and day

12 out and she never said a word.

13        That, ladies and gentlemen, is why Peter Brownstein

14 is entitled to be declared the co-author of this product, the

15 co-author of the LCID and why, I should mention, he's entitled

16 to get copies of it back because he didn't have copies of it

17 because they have it and they wouldn't give it to him.

18        Thank you very much for your attention.

19        THE COURT:  Thank you, Mr. McDaniel.

20        Mr. Klaproth.

21        MR. KLAPROTH:  Thank you, your Honor.

22        Ladies and gentlemen, as they say, there are two

23 sides to every story.  Now is my opportunity to give you my

24 clients' side.

25        This story has three parts.  Part one is that Tina

1   Lindsay created the Ethnic Determinant System.  That's the
2   system at issue in this case.

3           Part two is that Peter Brownstein gave up any
4   ownership that he had in that system, if any, he gave it up.

5           Part three is that his lawsuit is too late.  Statute
6   of limitation requires that he brings it within three years
7   when a reasonable person should have known.  He didn't.

8           So let's start with part one.  Tina Lindsay creates
9   the Ethnic Determinant System.  The year is 1990.  Tina
10  Lindsay worked for a number of years in computer programming,
11  database technology, NASA, McGraw-Hill, Manville Corporation,
12  she received letters of commendation for this work.

13          By 1990, the future is not very bright for her.
14  She's 50 years old, she's penniless, she's wandering around.
15  She went through a significant life change through the years,
16  she changed her name, she changed her gender.  So in 1988,
17  corporate America, she can't find a job.

18          Now, she enters nursing school thinking that maybe
19  they'll be a little bit more accepting of her lifestyle
20  change, but she needs money.

21          Now, Peter Brownstein, her and Peter Brownstein had
22  worked for a company called CMR.  Now, I know it's alphabet
23  soup and this is like the fifth acronym you already heard, but
24  I'll try to be slow with it, but they worked together at CMR
25  in the late '80s.  Okay, CMR there.

1        Now, he works with LSDI.  That's also called FCPI.

2   Now, that's the company that Mr. McDaniel was talking about,

3   List Service Direct, they went through a financial problem and

4   they changed their name.  I'm going to call them LSDI just for

5   simplicity.

6        So Peter Brownstein works at LSDI.  He manages to get

7   Tina Lindsay a job with LSDI.  They are in the list business.

8   Basically they compile names and data and they sell these

9   lists to companies in order for them to use direct marketing

10  techniques.

11       Now, the list business puts together -- lots of them

12  utilize systems, systems similar to the system at issue here.

13  Those systems try to analyze lists of names and determine the

14  ethnicity of a person.

15       Now, many of the systems in place in 1990 did this by

16  looking at the last name only.  Tina Lindsay, when she begins

17  working for LSDI, and she actually first had the idea when she

18  worked with CMR, has the idea that it's not the last name,

19  it's the first name.

20       So 1990, Tina has this idea, let's analyze the first

21  name, let's look at parts of the last name and then let's

22  predict.  This is a better system.  This system did not exist

23  before this.

24       Now, Tina's system, she's working at LSDI, she begins

25  putting in data, data that she researched on these names, data

1   utilizing her system.  She begins using the computers at LSDI

2   to input the data, refine the system and continue her

3   research.

4          Now, 1993, she tells Peter Brownstein about the

5   system.  When she tells Peter, Peter thinks it's a great idea,

6   never been done before.  Peter decides to take this idea up to

7   Tom Raskin, he's the boss at LSDI.  Basically wants to pitch

8   it to him, see what he thinks of it.  Tom Raskin, he thinks

9   it's an okay idea, but he's not very impressed.  He assigns

10  Peter Brownstein to write computer programs for her system,

11  however, in his capacity as an employee at LSDI.  So now Peter

12  and Tina are working together.

13         Tina is showing him -- she's got a background in

14  computers, she is showing him exactly how these programs

15  should utilize her system.  He follows her exact

16  specifications.

17         Now, LSDI in the meantime, they begin to see the

18  value in this program or in this system, I should say.  They

19  see the value in the system and they realize we can sell this

20  product to people.  So Tina and Peter begin to become a little

21  bit worried that LSDI is going to misappropriate her system

22  and claim it as their own.  So as part of this, she decides to

23  copyright her system.  This is February, 1996.

24         Now, once she copyrights her system, Peter

25  Brownstein, he's aware of what she's copyrighting, it contains

1  nothing of what he did.  It's February, 1996.  She submits

2  this, she gets back her registration saying that she has now

3  -- she's the copyright owner of the Ethnic Determinant System.

4  It's not LCID, it's not call LCID.  LSDI calls it LCID.  LSDI

5  takes the system, combines it with the programs her and Peter

6  had been working on and sells it as a product.

7       Now, Tina wants royalties for this.  This is her

8  idea, it's her copyright.  So she begins to have a conflict

9  with the bosses at LSDI, they don't want to give it to her,

10  they believe it's theirs.  Now, that's the copyright 1996.

11       Now, in June, 1996, Tina and Peter worry that LSDI is

12  going to take this idea, take this product, form their own

13  company, TAP Systems.  So TAP Systems is formed in 1996.  They

14  don't do anything with it at first in 1996.  It's almost like

15  a placeholder, recognizing that LSDI is going to come in,

16  potentially take away Tina's system, potentially

17  misappropriate her copyrights.  They form this company.

18       Now, of course, that's what ends up happening.  LSDI

19  begins to -- they recognize very quickly that LSDI is going to

20  use this system as their own.  Tina resigns, but in the

21  meantime, she's concerned because now LSDI is selling the LCID

22  system.  Essentially what they're saying is, your programs,

23  the programs that you did combined with your system, that's

24  our product.  She was concerned that somebody looking at the

25  copyright might say, well, how does this system work?  What

1  makes this system go?  So she submits parts of the source code

2  that her and Peter had worked on, she submits that to the

3  copyright office as an update to her first copyright.

4      She submits those programs not as a new copyright,

5  simply as examples to show how her system can be put in place.

6  The programs that were used, the programs that her and Peter

7  had worked on, the programs she showed him exactly how to do,

8  how to follow her system, these programs are simple compares

9  programs.  Now, you'll hear plaintiff tell you these are

10 simple compares programs.

11     What's a compare program?  It simply compares one

12 list of data versus another.  This program is something that

13 is common in almost every single Ethnic Determinant System out

14 there and there are others out there.  The thing that makes

15 Tina's system different is Tina's idea, Tina's concept that

16 you look at the first name first, look at part of the last

17 name and analyze it to predict the ethnicity of a person.

18     Now, the programs that Mr. Brownstein claims to have

19 authored were written in COBOL, that's a programming language,

20 COBOL.  COBOL is just one of many programming languages.

21 You'll hear testimony that these programs -- that Tina's

22 systems can work with any number of programs.

23     Now, the second copyright is filed December, 1996.

24     We have June, 1997.  This is the time when Tina, she

25 finally resigns from LSDI, she's now on her own.  They want to

1   get TAP up and running.  They want to start selling, they want

2   to start selling her system, they want to become a software

3   company.  Tina, in order to do that, licenses her system and

4   the programs they worked on at LSDI, licenses it to TAP so TAP

5   can now sell that.

6          Now, Tina will tell you that Peter knew about this

7   all along, because they're 50/50 owners in TAP.  He's the

8   vice-president, he's the treasurer, he's the secretary, he's

9   the programmer there.  He's claiming that he never knew TAP

10  had this license.

11         Now, after TAP is formed and this copyright is

12  transferred to TAP, LSDI sues Lindsay over the copyrights.

13  The copyrights at issue here, LSDI sues Lindsay over.  Peter

14  Brownstein is not named in the complaint initially.  LSDI

15  learns about this license agreement over to TAP, they learn

16  that Tina and Peter had set up this company named TAP, they

17  now sue TAP.

18         In that lawsuit, the complaint is about ownership of

19  the copyrights.  Peter Brownstein assists, actually has to

20  defend, but he assists in the defense of the lawsuit.  He

21  files an affidavit, in fact, an affidavit in which he tells

22  the story, a story that involves these copyrights and in that

23  story, you'll see he refers to as her work, her system, her

24  concept.

25         Now, this brings me to part two and I'm going to get

1  back to the lawsuit where LSDI sues Tina and Peter.  Part two,

2  Brownstein gives up his interest.  Now, TAP and TAP and CMR,

3  that company that Peter and Tina first worked for, the one

4  where they first met?  So CMR is in the list business.  CMR

5  merges with TAP.  This happens in September, 1994, and it

6  wasn't just to confuse you.  They now merge together.  It's a

7  new company.  It's called E-Tech.

8       E-Tech is my client, Ethnic Technologies, LLC.  Now,

9  as part of this merger, TAP vests all of its assets, including

10  copyrights, intellectual property, programs in the

11  newly-formed company, September, 1997.  So now Tina and Peter,

12  by virtue of their 50-percent ownership in TAP, become owners

13  in E-Tech.

14       Now, when this system, you've heard it called LCID,

15  LCID is Tina's concept, Tina's idea, her copyrighted work,

16  combined with the programs to form a product, LCID.  When

17  they're working at TAP, it's called TAP Systems so you may

18  hear that.  Now, when it goes to E-Tech, it's called the

19  E-Tech system.

20       The E-Tech system, which exists today, is Tina's

21  copyrights, combined with programs.  Now, in 2000 -- there's

22  two agreements; one in 1997, that forms E-Tech; there's a

23  second one in 2000.  In 2000, the second agreement, initialed

24  by Peter Brownstein, again reiterates that all of the assets

25  of TAP have now been vested in E-Tech.  E-Tech owns what TAP

1  had.  TAP had the copyrights, TAP had the programs.

2       Now, back to the LSDI lawsuit.  So it's September,

3  1998.  They're sued by LSDI.  The case settles.  There's a

4  settlement agreement.  As a result of that agreement, Tina

5  Lindsay will tell you, she retained ownership of her

6  copyrights.  LSDI retained ownership of the programs that were

7  made at LSDI, the programs plaintiff now claims to have

8  authored and own.

9       The programs were made on LSDI computers during his

10  employment with LSDI and as a result of the settlement, Tina

11  Lindsay will tell you, that the walk away was she keeps the

12  copyrights, LSDI gets the programs.

13       So now we are in 2009.  E-Tech has existed, Peter

14  Brownstein has worked there, he's an owner, they're selling

15  E-Tech system, they're making money.  Peter Brownstein sues

16  E-Tech and Tina Lindsay.  Now, you'll hear about this, it's

17  not the subject of this lawsuit.  He sues, the result is he

18  gets a buy out of his interest, he no longer is with E-Tech.

19  That's all that you need to know about this.  This lawsuit has

20  no affect on that, that had no affect on this.

21       So now we get to part three.  Part three involves the

22  statute of limitations.  The Judge has already told you, he

23  gave you a brief instruction about what the statute of

24  limitations is on a co-authorship claim.  It's three years.

25  Now, plaintiff agrees that it's three years.  He says that he

1  didn't know, nobody told him.

2        Now, there are a number of documents and evidence

3  that you will see that show that if he didn't know, he

4  certainly should have known.

5        Now, that's the last day which he could bring a

6  lawsuit for the co-authorship claim, March 22, 2007.  He

7  brought this lawsuit in 2009.  So fall, 1996, why is that

8  important?  It's important because the affidavit that he filed

9  in the lawsuit with LSDI, he reports overhearing a

10 conversation between Tom Raskin, who is the owner of LSDI, and

11 Tina Lindsay.  Tina Lindsay tells Tom Raskin, I own the

12 copyright, the work is mine.  I put my own time and money into

13 it.

14       He does not deny that he heard that conversation.

15       Now, that's in his affidavit, that's what he

16 submitted to court.  You'll see that affidavit.

17       The settlement agreement, this is the LSDI settlement

18 agreement, September 18, 1998.  Peter Brownstein signs this

19 document.  That document says, Tina Lindsay -- the parties

20 hereby acknowledge that Tina Lindsay obtained a copyright

21 registration on February 12, 1996.

22       The next paragraph, the parties hereby acknowledge

23 that Tina Lindsay obtained a second copyright registration in

24 December, 1996.

25       Peter Brownstein signed that document.  He's claiming

1  he did not know he was -- he didn't know at this point in time

2  prior to March 22, 2007, that he was not included as a

3  co-author.

4       December 28, 2000 agreement.  This is the agreement

5  that forms E-Tech, the company that I represent.  In this

6  agreement, they talk about what makes up the E-Tech system.

7  It refers specifically to copyrights and intellectual

8  property.  There are no other copyrights owned by E-Tech other

9  than the ones at issue here, the ones that Tina Lindsay

10  registered.

11       Peter Brownstein initialed that document.  Licensing

12  agreements.  So in his capacity as an owner of E-Tech, Peter

13  Brownstein then licensed to other companies the very product,

14  the E-Tech system which is made up of Tina Lindsay's

15  copyrights and the programs that E-Tech had done through the

16  years; programs that he had worked on, certainly.  He licensed

17  this product to other companies in 2001, 2002, 2003 and 2005.

18       Those license agreements specifically refer to the

19  intellectual property, including the copyrights of E-Tech.

20  Now, all of this would have led a reasonable person to have

21  asked whether he was a co-author, to have investigated whether

22  or not he had any interest in these copyrights.  He did

23  nothing.

24       So his claim of ignorance of his authorship doesn't

25  pass the smell test.

1    Now, there's a second claim that you'll hear a little
2  bit about and the Judge referred to it, it's called replevin,
3  it has a funny name.  We'll try to refer to it as something
4  else.  Basically it's plaintiff is seeking to get back
5  programs, these programs are the programs he authored prior to
6  2000.

7    Now, those programs, my client will tell you, she
8  doesn't know what he's talking about, which specific programs.
9  While working for these companies throughout the years, he was
10  a programmer.  There are many programmers who worked there.
11  This is what they do, they program. So see if he can identify
12  the specific programs.

13    Now, similarly, there's a statute of limitations
14  issue there.  The statute of limitations on that claim is six
15  years.  So he's claiming that he had programs, that he no
16  longer has, they were all authored prior to 2000.  In 2000,
17  that December 28, 2000 agreement that formed E-Tech, again,
18  all of the property of TAP was vested in the new company.  If
19  those programs were taken, they were taken on that date and he
20  signed -- I'm sorry, he initialed the agreement that formed
21  E-Tech.

22    Thank you.
23    THE COURT:  All right.
24    Thank you, Mr. Klaproth.  Let's take five minutes.
25  Go into the jury room, stretch your legs.

1          THE CLERK:  All rise.

2          (Jury is excused and the following takes place out of

3   the presence of the jury.)

4          THE COURT:  Take five minutes.

5          (Recess.)

6          THE CLERK:   All rise.

7          THE COURT:  Get the jury.

8          THE CLERK:   All rise.

9          (The following takes place in the presence of the

10  jury.)

11         THE COURT:  Are you folks all right to go for awhile?

12  You feel strong?  Okay, good.

13         Go ahead, Mr. McDaniel, call a witness.

14         MR. MC DANIEL:  The plaintiff calls Peter Brownstein.

15         P E T E R   B R O W N S T E I N, sworn.

16         DIRECT EXAMINATION BY MR. MCDANIEL:

17  Q    Good afternoon, Mr. Brownstein.

18  A    Good afternoon.

19  Q    How old are you, sir?

20  A    Sixty-one years old.

21  Q    And where do you currently reside?

22  A    I live in Palisades Park in an apartment, 54 Broad

23  Avenue, apartment 5B, as in boy.

24  Q    And are you married?

25  A    No, I am not married.

1  Q    Children?

2  A    No children, no.

3  Q    Share if you would with the jury, briefly, some of your

4  training and education?

5  A    Well, I first attended Fairleigh Dickinson University for

6  electrical engineering for a couple of years.  Then

7  transferred over to Union County Technical Institute for

8  computer science degree.  Because of -- completed all courses

9  except for the humanities courses, never could write well, so

10  never got my degree because I could never finish my

11  humanities.

12  Q    Are you currently employed?

13  A    Basically self-employed.  I'm starting up a couple of

14  businesses at the moment, computer-related.

15  Q    And what is your vocation, what is it you do for a

16  living?

17  A    Well, I'm a computer programmer, operations.  Over the

18  years I've done almost everything, including a little systems

19  engineering in computer industry.  I always worked in very

20  small companies, medium companies where your responsibilities

21  were more than your title were, was.

22       Like at Jamesway, I was -- my title was computer

23  operator, but I actually supervised a shift, the data entry

24  clerks, the other operators, maintained JCL and the check a

25  library.

1  Q    You just used the word JCl?

2  A    Job control language.  In the environment, the mainframe

3  computers, their operating systems as part of them have this

4  language that links together different programs and executes

5  them, links it with the system, links it with files, they read

6  in and read out and causes the execution of the programs.

7  It's how you get a process, run the process, basically.

8  Q    Obviously you know Tina Lindsay?

9  A    Oh, yes, for quite a few years.

10  Q    How did you first meet Tina Lindsay?

11  A    Actually, at Consumer Marketing Research back in, I

12  believe, '88, '89.  I think it was '88, but may have been '89.

13  She was interviewing with the then owner, Nelson.  What was

14  his first name?  I forget at the moment, Ginger's father.  He

15  owned the company.  He introduced me to Tina.  She was in

16  men's clothing at that time.

17  Q    Did you -- what was the nature of your relationship with

18  her while she worked at CMR?

19  A    Well, it changed some.  That's where we became friends.

20  We would go out and have lunch together almost everyday.  We

21  could discuss things about the data center.  She tells me

22  about what she did in the past and talk about almost anything.

23       I learned about her daughter, that she had children.  I

24  learned quite a bit.  We became very good friends and, in

25  fact, later on, I put her in as the executor of my living

1  will.  She literally had control of life and death over me.

2  Q    We'll come back to that.

3       What were her duties at CMR?

4  A    I don't remember.  Her exact title alludes me, but I

5  believe it was she was in charge of the data center.  She was

6  hired to be in charge of the data center.  I was already

7  working there as an operator in those days.

8  Q    So you worked for her?

9  A    Technically, yes, but it was such a small place, it was

10  more team like than strict organization.

11  Q    Now, how long did you work together at CMR?

12  A    I worked there 18 months.  Tina less.  Maybe 12, maybe

13  15.  I don't remember exactly how many months she worked, but

14  she was gone before I left.

15  Q    When did you next meet up again with Tina?

16  A    Actually we kept in touch intermittently.

17  Q    In what fashion?

18  A    Telephone calls.

19  Q    Did there come a time where you had worked with her

20  again?

21  A    Yes.

22  Q    When was that?

23  A    It was after the mainframe was installed at a company I

24  went to, hoping to improve my fortunes, Future Perspective

25  Clients, Incorporated, FPCI.

1  Q    What happened?

2  A    Well, I was basically, except for consultant, some

3  consultants, a one-man data center.  The work got heavy and I

4  asked John Raskin if I could have an assistant, somebody to be

5  an operator for me.  I pushed Tina as the operator, even

6  though she didn't have any operations experience that I knew

7  of.

8        She was hungry, she didn't have a job, she was a friend

9  and I felt sure she could do the work.  She knew enough, what

10 she didn't know, she could have learned, the job was simple

11 enough on computers.

12 Q    And what was the nature of the business of Future

13 Perspective Clients?

14 A    They resold data as mailing lists.  They didn't

15 particularly process anything or create anything.  They

16 basically were reseller, list broker.  They had rented from R.

17 L. Polk a master file, millions of names with data on it and

18 my purpose was to take that file, build programs to select

19 records off of it that matched the profile of the type of

20 people the clients wanted to market to.

21 Q    And what kind of information were you matching out of

22 that file?

23 A    There were so many different fields and they were always

24 just one or two byte size codes.  This is not a complete list,

25 I can't remember a complete list, nobody can.  But there was

1    age, there was income, there was at the time car ownership,

2    type of car ownership, marriage status, educational status.

3    There's much more.

4         The idea was simply that the client would provide you

5    with a profile of the person they thought they wanted to sell

6    to, the one that they felt most matched their best client.

7    This would be taken in by salesperson, given to me or Tina or

8    both of us at times.  Some of these were complex orders and it

9    took both of us working as a team to satisfy them, and the

10   programs I wrote simply were put into codes, into control card

11   images.

12        At the time everything was image, card readers and

13   stuff had become non-existent almost and run the programs and

14   the program would automatically select out those records.

15        We'd select the number of records required to fill the

16   order, then print it out, mailing stickers that's stuck on the

17   mailing piece, labels or index cards or stockbrokers use or

18   sent it out in some electronic form for the company that

19   bought it to use.

20   Q    Okay.

21        I direct your attention, if I could, to late 1993,

22   early 1994.

23        Did there come a time when Tina approached you with

24   some idea that she had?

25   A    Oh, yes.  That I remember very well.

1  Q    What happened?

2  A    Well, a day or two before that, a client -- we were

3  presented with a client request.  The first we ever had of

4  that type at FPCI.

5  Q    What type was that?

6  A    The data was to be selected by the person's ethnicity.

7  Tom wanted us, Tom Raskin, the owner, had created a list of

8  names of that particular ethnicity and select those records

9  out.  I remember clearly Tina saying I can do better than

10 that.

11 Q    Can you put a date on this?

12 A    Well, let's see.  Probably '93.  The computer mainframes

13 weren't installed until 1991.  We worked for awhile so, yes,

14 sometime in '93 I would say.

15 Q    And you said Tina Lindsay told you she thought she could

16 do it better.

17       In what way?

18 A    At the time she didn't say, but she came back next day or

19 a day or two and asked me -- we went into the little

20 conference room, a lunchroom, a jack-of-all-trades room and

21 explained her idea to me.

22 Q    And what was that?

23 A    It was fascinating.

24 Q    What was that idea?

25 A    Well, really it was to take the two present systems that

1 had been discredited by their inaccuracy, combine them with

2 certain features like using first names and suffix and

3 prefixes of last names and the point that she made the most

4 was the sequence and how these things were to be used so that

5 they would balance out the error factors that these older

6 systems had.

7        I told her immediately, she wanted to use something

8 that was all the rage at that time, a design concept called

9 rule-based expert system.  It had already been used by other

10 people.  It was just a general concept of how to design a

11 computer system.

12        But I told her all we had was COBOL and VSAM to work

13 with.

14 Q    Before we jump into that, you said earlier that these

15 other methods had been discredited.

16        By whom, in what context had they been discredited?

17 A    Use, people didn't believe at the time.  The general

18 belief in the list industry was that compiled list names that

19 had their ethnic identified by inferred type methodology like

20 our system that we developed would not work because it was too

21 inaccurate.  It would waste their money.

22        The idea of all of this data, whatever type of data it

23 was, was target marketing.  Cut down your marketing cost by

24 targeting the audience that you were selling to, people most

25 likely to buy.  In many cases that would be based on

 1   ethnicity.

 2   Q     You used the phrase a moment ago, the list industry.

 3         Can you describe for the jury what the list industry

 4   is?

 5   A     Well, it's gone on a lot of change over the years, but --

 6   Q     Focus on the time -- start with the time we're talking

 7   about, which is 1993.

 8   A     Basically they were companies that compiled information

 9   on people legally, but they didn't really believe in privacy.

10   They would use it for marketing purposes.  They would not sell

11   the information per se if they could help it, but basically it

12   was more of a rental type agreement than sale.

13         They would get a -- they would compile it together.

14   There were a few big compilers that would gather information

15   from multiple sources, compile them into these big files or

16   data bases, however you wanted to call them, and then rent

17   those things out to other people, like FPCI, who would had

18   clients like stockbrokers, real estate agents, what have you,

19   insurance companies, whoever wanted to target marketing and

20   then they would sell those names and addresses; just the names

21   and addresses most of the time, not the other information, to

22   these end clients and the clients would use it for marketing

23   campaign which usually sold on one-time use basis or special

24   arrangement multiuse, but it was basically rental in actuality

25   the way it worked business-wise.

1  Q    You said also that ethnic selections, marketing lists by

2  ethnic criteria was discredited.

3       Can you explain why?

4  A    Accuracy.  The final customers over the years really --

5  they found that they were wasting money buying them.  So at

6  the time they believed that lists, the only lists that were

7  anywhere reliable were organization lists, society, Asian

8  society, Korean society, black contributors to black colleges.

9       They didn't believe, because of the failures that they

10  had, that inferred ethnicity onto a database would be accurate

11  enough and cover enough names of the database to be worthy of

12  buying.  This thing we built together was a revolution.

13  Q    The idea that Tina Lindsay had, how was it presented to

14  you?  Was it spreadsheet, in what format?

15  A    Verbally.

16  Q    Verbally?

17  A    Except for, I think, it was the back of an envelope.  She

18  had a few names written on it.  Like she had been working

19  things out, but that's how the first meeting went.

20  Q    And what did the two of you decide to do after you had

21  that first meeting, if anything?

22  A    Oh, lots of things.  Really, to have something really new

23  like this to develop is a real treat, happiness, in fact.  I

24  got carried away, sorry.

25       Well, we decided to start building it quietly on the

1 side.  Tina would do her research at work, bring it in and

2 data enter it into the computers, actually the mainframe we

3 had at work.

4        I set up a logon.  She set up this file using what's

5 called ex edit.  It's a text edit, part of the operating

6 system VM, that IBM sold, that we had installed at FPCI at the

7 time.  It's just something generic that was part of the

8 operating system that allowed you to create just type in text.

9 You could create programs in it, you could create documents in

10 it, you could create JCL in it.

11       It's not like the word processors of today with all of

12 these functionalities that automatically line things and

13 paragraphs and stuff.  This was a plain, very plain text

14 editor that would allow you to move things around and put

15 things in anything.

16       You could program it to do some special stuff, but the

17 basic thing was just typing, like a sheet of paper.

18 Q    And what did you do, if anything?

19 A    Well, I covered her when she was doing the data entry

20 during the day, did the work.  I developed programs, I

21 developed the JCL, I defined -- I created the definitions of

22 the VSAM files necessary for the system.

23       In fact, I built a program to convert the form, what

24 she data entered into a form that would be usable in a COBOL

25 program or any similar program.  In fact, we did testing.

1    One of Tina's ideas I wrote and test was that one

2  program could access all of the reference files.  That's what

3  we called the name and address files, and the rules files,

4  prefix and suffix rules of the last name.  Take an input name

5  off of the list being encoded and run it against each file.

6  That proved to be impractical because of the nature of the

7  computer environment that we were working in.

8    So I broke up the functionality in separate programs,

9  added sorts and started using the files we had on hand.  At

10  the time, the first programs, the data records that we

11  encoded, the name and address records, were in the standard

12  master file format, record format, that is, of the FPCI.  I

13  didn't see any reason to change that so I just put that in the

14  programs at the time.

15  Q    Let me ask you just to kind of back up for a second.

16    Why couldn't you just use the text file that Tina

17  Lindsay had prepared, the information she was typing into the

18  mainframe?

19  A    Because the codes, it was like paragraphs, paragraph

20  headers.  There would be this line with an asterisk, an ethnic

21  code, another asterisk, the name of the ethnic, some spaces to

22  your right would be a couple of codes showing religion, race.

23    What else was there?  It changed over time, the

24  original format, and then there would be these four columns of

25  names, just names.  No codes, no identifiers of anything.

1          And then another header, they were of another ethnic

2     code.  They were effectively blocks of names.  You couldn't

3     create a sequential file out of that that could be used to

4     identify ethnicities because sequential files use each one at

5     a time.  You couldn't even use an indexed file.  Maybe, with a

6     lot of cross indexing, you could use it in a database file,

7     but that would be un -- wasteful design.

8          So what I had to do was to take the codes from the --

9     that one header line and take each name off of each other

10    line, each of the four names and combine it into one format, a

11    record as it's called, so that could be sorted in the proper

12    sequence if you're doing sequential, or if you have a file

13    with an index on it, again, proper sequence -- the file system

14    to search and an index file because most file indexes are

15    search binary.

16    Q     Okay.

17          How did you do this?

18    A     Wrote programs, in fact, and converted it all.  Actually,

19    we stumbled over a problem that I had to write another series

20    of programs for, to create a JCL job stream, duplicates.

21          At some point, Tina started entering duplicate names

22    into the files, the same name a couple of times and the same

23    ethnic so I created programs that would eliminate those

24    duplicates.

25    Q     How many programs did you write?

1  A     I don't remember.  Let's see, there were what I called

2  the support programs, the things that loaded.  Four, three,

3  four.  Let's see, the main, there were three original programs

4  to do the encoding.  Four for loading the data.  Looks like

5  about seven to start with and then that expanded.

6         The thing is that me and Tina would talk things over.

7  You should have seen her in those days when she found out

8  something interesting about a new name or a new rule, the

9  enthusiasm.  It was very contagious, a little boring, though.

10  I wasn't very interested in the names themselves.  Talking

11  about the programs, that was my bailiwick, but we learned it.

12         There was one thing that happened that had us both

13  making changes.  When we had first sat down describing this

14  program and talking back and forth about how the system would

15  be set up, it was decided that there would be a two position

16  ethnic code.

17         As Tina researched African tribes, the sheer number

18  over filled the numerical numbers we had set aside for African

19  names and African American names categories, the sheer number

20  of tribes.

21         Before the research started, the reading of books and

22  what have you, neither Tina or me realized that there were so

23  many different tribal names and names derived from all these

24  different tribes in Africa, so that required a change.

25  Instead of a purely numeric coding system, we had to change to

1  a combination number and alphabet coding system, alphanumeric

2  system.

3  Q    Why were you working on this?

4  A    Huh?

5  Q    Why did you do this?  Why did you work with Tina?

6  A    Why?

7  Q    Yeah, what was the purpose?  Were you assigned to do it?

8  A    No, she was a friend that brought a fantastic idea to me

9  that I could really sink my teeth in and build something

10  around.  It was giving me a chance to be like my ancestors,

11  create something.

12  Q    Did you have any plans for this thing that you were

13  creating?

14  A    Actually before she had that light bulb affect, I had

15  talked to her because I wasn't happy with working for Tom

16  Raskin, about creating a company, but she wasn't too sure

17  about that for one thing.  We were going to do the same thing,

18  at least I was proposing, to do the same thing that everybody

19  else was doing.

20       She said there had to be an idea that distinguished our

21  company.  Then she had the ethnic idea and we went there.

22  It's basically to have my own company, to work for myself, to

23  be creative.  This idea gave it to me and as we worked, things

24  came up.

25  Q    Let me ask you, were the two of you, during this process,

1   were you planning a business together or something else?

2   A    No, we were definitely planning a business together.

3   When we planned the business, but a lot of times we were just

4   concentrating on developing this ethnic system.  The point,

5   everybody seems to forget, is development like this is not

6   linear thing.  Tina would find something, I'd have to make a

7   change in the program, I'd find something, I'd make a change

8   in the program.  Things kept expanding and changing.

9        Tina's inventory program, program to printout uncoded

10  names, functions and the load program that permitted the

11  printing out of cross ethnic dupes, all of this we found out

12  during the research and development and trial and error of

13  testing, constantly back and forth.

14       Even in the inventory program, that wasn't really

15  envisioned at the beginning.

16  Q    What do you mean by "inventory program"?

17  A    Everybody asks me that and I'm always surprised at it.

18       An inventory program is simply a program that counts up

19  the records in a file and prints out a report of how many

20  records are coded this ethnic, how many are coded that ethnic,

21  same thing with religion.

22       Later on it was same thing with language, assimilation,

23  later developments that were added to the system.  That was an

24  inventory program.  Just like an inventory program is simply a

25  program that does an inventory.  Like you go into your store

1  and count everything up, you do an inventory of your store.

2  Q    Only this counted names?

3  A    Actually, this counted the codes on each of the records

4  and what ethnic counted codes and identified what ethnic that

5  code was in the printout.

6  Q    Now, at this point in time, when you're developing the

7  program, what, if anything, had you told the owners of Future

8  Perspective Clients?

9  A    Well, Tom and Micah were not the nicest guys to work with

10  or work for.  Actually, I told them that Tina had this idea

11  and we developed it and it was a good ethnic and it could be a

12  good moneymaker, because they were bitching because they were

13  having a fight with the partner.

14  Q    When did you first discuss this ethnic system with the

15  owners of FPCI?

16  A    See, either '94 or '95.

17  Q    What condition was the work in at the time that you

18  discussed it with them?

19  A    Well, the basic files and programs were complete in their

20  basic form and we were on test runs successfully encoding name

21  and address files.  So, yeah, late '94, early '95, around

22  then, most likely.

23       Also at that time because of their poor management, the

24  company was in problems.

25  Q    Now, did the Raskin's -- what assignments -- withdraw

1  that.

2       What did the Raskin's know about the work that you and

3  Tina were doing before you talked to them?

4  A    To my knowledge, nothing.

5  Q    Had the Raskin's given you any assignments -- withdrawn.

6       What happened next in this development process?

7  A    Well, we just continued with what we were doing since

8  there was zero interest and instructions not to use it for use

9  in products that FPCI was selling, but me and Tina, we were

10 confident.  We knew it was a great thing so we just continued.

11      Tina continued name research, I continued tinkering on

12 the programs, making improvements and running tests.  When she

13 had, Tina had put in a sufficient number of names that she

14 needed and had the files verified, I would run the within

15 ethnic dupe elimination program and that would eliminate the

16 dupes and reorganize the files back into code alphabetic

17 sequence.

18      In other words, alphabetics within the codes, it would

19 create these blocks again and create a new file.  I would load

20 that file down to the logon, on VM.  I would delete the old

21 file and rename the new one the exact same name as the old

22 file so it was transparent to Tina so she could continue her

23 work.

24 Q    We'll have a chance to talk a little bit about some of

25 the writing that you did in a little bit.

1        So you continued to work on the file.

2        Did there come a time during 1995, when the situation

3   with LSDI changed?

4   A    Yes.

5   Q    What happened?

6   A    Loretta showed up.  Loretta Pogio had a doctorate and she

7   had worked with Norman Nelson.  That's the name, Ginger's

8   father's name, Norman, Norman Nelson.

9   Q    The owner of CMR?

10  A    Yeah, the owner of CMR.

11       Back going, I don't know how far back, Ginger claims

12  that Norman started this in the '50s, but she left CMR and she

13  came to work as a salesperson.

14       Tina and me, because we knew her, respected her, liked

15  her, showed her what we had done.  Tina especially.  I printed

16  out the name files so Tina could sit down and go over the

17  names with Loretta Pogio because that was what her research

18  had been in, last names during CMR.

19  Q    What else did you do with Loretta?

20  A    At that point, well, struck up an old acquaintance sort

21  of thing.  Then with Loretta's enthusiasm, Tom Raskin started

22  to be a real problem.  There was a paper he distributed asking

23  us to sign that basically said anything we did when worked for

24  there, he owned it, we refused to sign it.

25       There was times where he would say that what a great

1  system Tina and Loretta had developed.  One time, first time I

2  heard that, I was walking down the hallway and when he said

3  it, I told him, no, Loretta had nothing to do with it.  He

4  just shut up and left.  I think he was angry because I

5  contradicted something.

6  Q    You said earlier, and my notes show, that you had

7  described their response to the initial overtures that you and

8  Tina made as having zero interest?

9  A    Yes.

10 Q    Can you elaborate on that a little bit more, please?

11 A    That was after the cut back.  I had talked to Tom instead

12 of -- he asked me to fire Loretta -- excuse me.  Wrong name.

13 I sometimes mix names up.

14        Tina, and it was either Tina or the secretary and I

15 told him, Tina could double as a secretary and still work with

16 me in the data center and they fired the secretary.

17        After that, one day Tina went into Tom, she told me Tom

18 wanted to use the system, she wanted him to pay us royalties.

19        I don't remember if this was '96 or '95.  Probably '96,

20 yeah, '96.  I know that in late '95, November, because of the

21 way the Raskin's were acting, Tina suggested that we should do

22 a copyright, so I printed out the files.

23        I asked her, what about the programs and she said, no,

24 not at this time. She wanted to protect what we had done.

25        It was also during this period that she told me the way

1  things were going, we discussed, suggested to me, I didn't

2  really listen because I felt she knew business better than I

3  did, to keep my head down, avoid mentioning my involvement at

4  all, keep it that it was Loretta -- excuse me, Tina that was

5  involved with the system because of the increasing friction.

6        I do know that me and Tina had quite a verbal fight

7  over sending in a copyright because I had given her the

8  printout and she said it was done.  This was at the beginning

9  of December, and she told me that she had taken this home.

10  She told me she wasn't going to send the package in until

11  January and I wanted it in there as quickly as possible

12  because I had seen Tom.   Tom, I felt, wasn't to be trusted.

13        MR. MC DANIEL:  We have a set of exhibits for you as

14  well.

15        THE COURT:  Okay.  Why don't we take five minutes?

16  We have been at this for about an hour.  We'll take five

17  minutes.

18        THE CLERK:  All rise.

19        (Jury is excused and the following takes place out of

20  the presence of the jury.)

21        THE COURT:  How much longer do you think you have

22  with the witness, the rest of the day?

23        Who is next?

24        MR. MC DANIEL:  I have Miss Lindsay for a short

25  while, but the rest comes in from Mr. Brownstein so it's

1  somewhat extended.  I'm not quite sure we'll finish everything

2  today.

3          THE COURT:  It doesn't look like we are.

4          Mr. Brownstein, I want to ask you one thing, sir.

5  Your answers are -- there hasn't been any objection, but your

6  answers have been very expansive.  I would suggest you listen

7  to the question and simply respond to the question.

8          THE WITNESS:  Thank you, your Honor.

9          (Recess.)

10          (The following takes place out of the presence of

11  the jury.)

12          THE COURT:  Let's get the jury.  We'll go until about

13  four o'clock today.

14          THE CLERK:  All rise.

15          (The following takes place in the presence of the

16  jury.)

17          THE COURT:  Take your seats, folks.

18          DIRECT EXAMINATION CONTINUES BY MR. MCDANIEL:

19  Q    Mr. Brownstein, I'd like to show you a document that has

20  been premarked as plaintiff's exhibit three.

21          Can you take a look at that, please?

22          Do you recognize that document, Mr. Brownstein?

23  A    Yes, most of it.  I printed it out from the FPCI

24  computers.

25  Q    And the particular compilation that you have in front of

1  you, do you recognize that?

2  A    Except for these first few pages, yes.  I recognize this,

3  it's the first copy sent into the copyright bureau for

4  registration.

5  Q    I'd like to show you, if I could, another document that

6  has been marked as plaintiff's exhibit two and ask you if you

7  recognize that document?

8  A    Yes.  I have been shown this document several times in

9  the last couple of years.

10  Q    What do you recognize it to be?

11  A    Copyright submittal form for submitting material to be

12  copyrighted at the copyright office for the ethnic system, for

13  the first copyright.

14  Q    When was the first time that you saw that document?

15  A    I can honestly say only about two years ago.

16  Q    You were aware that a copyright registration was being

17  made?

18  A    Yes.

19  Q    How was it that you only saw the certificate a couple of

20  years ago?

21  A    I'm not sure I have an answer.  I know it was being made,

22  but I was not curious.  It wasn't important to me to see that.

23  There was a lot of other things, at least at the time it was

24  being made, of higher concern.  Tina was taking care of it.

25  Tina was taking care of it so that was taken care of so it

1  just didn't matter to me because Tina was taking care of it.

2  Q    Did Tina give you a copy at the time that she was taking

3  care of it?

4  A    No.

5  Q    How did you come to see that certificate that you have in

6  front of you for the first time?

7  A    It's my understanding it was among the papers I had been

8  keeping for TAP, had stored away from the first lawsuit, TAP

9  versus LSDI.

10  Q    What do you mean by you have been storing papers?

11  A    Just that.  I would be given things by Tina, in this case

12  it was a big manilla envelope with a lot of other papers.  I

13  put a rubber band around it and put it in the drawer and left

14  it there.

15  Q    At or about the time that you provided those documents to

16  Miss Lindsay for the registration, in the months that

17  followed, did Tina ever hand to you something that said here's

18  a certificate of registration?

19  A    I remember her telling me that the -- she had gotten

20  stuff back from the registrar office; seeing them, no.

21  Q    Why didn't you ask to see them?

22  A    Simple answer, for that time, why?  Why should -- why?

23  Tina had taken care of it.  I trusted Tina completely.  It was

24  -- every time somebody asks me that, it confuses me because to

25  me it was simply Tina took care of it.  I don't understand

1  what the big thing is about doubt.

2  Q    Let me have the big document.

3       Mr. Brownstein, if you would take a look at this,

4  exhibit five, and tell me if you recognize that document?

5  A    It appears to be a copy of the second deposit for

6  registration at the copyright office.

7  Q    And do you know where that document came from?

8  A    Most of it I printed out from LSDI's computers.  There

9  are a few pages up front that I didn't, I don't know where

10 they came from.

11      THE COURT:  What's that exhibit, Mr. McDaniel?  You

12 didn't tell us what the number was.

13      MR. MC DANIEL:  I apologize.

14      That is plaintiff's five.

15 A    Five.

16 Q    Mr. Brownstein, if you could turn in that document, I

17 know it's rather large.  Actually, we're going to use the

18 graphics to show it to you.

19      I'd like you to turn to exhibit five, page 757, which

20 we'll show you.

21 A    I got page 757 up.

22 Q    Right.

23      Now, do you recognize that particular page of this

24 document?

25 A    Yes.

1  Q    What is that?

2  A    This is the JCL for basically the first version of the

3  ethnic system with the functions broken up in the separate

4  programs.

5  Q    There's a lot there so let's slow down.

6       JCL, JCL is?

7  A    Job control language.  This particular type of job

8  control language goes with IBM mainframe operating system

9  called VSE.

10 Q    Okay.

11      And did you write this?

12 A    Yes.

13 Q    Can you tell us what it is that you've written here?

14 A    Well, basically this is what they call a job flow,

15 multistep process laid out in JCL.  First step is execute a

16 sort.

17      Let's see.  Looks like sorting in name sequence, first

18 name sequence.

19 Q    Where is that?

20      That screen is a touch screen that you can use to

21 identify a particular spot.

22 A    Well, this here is the sort.

23      Down here is the control card specifying what it's

24 sorting and how it's sorting it and the size and block size of

25 the records, the blocks, control information for the sort.

1  Q    Okay.

2  A    That's -- yeah.  Here is the second step which is the

3  first name ethnic program, first version.

4        Here is another sort.  This time in last name version.

5  You see all this stuff can get quite extensive.

6        Here in the control fields, you see what positions in

7  the record it's going to sort, how many positions, size and so

8  forth.

9  Q    Okay.

10       Now, you said you wrote this?

11 A    Yes.

12 Q    Where did you write it?

13 A    This would be at FPCI.

14 Q    Okay.

15       Physically, where were you when you wrote it, in the

16 office?

17 A    Yes, in the office at a terminal.  There was no

18 teleprocessing into FPCI.

19 Q    Obviously this program was stored somewhere.  Where was

20 it stored?

21 A    Originally on FPCI's mainframe.

22 Q    On a storage device?

23 A    Oh, disk device.

24 Q    And it could be retrieved from that disk device?

25 A    Yes.

1  Q    What language is this program written in?

2  A    Well, this isn't really a program.  This is just a job

3  control language, a flow of different programs.

4       If you notice here, this statement that says "execute,"

5  that's a command to process the program that's named there.

6  This is the way you ran programs.  It isn't a program in and

7  of itself.

8  Q    Is there any discretion at all in the way this program is

9  run?

10 A    Quite a bit.

11 Q    How would you exercise discretion in writing this?

12 A    Well, this first name ethnic program, you could change it

13 from using tape as the storage media for the work files, to

14 using disk.  You could change the program to be called

15 program; sort we call it.

16      You could change the JCL.  This JCL has some unique

17 features in it.

18 Q    Is there any creativity in writing JCL?  If so, what is

19 it?

20      MR. KLAPROTH:  Objection, calls for lay opinion.

21      THE COURT:  Can you answer the question?

22      THE WITNESS:  Pretty much.

23      THE COURT:  Overruled.

24      Go ahead.

25 A    Some, yes, but in JCL, you do have to follow a lot of

1  basic rules because of the simplicity of it, but, yes.  The

2  creativity is simply what you are doing, what process do you

3  want to run, not -- and what devices you want to use for the

4  files.

5            THE COURT:  May I ask a question because I'm

6  confused?

7            The document you're looking at, Mr. Brownstein, is

8  page 757 of 842 pages, correct?

9            THE WITNESS:  Yes.

10           THE COURT:  What are the 842 pages collectively?

11  What is that?

12           THE WITNESS:  That, I said before, was the deposited

13  copy for copyright at the copyright office.  This is part of

14  the second copyright deposit.

15           THE COURT:  And this page 757 that you say you wrote,

16  when did you write it?

17           THE WITNESS:  Since it's the -- I would say well

18  before '96 because this was at the end of '96 and this was

19  already being used quite a bit.  So '95 maybe.

20           THE COURT:  Okay.

21  Q    798.

22           Mr. Brownstein, I have seven -- page 798 in front of

23  you, which is somewhat deeper back in this deposit copy.

24           I would ask you if you recognize that particular page

25  and we'll have some additional pages that we'll discuss?

1  A    Oh, yes.  This is the beginning of an actual program

2  written in COBOL.  My first tentative and crude forms of

3  inventory and name printout.

4  Q    What was the purpose of this program?

5  A    Well, it was -- on later pages you'll see the logic, but

6  the purpose was to allow somebody to select records off or the

7  whole file of a name and address file that had been sent

8  through the ethnic system to count up what it's been done.

9        It also has a second function of counting by individual

10  names, how many times a name occurred on the file and was

11  coded this particular ethnic code.

12  Q    Peter, I was actually looking for the program that

13  creates -- withdrawn.

14        Did you write a program, sir, that would create an

15  ethnic record file?

16  A    Oh, yes.

17  Q    What was the number of that program?

18  A    I think ethnic three or ethnic one.

19  Q    Do you want to take a moment and look through the

20  document that you have?

21  A    This is going to get messy.

22  Q    I don't want you to explain the wrong program again.

23        THE COURT:  Are you offering this entire exhibit into

24  evidence?

25        MR. MC DANIEL:  I'm going to, Judge.

1          THE COURT:  Is there any objection to it?

2          MR. KLAPROTH:  My only objection is juror confusion.

3   It's a large document and it just looks like computer

4   programs.

5          MR. MC DANIEL:  It's kind of got to be.

6          THE COURT:  I'm just asking the question.

7   A    You can start with page 759.  That will give you the

8   names of the programs, ethnic five.

9          This is job control language used to load the data into

10  the VSAM files for preparation for encoding a job, encoding a

11  file.

12  Q    Okay.

13  A    So it was ethnic five.

14  Q    Okay.

15         You just used the phrase called VSAM?

16  A    Yes.

17  Q    What is that?

18  A    It's a file management methodology.  All computers have

19  them, no matter what size.  They're used for controlling the

20  storage data.

21         In the case of VSAM, it was an upgraded version of an

22  indexed access method.  It's an acronym standing for Virtual

23  Sequential Access Method.

24  Q    What does it do?

25  A    On a mainframe, it allows you to load files into this

1  VSAM catalog which it keeps track.  It allows you to index

2  them, allows you to put files you read sequentially, allows

3  you to read them, what's called other methods.

4        Basically it's a method of storing files and managing

5  them.  There's a lot of things it will do for you.

6        In fact, it's the one that does -- when you request a

7  particular record from a file, all you have to do, index file,

8  is give it a key and it will do the searching of a file for

9  that particular record for you.  A lot of the housekeeping,

10 when it comes to files, is done for you with VSAM.  It's

11 basically a forerunner for a lot of the data bases out there

12 today.

13 Q    Okay.

14       So you had mentioned a moment ago ethnic five?

15 A    That's a program I wrote.

16 Q    One second.  Let me catch up with you.

17       If you could turn to page 788 in your document?

18 A    Got it.

19 Q    What is it that begins at page 788?

20 A    That's beginning of the program name ethnic five.  Its

21 purpose was to take what I later started to call human

22 readable form data, those text documents we talked about, and

23 convert them into record format and load them into a VSAM

24 file.

25       It also took advantage of certain functions of VSAM to

1  identify errors in the file, like duplicate records where the

2  same name was identified as two different ethnicities.

3  Q    Let's focus on the first thing.

4       You said it took the human readable and made it into?

5  A    Records, records format.

6  Q    Why was it necessary to do that?

7  A    Sorry.  I'm so used to programming, I sometimes forget

8  everybody doesn't know.

9       Simple.  On an index file, you specify what the index

10 is.  In this case it was the name.  Name was the index.  When

11 I was looking for a match of a name in the encoding system,

12 whether it was first or last name, what I do would be to use

13 the functions of VSAM to search the file to ident -- to match

14 those names, but what VSAM actually does, instead of reading

15 all the files, it reads an index, like an index in a book, to

16 find something specific, and match it.

17 Q    Okay.

18      So you needed something -- there was a lot there.

19 You're taking the human readable, you're putting it into a

20 data file?

21 A    Yeah, but because it needs a key, each record is

22 separate, independent, so each name had to have the ethnic

23 code, religion and race attached to it in just one record, not

24 a part of a title on a paragraph.

25 Q    Who designed the format of the record file?

1  A    I did.

2  Q    How did you do that?

3  A    I just did.  It's normal part of programming.  You see

4  how big the data becomes.

5       In this case, discussion with Tina and me establish

6  that the name field would be 20 positions in size.  We got

7  surprised.  During research, we were caught by some Polish

8  names.  Originally we had it at 15, we had to expand it to 20

9  because of the Polish testing research, what have you.  You

10 always get surprises when you're developing something.

11      A code, two positions; religion code was one position,

12 so like put one position right here, religion, the race code.

13      MR. KLAPROTH:  Objection, your Honor.  There is no

14 question pending right now.

15      THE COURT:  Well, I suppose he is right about that,

16 Mr. McDaniel.  Why don't you put a question and get an answer?

17      MR. MC DANIEL:  Okay.

18 Q    If you would look at the section that is denominated

19 01-REC, what is it that you were doing in this section of the

20 program?

21 A    This section was -- I was defining how the record would

22 look, telling the program where everything was placed in the

23 record.  This is my shorthand.

24 Q    How do you tell the program where the information is

25 placed in the record?

1   A    You see these 03s, they're called levels.  This EF is my

2   shorthand for ethnic field dash name; picture, 20 positions; X

3   is a code indicating alphanumeric field.  So it's 20 positions

4   and you can put either numbers or letters into that field.

5   Q    Okay.

6        The EF-name that you just mentioned, what is that?

7   A    That's the name of that field that's used within the

8   program.

9   Q    Okay.

10       Who wrote that?

11  A    I created that.  It's my program.

12  Q    And, again, with this program, where did you physically

13  write it?

14  A    Terminal at -- on the mainframe at FPCI.

15  Q    Okay.

16       Moving down to the sort file section of this, it says

17  SD, sort file, do you see that?

18  A    That's just S dash and my shorthand.

19  Q    What is it that you were doing here?

20  A    Oh, this is what's called is defining the fields for an

21  internal sort.  I was -- in the logic section of the program

22  was going to call a sort, to sort the records in the proper

23  sequence for loading into the VSAM file.

24  Q    Why would you have the program do that?

25  A    The index.  Indexes are always better in sequence, a

1  proper sequence.

2  Q    Why did you put it there?  Withdraw that.

3       Did you have, in preparing programs, do you have any

4  discretion about where you put different functions such as

5  this sort that you described?

6  A    In COBOL, there are what's called divisions and sections.

7  Each one is designed for specific information about what

8  you're doing.

9       This particular section is where you define the files

10  you're going to be working with.  The record layout, you

11  define it to the program.

12  Q    Who defines it?

13  A    The programmer.  I do in this case.  All that's required

14  is it be put into proper form.

15  Q    How do you define it?

16  A    These 01 and 03 levels, that's how you define it.  Also

17  what's above it.

18  Q    Physically, how do you define it?

19  A    Well, if it's an outside file that you're reading from

20  something else, you get a format from that other person or if

21  you can, you look at the raw data and define it by I.

22  Q    Okay.

23  A    But in the case of files that you're creating yourself,

24  you make it up.  You design it.

25  Q    How do you express what it is that you've made up or

1  decided?

2  A    In this particular programming language, it's what you

3  see on the screen.  It's what you create, names.

4       The one thing about COBOL is it's very English like so

5  you have the ability to name it whatever you want.

6  Q    And you physically have to write the code to name it?

7  A    When you're working with terminals, yes, definitely.  I

8  never used code generator of any type.

9  Q    Next page, 789.

10       If we can just continue down with this, I don't want to

11  drag you through the whole thing.  Take a look at the working

12  storage section.

13  A    Oh, working storage section is simple.

14  Q    Let me ask you a question.

15       First of all, if you can define what the working

16  storage section is?

17  A    That's areas in memory within the program you're defining

18  as different fields for you to use -- well, actually the

19  program to use for whatever processing you've designed it to

20  do.

21       In this case, there is a mixture of fields, fields for

22  counting, fields for holding data and memory and edit field

23  for printing out and field for returning status codes from the

24  VSAM section.

25  Q    Could you point those out to us?

1  A     The first one, FS, it was named file for returning -- is

2  the fields that the return codes from the VSAM system would

3  come in.

4       The next --

5  Q    Stop there for one second.

6       Return codes from the VSAM file, what does that mean?

7  A     Well, the VSAM file system would send back messages to

8  position codes, to your program telling it whether the

9  function is done correctly and if there was an error, what

10 type of error.

11 Q    Okay.

12 A     You can ignore it or you could provide a field in your

13 program so you could see what the code was.

14 Q    Okay.

15      So this section, if I understand you correctly, creates

16 such an area in the program?

17 A     That one line, yes, just that one line.

18 Q    Is that operational?  Do you have to have --

19 A     Oh, very operational, but program -- professional

20 programmers always do that, safety factor and it's great for

21 tracing down errors.

22 Q    Okay.

23      If you could move down to where it says 01, WS, code

24 table.

25      Do you see that?

1   A    Yes.

2   Q    What is that?

3   A    Just an area I created to store information temporarily

4   in the program to allow the program to do its work.  Those

5   paragraph headers I was mentioning later that show up in some

6   of the earlier pages in this document, I would have to store

7   the code from them, the name of the ethnic, the religion and

8   race and each time I read another line, and read the four

9   names, I would have to write these codes.

10        So this area is where I store it, my scratch area,

11  scratch work like you'd have a pad to write things down

12  temporarily.  Same thing with the program.

13  Q    What was the net result of this program when it had been

14  run, when it had been successfully run?  What did you achieve

15  with it?

16  A    I had a reference file that could be used by the ethnic

17  system to identify the ethnic of people on name and address

18  lists.

19  Q    And what information was in the ethnic file?

20  A    Depending on the file, would depend on the list.  This

21  particular one would load the name files.  In other words, one

22  reference file for first names, one for last names.  It was a

23  different program to load the prefix and suffix rules.

24  Q    Now, if I can direct your attention to -- I just want to,

25  if we could, define where within this document your work

1  begins, the work that you wrote.

2      THE COURT:  By "this document," the 800-some-odd

3  pages of exhibit five?

4      MR. MC DANIEL:  Right.

5      THE COURT:  Okay.

6  Q    If you could?

7  A    Well, stuff that I did on my own --

8  Q    Let me rephrase that.

9      Can you show us in this document where the programs are

10  that you wrote?

11  A    Starting with JCL at 757 and continuing through until the

12  end of the document, the programs, the JCL, I wrote all that.

13      THE COURT:  Mr. McDaniel, whenever it's logical to

14  break, we will, so I leave it to you.

15      MR. MC DANIEL:  I was about to start something that

16  would take awhile.  This is probably a good time.

17      THE COURT:  Let's break for the day, folks.  I'm

18  going to release you for the day.

19      Please travel safely.  Don't discuss the case with

20  each other or anyone else.  Keep an open mind and we'll see

21  you tomorrow morning.

22      We're going to go tomorrow until about three o'clock

23  based upon my schedule.  So as soon as everybody is here ready

24  to go tomorrow morning, we'll have you in the courtroom.  We

25  appreciate your attention.

1          THE CLERK:   All rise.

2          (Jury is excused and the following takes place out of

3    the presence of the jury.)

4          THE COURT:  You can step down, Mr. Brownstein.

5          I'd like counsel to stick around for a minute.

6          MR. MC DANIEL:  In terms of this, I was not going to

7    attempt to publish this to the jury.

8          THE COURT:  Let's let the jury go and we'll talk

9    about this.  Don't go anywhere.

10          I just want to get a sense on case management.  We

11   have Mr. Brownstein's testimony, he'll be cross-examined and

12   then you're calling Miss Lindsay?

13          MR. MC DANIEL:  She will be very short.

14          THE COURT:  And then do you have any other witnesses?

15          MR. MC DANIEL:  I do not have any other witnesses.

16   My case should be in by 11:30 or 12.

17          THE COURT:  What do you have?

18          MR. KLAPROTH:  I mean, I'm not going to cross-examine

19   Miss Lindsay when he calls her.  I'll start my case right

20   after and call her back, do my direct then.

21          THE COURT:  Okay.

22          Do you have any other witnesses?

23          MR. KLAPROTH:  No, just Miss Lindsay.

24          THE COURT:  My request to you is to start thinking

25   about a jury charge because if we're going to get the case to

1  the jury as you predicted on Thursday, this thing has to be in

2  pretty final form by sometime tomorrow.

3       I also, having learned about the case more than I

4  knew before today, would urge upon you to take a look at the

5  jury charge and limit it to that portion of copyright law

6  which pertains to this case, because if you let it go into its

7  natural habitat, it's going to be much longer than it needs to

8  be.

9       The issues in this case are very discreet and I think

10  we should explain them to the jury in very simple language.

11       MR. MC DANIEL:  Okay.

12       THE COURT:  Thanks a lot.

13       See you tomorrow morning.

14       (Trial adjourned until Wednesday morning, February

15  15, 2012, at 9 a.m.)

16

17

18

19

20

21

22

23

24

25

## $

**$50,000** [1] - 59:23

## '

**'50s** [1] - 107:12
**'80s** [1] - 78:25
**'88** [2] - 91:12
**'89** [1] - 91:12
**'93** [2] - 95:12, 95:14
**'94** [2] - 105:16, 105:21
**'95** [5] - 105:16, 105:21, 108:19, 108:20, 117:19
**'96** [5] - 108:19, 108:20, 117:18
**'97** [1] - 71:24

## /

**/KHAOE** [1] - 36:12
**/KHRAOUFP** [1] - 36:12
**/KWEUPB** [1] - 36:13

## 0

**01** [2] - 124:16, 126:23
**01-REC** [1] - 122:19
**03** [1] - 124:16
**03s** [1] - 123:1

## 1

**10-1581** [1] - 1:2
**100** [1] - 60:7
**100,000** [1] - 60:7
**10:30** [1] - 55:4
**11:00** [1] - 55:4
**11:30** [1] - 129:16
**11:50** [1] - 41:2
**12** [4] - 74:7, 86:21, 92:12, 129:16
**12:15** [1] - 56:5
**13** [1] - 33:21
**14** [2] - 1:10, 3:1
**15** [3] - 92:13, 122:8, 130:15
**16** [2] - 27:1
**17** [1] - 27:1
**18** [5] - 12:2, 12:12, 35:20, 86:18, 92:12
**1988** [1] - 78:16
**1990** [4] - 78:9, 78:13,

79:15, 79:20
**1991** [1] - 95:13
**1993** [5] - 60:19, 61:20, 80:4, 94:21, 97:7
**1994** [9] - 22:9, 23:8, 24:24, 60:20, 68:14, 68:18, 84:5, 94:22
**1995** [2] - 69:12, 107:2
**1996** [18] - 23:6, 23:9, 58:25, 70:3, 70:9, 70:19, 70:20, 72:12, 80:23, 81:1, 81:10, 81:11, 81:13, 81:14, 82:23, 86:7, 86:21, 86:24
**1997** [4] - 71:23, 82:24, 84:11, 84:22
**1998** [7] - 11:8, 12:2, 16:8, 24:24, 73:23, 85:3, 86:18
**1:00** [2] - 56:9, 56:20

## 2

**20** [4] - 122:6, 122:8, 123:2, 123:3
**2000** [9] - 50:3, 84:21, 84:23, 87:4, 88:6, 88:16, 88:17
**2001** [1] - 87:17
**2002** [1] - 87:17
**2003** [1] - 87:17
**2005** [1] - 87:17
**2007** [3] - 49:11, 86:6, 87:2
**2009** [2] - 85:13, 86:7
**2010** [7] - 16:24, 21:21, 49:8, 49:10, 50:14, 75:3
**2012** [3] - 1:10, 3:1, 130:15
**22** [2] - 86:6, 87:2
**22nd** [1] - 49:11
**24-year** [1] - 58:22
**25** [5] - 16:24, 26:13, 27:2, 58:9, 58:10
**26** [7] - 4:7, 5:2, 6:19, 8:5, 8:7, 8:18, 10:15
**26(a)(1** [3] - 8:10, 8:16, 8:21
**28** [3] - 1:21, 87:4, 88:17

## 3

**30** [2] - 55:6, 55:15

## 4

**403** [3] - 13:18, 13:19, 14:25
**408** [8] - 13:24, 14:2, 14:4, 14:17, 14:18, 14:21, 14:23
**4:00** [1] - 55:9

## 5

**5** [1] - 38:1
**50** [2] - 61:9, 78:14
**50-percent** [1] - 84:12
**50/50** [1] - 83:7
**500,000** [1] - 63:15
**54** [1] - 89:22
**5:05** [1] - 38:2
**5B** [1] - 89:23

## 7

**753** [1] - 1:21
**757** [5] - 113:19, 113:21, 117:8, 117:15, 128:11
**759** [1] - 119:7
**788** [2] - 120:17, 120:19
**789** [1] - 125:9
**798** [2] - 117:21, 117:22

## 8

**800-some-odd** [1] - 128:2
**842** [2] - 117:8, 117:10

## 9

**9** [1] - 130:15
**90** [1] - 2:3
**908)334-2472** [1] - 1:25

## A

**a)(1** [1] - 14:21
**a)(2** [1] - 14:22
**a)(2)** [1] - 8:10
**a.m** [2] - 41:2, 130:15
**ability** [4] - 33:15, 69:4, 125:5
**able** [3] - 40:18, 54:18, 76:16

**abolition** [1] - 67:18
**above-entitled** [1] - 1:23
**absolutely** [2] - 9:17, 17:7
**acceptable** [2] - 34:5, 34:6
**accepted** [1] - 60:23
**accepting** [1] - 78:19
**access** [2] - 100:2, 119:22
**Access** [1] - 119:23
**acclimated** [1] - 37:4
**accommodate** [3] - 36:20, 37:14, 55:25
**accommodating** [1] - 37:17
**accordance** [1] - 41:10
**according** [3] - 33:10, 60:10, 63:12
**accuracy** [2] - 61:9, 98:4
**accurate** [5] - 1:22, 41:24, 60:22, 61:19, 98:10
**achieve** [1] - 127:14
**achieved** [1] - 68:17
**acknowledge** [3] - 11:11, 86:20, 86:22
**acquaintance** [1] - 107:20
**acquainted** [1] - 35:1
**acronym** [2] - 78:23, 119:22
**acronyms** [1] - 71:6
**Act** [1] - 49:5
**acting** [1] - 108:21
**action** [3] - 20:12, 20:15, 29:11
**actions** [1] - 22:14
**actual** [3] - 40:24, 75:12, 118:1
**actuality** [1] - 97:24
**add** [1] - 73:21
**added** [3] - 49:2, 100:9, 104:23
**addition** [2] - 49:2, 59:13
**additional** [1] - 117:25
**address** [7] - 59:11, 61:1, 100:3, 100:11, 105:21, 118:7, 127:17
**addresses** [13] - 59:13, 59:14, 60:18, 60:24, 60:25, 61:5, 61:17, 62:23, 62:24, 64:2, 64:25, 97:20, 97:21

**adduced** [1] - 56:11
**adjourned** [1] - 130:14
**admissibility** [1] - 3:21
**admission** [1] - 14:7
**Adrian** [1] - 67:5
**advancement** [1] - 74:5
**advantage** [1] - 120:25
**adversarial** [1] - 43:10
**adversaries** [1] - 19:12
**adversary** [2] - 24:12, 24:22
**advice** [1] - 56:8
**advise** [2] - 50:10, 52:4
**advisory** [1] - 20:1
**affect** [3] - 85:20, 103:14
**affidavit** [5] - 83:21, 86:8, 86:15, 86:16
**Africa** [1] - 102:24
**African** [6] - 60:12, 61:18, 67:21, 102:17, 102:18, 102:19
**afternoon** [4] - 37:13, 57:25, 89:17, 89:18
**age** [1] - 94:1
**agents** [1] - 97:18
**ago** [4] - 97:2, 111:15, 111:20, 120:14
**agree** [7] - 11:11, 16:4, 18:20, 21:16, 23:19, 39:9, 42:13
**agreed** [5] - 17:21, 18:24, 19:7, 20:22, 20:25
**agreement** [22] - 11:2, 11:8, 11:10, 12:2, 13:1, 13:9, 16:6, 17:4, 17:23, 18:7, 83:15, 84:23, 85:4, 86:17, 86:18, 87:4, 87:6, 88:17, 88:20, 97:12
**Agreement** [1] - 16:24
**agreements** [8] - 3:21, 10:25, 11:1, 11:5, 13:2, 84:22, 87:12, 87:18
**agrees** [1] - 85:25
**ahead** [3] - 57:23, 89:13, 116:24
**Allan** [1] - 4:16
**allow** [4] - 18:25, 99:14, 118:6, 127:4
**allowed** [2] - 77:1,

99:8

**allows** [4] - 119:25, 120:1, 120:2
**alludes** [1] - 92:4
**almost** [8] - 38:25, 58:9, 81:14, 82:13, 90:18, 91:20, 91:22, 94:13
**alone** [2] - 41:20, 46:8
**alphabet** [2] - 78:22, 103:1
**alphabetic** [1] - 106:16
**alphabetics** [1] - 106:18
**alphanumeric** [2] - 103:1, 123:3
**alumni** [1] - 61:1
**ambiguous** [2] - 11:23, 13:17
**amended** [1] - 75:12
**America** [2] - 77:3, 78:17
**American** [4] - 60:12, 61:18, 67:21, 102:19
**analysis** [2] - 5:9, 13:18
**analyze** [3] - 79:13, 79:20, 82:17
**ancestors** [1] - 103:10
**angry** [1] - 108:4
**answer** [8] - 44:1, 44:2, 44:3, 44:5, 111:21, 112:22, 116:21, 122:16
**answers** [2] - 33:25, 110:5, 110:6
**anticipate** [1] - 47:8
**anticipated** [1] - 6:13
**apart** [1] - 74:21
**apartment** [2] - 89:22, 89:23
**apologize** [1] - 113:13
**appealing** [1] - 4:3
**appear** [1] - 15:6
**applicability** [1] - 63:20
**applicable** [1] - 14:3
**applies** [3] - 47:6, 51:11, 68:8
**apply** [7] - 14:17, 41:21, 65:4, 65:5, 68:6, 68:7, 75:16
**appreciate** [5] - 29:4, 29:12, 30:7, 56:2, 128:25
**appreciation** [1] - 36:1
**approached** [2] - 69:6, 94:23
**appropriately** [1] -

28:13
**area** [7] - 61:15, 67:19, 67:21, 126:16, 127:3, 127:10
**areas** [1] - 125:17
**argue** [2] - 16:3, 77:8
**argued** [1] - 15:17
**arguing** [3] - 22:4, 23:4, 24:18
**argument** [7] - 14:5, 15:15, 24:22, 38:20, 43:2, 43:20, 44:7
**arguments** [7] - 26:3, 31:20, 42:22, 43:3, 52:24, 54:11, 56:16
**arise** [4] - 22:18, 41:12, 42:2, 55:21
**arose** [2] - 49:7, 49:11
**arrangement** [1] - 97:24
**arrangements** [1] - 74:10
**article** [1] - 45:5
**articles** [1] - 44:23
**Asian** [2] - 61:19, 98:7
**aside** [1] - 102:18
**aspect** [2] - 48:14, 61:21
**aspects** [1] - 61:21
**assembled** [1] - 55:2
**assert** [5] - 23:17, 24:10, 25:20, 26:1, 31:11
**asserted** [3] - 7:11, 14:6, 50:9
**asserting** [2] - 19:20, 52:11
**assertions** [1] - 26:4
**assets** [2] - 84:9, 84:24
**assigned** [1] - 103:7
**assignment** [1] - 76:7
**assignments** [2] - 105:25, 106:5
**assigns** [1] - 80:9
**assimilation** [1] - 104:22
**assistant** [1] - 93:4
**assists** [2] - 83:19, 83:20
**association** [2] - 60:25, 61:2
**assume** [1] - 19:14
**assumed** [1] - 61:17
**asterisk** [2] - 100:20, 100:21
**attached** [1] - 121:23
**attempt** [1] - 129:7
**attempted** [1] - 27:16
**attended** [1] - 90:5

**attention** [5] - 54:17, 77:18, 94:21, 127:24, 128:25
**attorneys** [2] - 31:19, 35:19
**audience** [1] - 96:24
**author** [30] - 9:6, 9:22, 15:14, 15:15, 16:12, 21:10, 23:2, 23:5, 23:16, 24:4, 24:5, 24:9, 25:7, 25:11, 25:15, 25:20, 31:2, 31:7, 47:13, 47:23, 48:17, 48:19, 49:14, 74:14, 74:19, 77:14, 77:15, 87:3, 87:21
**authored** [5] - 50:2, 82:19, 85:8, 88:5, 88:16
**authority** [1] - 54:14
**authors** [4] - 9:10, 9:19, 9:20, 75:12
**authorship** [14] - 7:3, 23:21, 48:15, 49:3, 49:5, 49:9, 49:16, 49:21, 50:24, 51:1, 52:6, 85:24, 86:6, 87:24
**automatically** [2] - 94:14, 99:12
**Avenue** [1] - 89:23
**avoid** [1] - 109:3
**aware** [3] - 7:10, 80:25, 111:16
**awhile** [3] - 89:11, 95:13, 128:16
**Axiom** [5] - 70:3, 70:4, 70:5, 70:20, 76:1

## B

**background** [1] - 80:13
**bad** [2] - 36:5, 37:24
**bailiwick** [1] - 102:11
**balance** [2] - 51:19, 96:5
**band** [1] - 112:13
**barred** [4] - 20:12, 20:15, 48:1, 51:3
**based** [4] - 44:16, 96:9, 96:25, 128:23
**bases** [2] - 97:16, 120:11
**basic** [7] - 29:15, 42:15, 66:4, 99:17, 105:19, 105:20, 117:1

**basis** [4] - 6:5, 7:16, 10:20, 97:23
**beach** [1] - 46:9
**bear** [2] - 51:8, 71:6
**bearing** [1] - 51:24
**bears** [11] - 23:21, 23:23, 24:9, 25:16, 51:7, 51:15, 51:20, 52:5, 52:8, 52:12, 76:12
**became** [2] - 91:19, 91:24
**become** [5] - 77:1, 80:20, 83:2, 84:12, 94:13
**becomes** [1] - 122:4
**began** [5] - 60:19, 63:7, 68:14, 69:24, 70:2
**begin** [6] - 40:24, 54:8, 56:17, 59:3, 80:17, 80:20
**beginning** [9] - 8:22, 67:11, 68:5, 70:25, 75:15, 104:15, 109:8, 118:1, 120:20
**begins** [8] - 34:15, 79:16, 79:24, 80:1, 81:8, 81:19, 120:19, 128:1
**behalf** [1] - 56:11
**behind** [3] - 30:16, 72:4, 73:15
**belief** [1] - 96:18
**believability** [1] - 46:25
**believable** [1] - 46:20
**benefit** [3] - 28:15, 45:23, 56:16
**best** [5] - 33:19, 55:18, 58:10, 58:18, 94:6
**betrayed** [1] - 75:10
**better** [13] - 27:21, 36:24, 40:17, 61:23, 62:2, 62:8, 70:8, 79:22, 95:9, 95:16, 109:2, 123:25
**between** [14] - 12:4, 15:5, 16:8, 17:5, 22:5, 34:12, 48:11, 58:7, 67:3, 69:25, 72:6, 73:9, 77:5, 86:10
**Between** [1] - 16:24
**beyond** [2] - 51:10, 53:7
**big** [8] - 60:14, 71:8, 97:14, 97:15, 112:12, 113:1, 113:2, 122:4

**binary** [1] - 101:15
**binding** [1] - 47:10
**bit** [16] - 14:9, 45:16, 52:17, 52:18, 59:4, 66:7, 69:12, 78:19, 80:21, 88:2, 91:24, 106:24, 106:25, 108:10, 116:10, 117:19
**bitching** [1] - 105:12
**black** [2] - 98:8
**block** [1] - 114:24
**blocks** [2] - 101:2, 106:19, 114:25
**Bonnie** [2] - 3:16, 31:24
**BONNIE** [1] - 1:17
**book** [4] - 45:5, 63:9, 76:17, 121:15
**books** [1] - 102:21
**boring** [1] - 102:9
**boss** [1] - 80:7
**bosses** [1] - 81:9
**bothered** [1] - 76:9
**bought** [2] - 61:1, 94:19
**bound** [1] - 75:23
**box** [2] - 26:23, 27:1
**boy** [1] - 89:23
**break** [11] - 34:9, 34:24, 37:5, 37:14, 40:23, 55:5, 55:6, 55:14, 56:5, 128:14, 128:17
**breaks** [1] - 55:9
**BRIDE** [2] - 36:17, 37:19
**brief** [2] - 33:10, 85:23
**briefing** [1] - 13:23
**briefly** [1] - 90:3
**bright** [1] - 78:13
**Bright** [2] - 37:21, 37:22
**bring** [13] - 16:2, 21:2, 25:12, 39:5, 44:14, 47:24, 48:5, 51:3, 52:15, 55:13, 55:17, 86:5, 99:1
**bringing** [2] - 30:17, 53:10
**brings** [2] - 78:6, 83:25
**Broad** [1] - 89:22
**broke** [3] - 65:13, 71:23, 100:8
**broken** [1] - 114:3
**broker** [1] - 93:16
**brought** [8] - 17:16, 19:23, 31:12, 49:6, 50:12, 50:21, 86:7,

103:8

**BROWNSTEIN** [2] - 1:4, 2:2

**Brownstein** [87] - 3:9, 6:14, 7:3, 7:9, 9:6, 9:11, 9:20, 12:6, 12:13, 13:21, 15:4, 15:5, 17:1, 17:5, 18:8, 18:13, 20:17, 20:20, 20:23, 21:5, 21:12, 23:16, 25:6, 25:10, 25:19, 25:24, 27:13, 30:15, 31:1, 31:7, 31:10, 31:23, 47:12, 47:16, 47:23, 48:12, 48:17, 49:2, 50:1, 50:13, 50:23, 52:5, 52:14, 56:11, 58:8, 58:12, 58:14, 58:15, 60:16, 68:10, 70:1, 71:14, 75:17, 75:20, 76:24, 77:13, 78:3, 78:21, 79:6, 80:4, 80:10, 80:25, 82:18, 83:14, 83:19, 84:2, 84:24, 85:14, 85:15, 86:18, 86:25, 87:11, 87:13, 89:14, 89:17, 109:25, 110:4, 110:19, 110:22, 113:3, 113:16, 117:7, 117:22, 129:4

**Brownstein's** [8] - 16:11, 17:16, 49:13, 50:11, 50:17, 70:14, 76:21, 129:11

**Buddhist** [1] - 60:13

**build** [5] - 62:8, 63:23, 64:23, 93:18, 103:9

**building** [1] - 98:25

**built** [2] - 98:12, 99:23

**bulb** [1] - 103:14

**bump** [1] - 53:17

**bunch** [1] - 11:23

**burden** [20] - 23:21, 23:23, 24:9, 25:16, 28:21, 50:17, 51:6, 51:8, 51:10, 51:13, 51:15, 51:20, 51:22, 51:23, 51:24, 52:1, 52:5, 52:8, 52:12

**burdens** [1] - 52:4

**bureau** [3] - 72:22, 72:25, 111:3

**business** [32] - 5:17, 15:8, 18:14, 27:13, 27:14, 27:20, 28:22, 32:6, 32:15, 32:17, 32:18, 47:22, 52:18,

57:22, 58:20, 60:15, 63:23, 71:9, 73:6, 73:7, 73:15, 76:18, 79:7, 79:11, 84:4, 93:12, 97:25, 104:1, 104:2, 104:3, 109:2

**business-wise** [1] - 97:25

**businesses** [1] - 90:14

**buy** [3] - 60:24, 85:18, 96:25

**buying** [2] - 98:5, 98:12

**BY** [4] - 1:17, 1:19, 89:16, 110:18

**byte** [1] - 93:24

# C

**calculations** [1] - 67:12

**calm** [1] - 38:3

**campaign** [1] - 97:23

**candor** [1] - 30:7

**capable** [1] - 9:13

**capacity** [2] - 80:11, 87:12

**car** [2] - 94:1, 94:2

**card** [3] - 94:10, 94:12, 114:23

**cards** [1] - 94:17

**care** [9] - 15:2, 56:19, 111:24, 111:25, 112:1, 112:3, 112:23, 112:25

**carefully** [1] - 14:12

**carried** [2] - 51:23, 98:24

**carry** [1] - 52:1

**carrying** [1] - 51:21

**Caruso** [1] - 1:24

**case** [126] - 5:6, 7:3, 7:4, 7:8, 7:15, 9:18, 11:18, 13:4, 14:18, 14:20, 16:18, 17:6, 17:17, 17:22, 18:16, 19:2, 19:11, 22:2, 22:15, 22:25, 23:8, 24:5, 25:6, 26:8, 28:10, 29:7, 29:9, 29:12, 29:16, 30:10, 30:12, 30:13, 30:14, 30:25, 31:15, 31:17, 31:20, 31:21, 33:2, 33:8, 33:11, 33:18, 36:3, 36:5, 36:7, 37:8, 37:13, 37:17, 39:17, 41:8, 41:9,

41:10, 41:17, 42:1, 42:8, 43:4, 44:3, 44:16, 44:18, 44:22, 44:24, 45:4, 45:6, 45:24, 46:12, 46:17, 47:2, 47:3, 47:6, 47:11, 50:10, 50:15, 51:3, 51:7, 51:13, 52:3, 52:19, 52:20, 52:22, 53:1, 53:2, 53:5, 53:10, 53:16, 53:19, 54:2, 54:4, 54:8, 54:9, 54:13, 54:16, 55:3, 56:12, 58:6, 59:3, 59:5, 59:6, 60:1, 60:16, 66:15, 71:6, 73:19, 73:22, 73:23, 76:14, 76:20, 76:23, 78:2, 85:3, 112:11, 119:21, 121:10, 122:5, 124:13, 124:23, 125:21, 128:19, 129:10, 129:16, 129:19, 129:25, 130:3, 130:6, 130:9

**cases** [4] - 21:17, 27:19, 51:11, 96:25

**catalog** [1] - 120:1

**catch** [1] - 120:16

**categories** [1] - 102:19

**category** [1] - 8:12

**Catholic** [2] - 60:13, 64:19

**caught** [1] - 122:7

**causes** [1] - 91:6

**census** [3] - 61:12, 61:13, 61:17

**center** [5] - 91:21, 92:5, 92:6, 93:3, 108:16

**CEO** [2] - 3:11, 6:9

**certain** [13] - 3:23, 6:4, 14:13, 25:25, 29:25, 31:4, 42:20, 59:24, 61:17, 62:3, 67:6, 96:2, 120:25

**certainly** [7] - 7:15, 30:5, 44:13, 44:19, 45:23, 86:4, 87:16

**certificate** [4] - 75:11, 111:19, 112:5, 112:18

**certified** [1] - 1:22

**challenges** [2] - 27:5, 27:6

**chance** [8] - 13:10, 27:19, 33:23, 37:4,

65:14, 68:9, 103:10, 106:24

**change** [12] - 39:15, 78:15, 78:20, 97:5, 100:13, 102:24, 102:25, 104:7, 116:12, 116:14, 116:16

**changed** [6] - 78:16, 79:4, 91:19, 100:23, 107:3

**changes** [8] - 19:3, 19:4, 19:8, 19:9, 22:22, 34:18, 39:13, 102:13

**changing** [1] - 104:8

**chapter** [1] - 26:7

**characteristics** [3] - 60:8, 61:6, 61:23

**characterize** [3] - 7:1, 7:2, 18:6

**charge** [4] - 92:5, 92:6, 129:25, 130:5

**Charlie** [1] - 32:25

**check** [1] - 90:24

**children** [4] - 58:19, 90:1, 90:2, 91:23

**chooses** [1] - 56:13

**chosen** [1] - 29:23

**circumstance** [1] - 46:4

**circumstances** [4] - 7:10, 14:8, 71:5, 75:22

**circumstantial** [3] - 45:18, 45:25, 46:13

**cited** [1] - 8:9

**citizens** [1] - 28:22

**citizenship** [1] - 28:25

**CIVIL** [1] - 1:2

**civil** [7] - 30:12, 30:14, 30:25, 44:24, 51:7, 51:13, 53:5

**claim** [65] - 7:3, 7:11, 9:22, 14:23, 15:14, 16:12, 17:21, 19:18, 19:19, 19:24, 19:25, 20:3, 20:4, 21:14, 21:15, 23:17, 25:24, 26:1, 30:17, 30:21, 31:1, 31:12, 38:11, 38:16, 38:17, 38:22, 39:2, 39:5, 39:14, 39:18, 47:16, 47:18, 47:24, 48:1, 48:2, 48:3, 48:6, 48:12, 48:15, 49:3, 49:5, 49:7, 49:10, 49:16, 49:17, 49:21, 49:22, 49:24, 50:7, 50:8,

50:11, 50:16, 51:1, 52:6, 52:7, 71:2, 71:21, 77:9, 80:22, 85:24, 86:6, 87:24, 88:1, 88:14

**claiming** [3] - 83:9, 86:25, 88:15

**claims** [23] - 8:14, 19:11, 19:22, 20:6, 20:10, 20:21, 21:9, 25:7, 25:11, 31:5, 47:13, 49:7, 50:2, 50:13, 50:20, 50:23, 51:17, 52:10, 52:15, 82:18, 85:7, 107:11

**clarify** [1] - 66:6

**clear** [6] - 14:8, 14:21, 21:2, 21:5, 33:24, 52:16

**clearly** [2] - 76:23, 95:9

**CLERK** [12] - 28:6, 35:3, 40:11, 56:21, 57:13, 57:15, 89:1, 89:6, 89:8, 109:18, 110:14, 129:1

**clerk** [1] - 28:13

**clerks** [1] - 90:24

**client** [14] - 3:10, 11:18, 16:2, 24:3, 58:4, 58:8, 70:3, 73:1, 84:8, 88:7, 94:4, 94:6, 95:2, 95:3

**Clients** [12] - 62:16, 63:6, 68:20, 68:25, 69:6, 71:1, 71:7, 92:25, 93:13, 105:8

**clients** [6] - 43:13, 74:7, 93:20, 97:18, 97:22

**clients'** [1] - 77:24

**close** [5] - 54:17, 54:23, 57:19, 70:22, 70:24

**closer** [1] - 36:21

**closing** [2] - 52:24, 56:15, 56:16

**clothing** [1] - 91:16

**CMR** [20] - 12:13, 69:15, 73:14, 73:22, 74:2, 78:22, 78:24, 78:25, 79:18, 84:2, 84:4, 91:18, 92:3, 92:11, 107:9, 107:10, 107:12, 107:18

**co** [39] - 9:6, 9:20, 9:22, 21:10, 23:2, 23:5, 23:16, 23:21,

24:4, 24:5, 24:9, 25:7, 25:11, 25:15, 25:20, 31:2, 31:7, 47:13, 47:23, 48:15, 48:17, 49:3, 49:5, 49:9, 49:14, 49:16, 49:21, 50:24, 51:1, 52:6, 74:14, 74:19, 77:14, 77:15, 85:24, 86:6, 87:3, 87:21

**co-author** [26] - 9:6, 9:22, 21:10, 23:2, 23:5, 23:16, 24:4, 24:5, 24:9, 25:7, 25:11, 25:15, 25:20, 31:2, 31:7, 47:13, 47:23, 48:17, 49:14, 74:14, 74:19, 77:14, 77:15, 87:3, 87:21

**co-authors** [1] - 9:20

**co-authorship** [12] - 23:21, 48:15, 49:3, 49:5, 49:9, 49:16, 49:21, 50:24, 51:1, 52:6, 85:24, 86:6

**COBOL** [8] - 82:19, 82:20, 96:12, 99:24, 118:2, 124:6, 125:4

**code** [25] - 61:14, 62:9, 62:10, 64:19, 67:9, 67:10, 82:1, 100:21, 101:2, 102:16, 105:5, 106:16, 118:11, 121:23, 122:11, 122:12, 123:3, 125:6, 125:8, 126:13, 126:23, 127:7

**Code** [1] - 1:22

**coded** [4] - 67:16, 104:20, 118:11

**codes** [16] - 60:11, 63:12, 93:24, 94:10, 100:19, 100:22, 100:25, 101:8, 105:3, 105:4, 106:18, 125:23, 126:2, 126:6, 126:8, 127:9

**coding** [3] - 67:1, 102:25, 103:1

**collectively** [1] - 117:10

**college** [1] - 61:3

**college-educated** [1] - 61:3

**colleges** [1] - 98:8

**colloquy** [1] - 44:8

**columns** [1] - 100:24

**combination** [2] - 73:18, 103:1

**combinations** [2] - 62:3, 62:4

**combine** [3] - 73:15, 96:1, 101:10

**combined** [3] - 81:23, 84:16, 84:21

**combines** [1] - 81:5

**comfortable** [2] - 28:14, 55:25

**coming** [2] - 43:14, 57:18

**command** [1] - 116:5

**commendation** [1] - 78:12

**comments** [1] - 34:17

**commercial** [2] - 69:21, 72:17

**commission** [2] - 72:3

**common** [8] - 23:3, 24:13, 44:12, 44:13, 46:3, 46:6, 46:14, 82:13

**commonly** [1] - 42:16

**communications** [1] - 14:22

**companies** [8] - 79:9, 87:13, 87:17, 88:9, 90:20, 97:8, 97:19

**company** [33] - 30:19, 36:12, 63:6, 68:20, 69:14, 71:10, 72:1, 72:7, 72:13, 73:16, 74:2, 74:23, 75:4, 75:6, 76:1, 78:22, 79:2, 81:13, 81:17, 83:3, 83:16, 84:3, 84:7, 84:11, 87:5, 88:18, 91:15, 92:23, 94:18, 103:16, 103:21, 103:22, 105:24

**compare** [1] - 82:11

**compared** [2] - 61:5, 61:13

**compares** [4] - 67:8, 82:8, 82:10, 82:11

**comparisons** [1] - 67:12

**compensation** [1] - 18:8

**compilation** [1] - 110:25

**compile** [3] - 79:8, 97:13, 97:15

**compiled** [2] - 96:18, 97:8

**compilers** [1] - 97:14

**complaint** [2] - 83:14,

83:18

**complete** [6] - 31:16, 37:3, 72:10, 93:24, 93:25, 105:19

**completed** [1] - 90:8

**completely** [1] - 112:23

**complex** [2] - 68:11, 94:8

**complicated** [1] - 46:1

**comply** [2] - 10:19, 66:24

**compromise** [1] - 14:18

**computer** [48] - 10:2, 10:3, 10:4, 21:14, 25:25, 31:3, 31:4, 31:9, 31:19, 39:16, 47:18, 48:3, 48:5, 49:22, 50:1, 50:3, 50:4, 50:8, 50:25, 52:8, 53:6, 54:3, 58:20, 63:5, 63:11, 63:14, 64:3, 64:5, 64:7, 64:14, 68:13, 69:11, 72:22, 74:22, 75:24, 76:3, 76:12, 78:10, 80:10, 90:8, 90:14, 90:17, 90:19, 90:22, 95:12, 96:11, 100:7, 119:3

**computer-related** [1] - 90:14

**computerized** [3] - 65:25, 66:18, 67:24

**computers** [15] - 32:2, 62:22, 63:17, 64:16, 72:24, 74:22, 80:1, 80:14, 85:9, 91:3, 93:11, 99:2, 110:24, 113:8, 119:18

**concentrating** [1] - 104:4

**concept** [7] - 62:18, 63:19, 82:15, 83:24, 84:15, 96:8, 96:10

**concepts** [1] - 68:15

**concern** [3] - 24:11, 24:15, 111:24

**concerned** [5] - 25:2, 70:25, 75:3, 81:21, 81:24

**concerning** [1] - 30:22

**concluded** [3] - 33:11, 33:18, 56:12

**conclusion** [1] - 76:22

**condition** [1] - 105:17

**conduct** [4] - 5:8, 13:8, 52:17, 54:2

**conducted** [1] - 63:9

**conference** [2] - 62:15, 95:20

**confident** [1] - 106:10

**confines** [1] - 44:11

**conflict** [1] - 81:8

**confuse** [6] - 14:9, 14:13, 17:13, 22:16, 40:8, 84:6

**confused** [1] - 117:6

**confuses** [1] - 112:24

**confusing** [2] - 13:12, 66:7

**confusion** [2] - 15:2, 119:2

**connection** [4] - 11:2, 14:19, 14:22, 27:17

**consent** [1] - 27:5

**consider** [6] - 19:14, 19:16, 42:7, 42:14, 42:21, 44:3

**consideration** [1] - 21:18

**considerations** [1] - 14:2

**considered** [5] - 43:2, 43:7, 43:21, 51:16, 61:8

**consist** [1] - 42:10

**constantly** [1] - 104:13

**constructive** [2] - 19:12, 19:18

**consultant** [1] - 93:2

**consultants** [1] - 93:3

**Consumer** [2] - 12:5, 91:11

**Consumers** [4] - 69:15, 73:4, 73:5, 73:9

**contact** [4] - 45:3, 53:15, 53:24, 53:25

**contagious** [1] - 102:9

**contains** [2] - 11:23, 80:25

**contend** [1] - 31:10

**contention** [1] - 22:24

**context** [2] - 51:10, 96:16

**continue** [6] - 55:7, 69:10, 70:22, 80:2, 106:22, 125:10

**continued** [6] - 71:9, 106:7, 106:10, 106:11, 107:1

**CONTINUES** [1] - 110:18

**continuing** [1] - 128:11

**contract** [8] - 15:3, 15:17, 15:18, 16:9,

16:10, 16:23, 71:25, 72:1

**contradict** [1] - 12:12

**contradicted** [1] - 108:5

**contrary** [1] - 24:18

**contribute** [2] - 22:11, 22:12

**contribution** [2] - 9:20, 48:22

**contributions** [1] - 48:20

**contributors** [1] - 98:8

**control** [16] - 8:14, 65:16, 73:7, 75:4, 75:6, 76:25, 91:2, 92:1, 94:10, 114:7, 114:8, 114:23, 114:25, 115:6, 116:3, 119:9

**controlling** [1] - 119:19

**conversation** [7] - 6:8, 6:9, 6:14, 6:25, 7:8, 86:10, 86:14

**conversations** [2] - 6:15, 6:17

**convert** [4] - 66:18, 66:21, 99:23, 120:23

**converted** [6] - 63:14, 64:3, 64:7, 64:11, 67:25, 101:18

**convince** [3] - 46:21, 52:13, 77:8

**cooperation** [2] - 30:7, 35:18

**copied** [2] - 63:8, 63:10

**copies** [3] - 24:17, 77:16

**copy** [10] - 8:11, 11:12, 72:20, 72:21, 73:24, 111:3, 112:2, 113:5, 117:13, 117:23

**Copyright** [2] - 49:5, 59:1

**copyright** [48] - 7:4, 9:12, 11:19, 18:1, 20:18, 22:17, 23:3, 23:13, 24:13, 24:17, 25:8, 30:22, 31:8, 31:18, 47:14, 47:25, 48:2, 49:17, 53:6, 70:9, 77:3, 80:23, 81:3, 81:8, 81:10, 81:25, 82:3, 82:4, 82:23, 83:11, 86:12, 86:20, 86:23, 108:22, 109:7,

111:3, 111:11,
111:12, 111:13,
111:16, 113:6,
117:13, 117:14,
130:5
**copyrightable** [4] -
9:4, 9:21, 22:4, 31:2
**copyrighted** [16] -
23:8, 23:9, 23:17,
24:16, 25:8, 25:16,
25:21, 47:13, 47:17,
47:23, 48:24, 49:6,
50:24, 52:7, 84:15,
111:12
**copyrighting** [1] -
80:25
**copyrights** [23] - 6:10,
6:11, 12:14, 12:18,
22:18, 24:23, 80:24,
81:17, 83:12, 83:13,
83:19, 83:22, 84:10,
84:21, 85:1, 85:6,
85:12, 87:7, 87:8,
87:15, 87:19, 87:22
**corner** [1] - 38:4
**corporate** [1] - 78:17
**Corporation** [2] -
70:4, 78:11
**Correct** [1] - 24:6
**correct** [4] - 6:20,
12:3, 21:11, 117:8
**correctly** [3] - 67:5,
126:9, 126:15
**cost** [2] - 59:15, 96:23
**couched** [1] - 4:2
**counsel** [11] - 30:16,
30:18, 33:10, 37:10,
42:24, 52:24, 54:11,
56:10, 56:17, 57:22,
129:5
**count** [2] - 105:1,
118:8
**counted** [3] - 105:2,
105:3, 105:4
**counting** [2] - 118:9,
125:22
**country** [1] - 28:25
**counts** [1] - 104:18
**County** [2] - 29:3, 90:7
**couple** [12] - 3:18, 4:7,
14:15, 39:13, 66:6,
75:24, 90:6, 90:13,
100:22, 101:22,
111:9, 111:19
**course** [6] - 8:20,
41:8, 42:3, 47:9,
52:19, 81:18
**courses** [2] - 90:8,
90:9
**COURT** [135] - 1:1,

1:13, 3:4, 3:12, 3:16,
3:18, 4:1, 4:18, 4:21,
4:25, 5:13, 5:16, 6:5,
6:18, 6:21, 6:23, 8:1,
8:9, 8:16, 9:16, 9:23,
10:6, 10:14, 10:16,
11:1, 12:1, 12:4,
12:10, 12:17, 12:21,
12:23, 13:19, 13:23,
14:15, 15:13, 15:21,
16:4, 16:15, 16:21,
17:4, 17:8, 17:18,
18:11, 18:17, 18:19,
18:21, 19:5, 19:7,
19:15, 20:9, 20:15,
20:23, 21:1, 21:4,
21:9, 21:12, 21:19,
21:25, 23:12, 23:20,
23:23, 24:2, 24:8,
25:5, 26:8, 26:13,
26:22, 26:25, 27:8,
27:10, 28:2, 28:7,
32:1, 32:16, 32:20,
34:4, 34:7, 34:13,
34:20, 34:23, 35:5,
35:8, 35:12, 35:15,
36:19, 37:20, 37:23,
38:3, 38:12, 38:19,
39:9, 40:2, 40:5,
40:7, 40:10, 40:14,
41:3, 56:24, 57:3,
57:9, 57:12, 57:14,
57:18, 77:19, 88:23,
89:4, 89:7, 89:11,
109:15, 109:21,
110:3, 110:12,
110:17, 113:11,
116:21, 116:23,
117:5, 117:10,
117:15, 117:20,
118:23, 119:1,
119:6, 122:15,
128:2, 128:5,
128:13, 128:17,
129:4, 129:8,
129:14, 129:17,
129:21, 129:24,
130:12
**Court** [13] - 1:25,
14:20, 19:12, 19:22,
20:21, 24:15, 24:18,
25:3, 30:24, 36:10,
36:15, 38:23, 39:3
**court** [8] - 17:15,
28:14, 30:23, 32:24,
42:17, 44:12, 86:16
**Court's** [2] - 19:17,
20:7
**courthouse** [2] -
28:19, 53:17

**courtroom** [5] - 41:4,
44:11, 44:21, 54:5,
128:24
**courts** [1] - 27:21
**cover** [1] - 98:11
**coverage** [1] - 45:1
**covered** [1] - 99:19
**crack** [1] - 32:25
**create** [14] - 43:18,
59:22, 93:15, 99:8,
99:9, 99:10, 101:3,
101:20, 103:11,
106:19, 118:14,
125:3
**created** [9] - 47:13,
48:23, 60:16, 78:1,
95:7, 99:21, 101:23,
123:11, 127:3
**creates** [3] - 78:8,
118:13, 126:15
**creating** [3] - 103:13,
103:16, 124:23
**creative** [2] - 22:18,
103:23
**creativity** [3] - 48:23,
116:18, 117:2
**creature** [1] - 24:14
**credence** [1] - 15:11
**credibility** [4] - 6:4,
46:19, 46:22, 46:25
**credit** [2] - 58:17,
71:21
**criminal** [3] - 30:12,
51:10, 51:11
**criteria** [1] - 98:2
**cross** [4] - 101:6,
104:11, 129:11,
129:18
**cross-examine** [1] -
129:18
**cross-examined** [1] -
129:11
**crossed** [2] - 39:16,
39:23
**CRR** [1] - 1:24
**crude** [1] - 118:2
**Crusoe** [1] - 46:7
**crystal** [1] - 14:8
**CSR** [1] - 1:24
**Cultural** [1] - 66:12
**cumulative** [2] -
13:15, 14:12
**curative** [3] - 15:19,
15:22, 15:24
**curious** [2] - 15:1,
111:22
**custody** [1] - 8:13
**customer** [6] - 60:6,
65:1, 65:19, 66:21,
67:24

**customer's** [1] - 59:21
**customers** [2] - 74:13,
98:4
**cut** [2] - 96:23, 108:11

# D

**damages** [1] - 48:13
**Dan** [5] - 38:4, 55:21,
56:8, 56:19, 57:12
**Dan's** [1] - 34:1
**DANIEL** [76] - 1:16,
1:17, 3:8, 3:14, 4:24,
5:1, 5:14, 7:25,
10:10, 11:4, 12:3,
12:8, 12:11, 12:20,
12:22, 12:24, 13:20,
13:25, 15:12, 15:19,
15:22, 17:3, 18:4,
18:20, 18:24, 19:6,
19:8, 19:16, 20:22,
20:25, 21:2, 21:8,
21:11, 21:16, 21:20,
22:1, 23:11, 23:19,
23:22, 23:25, 24:7,
24:11, 26:6, 26:12,
26:23, 27:7, 27:9,
31:25, 32:10, 32:14,
34:6, 34:11, 34:19,
38:8, 38:14, 39:8,
39:12, 39:21, 40:1,
40:6, 57:1, 57:10,
57:24, 89:14,
109:13, 109:24,
113:13, 118:25,
119:5, 122:17,
128:4, 128:15,
129:6, 129:13,
129:15, 130:11
**dark** [1] - 55:11
**dash** [2] - 123:2,
123:18
**data** [41] - 61:12,
61:13, 64:18, 64:20,
64:24, 66:21, 67:23,
68:5, 68:6, 70:5,
79:8, 79:25, 80:2,
82:12, 90:23, 91:21,
92:5, 92:6, 93:3,
93:14, 93:17, 95:6,
96:22, 97:16, 99:2,
99:19, 99:24,
100:10, 102:4,
108:16, 119:9,
119:20, 120:11,
120:22, 121:20,
122:4, 124:21,
125:22
**database** [4] - 78:11,
98:10, 98:11, 101:6

**date** [4] - 21:17, 21:20,
88:19, 95:11
**daughter** [1] - 91:23
**David** [1] - 4:14
**days** [3] - 71:24, 92:7,
102:7
**deal** [2] - 13:7, 13:10
**deals** [2] - 62:22,
62:23
**death** [1] - 92:1
**December** [5] - 82:23,
86:24, 87:4, 88:17,
109:9
**decide** [16] - 18:2,
20:19, 22:3, 23:15,
38:24, 39:3, 42:6,
43:12, 43:18, 43:25,
44:16, 45:9, 49:17,
51:5, 54:4, 98:20
**decided** [7] - 70:8,
71:15, 73:8, 98:25,
102:15, 125:1
**deciders** [1] - 41:16
**decides** [2] - 80:6,
80:22
**deciding** [2] - 20:6,
48:10
**decision** [4] - 8:2,
20:8, 44:19, 70:13
**decision-making** [1] -
44:19
**decisions** [6] - 30:2,
42:4, 54:6, 63:1,
65:20, 66:25
**declared** [2] - 48:17,
77:14
**deeper** [1] - 117:23
**defend** [3] - 9:24,
9:25, 83:20
**defendant** [5] - 23:25,
24:1, 25:9, 47:15,
47:22
**defendant's** [1] -
30:18
**Defendants** [2] - 1:8,
1:20
**defendants** [9] -
30:17, 48:4, 49:1,
49:10, 50:5, 50:8,
50:14, 50:16, 73:22
**defendants'** [2] -
38:11, 38:17
**defense** [26] - 3:23,
6:19, 7:4, 7:12, 7:14,
7:16, 9:16, 21:23,
24:2, 24:9, 25:18,
25:23, 26:18, 31:10,
31:13, 38:23, 47:21,
49:4, 50:10, 50:25,
52:11, 52:12, 52:13,

**56**:13, 83:20
**defenses** [1] - 8:14
**defenses'** [1] - 26:1
**define** [8] - 124:9, 124:11, 124:15, 124:16, 124:18, 124:21, 125:15, 127:25
**defined** [1] - 99:21
**defines** [1] - 124:12
**defining** [3] - 122:21, 123:20, 125:17
**definitely** [2] - 104:2, 125:7
**definitions** [1] - 99:21
**degree** [3] - 48:23, 90:8, 90:10
**delete** [1] - 106:20
**deliberating** [1] - 56:17
**deliberations** [1] - 52:25
**demand** [4] - 31:3, 31:8, 75:11, 75:12
**demanded** [1] - 47:20
**denies** [2] - 25:10, 31:7
**denominated** [1] - 122:18
**deny** [4] - 31:8, 47:22, 48:4, 86:14
**department** [1] - 36:6
**depose** [1] - 5:3
**deposit** [4] - 24:17, 113:5, 117:14, 117:23
**deposited** [1] - 117:12
**deposition** [2] - 7:19, 7:23
**derived** [1] - 102:23
**describe** [1] - 97:3
**described** [4] - 25:21, 30:21, 108:7, 124:5
**describing** [1] - 102:13
**description** [2] - 8:11, 70:11
**desert** [1] - 46:7
**design** [4] - 96:8, 96:10, 101:7, 124:24
**designed** [4] - 64:20, 121:25, 124:7, 125:19
**detail** [2] - 37:8, 68:9
**detailed** [3] - 39:11, 47:1, 47:9
**details** [1] - 75:4
**Determinant** [4] - 78:1, 78:9, 81:3, 82:13

**determination** [4] - 20:1, 22:7, 66:9, 66:14
**determinations** [3] - 14:3, 42:19, 66:11
**determine** [8] - 25:15, 25:18, 46:19, 46:25, 60:1, 62:19, 67:2, 79:13
**determines** [1] - 39:1
**develop** [5] - 62:21, 63:22, 74:3, 98:23
**developed** [8] - 68:15, 68:16, 74:9, 96:20, 99:20, 99:21, 105:11, 108:1
**developing** [3] - 104:4, 105:6, 122:10
**development** [3] - 104:5, 104:12, 106:6
**developments** [1] - 104:23
**device** [3] - 115:22, 115:23, 115:24
**devices** [1] - 117:3
**Dickinson** [1] - 90:5
**difference** [1] - 22:5
**different** [21] - 10:4, 11:14, 16:3, 42:10, 45:17, 52:4, 60:21, 62:25, 66:23, 69:23, 75:21, 82:15, 91:4, 93:23, 102:23, 102:24, 116:3, 121:2, 124:4, 125:18, 127:23
**differently** [2] - 14:10, 51:18
**difficulty** [1] - 54:18
**diligence** [2] - 49:14, 50:19
**dire** [3] - 26:16, 26:18, 29:19
**direct** [13] - 45:18, 45:19, 45:23, 46:4, 46:9, 46:15, 59:9, 59:17, 79:9, 94:21, 127:24, 129:20
**DIRECT** [3] - 2:1, 89:16, 110:18
**Direct** [3] - 12:4, 71:10, 79:3
**directly** [2] - 45:22, 59:17
**disagree** [2] - 24:12, 39:8
**disclose** [1] - 8:5
**disclosed** [9] - 3:24, 5:2, 6:19, 7:18, 8:1, 8:8, 8:11, 10:15

**disclosing** [1] - 8:13
**disclosure** [2] - 8:17, 10:11
**disclosures** [2] - 5:2, 8:21
**discovered** [2] - 49:13, 50:18
**discovery** [3] - 3:24, 8:17, 8:20
**discredited** [4] - 96:1, 96:15, 96:16, 98:2
**discreet** [2] - 17:21, 130:9
**discretion** [5] - 29:22, 35:24, 116:8, 116:11, 124:4
**discuss** [13] - 14:15, 52:20, 52:21, 52:22, 53:1, 53:2, 53:3, 53:11, 53:12, 91:21, 105:14, 117:25, 128:19
**discussed** [5] - 6:9, 6:17, 37:12, 105:18, 109:1
**discussion** [2] - 66:3, 122:5
**Discussion** [1] - 40:9
**disk** [3] - 115:23, 115:24, 116:14
**dispute** [11] - 15:5, 15:7, 18:1, 27:13, 31:17, 48:11, 48:14, 49:2, 49:9, 50:8, 74:18
**disputed** [1] - 49:15
**disputes** [1] - 27:14
**disregard** [2] - 44:5, 45:11
**distance** [2] - 54:23, 55:1
**distinct** [1] - 25:1
**distinguished** [1] - 103:20
**distracted** [1] - 54:16
**distributed** [1] - 107:22
**DISTRICT** [3] - 1:1, 1:2, 1:13
**District** [2] - 28:9, 30:24
**divisions** [1] - 124:6
**doctorate** [1] - 107:6
**document** [41] - 11:16, 11:22, 13:13, 13:16, 14:1, 14:11, 15:9, 15:10, 15:25, 16:6, 16:23, 34:14, 34:18, 38:13, 45:22, 76:11, 86:19, 86:25,

87:11, 110:19, 110:22, 111:5, 111:7, 111:8, 111:14, 113:2, 113:4, 113:7, 113:16, 113:24, 117:7, 118:20, 119:3, 120:17, 127:6, 127:25, 128:2, 128:9, 128:12
**documents** [7] - 8:12, 42:12, 42:17, 86:2, 99:9, 112:15, 120:22
**done** [20] - 24:7, 29:8, 36:17, 55:10, 60:21, 63:20, 64:1, 70:12, 71:13, 75:23, 80:6, 87:15, 90:18, 107:15, 108:24, 109:8, 118:8, 120:10, 126:9
**door** [1] - 44:14
**double** [1] - 108:15
**doubt** [2] - 51:11, 113:1
**doubted** [1] - 58:23
**doubtful** [1] - 44:25
**down** [17] - 11:24, 33:25, 38:3, 96:23, 102:13, 106:20, 107:16, 108:2, 109:3, 114:5, 114:23, 123:16, 125:10, 126:21, 126:23, 127:11, 129:4
**draft** [1] - 16:13
**drag** [1] - 125:11
**draw** [4] - 17:24, 18:9, 46:3, 46:14
**drawer** [1] - 112:13
**drawn** [1] - 70:24
**draws** [1] - 46:10
**due** [2] - 49:14, 50:18
**dupe** [1] - 106:15
**dupes** [2] - 104:11, 106:16
**duplicate** [2] - 101:21, 121:1
**duplicates** [2] - 101:20, 101:24
**during** [20] - 8:20, 22:9, 42:2, 47:8, 52:19, 58:16, 58:21, 59:5, 72:11, 73:2, 75:7, 76:19, 85:9, 99:20, 103:25, 104:12, 107:2, 107:18, 108:25, 122:7

**duties** [2] - 71:4, 92:3
**duty** [3] - 29:3, 41:19, 43:17

---

**E**

**E-TECH** [1] - 1:7
**E-Tech** [28] - 3:11, 17:10, 73:16, 74:2, 74:9, 74:23, 84:7, 84:8, 84:13, 84:18, 84:19, 84:20, 84:22, 84:25, 85:13, 85:15, 85:16, 85:18, 87:5, 87:6, 87:8, 87:12, 87:14, 87:15, 87:19, 88:17, 88:21
**early** [7] - 37:14, 54:22, 60:19, 70:3, 70:19, 94:22, 105:21
**easier** [1] - 57:19
**easy** [1] - 5:12
**eat** [2] - 55:13, 55:18
**edible** [1] - 55:15
**edit** [3] - 99:5, 125:22
**editor** [1] - 99:14
**educated** [1] - 61:3
**education** [1] - 90:4
**educational** [1] - 94:2
**EF** [2] - 123:1, 123:6
**EF-name** [1] - 123:6
**effective** [3] - 65:11, 66:19, 67:23
**effectively** [1] - 101:2
**either** [4] - 68:11, 105:16, 108:14, 123:4
**elaborate** [1] - 108:10
**electrical** [1] - 90:6
**electronic** [1] - 94:18
**element** [4] - 39:18, 39:23, 39:24, 39:25
**elements** [2] - 9:18, 9:22
**elevator** [2] - 27:12, 53:22
**eliminate** [2] - 101:23, 106:15
**eliminates** [1] - 62:2
**elimination** [1] - 106:15
**emergency** [1] - 55:20
**emergent** [1] - 33:17
**employed** [4] - 68:19, 71:3, 90:12, 90:13
**employee** [1] - 80:11
**employees** [1] - 5:5
**employment** [2] - 17:10, 85:10

**encode** [4] - 60:9, 60:17, 60:24, 62:11
**encoded** [3] - 61:12, 100:5, 100:11
**encoding** [13] - 60:4, 60:5, 60:9, 60:14, 60:20, 62:9, 69:17, 74:21, 102:4, 105:20, 119:10, 121:11
**encompasses** [1] - 23:10
**end** [19] - 10:16, 28:1, 29:11, 33:12, 33:18, 36:18, 46:12, 47:2, 47:10, 54:8, 58:12, 58:24, 62:1, 62:4, 65:24, 75:3, 97:22, 117:18, 128:12
**ended** [1] - 17:10
**ends** [1] - 81:18
**engage** [1] - 29:16
**engineering** [2] - 90:6, 90:19
**English** [1] - 125:4
**ensure** [1] - 5:22
**enter** [2] - 20:21, 99:2
**entered** [1] - 99:24
**entering** [1] - 101:21
**enters** [1] - 78:18
**enthusiasm** [2] - 102:9, 107:21
**enthusiastic** [1] - 63:3
**entire** [3] - 54:5, 65:7, 118:23
**entirely** [3] - 42:5, 46:19, 46:24
**entitled** [6] - 1:23, 16:24, 20:24, 29:22, 30:7, 35:24, 48:4, 50:1, 77:14, 77:15
**entity** [1] - 47:22
**entry** [2] - 90:23, 99:19
**envelope** [3] - 62:14, 98:17, 112:12
**environment** [2] - 91:2, 100:7
**envision** [1] - 20:9
**envisioned** [1] - 104:15
**equipped** [1] - 27:21
**equitable** [16] - 19:11, 19:13, 19:18, 19:19, 19:22, 19:25, 20:2, 20:5, 20:9, 20:21, 21:1, 38:9, 38:21, 38:22, 38:23, 39:4
**era** [1] - 72:24
**error** [4] - 96:5,

104:12, 126:9, 126:10
**errors** [2] - 121:1, 126:21
**especially** [1] - 107:15
**ESQ** [3] - 1:17, 1:17, 1:19
**essential** [3] - 13:22, 24:11, 24:22
**essentially** [3] - 31:17, 61:13, 81:22
**establish** [2] - 21:22, 122:5
**estate** [1] - 97:18
**estimate** [1] - 33:13
**estimated** [1] - 33:13
**estoppel** [7] - 19:13, 19:19, 20:2, 38:9, 38:21, 38:22, 39:4
**ET** [1] - 12:13
**Ethnic** [17] - 4:13, 4:14, 4:15, 6:12, 12:6, 16:25, 30:19, 31:6, 32:4, 32:6, 32:12, 73:16, 78:1, 78:9, 81:3, 82:13, 84:8
**ethnic** [6] - 22:6, 60:4, 60:5, 60:8, 60:14, 60:20, 61:6, 61:23, 62:8, 66:9, 66:10, 66:11, 66:13, 67:1, 69:1, 69:17, 74:21, 75:23, 96:19, 98:1, 98:2, 100:20, 100:21, 101:1, 101:23, 102:16, 103:21, 104:4, 104:11, 104:20, 105:4, 105:11, 105:14, 106:15, 111:12, 114:3, 115:3, 116:12, 118:8, 118:11, 118:15, 118:18, 119:8, 119:13, 120:14, 120:20, 121:22, 123:2, 127:7, 127:16, 127:17, 127:19
**ethnically** [1] - 60:23
**ethnicities** [2] - 101:4, 121:2
**ethnicity** [10] - 60:2, 60:11, 62:5, 79:14, 82:17, 95:6, 95:8, 97:1, 98:10
**event** [5] - 15:8, 20:11, 36:10, 37:13, 51:2
**events** [2] - 5:6, 22:10

**everyday** [5] - 37:25, 74:8, 77:11, 91:20
**evidence** [73] - 8:8, 13:3, 25:17, 25:19, 41:10, 41:19, 42:8, 42:9, 42:15, 42:18, 42:21, 42:22, 42:23, 43:1, 43:2, 43:4, 43:8, 43:15, 43:16, 43:21, 43:22, 44:3, 44:8, 44:10, 45:15, 45:16, 45:17, 45:18, 45:19, 45:23, 45:25, 46:9, 46:13, 46:15, 46:18, 47:7, 49:18, 51:9, 51:14, 51:15, 51:19, 52:6, 52:9, 52:14, 54:10, 56:11, 56:13, 56:15, 58:11, 63:5, 63:22, 63:25, 64:20, 65:1, 65:24, 66:3, 69:8, 69:24, 70:4, 70:14, 74:15, 74:23, 75:14, 76:9, 76:11, 76:14, 77:8, 86:2, 118:24
**ex** [1] - 99:5
**exact** [3] - 80:15, 92:4, 106:21
**exactly** [6] - 23:22, 33:15, 64:17, 80:14, 82:7, 92:13
**examination** [2] - 11:24, 13:8
**EXAMINATION** [2] - 89:16, 110:18
**examine** [1] - 129:18
**examined** [1] - 129:11
**example** [9] - 42:24, 43:23, 46:6, 46:13, 59:22, 61:7, 62:3, 64:20, 67:4
**examples** [1] - 82:5
**excellence** [1] - 32:25
**except** [6] - 17:6, 36:11, 90:9, 93:2, 98:17, 111:2
**exceptions** [1] - 56:24
**excludable** [1] - 13:24
**exclusive** [2] - 39:24, 39:25
**excuse** [9] - 27:4, 34:24, 35:20, 35:25, 36:4, 38:25, 39:4, 108:12, 109:4
**excused** [10] - 35:22, 36:4, 36:8, 36:11, 36:14, 38:6, 56:22, 89:2, 109:19, 129:2
**execute** [2] - 114:15,

116:4
**executed** [2] - 11:17, 76:6
**executes** [1] - 91:4
**execution** [1] - 91:6
**executor** [1] - 91:25
**exercise** [4] - 28:25, 49:14, 50:18, 116:11
**exercising** [1] - 50:6
**exhibit** [7] - 110:20, 111:6, 113:4, 113:11, 113:19, 118:23, 128:3
**exhibits** [4] - 32:3, 42:12, 42:17, 109:13
**exist** [2] - 42:12, 47:19, 79:22
**existed** [4] - 67:17, 69:17, 69:25, 85:13
**existence** [3] - 5:10, 22:17, 70:9
**existent** [1] - 94:13
**exists** [3] - 10:2, 46:2, 84:20
**expand** [1] - 122:8
**expanded** [1] - 102:5
**expanding** [1] - 104:8
**expansive** [1] - 110:6
**expect** [2] - 33:18, 54:18
**expects** [1] - 33:11
**experience** [4] - 29:6, 44:13, 93:6
**expert** [11] - 5:13, 5:14, 5:19, 5:20, 9:1, 10:8, 10:10, 10:18, 53:9, 69:17, 96:9
**explain** [8] - 17:15, 29:18, 41:7, 43:9, 61:12, 98:3, 118:22, 130:10
**explained** [1] - 95:21
**express** [1] - 124:25
**expressed** [2] - 64:13, 64:24
**expression** [3] - 64:21, 67:25, 77:1
**extended** [1] - 110:1
**extensive** [2] - 13:8, 115:5
**extent** [4] - 19:25, 20:3, 20:5, 69:17
**extract** [1] - 66:20
**extracting** [1] - 68:5
**eye** [1] - 45:20

**F**

**facilities** [1] - 55:16

**fact** [44] - 5:6, 7:10, 13:15, 13:16, 14:10, 14:12, 15:3, 15:4, 17:18, 17:20, 17:25, 20:15, 21:17, 21:20, 21:21, 21:24, 29:2, 29:5, 29:13, 29:20, 36:1, 37:25, 42:4, 42:7, 44:5, 45:19, 45:22, 46:1, 46:2, 46:17, 49:18, 50:4, 54:6, 58:11, 74:13, 74:18, 83:21, 91:25, 98:23, 99:23, 99:25, 101:18, 120:6
**factor** [1] - 126:20
**factors** [1] - 96:5
**facts** [11] - 31:20, 41:14, 41:17, 41:20, 41:21, 42:10, 42:19, 46:4, 51:16, 58:6
**factual** [2] - 22:24, 26:4
**fail** [1] - 23:17
**failed** [8] - 24:10, 25:20, 26:1, 31:10, 47:24, 48:5, 51:25, 52:15
**fails** [1] - 51:24
**failure** [2] - 25:11, 39:4
**failures** [1] - 98:9
**fair** [1] - 33:6
**Fairleigh** [1] - 90:5
**fairly** [1] - 14:5
**fall** [1] - 86:7
**falls** [1] - 14:3
**family** [1] - 53:10
**fan** [1] - 36:12
**fantastic** [1] - 103:8
**far** [2] - 51:12, 107:11
**fascinating** [1] - 95:23
**fashion** [8] - 23:18, 24:10, 25:12, 25:21, 26:2, 41:11, 52:15, 92:17
**fast** [1] - 69:12
**father** [2] - 69:2, 91:14
**father's** [1] - 107:8
**favor** [4] - 20:19, 51:21, 51:22, 51:25
**FCPI** [1] - 79:1
**features** [2] - 96:2, 116:17
**February** [7] - 1:10, 3:1, 49:9, 80:23, 81:1, 86:21, 130:14
**Federal** [1] - 49:5
**federal** [3] - 27:11, 30:23, 53:5

**fellows** [1] - 18:21
**felt** [4] - 93:9, 94:6, 109:2, 109:12
**few** [10] - 38:5, 54:25, 60:21, 69:5, 71:24, 91:9, 97:14, 98:18, 111:2, 113:9
**field** [8] - 122:6, 123:2, 123:3, 123:4, 123:7, 125:22, 125:23, 126:12
**fields** [8] - 93:23, 115:6, 123:20, 125:18, 125:21, 125:22, 126:2
**fifth** [1] - 78:23
**fight** [2] - 105:13, 109:6
**figure** [1] - 13:14
**file** [56] - 64:1, 64:4, 64:10, 64:12, 64:13, 64:24, 65:2, 65:19, 66:18, 67:24, 93:17, 93:18, 93:22, 99:4, 100:5, 100:12, 100:16, 101:3, 101:5, 101:6, 101:12, 101:13, 101:14, 104:19, 106:19, 106:20, 106:21, 106:22, 107:1, 118:7, 118:10, 118:15, 119:11, 119:18, 120:7, 120:8, 120:24, 121:1, 121:9, 121:13, 121:20, 121:25, 123:16, 123:17, 123:23, 124:19, 126:1, 126:6, 126:7, 127:16, 127:19, 127:20, 127:22
**filed** [6] - 21:7, 49:12, 73:20, 75:13, 82:23, 86:8
**files** [29] - 66:21, 66:22, 83:21, 91:5, 97:15, 99:22, 100:2, 100:3, 100:9, 101:4, 101:22, 105:19, 105:21, 106:14, 106:16, 107:16, 108:22, 116:13, 117:4, 119:10, 119:25, 120:2, 120:4, 120:10, 121:15, 124:9, 124:23, 127:21
**filing** [1] - 11:19

**filings** [1] - 22:13
**fill** [1] - 94:15
**filled** [1] - 102:18
**final** [10] - 4:3, 4:5, 4:7, 25:22, 26:9, 37:2, 52:23, 54:11, 98:4, 130:2
**finally** [3] - 67:15, 67:22, 82:25
**financial** [2] - 71:8, 79:3
**fine** [5] - 16:14, 16:19, 18:17, 39:15, 40:15
**finish** [2] - 90:10, 110:1
**finished** [1] - 40:6
**fire** [1] - 108:12
**fired** [1] - 108:16
**FIRM** [1] - 1:16
**first** [83] - 3:7, 3:16, 3:18, 4:1, 4:22, 5:14, 5:19, 11:5, 11:7, 14:16, 16:15, 21:23, 22:3, 22:23, 23:15, 31:1, 33:6, 33:21, 39:14, 40:25, 42:22, 44:6, 44:17, 49:7, 50:3, 52:19, 57:21, 61:21, 61:22, 62:9, 63:25, 64:6, 64:8, 64:18, 64:21, 65:6, 66:17, 67:1, 67:2, 67:3, 67:5, 67:6, 68:7, 75:9, 75:25, 79:17, 79:19, 79:20, 81:14, 82:3, 82:16, 84:3, 84:4, 90:5, 91:10, 91:14, 95:3, 96:2, 98:19, 98:21, 100:10, 102:13, 105:14, 108:1, 111:2, 111:3, 111:13, 111:14, 112:6, 112:8, 114:2, 114:15, 114:17, 115:3, 116:12, 118:2, 121:3, 121:12, 125:15, 126:1, 127:22
**fit** [1] - 14:7
**five** [18] - 12:15, 34:22, 34:23, 37:2, 67:9, 88:24, 89:4, 109:15, 109:16, 113:4, 113:14, 113:15, 113:19, 119:8, 119:13, 120:14, 120:20, 128:3
**five-letter** [1] - 67:9

**fixed** [3] - 22:8, 24:24
**fixing** [4] - 22:16, 22:17, 22:18, 24:25
**flow** [2] - 114:14, 116:3
**focus** [2] - 97:6, 121:3
**fold** [1] - 5:1
**folks** [16] - 8:25, 12:7, 28:20, 29:1, 31:22, 32:20, 32:22, 33:20, 34:10, 36:14, 37:17, 41:5, 57:20, 89:11, 110:17, 128:17
**follow** [8] - 41:16, 41:23, 43:22, 54:18, 55:9, 68:16, 82:8, 116:25
**followed** [2] - 56:10, 112:17
**following** [16] - 1:22, 3:2, 28:4, 35:13, 38:6, 40:12, 56:14, 56:22, 57:7, 57:16, 89:2, 89:9, 109:19, 110:10, 110:15, 129:2
**follows** [2] - 48:16, 80:15
**footprint** [2] - 46:9, 46:10
**FOR** [1] - 1:2
**forerunner** [1] - 120:11
**forget** [3] - 91:14, 104:5, 121:7
**forgot** [1] - 72:23
**form** [17] - 22:8, 31:2, 37:2, 42:13, 73:8, 73:16, 81:12, 81:17, 84:16, 94:18, 99:23, 99:24, 105:20, 111:11, 120:22, 124:14, 130:2
**format** [13] - 63:14, 64:7, 64:13, 64:20, 98:14, 100:12, 100:24, 101:10, 120:23, 121:5, 121:25, 124:20
**formats** [1] - 66:23
**formed** [6] - 72:12, 81:13, 83:11, 84:11, 88:17, 88:20
**forming** [1] - 54:8
**forms** [5] - 42:11, 42:15, 84:22, 87:5, 118:2
**forth** [4] - 18:6, 102:14, 104:13, 115:8

**fortunes** [1] - 92:24
**forum** [1] - 58:5
**forward** [2] - 43:11, 69:12
**fought** [1] - 58:15
**four** [13] - 12:9, 12:15, 40:4, 40:5, 61:21, 67:9, 100:24, 101:10, 102:2, 102:3, 102:4, 110:13, 127:8
**four-letter** [1] - 67:9
**FPCI** [15] - 69:13, 69:14, 70:1, 76:5, 92:25, 95:4, 97:17, 99:6, 100:12, 105:15, 106:9, 110:23, 115:13, 115:18, 123:14
**FPCI's** [2] - 69:2, 115:21
**frankly** [1] - 43:21
**friction** [1] - 109:5
**Friday** [1] - 37:16
**friend** [4] - 58:18, 62:13, 93:8, 103:8
**friends** [4] - 53:10, 58:10, 91:19, 91:24
**front** [5] - 43:19, 110:25, 112:6, 113:9, 117:22
**FS** [1] - 126:1
**fully** [2] - 33:18, 54:24
**function** [2] - 118:9, 126:9
**functionalities** [1] - 99:12
**functionality** [1] - 100:8
**functions** [5] - 104:10, 114:3, 120:25, 121:13, 124:4
**fundamental** [9] - 7:17, 8:18, 9:1, 10:22, 23:15, 23:20, 25:14, 28:24, 52:9
**fundamentally** [1] - 11:16
**funny** [1] - 88:3
**Future** [10] - 62:16, 63:6, 68:20, 68:24, 69:6, 70:25, 71:7, 92:24, 93:12, 105:7
**future** [1] - 78:13

**G**

**GARTENBERG** [1] - 1:19

**gather** [2] - 36:21, 97:14
**gender** [1] - 78:16
**general** [11] - 8:17, 13:1, 28:16, 30:10, 39:10, 47:3, 47:5, 69:9, 71:3, 96:10, 96:17
**generally** [8] - 7:13, 30:21, 30:24, 44:22, 45:13, 45:17, 60:22, 69:16
**generator** [1] - 125:8
**generic** [2] - 66:9, 99:7
**genesis** [1] - 11:6
**gentleman** [2] - 3:13, 32:1
**gentlemen** [3] - 57:24, 77:13, 77:22
**geocode** [1] - 62:12
**germane** [1] - 75:4
**Ginger** [4] - 32:11, 73:7, 73:22, 107:11
**Ginger's** [2] - 91:14, 107:7
**given** [12] - 7:9, 13:15, 13:16, 14:10, 29:17, 33:20, 54:5, 94:7, 106:5, 109:7, 112:11
**goal** [1] - 55:8
**goods** [1] - 50:12
**graphics** [1] - 113:18
**great** [8] - 13:7, 34:20, 56:18, 68:25, 80:5, 106:10, 107:25, 126:20
**greeted** [1] - 28:13
**grievance** [1] - 58:5
**guess** [4] - 11:5, 18:24, 38:16, 74:7
**guide** [1] - 14:2
**guidelines** [1] - 47:1
**guy** [1] - 70:17
**guys** [1] - 105:9

**H**

**habitat** [1] - 130:7
**hallway** [1] - 108:2
**hand** [8] - 7:22, 24:8, 31:6, 41:13, 42:20, 45:2, 100:9, 112:17
**handed** [2] - 34:10, 38:13
**handled** [1] - 68:12
**Hanks** [2] - 72:1, 76:5
**happiness** [1] - 98:23
**happy** [2] - 58:17,

103:15
**Hard** [2] - 72:1, 76:5
**Hard-Hanks** [2] - 72:1, 76:5
**head** [1] - 109:3
**headaches** [1] - 55:12
**header** [2] - 101:1, 101:9
**headers** [2] - 100:20, 127:5
**hear** [20] - 25:2, 27:2, 42:24, 44:20, 46:17, 46:24, 49:23, 49:25, 58:19, 59:4, 64:11, 64:16, 70:4, 70:14, 71:11, 82:9, 82:21, 84:18, 85:16, 88:1
**heard** [9] - 44:11, 51:10, 52:24, 54:10, 58:5, 78:23, 84:14, 86:14, 108:2
**hearing** [1] - 47:8
**hearsay** [2] - 15:3, 16:16
**heavy** [1] - 93:3
**held** [6] - 39:17, 39:19, 40:9, 50:12, 50:14, 65:15
**help** [2] - 66:2, 97:11
**hereby** [2] - 86:20, 86:22
**higher** [1] - 111:24
**highly** [1] - 44:24
**Hill** [1] - 78:11
**himself** [1] - 46:8
**hindsight** [1] - 45:9
**hired** [1] - 92:6
**hires** [1] - 69:13
**historical** [3] - 15:4, 17:18, 17:20
**hold** [3] - 5:16, 12:17, 33:13
**holding** [1] - 125:22
**holiday** [1] - 37:16
**home** [4] - 37:19, 53:4, 55:8, 109:9
**honestly** [1] - 111:15
**Honor** [9] - 3:14, 5:21, 17:7, 19:5, 38:8, 57:24, 77:21, 110:8, 122:13
**HONORABLE** [1] - 1:13
**hope** [1] - 28:14
**hoping** [1] - 58:2, 92:24
**Hosfield** [4] - 4:12, 4:18, 5:20, 10:6
**hour** [1] - 109:16
**hours** [3] - 37:19,

37:23, 38:1
**house** [2] - 59:15, 59:24
**housekeeping** [1] - 120:9
**HOWARD** [1] - 1:19
**huge** [3] - 59:22, 66:22, 70:5
**human** [5] - 44:13, 66:18, 120:21, 121:4, 121:19
**humanities** [2] - 90:9, 90:11
**hundred** [2] - 59:22, 63:15
**hundred-million-name** [1] - 59:22
**hundreds** [3] - 59:19, 59:20, 62:25
**hungry** [1] - 93:8
**husband** [1] - 37:24

## I

**i.e** [1] - 25:22
**IBM** [2] - 99:6, 114:8
**idea** [50] - 5:11, 24:20, 33:4, 47:8, 50:22, 61:2, 61:20, 61:22, 62:6, 62:9, 62:12, 62:14, 62:17, 62:20, 63:2, 63:13, 63:19, 67:25, 68:15, 68:25, 69:9, 73:15, 74:15, 74:16, 75:10, 75:16, 77:1, 79:17, 79:18, 79:20, 80:5, 80:6, 80:9, 81:8, 81:12, 82:15, 84:15, 94:4, 94:24, 95:21, 95:24, 96:22, 98:13, 103:8, 103:20, 103:21, 103:23, 105:10
**ideas** [2] - 68:15, 100:1
**ident** [1] - 121:13
**Identification** [1] - 66:12
**identified** [4] - 12:15, 96:19, 105:4, 121:2
**identifier** [2] - 61:23, 62:2
**identifiers** [1] - 100:25
**identify** [7] - 60:8, 60:10, 88:11, 101:4, 114:21, 121:1, 127:17
**ignorance** [1] - 87:24
**ignore** [1] - 126:12

**image** [1] - 94:12
**images** [1] - 94:11
**immediately** [2] - 55:23, 96:7
**impartial** [1] - 33:7
**impeachment** [2] - 8:8, 8:15
**implement** [1] - 10:5
**important** [6] - 15:10, 16:10, 21:18, 22:16, 24:20, 29:1, 46:16, 46:23, 54:7, 55:10, 58:3, 58:4, 86:8, 111:22
**imposition** [1] - 20:10
**impractical** [1] - 100:6
**impressed** [1] - 80:9
**improve** [1] - 92:24
**improvements** [1] - 106:12
**IN** [1] - 1:1
**inaccuracy** [1] - 96:1
**inaccurate** [2] - 61:8, 96:21
**Inc** [8] - 12:4, 62:16, 63:6, 68:20, 69:6, 71:1, 71:7, 71:10
**incident** [1] - 45:20
**includable** [1] - 20:18
**include** [3] - 12:24, 26:9, 70:12
**included** [5] - 26:16, 70:11, 71:20, 87:2
**including** [5] - 22:9, 76:8, 84:9, 87:19, 90:18
**income** [1] - 94:1
**incomes** [1] - 59:23
**Incorporated** [1] - 92:25
**increasing** [1] - 109:5
**indeed** [3] - 4:6, 5:20, 29:7
**independent** [4] - 9:12, 44:15, 54:2, 121:22
**independently** [3] - 10:2, 48:22, 72:20
**index** [11] - 94:17, 101:13, 101:14, 120:1, 120:7, 121:9, 121:10, 121:15, 123:25
**indexed** [2] - 101:5, 119:22
**indexes** [2] - 101:14, 123:25
**indexing** [1] - 101:6
**indicate** [2] - 42:3, 65:8

**indicating** [1] - 123:3
**indicator** [1] - 62:5
**indicators** [1] - 67:7
**individual** [1] - 118:9
**industry** [17] - 59:8, 59:9, 59:11, 59:17, 59:18, 60:14, 60:21, 61:16, 62:7, 62:22, 63:16, 74:6, 90:19, 96:18, 97:2, 97:3
**inextricably** [3] - 75:23, 76:2, 76:13
**infer** [3] - 17:12, 46:2, 67:20
**inference** [4] - 18:9, 46:3, 46:5, 46:10
**inferences** [2] - 17:24, 46:14
**inferred** [2] - 96:19, 98:10
**influence** [1] - 45:7
**influenced** [2] - 44:20, 53:9
**information** [17] - 7:9, 30:1, 54:1, 59:12, 59:16, 64:7, 93:21, 97:8, 97:11, 97:14, 97:21, 100:17, 114:25, 122:24, 124:7, 127:3, 127:19
**initial** [3] - 8:17, 8:21, 108:7
**initialed** [3] - 84:23, 87:11, 88:20
**injury** [4] - 21:17, 21:20, 21:21, 21:23
**input** [2] - 80:2, 100:4
**inseparable** [3] - 9:11, 9:13, 48:20
**insinuate** [1] - 53:13
**installed** [3] - 92:23, 95:13, 99:6
**instance** [2] - 5:15, 48:7
**instead** [4] - 36:11, 102:25, 108:11, 121:14
**Institute** [1] - 90:7
**instruct** [4] - 41:22, 42:14, 44:22, 52:24
**instructed** [1] - 16:7
**instructing** [1] - 52:19
**instruction** [16] - 15:1, 15:19, 15:22, 15:25, 16:20, 17:14, 18:5, 26:9, 45:10, 45:11, 45:13, 47:4, 47:7, 48:16, 56:25, 85:23
**instructions** [19] - 25:22, 31:14, 34:9,

34:15, 35:11, 37:1, 37:7, 39:11, 40:23, 41:16, 41:23, 42:9, 47:1, 47:10, 52:2, 52:23, 54:11, 56:15, 106:8
**insurance** [1] - 97:19
**integral** [1] - 46:23
**intellectual** [3] - 84:10, 87:7, 87:19
**intelligence** [1] - 44:15
**intelligent** [1] - 30:1
**intend** [6] - 9:23, 9:24, 9:25, 25:5, 25:6, 34:13
**intended** [5] - 11:25, 13:3, 13:10, 30:4, 30:5
**intent** [1] - 9:19
**intention** [3] - 48:20, 77:5
**interdependent** [2] - 9:11, 48:21
**interest** [9] - 25:20, 31:11, 47:19, 75:22, 84:2, 85:18, 87:22, 106:8, 108:8
**interested** [2] - 27:18, 56:1, 69:3, 70:5, 70:6, 102:10
**interesting** [3] - 29:9, 76:16, 102:8
**interests** [2] - 24:10, 43:11
**interfered** [1] - 50:19
**interferes** [1] - 28:22
**intermittently** [1] - 92:16
**internal** [1] - 123:21
**internet** [1] - 54:3
**intertwined** [2] - 76:3, 76:13
**interviewing** [1] - 91:13
**introduce** [2] - 31:22, 56:13
**introduced** [2] - 32:21, 91:15
**inventory** [9] - 104:9, 104:14, 104:16, 104:18, 104:24, 104:25, 105:1, 118:3
**investigated** [1] - 87:21
**involved** [6] - 32:6, 33:17, 53:15, 53:19, 54:1, 109:5
**involvement** [1] - 109:3

**involves** [2] - 83:22, 85:21
**Irish** [2] - 60:3, 61:8
**island** [2] - 46:7, 46:11
**issue** [34] - 3:22, 5:6, 6:3, 6:22, 10:24, 12:25, 15:20, 16:18, 19:10, 19:17, 19:23, 22:10, 22:11, 23:1, 23:6, 24:13, 24:16, 25:18, 38:8, 43:18, 47:15, 48:11, 51:8, 51:20, 52:13, 59:25, 60:15, 66:15, 76:19, 78:2, 79:12, 83:13, 87:9, 88:14
**issues** [25] - 3:6, 3:18, 3:19, 6:4, 17:19, 19:14, 19:16, 20:18, 20:20, 22:13, 22:14, 23:15, 23:20, 25:14, 41:11, 41:15, 42:2, 42:7, 46:17, 49:16, 49:18, 49:20, 51:4, 52:9, 130:9
**itself** [5] - 9:21, 13:9, 43:1, 49:3, 116:7

**J**

**jack** [1] - 95:20
**jack-of-all-trades** [1] - 95:20
**Jamesway** [1] - 90:22
**January** [1] - 109:11
**JAY** [1] - 1:17
**Jay** [1] - 31:23
**JCL** [15] - 65:16, 90:24, 99:10, 99:21, 101:20, 114:2, 114:6, 114:15, 116:16, 116:18, 116:25, 128:11, 128:12
**JCI** [1] - 91:1
**JERSEY** [1] - 1:2
**Jersey** [2] - 1:10, 50:11
**Jesse** [2] - 19:1, 32:5
**JESSE** [1] - 1:19
**Joanne** [2] - 4:13, 32:24
**job** [20] - 58:12, 58:16, 62:17, 65:16, 66:20, 70:20, 73:13, 76:25, 78:17, 79:7, 91:2, 93:8, 93:10, 101:20, 114:7, 114:14, 116:2, 119:9, 119:10

**JOEL** [1] - 1:13
**John** [2] - 4:12, 93:4
**join** [1] - 58:1
**joint** [4] - 9:9, 9:19, 48:18, 73:8
**Judge** [9] - 11:5, 12:3, 22:2, 28:9, 58:1, 85:22, 88:2, 118:25
**judge** [4] - 4:6, 4:16, 41:8, 53:7
**JUDGE** [1] - 1:13
**judge's** [1] - 8:2
**judges** [4] - 41:6, 41:13, 41:18, 41:20
**judgment** [3] - 20:21, 29:22, 43:14
**jump** [1] - 96:14
**juncture** [1] - 5:4
**June** [4] - 71:24, 72:12, 81:11, 82:24
**jurisdiction** [1] - 30:23
**JUROR** [2] - 37:22, 37:24
**juror** [2] - 33:7, 119:2
**juror's** [1] - 46:23
**jurors** [4] - 27:10, 35:24, 41:1, 52:17
**JURY** [1] - 1:14
**Jury** [7] - 34:3, 38:6, 41:2, 56:22, 89:2, 109:19, 129:2
**jury** [77] - 3:3, 13:7, 14:9, 14:13, 15:1, 16:5, 16:22, 17:11, 17:22, 18:15, 18:23, 19:14, 19:21, 19:25, 20:6, 20:11, 20:19, 21:4, 22:3, 23:14, 23:15, 24:3, 24:5, 25:2, 25:5, 25:6, 25:14, 25:18, 26:13, 27:11, 27:23, 28:5, 29:3, 29:10, 29:16, 29:19, 29:24, 30:3, 33:3, 34:5, 34:6, 34:15, 34:24, 34:25, 35:14, 36:5, 37:4, 38:4, 38:7, 39:1, 39:6, 40:10, 40:13, 44:22, 55:16, 56:19, 56:23, 57:8, 57:17, 88:25, 89:3, 89:7, 89:10, 90:3, 97:3, 109:20, 110:11, 110:12, 110:16, 129:3, 129:7, 129:8, 129:25, 130:1, 130:5, 130:10
**jury's** [4] - 13:13, 19:23, 27:22, 28:21

**justice** [1] - 51:19

**K**

**keep** [13] - 29:9, 33:19, 34:2, 54:7, 54:12, 55:18, 55:25, 56:1, 58:15, 73:25, 109:3, 109:4, 128:20
**keeping** [1] - 112:8
**keeps** [3] - 14:18, 85:11, 120:1
**kept** [2] - 92:16, 104:8
**key** [2] - 120:8, 121:21
**kind** [8] - 14:11, 60:25, 73:14, 73:19, 76:5, 93:21, 100:15, 119:5
**kinds** [1] - 59:25
**KIRSCH** [1] - 1:19
**Klaproth** [13] - 4:2, 4:11, 5:19, 8:4, 10:14, 14:24, 17:4, 18:11, 32:5, 32:9, 32:16, 77:20, 88:24
**KLAPROTH** [50] - 1:19, 3:10, 3:25, 4:12, 4:20, 5:21, 6:7, 6:20, 6:22, 8:7, 8:10, 9:9, 9:17, 9:25, 10:15, 10:24, 15:24, 16:14, 16:19, 17:7, 17:9, 18:15, 18:18, 19:4, 19:24, 20:14, 22:23, 24:1, 24:6, 26:11, 26:20, 28:1, 32:17, 34:5, 34:17, 34:22, 35:7, 38:10, 38:15, 38:20, 39:14, 39:22, 40:4, 57:2, 77:21, 116:20, 119:2, 122:13, 129:18, 129:23
**knowledge** [12] - 7:10, 11:19, 15:13, 16:11, 21:6, 21:13, 54:6, 58:25, 106:4
**known** [6] - 39:2, 58:9, 61:5, 77:10, 78:7, 86:4
**knows** [1] - 18:15
**Korean** [1] - 98:8

**L**

**labels** [1] - 94:17
**lack** [1] - 16:11
**ladies** [3] - 57:24, 77:13, 77:22
**laid** [2] - 17:13, 114:15

**landed** [1] - 72:1
**language** [17] - 14:21, 18:21, 37:3, 39:22, 65:16, 76:25, 82:19, 91:2, 91:4, 104:22, 114:7, 114:8, 116:1, 116:3, 119:9, 125:2, 130:10
**languages** [4] - 10:4, 74:12, 82:20
**large** [2] - 113:17, 119:3
**last** [28] - 27:19, 38:10, 38:17, 61:5, 61:6, 61:24, 62:1, 62:4, 62:10, 62:11, 64:19, 65:7, 67:13, 68:7, 73:14, 79:16, 79:18, 79:21, 82:16, 86:5, 96:3, 100:4, 107:18, 111:9, 115:4, 121:12, 127:22
**lastly** [1] - 54:7
**late** [10] - 60:19, 61:20, 70:19, 71:24, 73:23, 78:5, 78:25, 94:21, 105:21, 108:20
**law** [15] - 7:8, 20:20, 23:3, 23:13, 24:13, 29:20, 31:12, 39:17, 41:11, 41:22, 47:5, 47:25, 50:11, 51:10, 130:5
**LAW** [1] - 1:16
**lawful** [1] - 39:15
**Lawrence** [4] - 4:16, 4:18, 10:7
**laws** [1] - 77:3
**lawsuit** [24] - 16:7, 21:7, 25:12, 47:15, 47:24, 48:6, 49:12, 50:21, 71:23, 72:6, 73:21, 75:3, 75:13, 78:5, 83:18, 83:20, 84:1, 85:2, 85:17, 85:19, 86:6, 86:7, 86:9, 112:8
**lawyer** [3] - 43:16, 43:20, 53:22
**lawyers** [18] - 27:16, 29:21, 30:1, 30:6, 31:23, 32:22, 35:23, 37:12, 42:13, 42:23, 42:25, 43:3, 43:12, 43:24, 44:8, 49:23, 53:18, 53:21
**lay** [1] - 116:20
**layoffs** [1] - 58:16

**layout** [1] - 124:10
**LCID** [22] - 22:7, 66:5, 66:12, 66:13, 66:14, 66:19, 69:18, 69:23, 73:11, 74:21, 75:9, 75:15, 76:2, 76:8, 77:15, 81:4, 81:21, 84:14, 84:15, 84:16
**lead** [1] - 51:16
**leads** [1] - 46:15
**learn** [1] - 83:15
**learned** [5] - 91:23, 91:24, 93:10, 102:11, 130:3
**learns** [1] - 83:15
**least** [7] - 11:6, 23:8, 24:21, 52:22, 70:14, 103:18, 111:23
**leave** [7] - 16:13, 26:3, 26:10, 29:11, 31:19, 44:14, 128:14
**led** [1] - 87:20
**left** [8] - 71:23, 72:19, 76:4, 92:14, 107:12, 108:4, 112:13
**legal** [12] - 3:19, 15:5, 15:7, 41:15, 41:23, 42:2, 43:18, 49:24, 52:23, 54:10, 56:15
**legally** [1] - 97:9
**legitimate** [1] - 51:1
**legs** [1] - 88:25
**lengthy** [1] - 16:6
**less** [1] - 92:12
**letter** [6] - 62:3, 62:4, 67:9, 67:10
**letters** [3] - 61:25, 78:12, 123:4
**level** [2] - 69:1, 70:7
**levels** [2] - 123:1, 124:16
**liability** [2] - 14:7, 48:10
**library** [1] - 90:25
**license** [7] - 70:6, 70:21, 75:24, 76:1, 83:10, 83:15, 87:18
**licensed** [2] - 87:13, 87:16
**licenses** [3] - 74:12, 83:3, 83:4
**licensing** [2] - 74:24, 87:11
**life** [2] - 78:15, 92:1
**lifestyle** [1] - 78:19
**light** [3] - 51:16, 69:23, 103:14
**likelihood** [1] - 13:7
**likely** [3] - 51:17, 96:25, 105:22

**limine** [1] - 3:20
**limit** [1] - 130:5
**limitation** [1] - 78:6
**limitations** [22] - 7:5, 7:7, 20:13, 20:16, 21:8, 21:22, 23:24, 25:22, 31:13, 38:18, 39:2, 48:2, 48:6, 49:4, 50:9, 50:15, 52:12, 77:9, 85:22, 85:24, 88:13, 88:14
**limited** [1] - 15:18
**Lindsay** [63] - 3:10, 6:11, 11:10, 11:11, 12:5, 12:13, 15:5, 16:25, 17:6, 18:14, 25:9, 25:10, 27:13, 30:18, 31:5, 31:6, 32:4, 32:5, 47:15, 47:21, 58:9, 58:12, 58:14, 58:25, 60:17, 61:20, 63:7, 64:2, 64:10, 66:12, 70:1, 71:14, 71:23, 72:2, 74:17, 75:7, 76:5, 78:1, 78:8, 78:10, 79:7, 79:16, 83:12, 83:13, 85:5, 85:11, 85:16, 86:11, 86:19, 86:20, 86:23, 87:9, 91:8, 91:10, 95:15, 98:13, 100:17, 109:24, 112:16, 129:12, 129:19, 129:23
**LINDSAY** [1] - 1:7
**Lindsay's** [9] - 9:3, 10:1, 15:13, 15:15, 16:12, 21:9, 48:25, 76:12, 87:14
**line** [8] - 11:24, 99:12, 100:20, 101:9, 101:10, 126:17, 127:8
**linear** [1] - 104:6
**lines** [2] - 16:5, 22:22
**links** [3] - 91:4, 91:5
**list** [40] - 59:7, 59:9, 59:11, 59:13, 59:18, 59:19, 59:21, 59:22, 60:6, 60:9, 60:14, 60:21, 60:24, 61:1, 61:3, 61:15, 62:22, 63:15, 63:16, 64:23, 65:19, 66:11, 73:6, 79:7, 79:11, 82:12, 84:4, 93:16, 93:24, 93:25, 95:7, 96:18, 97:2, 97:3, 100:5, 127:20
**List** [3] - 12:4, 71:10, 79:3
**listed** [1] - 5:23
**listen** [3] - 44:23, 109:2, 110:6
**lists** [17] - 8:11, 59:12, 59:19, 59:25, 60:1, 60:17, 61:4, 63:8, 64:25, 79:9, 79:13, 93:14, 98:1, 98:6, 98:7, 127:18
**literally** [4] - 62:14, 62:24, 72:24, 92:1
**litigated** [1] - 17:19
**litigation** [13] - 3:22, 8:20, 11:3, 11:9, 12:19, 12:25, 16:8, 16:18, 18:5, 18:12, 71:11, 75:6, 75:7
**live** [5] - 37:20, 59:14, 59:23, 67:21, 89:22
**lives** [3] - 28:22, 28:23, 30:6
**living** [2] - 90:16, 91:25
**LLC** [3] - 30:20, 31:7, 84:8
**load** [2] - 104:10, 106:19, 119:9, 119:25, 120:23, 127:21, 127:23
**loaded** [1] - 102:2
**loading** [2] - 102:4, 123:23
**located** [1] - 65:8
**location** [1] - 8:12
**logic** [2] - 118:5, 123:21
**logical** [2] - 55:5, 128:13
**logon** [2] - 99:4, 106:20
**look** [28] - 4:5, 5:19, 13:11, 14:12, 16:5, 34:13, 54:3, 58:6, 61:16, 64:8, 64:14, 64:18, 65:8, 65:18, 65:19, 67:18, 79:21, 82:16, 110:3, 110:21, 113:3, 118:19, 122:18, 122:22, 124:21, 125:11, 130:4
**looked** [3] - 23:12, 63:8, 69:23
**looking** [9] - 12:1, 58:7, 59:3, 60:1, 79:16, 81:24, 117:7, 118:12, 121:11
**looks** [6] - 67:1, 67:13, 67:16, 102:4, 114:17, 119:3
**loosely** [1] - 63:12
**Loretta** [12] - 69:13, 69:21, 69:22, 70:2, 107:6, 107:17, 107:19, 108:1, 108:3, 108:12, 109:4
**Loretta's** [1] - 107:21
**low** [1] - 14:12
**LSDI** [49] - 11:8, 32:18, 71:10, 71:11, 71:22, 72:4, 72:6, 72:19, 73:12, 73:20, 73:24, 79:1, 79:4, 79:6, 79:7, 79:17, 79:24, 80:1, 80:7, 80:11, 80:17, 80:21, 81:4, 81:9, 81:11, 81:15, 81:18, 81:19, 81:21, 82:25, 83:4, 83:12, 83:13, 83:14, 84:1, 85:2, 85:3, 85:6, 85:7, 85:9, 85:10, 85:12, 86:9, 86:10, 86:17, 107:3, 112:9
**LSDI's** [1] - 113:8
**lunch** [7] - 40:23, 42:23, 55:6, 55:14, 56:5, 56:9, 91:20
**Luncheon** [1] - 57:5
**lunchroom** [1] - 95:20
**Lynch** [3] - 36:13, 36:23, 40:17

**M**

**Magiano** [2] - 3:14, 3:15
**Magio** [1] - 32:1
**magistrate** [4] - 4:6, 4:15, 5:24, 8:2
**mail** [1] - 59:10
**mailing** [3] - 93:14, 94:16, 94:17
**main** [1] - 102:3
**mainframe** [8] - 91:2, 92:23, 99:2, 100:18, 114:8, 115:21, 119:25, 123:14
**mainframes** [1] - 95:12
**maintained** [1] - 90:24
**man** [1] - 93:3
**manage** [1] - 41:14
**management** [10] - 68:22, 68:24, 69:2, 69:6, 69:22, 70:1, 105:23, 119:18, 129:10
**manages** [1] - 79:6
**managing** [1] - 120:4
**manilla** [1] - 112:12
**Manville** [1] - 78:11
**March** [3] - 49:11, 86:6, 87:2
**marked** [1] - 111:6
**market** [3] - 59:17, 72:15, 93:20
**marketed** [1] - 72:10
**Marketing** [6] - 12:6, 69:15, 73:5, 73:9, 91:11
**marketing** [9] - 59:10, 59:17, 79:9, 96:23, 97:10, 97:19, 97:22, 98:1
**marooned** [1] - 46:7
**marriage** [1] - 94:2
**married** [2] - 89:24, 89:25
**massage** [1] - 59:20
**master** [2] - 93:17, 100:12
**match** [11] - 65:6, 65:7, 67:2, 67:3, 67:5, 67:14, 67:23, 121:11, 121:13, 121:16
**matched** [3] - 67:4, 93:19, 94:6
**matches** [1] - 62:25
**matching** [1] - 93:21
**material** [2] - 54:19, 111:11
**materials** [1] - 31:11
**matter** [11] - 14:6, 15:3, 20:20, 29:2, 29:20, 33:17, 45:4, 75:18, 112:1, 119:19
**mattered** [3] - 58:16, 58:21, 76:15
**matters** [1] - 35:10
**MC** [78] - 1:16, 1:17, 3:8, 3:14, 4:24, 5:1, 5:14, 7:25, 10:10, 11:4, 12:3, 12:8, 12:11, 12:20, 12:22, 12:24, 13:20, 13:25, 15:12, 15:19, 15:22, 17:3, 18:4, 18:20, 18:24, 19:6, 19:8, 19:16, 20:22, 20:25, 21:2, 21:8, 21:11, 21:16, 21:20, 22:1, 23:11, 23:19, 23:22, 23:25, 24:7, 24:11, 26:6, 26:12, 26:23, 27:7, 27:9, 31:25, 32:10, 32:14, 34:6, 34:11, 34:19, 36:17, 37:19, 38:8, 38:14, 39:8, 39:12, 39:21, 40:1, 40:6, 57:1, 57:10, 57:24, 89:14, 109:13, 109:24, 113:13, 118:25, 119:5, 122:17, 128:4, 128:15, 129:6, 129:13, 129:15, 130:11
**McBride** [4] - 36:13, 36:16, 36:22, 37:11
**McDaniel** [19] - 2:3, 3:7, 4:23, 7:21, 9:2, 10:9, 23:4, 26:17, 31:23, 32:9, 38:13, 57:23, 61:7, 77:19, 79:2, 89:13, 113:11, 122:16, 128:13
**MCDANIEL** [2] - 89:16, 110:18
**McGraw** [1] - 78:11
**McGraw-Hill** [1] - 78:11
**meal** [1] - 36:13
**mean** [12] - 9:17, 13:11, 20:23, 22:23, 23:3, 23:10, 34:17, 55:6, 104:16, 112:10, 126:6, 129:18
**means** [5] - 13:14, 44:2, 48:19, 51:14, 52:21
**meant** [1] - 35:22
**meantime** [2] - 80:17, 81:21
**meanwhile** [1] - 63:18, 70:7, 73:20
**media** [2] - 45:1, 116:13
**medium** [1] - 90:20
**meet** [4] - 7:20, 27:16, 91:10, 92:15
**meeting** [3] - 6:11, 98:19, 98:21
**memory** [2] - 125:17, 125:22
**men's** [1] - 91:16
**mention** [2] - 72:23, 77:15
**mentioned** [6] - 6:24, 32:9, 32:23, 76:1, 120:14, 123:6
**mentioning** [2] - 109:3, 127:5
**merely** [1] - 46:1

merge [1] - 84:6
merged [1] - 48:20
merger [1] - 84:9
merges [1] - 84:5
messages [1] - 126:7
messy [1] - 118:21
met [1] - 84:4
method [2] - 119:22, 120:4
Method [1] - 119:23
methodology [2] - 96:19, 119:18
methods [2] - 96:15, 120:3
Micah [4] - 32:12, 32:14, 69:2, 105:9
microphone [1] - 34:1
middle [2] - 27:20, 69:12
might [10] - 14:9, 31:11, 32:2, 42:2, 43:7, 44:17, 53:18, 57:19, 61:7, 81:25
million [4] - 59:22, 60:7, 65:2, 65:4
million-name [2] - 65:2, 65:4
millions [5] - 59:20, 62:22, 62:23, 62:24, 93:17
mind [3] - 54:8, 54:12, 128:20
mindful [1] - 52:3
mine [3] - 11:6, 42:5, 86:12
minimal [1] - 48:23
minute [4] - 5:17, 27:24, 48:8, 129:5
minutes [11] - 34:22, 34:23, 37:2, 38:5, 54:25, 55:6, 55:16, 88:24, 89:4, 109:15, 109:17
miriad [1] - 10:3
misappropriate [2] - 80:21, 81:17
misplaced [1] - 58:25
Miss [28] - 3:8, 9:3, 18:14, 21:9, 27:13, 31:5, 31:6, 32:4, 32:5, 36:13, 36:16, 36:21, 36:23, 37:11, 40:17, 47:21, 48:24, 58:9, 58:25, 63:7, 64:1, 64:10, 109:24, 112:16, 129:12, 129:19, 129:23
miss [5] - 3:16, 36:11, 36:12, 36:13
missing [1] - 35:17

misspellings [1] - 62:3
mix [1] - 108:13
mixture [1] - 125:21
moment [6] - 22:18, 90:14, 91:14, 97:2, 118:19, 120:14
Monday [1] - 37:16
money [8] - 58:13, 72:5, 72:17, 78:20, 85:15, 86:12, 96:21, 98:5
moneymaker [1] - 105:12
Monmouth [1] - 29:3
month [1] - 75:13
months [4] - 69:5, 92:12, 92:13, 112:16
morning [12] - 3:4, 27:24, 28:7, 28:21, 31:25, 53:22, 54:22, 57:25, 128:21, 128:24, 130:13, 130:14
most [14] - 19:9, 28:24, 42:16, 58:10, 70:11, 74:24, 94:6, 96:3, 96:24, 97:21, 101:14, 105:22, 110:23, 113:8
motion [5] - 3:20, 4:2, 5:22, 6:2, 19:22
mousetrap [1] - 62:8
move [5] - 36:22, 37:10, 40:17, 99:14, 126:23
moving [2] - 33:19, 123:16
MR [125] - 3:8, 3:10, 3:14, 3:25, 4:12, 4:20, 4:24, 5:1, 5:14, 5:21, 6:7, 6:20, 6:22, 7:25, 8:7, 8:10, 9:9, 9:17, 9:25, 10:10, 10:15, 10:24, 11:4, 12:3, 12:8, 12:11, 12:20, 12:22, 12:24, 13:20, 13:25, 15:12, 15:19, 15:22, 15:24, 16:14, 16:19, 17:3, 17:7, 17:9, 18:4, 18:15, 18:18, 18:20, 18:24, 19:4, 19:6, 19:8, 19:16, 19:24, 20:14, 20:22, 20:25, 21:2, 21:8, 21:11, 21:16, 21:20, 22:1, 22:23, 23:11, 23:19, 23:22, 23:25, 24:1, 24:6, 24:7, 24:11,

26:6, 26:11, 26:12, 26:20, 26:23, 27:7, 27:9, 28:1, 31:25, 32:10, 32:14, 32:17, 34:5, 34:6, 34:11, 34:17, 34:19, 34:22, 35:7, 38:8, 38:10, 38:14, 38:15, 38:20, 39:8, 39:12, 39:14, 39:21, 39:22, 40:1, 40:4, 40:6, 57:1, 57:2, 57:10, 57:24, 77:21, 89:14, 89:16, 109:13, 109:24, 110:18, 113:13, 116:20, 118:25, 119:2, 119:5, 122:13, 122:17, 128:4, 128:15, 129:6, 129:13, 129:15, 129:18, 129:23, 130:11
MS [3] - 3:17, 36:17, 37:19
multiple [1] - 97:15
multistep [1] - 114:15
multiuse [1] - 97:24
Murphy [1] - 32:24
must [11] - 41:22, 42:14, 43:22, 46:5, 46:11, 48:18, 49:6, 49:10, 50:3, 50:12, 51:8

N

name [81] - 3:16, 30:14, 30:19, 32:13, 32:18, 59:2, 59:22, 61:1, 61:13, 62:2, 62:5, 64:19, 65:2, 65:4, 65:6, 65:7, 65:8, 66:9, 67:1, 67:3, 67:5, 67:14, 71:9, 71:17, 71:18, 73:6, 73:14, 75:8, 78:16, 79:4, 79:16, 79:18, 79:19, 79:21, 82:16, 82:17, 88:3, 91:14, 100:3, 100:4, 100:11, 100:21, 101:9, 101:22, 102:8, 105:20, 106:11, 106:21, 107:7, 107:8, 107:16, 108:12, 114:17, 114:18, 115:3, 115:4, 116:12, 118:3, 118:7, 118:10,

120:20, 121:2, 121:10, 121:11, 121:12, 121:22, 122:6, 123:2, 123:6, 123:7, 125:5, 125:6, 127:7, 127:17, 127:21
named [7] - 22:7, 69:2, 69:13, 83:14, 83:16, 116:5, 126:1
names [83] - 32:8, 32:11, 32:22, 58:3, 59:11, 59:13, 59:14, 59:20, 59:21, 60:7, 60:10, 60:17, 60:24, 60:25, 61:5, 61:6, 61:12, 61:16, 61:22, 61:24, 62:1, 62:9, 62:10, 62:11, 62:23, 62:24, 62:25, 63:8, 63:10, 63:15, 64:2, 64:25, 65:20, 67:2, 67:6, 67:13, 67:16, 67:17, 67:19, 67:20, 68:7, 68:8, 76:16, 79:8, 79:13, 79:25, 93:17, 95:8, 96:2, 96:3, 96:18, 97:20, 98:11, 98:18, 100:25, 101:2, 101:10, 101:21, 102:10, 102:19, 102:23, 104:10, 105:2, 106:13, 107:17, 107:18, 108:13, 118:10, 119:8, 121:14, 122:8, 125:3, 127:9, 127:22
NASA [1] - 78:11
natural [1] - 130:7
nature [6] - 22:12, 42:12, 43:9, 91:17, 93:12, 100:6
necessarily [1] - 38:21
necessary [3] - 62:20, 99:22, 121:6
need [9] - 3:19, 8:8, 18:22, 23:14, 29:25, 34:9, 34:11, 36:6, 37:18, 48:13, 49:18, 49:19, 49:24, 54:4, 55:17, 57:11, 64:18, 70:16, 85:19
needed [3] - 58:13, 106:14, 121:18
needs [9] - 9:10, 9:18, 9:19, 27:11, 39:6, 66:24, 78:20, 121:21, 130:7

negates [1] - 16:1
negotiated [3] - 15:8, 16:8, 71:25
negotiation [1] - 14:19
Nelson [9] - 12:5, 12:13, 16:25, 32:11, 73:7, 73:22, 91:13, 107:7, 107:8
net [1] - 127:13
never [21] - 3:24, 6:19, 10:11, 58:16, 58:22, 65:11, 71:17, 74:15, 74:16, 74:17, 74:19, 76:9, 76:19, 76:20, 77:12, 80:6, 83:9, 90:9, 90:10, 125:8
NEW [1] - 1:2
new [29] - 69:1, 73:16, 74:2, 74:11, 82:4, 84:7, 88:18, 98:22, 102:8, 106:19, 106:21
New [2] - 1:10, 50:11
newly [1] - 84:11
newly-formed [1] - 84:11
news [3] - 36:4, 36:5, 44:23
newspaper [1] - 44:23
newspapers [1] - 63:9
next [12] - 33:14, 64:22, 67:8, 74:7, 86:22, 92:15, 95:18, 106:6, 109:23, 125:9, 126:4
nicest [1] - 105:9
Nicholson [3] - 4:13, 4:18, 10:7
nights [1] - 68:21
nine [1] - 54:23
NO [1] - 1:2
nobody [3] - 74:13, 86:1, 93:25
nobody's [1] - 19:22
nominal [1] - 13:21
non [5] - 61:15, 65:9, 67:19, 67:21, 94:13
non-existent [1] - 94:13
non-white [4] - 61:15, 65:9, 67:19, 67:21
none [2] - 30:4, 57:2
normal [1] - 122:3
Norman [4] - 107:7, 107:8, 107:12
note [2] - 54:16, 54:20
notes [3] - 54:14, 54:15, 108:6
nothing [8] - 11:17, 17:16, 23:5, 42:2,

81:1, 87:23, 106:4, 108:3
**notice** [10] - 10:20, 13:5, 22:21, 24:23, 39:1, 41:4, 66:5, 66:17, 116:4
**noticed** [1] - 61:25
**notion** [1] - 44:17
**novel** [1] - 5:12
**November** [1] - 108:20
**number** [19] - 10:1, 10:3, 11:13, 11:14, 42:10, 55:22, 65:16, 73:4, 76:24, 78:10, 82:22, 86:2, 94:15, 102:17, 102:19, 103:1, 106:13, 113:12, 118:17
**numbers** [3] - 55:22, 102:18, 123:4
**numeric** [1] - 102:25
**numerical** [1] - 102:18
**nursing** [1] - 78:18

## O

**o'clock** [3] - 54:24, 110:13, 128:22
**object** [3] - 7:21, 7:25, 39:18
**objection** [17] - 4:21, 4:23, 10:8, 11:16, 15:23, 43:17, 43:20, 43:25, 44:2, 44:4, 44:5, 44:7, 110:5, 116:20, 119:1, 119:2, 122:13
**objections** [5] - 21:3, 26:19, 26:20, 43:5, 43:6
**obligation** [4] - 29:2, 29:4, 43:13, 53:1
**obligations** [4] - 8:17, 8:18, 8:19, 36:8
**observations** [1] - 61:22
**obstructed** [1] - 40:19
**obtained** [5] - 11:12, 11:13, 86:20, 86:23
**obviously** [6] - 59:15, 64:17, 75:1, 76:23, 91:8, 115:19
**occasions** [1] - 75:24
**occur** [1] - 21:21
**occurred** [8] - 21:24, 22:14, 61:11, 64:15, 74:16, 74:18, 74:19, 118:10
**occurs** [5] - 22:17,

36:12, 45:12, 55:24, 60:5
**OF** [2] - 1:2, 1:5
**offer** [2] - 7:14, 13:22
**offered** [8] - 7:6, 10:8, 11:9, 13:4, 14:6, 16:17, 17:3, 43:15
**offering** [1] - 118:23
**offers** [1] - 14:18
**Office** [1] - 59:2
**office** [7] - 82:3, 111:12, 112:20, 113:6, 115:16, 115:17, 117:13
**officer** [1] - 32:25
**Official** [1] - 1:25
**often** [1] - 59:19
**old** [6] - 78:14, 89:19, 89:20, 106:20, 106:21, 107:20
**older** [1] - 96:5
**olympic** [1] - 63:8
**once** [3] - 58:22, 64:15, 80:24
**one** [81] - 4:1, 5:1, 9:7, 9:10, 10:1, 10:10, 11:7, 12:5, 15:11, 16:16, 17:24, 19:10, 22:14, 24:25, 25:15, 27:1, 27:25, 28:24, 29:7, 30:17, 32:11, 33:5, 33:24, 37:5, 43:24, 46:8, 46:16, 48:19, 53:17, 53:18, 53:21, 57:4, 57:18, 58:3, 60:23, 65:5, 65:6, 68:8, 68:12, 69:7, 72:22, 73:1, 77:25, 78:8, 82:11, 82:20, 84:3, 84:22, 84:23, 89:20, 93:3, 93:24, 94:6, 97:23, 100:1, 101:4, 101:9, 101:10, 102:12, 103:17, 106:21, 108:1, 108:17, 110:4, 118:18, 120:6, 120:16, 121:23, 122:11, 122:12, 124:7, 125:4, 126:1, 126:5, 126:17, 127:21, 127:22
**one-man** [1] - 93:3
**one-time** [1] - 97:23
**ones** [3] - 26:20, 87:9
**ongoing** [1] - 69:9
**open** [3] - 54:7, 54:12, 128:20
**opening** [7] - 19:1,

35:11, 37:10, 42:24, 42:25, 56:10, 57:22
**operated** [2] - 72:19, 76:20
**operating** [6] - 32:2, 72:19, 91:3, 99:5, 99:8, 114:8
**operation** [1] - 71:9
**operational** [2] - 126:18, 126:19
**operations** [2] - 90:17, 93:6
**operator** [4] - 90:23, 92:7, 93:5
**operators** [1] - 90:24
**opinion** [4] - 5:25, 10:18, 54:9, 116:20
**opinions** [2] - 10:21, 53:9
**opportunity** [2] - 5:3, 77:23
**orchestrate** [1] - 65:17
**order** [26] - 4:3, 4:5, 4:8, 5:24, 7:14, 9:9, 10:7, 20:5, 21:22, 26:25, 29:25, 42:6, 48:16, 49:17, 49:25, 57:21, 60:17, 62:19, 63:13, 66:19, 66:20, 66:24, 67:22, 79:9, 83:3, 94:16
**orderly** [1] - 41:11
**orders** [1] - 94:8
**organization** [3] - 65:15, 92:10, 98:7
**organized** [1] - 63:12
**orientation** [1] - 28:16
**original** [2] - 100:24, 102:3
**originally** [2] - 115:21, 122:8
**ought** [2] - 42:4, 54:9
**outcome** [1] - 54:9
**outset** [5] - 25:3, 28:12, 29:18, 30:9, 41:25
**outside** [5] - 44:11, 44:20, 71:3, 73:18, 124:19
**overarching** [1] - 65:15
**overhearing** [1] - 86:9
**overly** [3] - 30:5, 54:19, 68:11
**overrule** [1] - 44:1
**overruled** [1] - 116:23
**overtures** [1] - 108:7
**overview** [1] - 26:7
**owed** [1] - 72:4
**own** [17] - 27:21, 35:9,

68:21, 71:17, 71:18, 73:14, 74:17, 76:6, 80:22, 81:12, 81:20, 82:25, 85:8, 86:11, 86:12, 103:22, 128:7
**owned** [5] - 6:11, 50:6, 87:8, 91:15, 107:24
**owner** [8] - 81:3, 85:14, 86:10, 87:12, 91:13, 95:7, 107:9, 107:10
**owners** [7] - 12:14, 32:12, 32:15, 83:7, 84:12, 105:7, 105:15
**ownership** [9] - 47:16, 71:2, 78:4, 83:18, 84:12, 85:5, 85:6, 94:1, 94:2
**owns** [1] - 84:25

## P

**p.m** [1] - 38:1
**package** [1] - 109:10
**pad** [1] - 127:11
**page** [19] - 4:7, 33:21, 33:22, 34:15, 34:16, 38:10, 40:4, 40:5, 113:19, 113:21, 113:23, 117:8, 117:15, 117:22, 117:24, 119:7, 120:17, 120:19, 125:9
**pages** [9] - 34:14, 111:2, 113:9, 117:8, 117:10, 117:25, 118:5, 127:6, 128:3
**Palisades** [1] - 89:22
**panel** [1] - 26:13
**paper** [2] - 99:17, 107:22
**papers** [6] - 3:12, 6:25, 8:4, 112:7, 112:10, 112:12
**par** [1] - 32:25
**paragraph** [6] - 12:12, 38:11, 86:22, 100:19, 121:24, 127:5
**paragraphs** [7] - 11:15, 12:8, 12:12, 12:15, 16:1, 99:13, 100:19
**PARK** [2] - 1:17, 3:17
**Park** [4] - 3:8, 3:16, 31:24, 89:22
**part** [31] - 9:16, 9:17, 12:5, 12:22, 15:25,

17:10, 18:16, 34:14, 38:21, 39:20, 50:10, 70:3, 71:6, 77:25, 78:3, 78:5, 78:8, 80:22, 82:16, 83:25, 84:1, 84:9, 85:21, 91:3, 99:5, 99:7, 117:13, 121:24, 122:3
**participated** [1] - 45:21
**particular** [19] - 31:14, 31:20, 51:20, 52:2, 52:3, 60:11, 61:14, 95:8, 110:25, 113:23, 114:7, 114:21, 117:24, 118:11, 120:7, 120:9, 124:9, 125:2, 127:21
**particularly** [2] - 60:22, 93:15
**parties** [20] - 11:11, 11:24, 13:9, 16:8, 16:9, 17:20, 17:25, 22:5, 29:22, 32:15, 36:11, 43:10, 43:12, 48:11, 49:20, 53:17, 58:7, 86:19, 86:22
**parties'** [1] - 8:19
**partner** [3] - 3:8, 71:20, 105:13
**parts** [6] - 8:18, 48:21, 77:25, 79:21, 82:1
**party** [6] - 8:13, 51:7, 51:17, 51:21, 51:23, 51:24
**pass** [1] - 87:25
**past** [1] - 91:22
**pay** [2] - 54:17, 108:18
**paychecks** [1] - 72:4
**pending** [1] - 122:14
**penniless** [1] - 78:14
**people** [32] - 3:23, 4:10, 6:10, 10:18, 26:14, 27:1, 27:14, 27:20, 32:8, 32:10, 32:21, 55:1, 59:10, 59:14, 59:17, 59:23, 60:2, 60:9, 60:10, 61:2, 67:20, 75:19, 77:6, 80:20, 93:20, 96:10, 96:17, 96:24, 97:9, 97:17, 127:17
**per** [2] - 19:21, 97:11
**percent** [1] - 61:9
**peremptory** [1] - 27:6
**perfect** [1] - 17:14
**performance** [1] - 46:23

**period** [8] - 47:25, 58:22, 69:25, 72:12, 72:18, 73:2, 76:19, 108:25

**permission** [1] - 69:10

**permit** [3] - 52:21, 53:11, 54:15

**permitted** [1] - 104:10

**person** [14] - 4:17, 49:12, 50:17, 51:15, 51:19, 62:5, 65:9, 73:6, 78:7, 79:14, 82:17, 87:20, 94:5, 124:20

**person's** [1] - 95:6

**personal** [4] - 28:23, 30:5, 30:6, 35:23

**personally** [2] - 35:22, 53:21

**perspective** [2] - 18:2, 70:15

**Perspective** [10] - 62:16, 63:6, 68:20, 68:24, 69:6, 71:1, 71:7, 92:24, 93:13, 105:8

**pertains** [1] - 130:6

**PETER** [2] - 1:4, 2:2

**Peter** [78] - 22:11, 25:6, 25:10, 30:14, 58:11, 58:14, 58:15, 58:16, 58:19, 60:16, 62:13, 62:16, 63:2, 63:4, 63:18, 64:9, 65:3, 68:16, 68:24, 69:3, 69:14, 70:1, 70:8, 70:14, 71:13, 71:16, 71:18, 71:23, 72:7, 72:12, 72:18, 73:12, 73:21, 74:8, 74:14, 74:15, 75:9, 75:17, 75:20, 76:6, 76:10, 76:20, 76:24, 77:9, 77:13, 78:3, 78:21, 79:6, 80:4, 80:5, 80:6, 80:10, 80:11, 80:20, 80:24, 81:5, 81:11, 82:2, 82:6, 83:6, 83:13, 83:16, 83:19, 84:1, 84:3, 84:11, 84:24, 85:13, 85:15, 86:18, 86:25, 87:11, 87:12, 89:14, 118:12

**Peter's** [3] - 58:25, 75:8, 76:8

**phases** [1] - 13:17

**Philadelphia** [1] - 37:25

**phone** [2] - 55:22, 63:9

**photograph** [1] - 45:22

**phrase** [3] - 49:24, 97:2, 119:15

**physically** [4] - 115:15, 123:12, 124:18, 125:6

**pick** [1] - 76:16

**picture** [1] - 123:2

**piece** [1] - 94:17

**pieces** [1] - 66:23

**Pisano** [1] - 28:9

**PISANO** [1] - 1:13

**pitch** [1] - 80:7

**place** [3] - 2, 28:4, 35:13, 38:6, 40:12, 44:6, 56:22, 57:7, 57:16, 62:15, 67:4, 72:22, 73:3, 73:13, 79:15, 82:5, 89:2, 89:9, 92:9, 109:19, 110:10, 110:15, 129:2

**placed** [2] - 122:22, 122:25

**placeholder** [1] - 81:15

**plain** [2] - 99:13

**plaintiff** [20] - 6:4, 6:8, 7:13, 10:5, 25:7, 25:15, 30:15, 30:16, 39:1, 39:15, 39:23, 47:12, 48:18, 49:7, 57:1, 82:9, 85:7, 85:25, 88:4, 89:14

**Plaintiff** [2] - 1:5, 1:18

**plaintiff's** [7] - 9:18, 48:22, 49:10, 56:12, 110:20, 111:6, 113:14

**planned** [2] - 75:2, 104:3

**planning** [2] - 104:1, 104:2

**plans** [1] - 103:12

**play** [1] - 20:11

**pled** [2] - 20:4, 38:22

**plenty** [1] - 55:10

**Pogio** [6] - 69:13, 69:21, 69:22, 70:2, 107:6, 107:17

**point** [20] - 5:18, 12:25, 13:22, 14:25, 15:6, 15:17, 16:3, 21:21, 68:19, 69:8, 69:19, 72:8, 75:10, 87:1, 96:3, 101:21, 104:4, 105:6, 107:20, 125:25

**policy** [1] - 14:2

**Polish** [2] - 122:7, 122:9

**Polk** [1] - 93:17

**poor** [1] - 105:23

**portion** [4] - 12:1, 38:16, 70:10, 130:5

**portions** [1] - 4:3

**position** [9] - 22:6, 23:6, 26:1, 49:13, 50:18, 102:15, 122:11, 122:12, 126:8

**positions** [7] - 26:5, 115:6, 115:7, 122:6, 122:11, 123:2, 123:3

**possess** [1] - 50:20

**possessed** [1] - 48:23

**possession** [2] - 8:13, 39:24, 39:25

**possible** [3] - 39:10, 54:22, 109:11

**potential** [2] - 14:20, 17:11

**potentially** [1] - 81:16

**PowerPoints** [1] - 18:25

**precise** [1] - 64:17

**precluded** [4] - 4:6, 4:10, 4:22, 8:24

**precludes** [1] - 4:4

**preconceived** [1] - 44:17

**predict** [3] - 33:15, 79:22, 82:17

**predicted** [1] - 130:1

**predictions** [1] - 66:11

**prefer** [1] - 54:14

**prefix** [2] - 100:4, 127:23

**prefixes** [6] - 62:1, 62:10, 65:6, 67:9, 68:8, 96:3

**prejudice** [4] - 7:18, 13:7, 24:21, 26:7

**prejudiced** [1] - 24:19

**prejudicial** [1] - 16:16

**preliminary** [10] - 3:6, 19:2, 34:9, 35:10, 37:7, 40:22, 47:7, 48:11, 48:16, 56:24

**Preliminary** [1] - 34:15

**premarked** [1] - 110:20

**preparation** [1] - 119:10

**prepare** [1] - 70:21

**prepared** [8] - 7:20, 11:17, 15:23, 27:23, 48:19, 64:9, 66:2, 100:17

**preparing** [2] - 75:25, 124:3

**preponderance** [7] - 25:17, 25:19, 51:9, 51:14, 52:5, 52:9, 52:14

**presence** [3] - 2, 28:4, 35:13, 38:7, 40:12, 56:23, 57:7, 57:16, 89:3, 89:9, 109:20, 110:10, 110:15, 129:3

**present** [3] - 6:15, 6:17, 95:25

**presented** [2] - 69:18, 95:3, 98:13

**presents** [1] - 30:23

**preside** [1] - 42:1

**president** [1] - 83:8

**presiding** [3] - 28:10, 41:8, 41:9

**pretrial** [6] - 4:3, 4:5, 4:8, 5:23, 10:7, 20:5

**pretty** [5] - 7:17, 47:5, 61:2, 116:22, 130:2

**prevents** [1] - 25:12

**primarily** [1] - 74:24

**principal** [1] - 47:22

**print** [2] - 71:14, 94:16

**printed** [6] - 70:10, 71:16, 107:15, 108:22, 110:23, 113:8

**printing** [2] - 104:11, 125:23

**printout** [4] - 104:9, 105:5, 109:8, 118:3

**prints** [1] - 104:19

**privacy** [1] - 97:9

**privilege** [1] - 58:8

**probative** [4] - 13:20, 14:13, 16:11, 16:18

**problem** [6] - 14:23, 18:4, 20:6, 79:3, 101:19, 107:22

**problems** [6] - 37:12, 55:12, 55:21, 55:23, 71:8, 105:24

**proceed** [1] - 57:21

**PROCEEDINGS** [1] - 1:5

**proceedings** [1] - 1:23

**process** [23] - 22:20, 29:17, 29:19, 29:21, 35:20, 43:10, 44:19, 60:3, 60:6, 60:10, 61:4, 64:25, 65:17, 65:18, 68:14, 91:7, 93:15, 103:25, 106:6, 114:15, 116:5, 117:2

**processes** [3] - 59:11, 67:24, 73:18

**processing** [2] - 69:1, 125:19

**processor** [1] - 64:5

**processors** [1] - 99:11

**produce** [2] - 10:20, 51:15

**product** [39] - 60:15, 60:16, 60:19, 63:13, 63:16, 63:21, 65:11, 66:8, 66:13, 66:15, 66:20, 68:1, 69:19, 69:20, 70:3, 72:2, 72:8, 72:9, 72:14, 72:17, 73:1, 73:14, 74:3, 75:16, 76:15, 76:18, 76:19, 77:1, 77:6, 77:14, 80:20, 81:6, 81:12, 81:24, 84:16, 87:13, 87:17

**products** [1] - 106:9

**profession** [1] - 59:16

**professional** [1] - 126:19

**proffer** [1] - 7:17

**profile** [2] - 93:19, 94:5

**program** [80] - 10:5, 31:3, 48:3, 64:9, 64:10, 64:23, 65:3, 66:10, 66:25, 68:4, 69:18, 70:22, 73:25, 74:9, 74:22, 75:9, 76:24, 80:18, 82:11, 82:12, 88:11, 94:14, 99:16, 99:23, 99:25, 100:2, 102:14, 104:7, 104:8, 104:9, 104:10, 104:14, 104:16, 104:18, 104:24, 104:25, 105:7, 106:15, 115:3, 115:19, 116:1, 116:2, 116:5, 116:6, 116:8, 116:12, 116:14, 116:15, 118:1, 118:4, 118:12, 118:14, 118:17, 118:22, 120:15, 120:20, 122:20, 122:22, 122:24, 123:8, 123:11, 123:12, 123:21, 123:24, 124:11, 125:17, 125:19, 126:8, 126:13,

126:16, 126:19, 127:4, 127:12, 127:13, 127:23

**programmer** [8] - 4:12, 4:14, 4:15, 4:17, 83:9, 88:10, 90:17, 124:13

**programmers** [4] - 4:19, 9:13, 88:10, 126:20

**programming** [6] - 78:10, 82:19, 82:20, 121:7, 122:3, 125:2

**programs** [113] - 5:9, 9:12, 9:14, 10:2, 10:3, 10:4, 21:15, 25:25, 31:4, 31:9, 31:19, 39:16, 39:24, 47:18, 48:5, 49:23, 50:2, 50:3, 50:4, 50:8, 50:13, 50:16, 50:20, 50:25, 51:2, 52:8, 53:6, 58:21, 62:21, 63:18, 65:13, 65:14, 65:17, 65:18, 65:23, 68:17, 68:18, 70:12, 71:15, 71:17, 71:19, 72:21, 75:8, 75:24, 76:3, 76:8, 76:13, 76:24, 77:7, 80:10, 80:14, 81:5, 81:22, 81:23, 82:4, 82:6, 82:7, 82:8, 82:9, 82:10, 82:18, 82:21, 82:22, 83:4, 84:10, 84:16, 84:21, 85:1, 85:6, 85:7, 85:9, 85:12, 87:15, 87:16, 88:5, 88:7, 88:8, 88:12, 88:15, 88:19, 91:4, 91:6, 93:18, 94:10, 94:13, 99:9, 99:20, 100:8, 100:10, 100:14, 101:18, 101:20, 101:23, 101:25, 102:2, 102:3, 102:11, 105:19, 106:12, 108:23, 114:4, 116:3, 116:6, 119:4, 119:8, 124:3, 128:9, 128:12

**progress** [1] - 35:7

**project** [2] - 63:4, 69:9

**promise** [1] - 46:12

**promised** [1] - 72:2

**promote** [1] - 58:17

**promoted** [1] - 58:14

**prompt** [1] - 3:5

**proof** [20] - 23:21,

23:23, 25:16, 45:19, 46:1, 46:4, 51:7, 51:8, 51:10, 51:13, 51:15, 51:20, 51:23, 51:24, 52:1, 52:4, 52:5, 52:8, 52:12

**proper** [5] - 101:11, 101:13, 123:22, 124:1, 124:14

**properly** [2] - 20:18, 43:15

**property** [7] - 39:15, 48:7, 50:4, 84:10, 87:8, 87:19, 88:18

**proposal** [1] - 69:7

**proposing** [1] - 103:18

**proposition** [1] - 13:1

**protect** [1] - 108:24

**protected** [2] - 70:16, 77:2

**Protestant** [1] - 60:13

**proud** [1] - 29:8

**prove** [2] - 24:3, 24:4

**proved** [1] - 100:6

**proves** [1] - 45:22

**provide** [5] - 8:19, 22:20, 22:21, 94:4, 126:12

**provided** [1] - 112:15

**provider** [1] - 70:5

**provides** [2] - 8:7, 59:18

**province** [2] - 20:7, 42:5

**proving** [1] - 24:9

**provision** [2] - 8:23, 16:3

**provisions** [5] - 11:23, 13:11, 15:16, 15:17, 15:18

**pry** [1] - 30:5

**publications** [1] - 12:14

**publish** [1] - 129:7

**purchased** [1] - 18:16

**purely** [1] - 102:25

**purported** [1] - 76:7

**purpose** [8] - 5:22, 11:17, 72:13, 93:18, 103:7, 118:4, 118:6, 120:21

**purposes** [1] - 97:10

**Pursuant** [1] - 1:21

**push** [1] - 69:1

**pushed** [1] - 93:5

**put** [33] - 12:22, 14:1, 23:14, 26:14, 26:23, 26:25, 27:3, 43:6, 43:11, 43:24, 51:18,

53:10, 66:16, 72:14, 76:25, 82:5, 86:12, 91:25, 94:10, 95:11, 99:14, 100:13, 106:13, 112:13, 120:2, 122:12, 122:16, 123:4, 124:2, 124:4, 124:14

**puts** [1] - 79:11

**putting** [2] - 79:25, 121:19

### Q

**quantum** [1] - 74:5

**questionnaire** [2] - 26:14, 33:21

**questionnaires** [1] - 29:17

**questions** [11] - 26:16, 26:17, 27:3, 33:21, 33:22, 33:25, 42:23, 43:3, 56:3, 56:18, 59:6

**quickly** [2] - 81:19, 109:11

**quietly** [1] - 98:25

**quite** [9] - 76:23, 91:9, 91:24, 109:6, 110:1, 115:5, 116:10, 117:19

### R

**race** [5] - 60:2, 100:22, 121:23, 122:12, 127:8

**rage** [1] - 96:8

**raise** [1] - 43:17

**raised** [2] - 49:1, 49:4

**ran** [2] - 73:13, 116:6

**ranks** [2] - 36:21, 57:19

**Raskin** [12] - 12:5, 32:12, 32:14, 69:3, 80:7, 80:8, 86:10, 86:11, 93:4, 95:7, 103:16, 107:21

**Raskin's** [6] - 69:9, 70:16, 105:25, 106:2, 106:5, 108:21

**rates** [1] - 61:9

**rather** [4] - 28:20, 45:2, 54:16, 113:17

**raw** [1] - 124:21

**reaching** [2] - 27:15, 27:17

**read** [13] - 34:14, 34:15, 40:7, 44:23,

63:9, 64:4, 64:8, 91:5, 91:6, 120:2, 120:3, 127:8

**readable** [3] - 120:22, 121:4, 121:19

**readers** [1] - 94:12

**reading** [5] - 5:18, 45:5, 102:21, 121:14, 121:19

**reads** [1] - 121:15

**ready** [7] - 3:5, 56:9, 57:9, 57:12, 57:13, 57:21, 128:23

**real** [3] - 97:18, 98:23, 107:22

**realize** [1] - 80:19

**realized** [1] - 102:22

**really** [20] - 5:25, 14:7, 20:11, 23:13, 26:9, 55:14, 64:21, 69:1, 70:16, 74:4, 75:4, 95:25, 97:9, 98:4, 98:22, 103:9, 104:14, 109:2, 116:2

**reason** [5] - 8:2, 27:4, 33:6, 33:7, 100:13

**reasonable** [5] - 49:12, 50:17, 51:11, 78:7, 87:20

**reasonably** [1] - 52:16

**rebut** [1] - 7:14

**rebuttal** [7] - 6:3, 6:22, 7:2, 7:12, 7:13, 7:15, 8:5

**receipt** [1] - 56:14

**receive** [2] - 56:20, 72:3

**received** [3] - 18:8, 42:17, 78:12

**recess** [1] - 57:5

**Recess** [4] - 28:3, 35:4, 89:5, 110:9

**recognize** [9] - 81:19, 110:22, 111:1, 111:2, 111:7, 111:10, 113:4, 113:23, 117:24

**recognized** [1] - 69:16

**recognizing** [1] - 81:15

**recommended** [1] - 69:22

**record** [29] - 1:22, 6:24, 40:9, 45:8, 45:12, 64:12, 64:13, 64:24, 65:2, 65:4, 65:5, 65:19, 66:18, 66:21, 100:12, 101:11, 115:7, 118:15, 120:7,

120:9, 120:23, 121:21, 121:23, 122:21, 122:23, 122:25, 124:10

**records** [15] - 93:19, 94:14, 94:15, 95:8, 100:10, 100:11, 104:19, 104:20, 105:3, 114:25, 118:6, 121:1, 121:5, 123:22

**recovering** [1] - 25:13

**recovery** [1] - 51:4

**redundant** [2] - 11:20, 13:5

**refer** [3] - 66:14, 87:18, 88:3

**reference** [4] - 24:16, 100:2, 127:16, 127:22

**referred** [3] - 32:17, 49:23, 88:2

**referring** [3] - 11:20, 25:3, 66:15

**refers** [3] - 24:15, 83:23, 87:7

**refine** [1] - 80:2

**refinements** [1] - 74:10

**reflect** [1] - 75:12

**refrigerator** [1] - 55:17

**refused** [1] - 107:24

**regard** [1] - 30:8

**regarding** [1] - 50:20

**register** [2] - 23:5, 70:8

**registered** [5] - 25:4, 59:1, 71:17, 75:8, 87:10

**registering** [1] - 71:18

**registrar** [1] - 112:20

**registration** [19] - 11:13, 11:14, 11:19, 22:16, 22:20, 22:21, 23:9, 25:1, 70:18, 71:13, 71:16, 81:2, 86:21, 86:23, 111:4, 111:16, 112:16, 112:18, 113:6

**registrations** [1] - 23:1, 23:6, 23:7, 25:9, 47:14

**Reinken** [3] - 4:14, 4:19, 10:7

**reiterates** [1] - 84:24

**rejected** [1] - 75:13

**related** [1] - 90:14

**relationship** [3] - 58:7, 75:2, 91:17

relatively [1] - 74:6
relax [1] - 36:19
release [1] - 128:18
relevance [3] - 9:2, 9:6, 9:15
relevant [5] - 5:5, 5:25, 15:18, 17:8, 17:9
reliable [1] - 98:7
relied [1] - 10:12
religion [8] - 60:2, 60:12, 100:22, 104:21, 121:23, 122:11, 122:12, 127:7
remedies [2] - 21:1, 22:21
remedy [1] - 7:23
remember [8] - 92:4, 92:13, 93:25, 94:25, 95:9, 102:1, 108:19, 112:19
rename [1] - 106:21
rent [1] - 97:16
rental [2] - 97:12, 97:24
rented [1] - 93:16
reorganize [1] - 106:16
rephrase [1] - 128:8
replevin [9] - 19:24, 20:10, 21:15, 38:16, 39:14, 39:25, 49:24, 50:7, 88:2
report [2] - 10:11, 104:19
reporter [1] - 32:24
Reporter [1] - 1:25
reports [3] - 10:20, 44:24, 86:9
represent [4] - 5:20, 12:13, 33:17, 58:8, 87:5
representation [1] - 68:3
represented [3] - 31:23, 32:4, 74:5
representing [2] - 29:21, 43:12
request [3] - 95:3, 120:6, 129:24
require [1] - 54:19
required [5] - 31:12, 65:18, 94:15, 102:24, 124:13
requires [2] - 63:16, 78:6
research [25] - 54:2, 63:7, 63:9, 63:10, 63:20, 64:1, 64:13,

68:18, 69:11, 70:12, 72:20, 75:16, 75:23, 76:2, 76:17, 77:7, 80:3, 99:1, 102:21, 104:12, 106:11, 107:17, 122:7, 122:9
Research [6] - 12:6, 69:15, 73:5, 73:9, 91:11
researched [2] - 79:25, 102:17
reseller [1] - 93:16
reserve [1] - 6:2
reside [1] - 89:21
resigns [2] - 81:20, 82:25
resold [1] - 93:14
resolutions [1] - 27:21
resolve [3] - 3:6, 15:20, 42:1
resolved [2] - 3:19, 27:14
respected [1] - 107:14
respective [2] - 41:7, 43:12
respond [1] - 110:7
responded [1] - 29:1
response [3] - 38:11, 38:17, 108:7
responsibilities [1] - 90:20
responsibility [2] - 41:14, 42:1
rest [3] - 57:3, 109:22, 109:25
result [5] - 69:7, 85:4, 85:10, 85:17, 127:13
resulted [1] - 17:5
retained [3] - 6:9, 85:5, 85:6
retire [1] - 52:25
retrieved [1] - 115:24
return [17] - 21:14, 25:25, 31:4, 31:9, 47:20, 48:3, 48:4, 48:7, 49:22, 50:7, 50:12, 50:16, 50:24, 51:2, 52:8, 126:2, 126:6
returning [2] - 125:23, 126:1
revenue [1] - 74:24
reverse [1] - 8:2
revolution [1] - 98:12
rewarded [1] - 29:12
rights [3] - 31:18, 50:6, 50:19
rise [2] - 28:6, 35:3, 40:11, 41:5, 56:21, 57:15, 89:1, 89:6,

89:8, 109:18, 110:14, 129:1
road [2] - 55:8, 55:11
Robinson [1] - 46:7
roles [1] - 41:7
room [10] - 29:10, 35:1, 37:4, 38:4, 55:16, 56:19, 62:15, 88:25, 95:20
rope [1] - 58:13
routine [1] - 40:15
row [2] - 27:2, 36:22
royalties [2] - 81:7, 108:18
rubber [1] - 112:13
Rule [17] - 5:2, 6:19, 8:5, 8:7, 8:16, 8:18, 8:21, 10:15, 13:24, 14:2, 14:4, 14:17, 14:18, 14:21, 14:23, 14:25
rule [5] - 8:19, 41:11, 41:15, 96:9, 102:8
rule-based [1] - 96:9
ruled [1] - 5:24
rules [14] - 8:23, 10:19, 27:11, 41:10, 43:16, 62:23, 64:2, 65:5, 66:18, 76:13, 100:3, 100:4, 117:1, 127:23
ruling [2] - 43:21, 43:22
run [1] - 37:9, 53:21, 70:20, 91:7, 94:13, 100:5, 106:14, 116:9, 117:3, 127:14
running [2] - 83:1, 106:12
runs [1] - 105:20

**S**

s/Joanne [1] - 1:24
sacrifice [3] - 29:5, 29:13, 36:2
safely [1] - 128:19
safety [1] - 126:20
sale [2] - 18:8, 97:12
salesperson [2] - 94:7, 107:13
sat [4] - 61:14, 62:14, 69:5, 102:13
satisfied [1] - 36:9
satisfy [1] - 94:9
satisfying [1] - 46:22
saw [4] - 10:11, 69:23, 111:14, 111:19
scales [5] - 51:19,

51:21, 51:22, 51:25
schedule [5] - 33:16, 54:21, 55:9, 56:17, 128:23
scheduling [1] - 37:12
school [1] - 78:18
science [1] - 90:8
scope [3] - 10:12, 14:4, 73:19
Scott [1] - 61:7
Scottish [3] - 60:3, 60:12, 67:5
scratch [2] - 127:10, 127:11
screen [6] - 32:3, 36:24, 40:19, 114:20, 125:3
SD [1] - 123:17
se [2] - 19:21, 97:11
Sea [2] - 37:21, 37:22
search [3] - 101:14, 101:15, 121:13
searching [1] - 120:8
seat [5] - 28:8, 35:5, 35:16, 40:16, 57:19
seats [2] - 40:14, 110:17
second [26] - 5:15, 11:22, 23:1, 25:17, 33:22, 36:22, 50:4, 61:25, 71:7, 71:12, 72:8, 74:20, 76:4, 77:4, 82:23, 84:23, 86:23, 88:1, 100:15, 113:5, 115:2, 117:14, 118:9, 120:16, 126:5
secondarily [1] - 5:4
secondly [2] - 33:7, 48:21, 52:7
secretary [4] - 83:8, 108:14, 108:15, 108:16
section [11] - 122:18, 122:19, 122:21, 123:16, 123:21, 124:9, 125:12, 125:13, 125:16, 125:24, 126:15
Section [1] - 1:21
sections [1] - 124:6
security [1] - 32:25
see [51] - 3:6, 4:6, 4:15, 11:23, 14:5, 18:6, 36:12, 36:23, 40:18, 40:20, 44:20, 46:18, 49:17, 55:16, 57:3, 63:19, 63:21, 67:13, 67:19, 68:4, 68:10, 73:19, 76:23,

77:4, 80:8, 80:17, 80:19, 83:23, 86:3, 86:16, 88:11, 95:12, 100:13, 102:1, 102:3, 105:16, 111:22, 112:5, 112:21, 114:17, 115:5, 115:6, 118:5, 122:3, 123:1, 123:17, 125:3, 126:13, 126:25, 128:20, 130:13
seeing [2] - 41:9, 112:20
seeking [3] - 49:5, 50:11, 88:4
seem [2] - 15:16, 20:24
sees [1] - 46:9
segregate [1] - 17:21
segregated [1] - 17:25
select [6] - 30:2, 93:18, 94:14, 94:15, 95:8, 118:6
selected [2] - 29:7, 95:6
selecting [2] - 29:23, 35:24
selection [6] - 29:16, 29:19, 29:21, 33:4, 34:3, 35:20
selections [1] - 98:1
self [1] - 90:13
self-employed [1] - 90:13
sell [5] - 69:19, 70:2, 72:16, 79:8, 80:19, 83:5, 94:5, 97:10, 97:20
selling [6] - 81:21, 83:1, 83:2, 85:14, 96:24, 106:9
sells [1] - 81:6
send [4] - 35:9, 59:10, 109:10, 126:7
sending [1] - 109:7
sends [1] - 67:3
sense [6] - 28:16, 44:13, 46:3, 46:14, 71:19, 129:10
sent [4] - 3:13, 94:18, 111:3, 118:7
sentence [2] - 38:17, 39:9
separate [4] - 50:9, 74:21, 75:15, 100:8, 114:3, 121:22
separated [1] - 9:14
September [5] - 12:2, 84:5, 84:11, 85:2,

86:18
**sequence** [9] - 96:4,
101:12, 101:13,
106:17, 114:17,
114:18, 123:23,
123:25, 124:1
**sequential** [3] - 101:3,
101:4, 101:12
**Sequential** [1] -
119:23
**sequentially** [1] -
120:2
**series** [5] - 37:1, 62:7,
65:13, 65:18, 101:19
**serve** [2] - 27:4, 33:8
**Service** [2] - 12:4,
79:3
**service** [5] - 28:21,
58:2, 72:21, 72:25,
73:1
**Services** [1] - 71:10
**services** [1] - 59:18
**set** [10] - 47:25, 63:5,
63:12, 63:18, 83:16,
99:4, 102:15,
102:18, 109:13
**sets** [2] - 61:14, 66:3
**settle** [1] - 27:19
**settled** [3] - 16:9,
18:13, 73:23
**settlement** [27] - 3:21,
10:25, 11:1, 11:2,
11:5, 11:8, 11:10,
12:2, 13:1, 13:9,
13:16, 13:25, 14:1,
14:11, 14:20, 16:6,
16:17, 17:5, 17:15,
17:23, 27:17, 73:24,
85:4, 85:10, 86:17
**Settlement** [1] - 16:24
**settlements** [1] -
27:15
**settles** [1] - 85:3
**seven** [9] - 27:10,
34:25, 35:9, 35:21,
36:14, 41:2, 68:2,
102:5, 117:22
**several** [2] - 5:6, 111:8
**shape** [1] - 73:25
**share** [1] - 90:3
**shared** [1] - 9:19
**shares** [3] - 17:16,
18:9, 18:16
**sheer** [2] - 102:17,
102:19
**sheet** [1] - 99:17
**shift** [1] - 90:23
**short** [16] - 34:24,
54:16, 55:5, 55:6,
55:9, 55:14, 56:5,

65:16, 71:11, 71:12,
72:18, 74:6, 75:5,
109:24, 129:13
**shorthand** [3] -
122:23, 123:2,
123:18
**show** [34] - 9:18, 9:19,
21:23, 25:19, 43:1,
48:18, 49:10, 49:20,
50:3, 58:11, 63:5,
63:22, 63:25, 64:21,
65:1, 65:24, 66:4,
69:8, 69:25, 74:15,
74:23, 75:14, 76:9,
76:11, 76:14, 82:5,
86:3, 108:6, 110:19,
111:5, 113:18,
113:20, 127:5, 128:9
**showed** [2] - 82:7,
107:6, 107:15
**showing** [5] - 10:1,
50:17, 80:13, 80:14,
100:22
**shown** [1] - 111:8
**shows** [1] - 17:9
**shut** [1] - 108:4
**side** [4] - 7:19, 43:15,
77:24, 99:1
**sides** [2] - 19:19,
77:23
**sign** [3] - 63:5, 107:23,
107:24
**signature** [1] - 76:12
**signed** [5] - 12:7,
15:4, 15:8, 86:25,
88:20
**significant** [1] - 78:15
**signs** [1] - 86:18
**similar** [2] - 79:12,
99:25
**similarity** [1] - 9:7
**similarly** [2] - 43:5,
88:13
**simple** [14] - 5:12,
18:12, 45:7, 46:11,
53:8, 64:4, 68:11,
82:8, 82:10, 93:10,
112:22, 121:9,
125:13, 130:10
**simplicity** [2] - 79:5,
117:1
**simplify** [1] - 23:12
**simply** [12] - 1:12,
61:15, 82:5, 82:11,
94:4, 94:10, 104:18,
104:24, 110:7,
112:25, 117:2
**single** [1] - 82:13
**sink** [1] - 103:9
**sit** [6] - 29:7, 29:23,

30:2, 31:16, 62:4,
107:16
**site** [3] - 70:6, 70:21,
74:12
**sitting** [4] - 29:10,
30:11, 30:16, 30:18
**situation** [3] - 14:17,
71:22, 107:2
**six** [6] - 21:13, 48:8,
50:13, 50:21, 66:1,
88:14
**sixty** [1] - 89:20
**sixty-one** [1] - 89:20
**size** [6] - 93:24,
114:24, 115:7,
119:19, 122:6
**slavery** [1] - 67:18
**slide** [2] - 66:1, 68:2
**slow** [3] - 65:10,
78:24, 114:5
**small** [6] - 6:22, 90:20,
92:9
**smell** [1] - 87:25
**snack** [1] - 55:18
**society** [3] - 98:7, 98:8
**software** [8] - 22:9,
66:4, 70:17, 74:23,
74:25, 75:8, 76:21,
83:2
**sold** [5] - 63:14, 68:1,
72:2, 97:23, 99:6
**sole** [5] - 12:14, 15:14,
15:15, 16:12, 41:16
**solely** [1] - 8:15
**someone** [4] - 45:21,
53:4, 62:21
**sometime** [2] - 95:14,
130:2
**sometimes** [3] -
27:19, 108:13, 121:7
**somewhat** [2] - 110:1,
117:23
**somewhere** [2] -
28:20, 115:19
**son** [1] - 69:2
**soon** [3] - 51:3, 55:23,
128:23
**sorry** [6] - 3:14, 11:1,
38:15, 88:20, 98:24,
121:7
**sort** [19] - 3:20, 5:9,
7:22, 23:10, 68:6,
68:7, 107:20,
114:16, 114:22,
114:25, 115:4,
115:7, 116:15,
123:16, 123:17,
123:21, 123:22,
124:5
**sorted** [1] - 101:11

**sorting** [3] - 114:17,
114:24
**sorts** [4] - 59:16,
66:22, 68:8, 100:9
**sounds** [4] - 5:13,
26:11, 26:12, 45:25
**soup** [1] - 78:23
**source** [2] - 54:6, 82:1
**sources** [2] - 63:11,
97:15
**spaces** [1] - 100:21
**speaking** [2] - 30:24,
45:17
**speaks** [1] - 14:22
**special** [2] - 97:23,
99:16
**specific** [7] - 6:3,
45:13, 47:4, 88:8,
88:12, 121:16, 124:7
**specifically** [2] - 87:7,
87:18
**specifications** [1] -
80:16
**specify** [1] - 121:9
**specifying** [1] -
114:23
**spend** [1] - 65:23
**spot** [1] - 114:21
**spreadsheet** [1] -
98:14
**stable** [1] - 68:17
**staff** [1] - 28:13
**stage** [1] - 24:21
**stand** [3] - 33:24,
40:20, 43:23
**standard** [2] - 22:8,
100:11
**standing** [1] - 119:22
**stands** [1] - 66:12
**start** [13] - 27:24,
54:25, 64:24, 78:8,
83:1, 83:2, 97:6,
98:25, 102:5, 119:7,
128:15, 129:19,
129:24
**started** [11] - 35:2,
54:22, 55:2, 63:3,
74:6, 100:9, 101:21,
102:21, 107:12,
107:21, 120:21
**starting** [2] - 90:13,
128:11
**starts** [2] - 38:11, 67:9
**state** [2] - 17:15, 74:5
**statement** [6] - 19:2,
22:2, 22:15, 22:25,
23:8, 116:4
**statements** [8] -
14:19, 37:10, 42:22,
42:24, 42:25, 43:3,

56:10, 57:22
**STATES** [2] - 1:1, 1:13
**States** [6] - 1:21, 28:9,
30:24, 59:1, 67:18,
77:3
**status** [4] - 49:14,
94:2, 125:23
**statute** [24] - 7:5, 7:7,
20:12, 20:16, 21:8,
21:22, 23:24, 24:14,
25:22, 31:13, 38:18,
39:2, 48:1, 48:6,
49:4, 50:9, 50:15,
52:12, 77:9, 78:5,
85:22, 85:23, 88:13,
88:14
**statutory** [1] - 24:25
**stay** [3] - 13:17, 14:14,
35:21, 36:14, 36:22,
36:23, 40:14, 58:3
**stenographically** [1] -
1:22
**step** [4] - 40:7, 114:15,
115:2, 129:4
**steps** [4] - 66:4, 68:12,
68:16
**stick** [2] - 24:20, 129:5
**stickers** [1] - 94:16
**still** [6] - 36:19, 37:13,
47:5, 68:19, 73:24,
108:15
**stipulate** [1] - 42:13
**stipulation** [2] - 18:11,
18:12
**stockbrokers** [2] -
94:17, 97:18
**stop** [1] - 126:5
**storage** [6] - 115:22,
116:13, 119:20,
125:12, 125:13,
125:16
**store** [5] - 104:25,
105:1, 127:3, 127:6,
127:10
**stored** [3] - 112:8,
115:19, 115:20
**storing** [2] - 112:10,
120:4
**story** [10] - 10:17,
17:11, 46:6, 69:16,
73:3, 77:23, 77:25,
83:22, 83:23
**strategy** [1] - 43:13
**stream** [1] - 101:20
**stretch** [1] - 88:25
**strict** [1] - 92:10
**strike** [1] - 45:12
**stringent** [1] - 51:12
**strong** [1] - 89:12
**struck** [1] - 107:20

**stuck** [2] - 54:25, 94:16

**stuff** [8] - 59:10, 73:11, 94:13, 99:13, 99:16, 112:20, 115:5, 128:7

**stumbled** [1] - 101:19

**subindustry** [1] - 59:9

**subject** [5] - 25:8, 43:16, 45:4, 47:14, 85:17

**submit** [1] - 10:20

**submits** [4] - 81:1, 82:1, 82:2, 82:4

**submittal** [1] - 111:11

**submitted** [3] - 26:17, 26:21, 86:16

**submitting** [1] - 111:11

**subpart** [1] - 8:10

**subsequent** [1] - 22:10

**subsequently** [1] - 71:22

**subset** [1] - 68:5

**substance** [1] - 16:17

**successful** [2] - 74:4

**successfully** [2] - 105:20, 127:14

**sue** [1] - 83:17

**sued** [1] - 85:3

**sues** [5] - 83:12, 83:13, 84:1, 85:15, 85:17

**sufficient** [2] - 77:8, 106:13

**suffix** [4] - 68:8, 96:2, 100:4, 127:23

**suffixes** [3] - 62:1, 62:10, 67:8

**suggest** [4] - 42:25, 76:22, 77:7, 110:6

**suggested** [2] - 35:9, 108:21, 109:1

**suited** [1] - 75:22

**summaries** [1] - 5:23

**summary** [3] - 5:18, 47:5, 66:2

**summons** [1] - 29:1

**supervised** [1] - 90:23

**supplemental** [1] - 27:3

**support** [4] - 8:14, 8:24, 26:4, 102:2

**suppose** [1] - 122:15

**supposed** [3] - 53:20, 53:23, 74:14

**surprised** [2] - 104:17, 122:7

**surprises** [1] - 122:10

**surroundings** [1] - 37:5

**sustain** [2] - 7:22, 44:4

**swear** [1] - 40:25

**sworn** [2] - 41:2, 89:15

**System** [4] - 78:1, 78:9, 81:3, 82:13

**system** [97] - 9:14, 10:2, 10:5, 22:7, 59:6, 59:7, 62:9, 62:21, 63:5, 63:11, 64:21, 65:25, 66:4, 66:9, 66:10, 66:13, 66:14, 66:24, 67:15, 67:22, 68:1, 68:11, 68:17, 69:11, 70:11, 73:11, 73:17, 74:19, 74:21, 75:16, 75:17, 75:19, 75:20, 76:25, 78:2, 78:4, 79:12, 79:22, 79:24, 80:1, 80:2, 80:5, 80:10, 80:15, 80:18, 80:19, 80:21, 80:23, 80:24, 81:5, 81:16, 81:20, 81:22, 81:23, 81:25, 82:1, 82:5, 82:8, 82:15, 83:2, 83:3, 83:23, 84:14, 84:19, 84:20, 85:15, 87:6, 87:14, 91:5, 96:9, 96:11, 96:20, 99:6, 99:8, 99:22, 101:13, 102:14, 102:25, 103:1, 103:2, 104:4, 104:23, 105:14, 108:1, 108:18, 109:5, 111:12, 114:3, 114:8, 118:8, 121:11, 126:2, 126:7, 127:17

**Systems** [5] - 72:13, 81:13, 84:17

**systems** [10] - 68:15, 79:12, 79:13, 79:15, 82:22, 90:18, 91:3, 95:25, 96:6

## T

**table** [3] - 30:16, 30:18, 126:24

**tactics** [1] - 43:13

**tag** [1] - 61:7

**talks** [2] - 8:16, 8:21

**tangible** [1] - 8:12

**TAP** [39] - 12:5, 12:13, 16:25, 18:9, 72:13, 72:19, 73:9, 73:11, 73:21, 74:2, 76:9, 81:13, 83:1, 83:4, 83:7, 83:9, 83:11, 83:12, 83:15, 83:16, 83:17, 84:2, 84:5, 84:9, 84:12, 84:17, 84:25, 85:1, 88:18, 112:8

**tape** [2] - 73:12, 116:13

**tapes** [1] - 72:25

**target** [2] - 96:23, 97:19

**targeting** [1] - 96:24

**team** [3] - 15:7, 92:10, 94:9

**teams** [1] - 63:8

**TECH** [1] - 1:7

**Tech** [28] - 3:11, 17:10, 73:16, 74:2, 74:9, 74:23, 84:7, 84:8, 84:13, 84:18, 84:19, 84:20, 84:22, 84:25, 85:13, 85:15, 85:16, 85:18, 87:5, 87:6, 87:8, 87:12, 87:14, 87:15, 87:19, 88:17, 88:21

**Technical** [1] - 90:7

**technical** [2] - 54:19, 65:22

**technically** [1] - 92:9

**technician** [3] - 3:15, 32:2, 57:10

**techniques** [1] - 79:10

**Technologies** [11] - 4:13, 6:12, 6:16, 16:25, 30:19, 31:7, 32:4, 32:7, 32:12, 73:16, 84:8

**technology** [1] - 78:11

**Technology** [2] - 4:14, 4:15

**teeth** [1] - 103:9

**telephone** [2] - 76:17, 92:18

**teleprocessing** [1] - 115:18

**television** [1] - 45:5

**temporarily** [2] - 127:3, 127:12

**tension** [2] - 69:25, 70:7

**tentative** [1] - 118:2

**terminal** [2] - 115:17, 123:14

**terminals** [1] - 125:7

**terms** [11] - 4:3, 14:22, 16:9, 22:2, 34:9, 46:16, 48:13, 54:21, 66:6, 73:24, 129:6

**test** [5] - 65:4, 70:20, 87:25, 100:1, 105:20

**testified** [1] - 75:7

**testifies** [1] - 68:10

**testify** [7] - 5:11, 9:11, 11:18, 11:20, 13:21, 63:4

**testimony** [26] - 5:4, 5:8, 5:13, 5:14, 5:18, 5:25, 6:6, 6:7, 7:20, 10:1, 10:13, 10:19, 13:6, 33:16, 42:11, 42:16, 44:9, 45:20, 46:21, 49:19, 56:14, 64:11, 64:16, 82:21, 129:11

**testing** [3] - 99:25, 104:13, 122:9

**tests** [1] - 106:12

**text** [8] - 64:1, 64:4, 64:10, 99:5, 99:8, 99:13, 100:16, 120:22

**THE** [155] - 1:1, 1:2, 1:13, 3:4, 3:12, 3:16, 3:18, 4:1, 4:18, 4:21, 4:25, 5:13, 5:16, 6:5, 6:18, 6:21, 6:23, 8:1, 8:9, 8:16, 9:16, 9:23, 10:6, 10:14, 10:16, 11:1, 12:1, 12:4, 12:10, 12:17, 12:21, 12:23, 13:19, 13:23, 14:15, 15:13, 15:21, 16:4, 16:15, 16:21, 17:4, 17:8, 17:18, 18:11, 18:17, 18:19, 18:21, 19:5, 19:7, 19:15, 20:9, 20:15, 20:23, 21:1, 21:4, 21:9, 21:12, 21:19, 21:25, 23:12, 23:20, 23:23, 24:2, 24:8, 25:5, 26:8, 26:13, 26:22, 26:25, 27:8, 27:10, 28:2, 28:6, 28:7, 32:1, 32:16, 32:20, 34:4, 34:7, 34:13, 34:20, 34:23, 35:3, 35:5, 35:8, 35:12, 35:15, 36:19, 37:20, 37:22, 37:23, 37:24, 38:3, 38:12, 38:19, 39:9, 40:2, 40:5, 40:7, 40:10, 40:11, 40:14, 41:3, 56:21, 56:24, 57:3, 57:9, 57:12, 57:13, 57:14, 57:15, 57:18, 77:19, 88:23, 89:1, 89:4, 89:6, 89:7, 89:8, 89:11, 109:15, 109:18, 109:21, 110:3, 110:8, 110:12, 110:14, 110:17, 113:11, 116:21, 116:22, 116:23, 117:5, 117:9, 117:10, 117:12, 117:15, 117:17, 117:20, 118:23, 119:1, 119:6, 122:15, 128:2, 128:5, 128:13, 128:17, 129:1, 129:4, 129:8, 129:14, 129:17, 129:21, 129:24, 130:12

**theirs** [1] - 81:10

**themselves** [4] - 53:13, 63:24, 72:15, 102:10

**therefore** [1] - 51:3

**they've** [3] - 28:14, 34:8, 73:25

**thinking** [5] - 16:4, 29:12, 45:7, 78:18, 129:24

**thinks** [4] - 46:7, 80:5, 80:8

**third** [1] - 39:20

**Thomas** [1] - 32:14

**thousands** [2] - 59:20, 62:25

**three** [27] - 12:8, 12:15, 21:6, 21:24, 26:16, 27:8, 27:9, 33:22, 34:16, 38:10, 48:2, 49:6, 49:11, 62:4, 67:10, 77:25, 78:5, 78:6, 85:21, 85:24, 85:25, 102:2, 102:3, 110:20, 118:18, 128:22

**three-letter** [1] - 67:10

**throughout** [2] - 70:23, 88:9

**Thursday** [4] - 36:19, 37:13, 37:15, 130:1

**tilt** [2] - 51:21, 51:25

**timely** [6] - 23:18, 24:10, 25:12, 25:21, 26:2, 52:15

**Tina** [116] - 3:10, 6:11, 10:1, 11:10, 11:11, 22:11, 25:9, 25:10, 30:18, 47:15, 58:12,

58:14, 58:17, 60:17, 61:20, 62:16, 68:25, 69:4, 69:5, 69:10, 69:14, 70:1, 70:8, 70:15, 71:14, 71:16, 71:17, 71:23, 72:2, 72:6, 72:12, 72:18, 73:21, 74:9, 74:17, 75:7, 75:21, 76:5, 76:12, 77:25, 78:8, 78:9, 79:7, 79:16, 79:20, 80:12, 80:13, 80:20, 81:7, 81:11, 81:20, 82:24, 83:3, 83:6, 83:16, 84:1, 84:3, 84:11, 85:4, 85:10, 85:16, 86:11, 86:19, 86:20, 86:23, 87:9, 87:14, 91:8, 91:10, 91:15, 92:12, 92:15, 93:5, 94:7, 94:23, 95:9, 95:15, 98:13, 99:1, 100:16, 101:21, 102:6, 102:17, 102:22, 103:5, 104:6, 105:10, 106:3, 106:9, 106:11, 106:13, 106:22, 107:14, 107:15, 107:16, 108:1, 108:8, 108:14, 108:15, 108:17, 108:21, 109:4, 109:6, 111:24, 111:25, 112:1, 112:2, 112:11, 112:17, 112:23, 112:25, 122:5

**TINA** [1] - 1:7

**Tina's** [13] - 67:25, 70:10, 79:24, 81:16, 82:15, 82:21, 84:15, 84:20, 100:1, 104:9

**tinkering** [1] - 106:11

**tip** [1] - 51:22

**Title** [1] - 1:21

**title** [4] - 90:21, 90:22, 92:4, 121:24

**today** [13] - 29:14, 36:2, 36:4, 36:7, 58:8, 59:2, 75:1, 84:20, 99:11, 110:2, 110:13, 120:12, 130:4

**together** [21] - 34:10, 35:9, 54:24, 59:12, 62:15, 63:4, 63:7, 65:15, 66:16, 72:15, 78:24, 79:11, 80:12,

84:6, 91:4, 91:20, 92:11, 97:13, 98:12, 104:1, 104:2

**Tom** [16] - 32:12, 69:2, 80:7, 80:8, 86:10, 86:11, 95:7, 103:15, 105:9, 107:21, 108:11, 108:17, 109:12

**tomorrow** [5] - 128:21, 128:22, 128:24, 130:2, 130:13

**took** [12] - 59:1, 64:10, 65:12, 70:9, 72:20, 72:21, 73:12, 94:9, 112:25, 120:25, 121:4

**top** [2] - 66:5, 67:23

**touch** [1] - 92:16, 114:20

**touches** [2] - 45:3, 54:1

**tracing** [1] - 126:21

**track** [1] - 120:1

**trades** [1] - 95:20

**traffic** [3] - 37:24, 55:1, 55:11

**training** [1] - 90:4

**transaction** [1] - 45:21

**transcribed** [1] - 34:3

**TRANSCRIPT** [1] - 1:5

**transcript** [1] - 1:22

**transfer** [1] - 76:7

**transferred** [2] - 83:12, 90:7

**translated** [1] - 74:11

**transparent** [1] - 106:22

**travel** [1] - 128:19

**travels** [1] - 45:4

**treasurer** [1] - 83:8

**treat** [1] - 98:23

**treated** [2] - 41:6, 41:17

**Trenton** [1] - 1:10

**trial** [16] - 6:1, 19:21, 27:10, 27:20, 27:23, 33:4, 33:10, 37:8, 40:24, 41:8, 41:14, 42:3, 43:9, 47:9, 48:9, 104:12

**Trial** [1] - 130:14

**TRIAL** [1] - 1:6

**tribal** [1] - 102:23

**tribes** [3] - 102:17, 102:20, 102:24

**tried** [4] - 17:21, 33:11, 41:10, 50:22

**tries** [2] - 53:13, 67:2

**trite** [1] - 46:12

**true** [4] - 10:14, 20:14, 46:5, 51:17

**trust** [5] - 19:12, 19:18, 20:11, 28:15, 58:24

**trusted** [3] - 58:23, 109:12, 112:23

**truth** [1] - 14:6

**try** [17] - 26:8, 29:6, 29:8, 29:9, 29:10, 34:1, 45:10, 53:25, 54:21, 54:23, 55:18, 70:2, 71:2, 72:16, 78:24, 79:13, 88:3

**trying** [8] - 10:23, 13:14, 21:4, 36:3, 36:7, 48:14, 72:9, 76:18

**Tuesday** [1] - 33:14

**Turkish** [2] - 60:3, 60:12

**turn** [3] - 113:16, 113:19, 120:17

**turned** [1] - 58:24

**turns** [1] - 53:22

**two** [45] - 3:19, 5:1, 11:4, 11:14, 12:15, 16:1, 17:13, 23:20, 25:8, 25:14, 29:3, 30:17, 34:15, 37:19, 37:23, 37:25, 45:17, 47:14, 58:7, 62:4, 63:3, 66:16, 67:10, 70:13, 70:24, 73:16, 73:18, 76:15, 77:5, 77:22, 78:3, 83:25, 84:1, 84:22, 93:24, 95:2, 95:19, 95:25, 98:20, 102:15, 103:25, 111:6, 111:15, 121:2, 122:11

**two-fold** [1] - 5:1

**two-letter** [1] - 67:10

**type** [16] - 59:24, 63:10, 66:8, 67:17, 69:11, 93:19, 94:2, 95:4, 95:5, 96:19, 96:22, 97:12, 99:8, 114:7, 125:8, 126:10

**types** [1] - 45:17

**typing** [5] - 64:2, 64:4, 64:10, 99:17, 100:17

22:7, 29:23, 74:11

**unacceptable** [1] - 18:10

**unanimous** [1] - 27:11

**uncoded** [1] - 104:9

**uncontroverted** [1] - 13:6

**under** [10] - 7:8, 13:18, 13:24, 14:25, 39:4, 49:5, 50:10, 59:2, 71:9, 75:8

**underlying** [1] - 38:16

**undermines** [1] - 15:14

**understood** [1] - 6:10

**unfortunately** [1] - 70:21

**Union** [1] - 90:7

**unique** [1] - 116:16

**unitary** [1] - 48:21

**UNITED** [2] - 1:1, 1:13

**United** [6] - 1:21, 28:9, 30:24, 59:1, 67:17, 77:3

**university** [1] - 61:1

**University** [1] - 90:5

**unless** [3] - 8:14, 13:8, 77:10

**untoward** [1] - 55:24

**up** [54] - 8:22, 16:2, 19:23, 21:2, 22:2, 27:12, 32:11, 32:19, 33:24, 34:2, 34:10, 38:13, 40:7, 46:19, 46:24, 52:13, 54:4, 57:19, 63:2, 63:5, 63:12, 67:23, 69:1, 78:3, 78:4, 80:6, 81:18, 83:1, 83:16, 84:2, 87:6, 87:14, 90:13, 92:15, 99:4, 100:8, 100:15, 102:15, 103:24, 104:18, 105:1, 107:6, 107:20, 108:4, 108:13, 113:9, 113:21, 114:3, 118:8, 120:16, 124:24, 124:25, 127:5

**update** [1] - 82:3

**upgraded** [1] - 119:21

**urge** [1] - 130:4

**usable** [2] - 22:8, 99:24

**utilize** [5] - 9:14, 10:3, 77:6, 79:12, 80:15

**utilizing** [1] - 80:1

---

# U

**Ultimately** [1] - 73:23

**ultimately** [4] - 20:7,

# V

**vacuum** [1] - 31:16

**valid** [1] - 77:9

**validity** [1] - 62:20

**value** [6] - 13:20, 14:13, 48:13, 76:17, 80:18, 80:19

**various** [1] - 13:17

**venture** [1] - 73:9

**verbal** [1] - 109:6

**verbally** [2] - 98:15, 98:16

**verified** [1] - 106:14

**version** [5] - 68:17, 114:2, 115:3, 115:4, 119:21

**versions** [1] - 74:11

**versus** [3] - 23:9, 82:12, 112:9

**vested** [2] - 84:25, 88:18

**vests** [1] - 84:9

**viability** [1] - 69:21

**vice** [1] - 83:8

**vice-president** [1] - 83:8

**video** [1] - 28:16

**view** [2] - 14:17, 24:12

**Vince** [2] - 3:15, 32:1

**Virtual** [1] - 119:22

**virtue** [1] - 84:12

**VM** [2] - 99:6, 106:20

**vocation** [1] - 90:15

**voice** [2] - 33:24, 34:2

**voir** [3] - 26:16, 26:18, 29:19

**vs** [1] - 1:6

**VSAM** [16] - 96:12, 99:22, 119:10, 119:15, 119:21, 120:1, 120:10, 120:23, 120:25, 121:13, 121:14, 123:23, 125:24, 126:2, 126:6, 126:7

**VSE** [1] - 114:9

# W

**wait** [1] - 5:17

**walk** [2] - 41:4, 85:11

**walked** [2] - 71:8, 72:5

**walking** [2] - 53:16, 108:2

**wandering** [1] - 78:14

**wants** [3] - 19:1, 80:7, 81:7

**waste** [1] - 96:21
**wasteful** [1] - 101:7
**wasting** [1] - 98:5
**water** [1] - 57:10
**ways** [3] - 28:24, 60:22, 60:23
**wealth** [1] - 44:12
**Wednesday** [1] - 130:14
**week** [3] - 33:12, 33:18, 36:18
**weekend** [1] - 36:20
**weekends** [1] - 68:22
**weeks** [1] - 29:3
**welcome** [1] - 36:25
**welcomed** [1] - 28:15
**white** [5] - 61:15, 65:9, 67:19, 67:21
**whole** [11] - 11:24, 13:15, 13:17, 22:11, 23:10, 48:21, 59:12, 62:2, 67:14, 118:7, 125:11
**wife** [1] - 58:20
**Wilhoit** [10] - 3:11, 4:10, 6:16, 6:18, 7:1, 7:6, 7:15, 8:24, 16:25, 32:6
**Wilhoit's** [2] - 6:5, 6:7
**wins** [1] - 20:23
**wise** [1] - 97:25
**withdraw** [3] - 15:23, 105:25, 124:2
**withdrawn** [3] - 75:18, 106:5, 118:13
**withheld** [1] - 50:5
**witness** [19] - 5:20, 6:19, 7:2, 7:6, 7:15, 7:16, 8:6, 40:18, 40:20, 43:6, 43:23, 43:24, 44:1, 44:2, 44:4, 44:9, 45:20, 89:13, 109:22
**WITNESS** [6] - 2:1, 110:8, 116:22, 117:9, 117:12, 117:17
**witness'** [2] - 33:15, 42:16
**witnesses** [25] - 3:23, 4:4, 4:7, 5:19, 6:3, 8:7, 9:1, 10:6, 10:8, 31:20, 32:8, 33:16, 36:24, 42:11, 46:18, 46:19, 46:20, 46:21, 46:22, 46:24, 49:19, 53:18, 129:14, 129:15, 129:22
**woman** [1] - 69:13
**word** [8] - 39:17,

49:25, 64:5, 67:11, 74:13, 77:12, 91:1, 99:11
**words** [4] - 31:13, 48:1, 106:18, 127:21
**workplace** [1] - 58:15
**works** [6] - 12:24, 47:17, 62:22, 74:22, 79:1, 79:6
**world** [1] - 58:18
**worried** [1] - 80:21
**worry** [4] - 37:20, 45:2, 49:25, 81:11
**worth** [1] - 34:22
**worthy** [1] - 98:11
**woulb** [1] - 32:11
**write** [13] - 18:3, 80:10, 90:9, 101:19, 101:25, 114:11, 115:12, 117:16, 118:14, 123:13, 125:6, 127:9, 127:11
**writing** [5] - 63:18, 70:17, 106:25, 116:11, 116:18
**written** [7] - 44:25, 75:20, 82:19, 98:18, 114:13, 116:1, 118:2
**wrongfully** [4] - 39:17, 39:19, 50:5, 50:14
**wrongly** [1] - 39:16
**wrote** [19] - 65:3, 65:16, 75:17, 75:19, 75:20, 76:24, 76:25, 94:10, 100:1, 101:18, 115:10, 115:15, 117:15, 120:15, 123:10, 128:1, 128:10, 128:12
**WS** [1] - 126:23

### Y

**year** [3] - 24:24, 50:2, 78:9
**years** [35] - 5:6, 5:10, 21:6, 21:13, 21:24, 48:2, 48:8, 49:6, 49:11, 50:13, 50:21, 58:9, 58:10, 70:24, 73:4, 74:8, 75:21, 78:6, 78:10, 78:14, 78:15, 85:24, 85:25, 87:16, 88:9, 88:15, 89:20, 90:6, 90:18, 91:9, 97:5, 98:4, 111:9, 111:15, 111:20

**yourself** [2] - 33:14, 124:23

### Z

**Zach** [2] - 3:11, 32:6
**zero** [2] - 106:8, 108:8
**zip** [2] - 60:11, 61:14
**zone** [1] - 36:13