# Exhibit 13

AGREEMENT made this 25th day of September, 2001 between Ethnic Technologies, LLC ("ET") a New Jersey Limited Liability Company having an address at 600 Huyler Street, South Hackensack, New Jersey 07606 and Edith Roman Associates, Inc. (hereinafter "MANAGER" a New York Corporation having an address at 1 Blue Hill Plaza, Pearl River, NY 10965-8556

WITNESSETH:

WHEREAS, ET has by means of extensive research and the expenditure of substantial sums of money developed know-how and skills relating to means of ascertaining the ethnic, religious, minority and un-assimilated backgrounds of individuals by reference to their first and last names and their addresses, and has developed the ability to recognize and to produce lists of such names sorted by ethnic, religious, minority and un-acculturated background, which lists are of great value, inter alia, in the direct mail field, and

WHEREAS, these skills and know how are embodied in the computer process called E-TECH, which consists of a set of both computer programs and data files as follows:
- 1  Unique first name files, by ethnicity
- 2  Surname files, by ethnicity
- 3  Non unique first name files
- 4  A series of two (2) to five (5) character prefix rule files, by ethnicity
- 5  A series of three (3) to five (5) character suffix rule files, by ethnicity
- 6  A series of codes to attach to a name record and classify it's ethnic, religious, minority and language preference status
- 7  Geocentric reference tables
- 8  A series of computer programs that apply the above mentioned data groups to lists and databases, which can be supplied on magnetic media, and to which ET owns all rights, including copyrights; and

WHEREAS, MANAGER wishes ET to apply E-TECH to MANAGER's Managed Mailing Lists (hereinafter the "LISTS") in order to sort and output these LISTS by ethnic, religious, minority and language preference criteria enabling MANAGER to use the encoded LISTS in providing direct marketing products and services to its customers; and

WHEREAS, MANAGER acknowledges that ET's methods, criteria, knowledge and information as embodied in E-TECH are confidential, secret and the exclusive property of ET; and

WHEREAS, ET acknowledges that the LISTS are confidential, secret and the exclusive property of MANAGER's list owners.

NOW, THEREFORE, in consideration of the foregoing premises and the covenants and agreements hereinafter set forth, the parties agree as follows:

### 1.    PURPOSE:

The purpose of this Agreement between MANAGER and ET is to append the E-TECH Ethnic, Religious, Minority and Language Preference targeting system's data onto the LISTS for use as selection criteria, so that the LISTS may be used by MANAGER's direct marketing owners for their own marketing purposes and so that the LISTS may be rented to MANAGER's customers for direct marketing purposes. The E-TECH overlay will enable those who rent the LISTS to select names and addresses based on Probable Religion, Ethnic Group, Minority Group and/or Language Preference.

1



2.   **DELIVERIES AND INSTALLATION:**
A. MANAGER will provide the LISTS to ET on magnetic media, so that E-TECH can be applied to the LISTS. MANAGER warrants and represents that it owns the LISTS and has the legal right to transfer the LISTS to ET for the purposes listed herein.

B.   ET acknowledges that at all times the LISTS remains the property of MANAGER's list owners. ET further acknowledges that it shall process, copy or otherwise use the LISTS only in a manner specifically contemplated by this Agreement.

C. MANAGER shall furnish to ET updates of the LISTS as they become available.

3.   **ENCODING AND MAINTENANCE OF THE LISTS:**
A.   ET agrees to apply E-TECH to the LISTS at ET's on site computer facility, producing an E-TECH targeted version of the LISTS. ET represents and warrants that it owns E-TECH and has legal right to apply E-TECH to the LISTS. LISTS will be maintained at MANAGERS in house computer facility and all orders shall be fulfilled by MANAGER.

4.   **PERMITTED USES OF E-TECH AND THE ENCODED LISTS:**
A.   THE LISTS
ET will become a reseller of the E-TECH encoded LISTS with a thirty percent (30%) value added reseller discount **from base rate, excluding selection charges.**

B.   SCREENING LISTS
ET agrees to use E-TECH to do both positive screens and negative screens from outside list rentals for MANAGER's own direct marketing customers usage only. A "positive screen" is the process whereby E-TECH is used to select names from lists. A "negative screen" is the process whereby E-TECH is used to eliminate names from mailing lists.

C.   RIGHT OF REFUSAL
MANAGER reserves the right to refuse access to the LISTS. All prospective clients of ET who wish to access the LISTS must have MANAGER's prior approval; such approval shall not be unreasonably withheld.

5.   **PROTECTIONS AND PROHIBITIONS:**
A.   MANAGER guarantees that it is not in the business of ethnic, religious, minority and language preference coding or segmentation of lists except as specifically stated in this Agreement, and agrees not to enter the business of ethnic or religious coding or segmentation for a period of sixty (60) months after the expiration of this Agreement or any renewals thereof, written or oral.

B.   ET acknowledges that at all times the LISTS remain the property of 's list owners and agrees not to use the LISTS in any way other than contemplated by this Agreement.

C. MANAGER recognizes that E-TECH is protected under the copyright laws of the United States and agrees that it will not utilize any of the materials supplied to it by ET hereunder for any purposes not specifically herein authorized and, without limitation, will not transfer, duplicate, copy or in any way in whole or in part reproduce or attempt to recreate or analyze the E-TECH system.

2

6.    PRICES AND COMPENSATION:
   A.   LIST RENTALS
   ET shall receive from MANAGER a royalty of $4 per thousand names from all list rental sales or uses utilizing ethnic, religious, minority or language preference selection criteria even though other selection criteria may have been run in conjunction with the ethnic, religious, minority or language preference selections.

   B.   SCREENING LISTS
   ET shall receive from MANAGER a royalty of $4 per thousand names from all screening of lists. This includes the use of the ethnic, religious, and minority or language preference selection criteria as either negative or positive screens of lists.

        1.   When E-TECH is used to eliminate names from a list, it is being used as a negative screen and ET shall receive its royalty based upon the number of records eliminated.

        2.   When E-TECH is used to select names from a list, it is being used as a positive screen and ET shall receive its royalty based upon the number of records selected.

   C.   ET RENTALS OF THE LISTS
        1) When ET resells the E-TECH enhanced LISTS, ET will not pay the ethnic, religious, minority or language preference selection charge.

   **2) When ET resells the E-TECH enhanced LISTS, ET will receive a thirty (30) percent reseller's commission on the base price of the LISTS, excluding selection charges.**

        3) ET hereby agrees that MANAGER will set all retail pricing for LISTS at its sole discretion. ET further agrees that it shall charge the prices stipulated by MANAGER for the LISTS without change and shall not undercut MANAGERS price.

   D.   MANAGER shall provide to ET two monthly reports 1) a current payment report; 2) a detailed monthly usage report for the previous month showing all E-TECH related sales, collections and moneys due to ET.

   **1) Payments to E-TECH**

   **Consistent with industry standards, ERA shall be under no obligation to remit to E-TECH any fees due E-TECH for the rental of any List unless and until ERA has received payment from the third-party renter of such list or its agent. If a third-party renter pays ERA on or before the end of any month, then ERA shall pay E-TECH the fees due E-TECH for such rental by the 15th of the next month.**

7.    DATA / SERVICES WARRANTY:
   Each party warrants to the other that it has all rights to perform the services and deliver E-TECH and the LISTS as contemplated by this Agreement.

8.    DEFAULT:

A.    In the event MANAGER: (I) breaches any term, covenant or representation in this Agreement with cause; or (ii) becomes insolvent, makes an assignment for the benefit of creditors, calls a meeting of its creditors to obtain any greater financial accommodation, suspends business or commences or has commenced against any case or proceeding under any provision of the Bankruptcy Code; then in addition to ET's rights and remedies provided by law and subject to the liability limitations set forth herein, ET may immediately terminate this Agreement.

B.    In the event ET: (I) breaches any term, covenant or representation in this Agreement with cause; or (ii) becomes insolvent, makes an assignment for the benefit of creditors, calls a meeting of its creditors to obtain any greater financial accommodation, suspends business or commences or has commenced against any case or proceeding under any provision of the Bankruptcy Code; then in addition to MANAGER's rights and remedies provided by law and subject to the liability limitations set forth herein, MANAGER may immediately terminate this Agreement.

C.    Both parties remedy of law for breach, with cause, of this Agreement may be inadequate and ET and MANAGER shall in addition to all other remedies available at law or in equity, may be entitled to injunctive relief. Injunctive relief can never exclude ET from conducting its regular business which is the sale of, encoding and managing of Ethnic, Religious, Minority and Language Preference lists not derived from MANAGER's LISTS data. Injunctive relief can never exclude MANAGER from conducting its regular business but may preclude any use of ET's data and coding derived from E-TECH.

D.    For purposes of this section, "with cause" means (I) a breach of any condition or representation by either party to this Agreement, (ii) notice to the breaching party in writing by the non-breaching party and (iii) the failure to cure said breach within 60 days of notice.

9.    ASSIGNMENT:

A.    MANAGER may not assign its rights or obligations hereunder without approval of ET. The change of beneficial or record owners of 50% or more of any class of outstanding capital stock, or the merger, consolidation or reorganization of MANAGER hereto   Agreement shall be considered as constituting an improper assignment hereof and shall give ET the option of terminating this Agreement.

B.    ET may not assign its rights or obligations hereunder without approval of MANAGER. The change of beneficial or record owners of 50% or more of any class of outstanding capital stock, or the merger, consolidation or reorganization of ET hereto shall be considered as constituting an improper assignment hereof and shall give MANAGER the option of terminating this Agreement.

10.    SALES PROMOTION FOR THE ENCODED LISTS AND LICENSES:

MANAGER may, at its option, develop promotional materials and advertising to promote the uses of the targeted LISTS and the E-TECH targeting system. ET may, at its option, develop promotional materials and advertising to promote the uses of the targeted LISTS. **Manager shall approve all advertising copy and materials issued by ET concerning the LISTS**

4

11.   CONFIDENTIALITY:

Each of the parties hereto agree and acknowledge that in the performance of their services pursuant to this Agreement, they will or may be provided access to certain confidential information of the other party, including, without limitation, codes, code sources, data bases, sales and marketing information, and other confidential or proprietary information or trade secrets that is either in existence as of the date of this Agreement or subsequently created. Each party, one to the other, acknowledges that the control and maintenance of the confidential information and restriction on each other's use of such information is essential to protecting the value of each of these assets. Each party therefore agrees it will not at any time divulge any confidential information to any person, entity or party, directly or indirectly, or utilize the information for their benefit, without the prior written consent of the party having rights to said confidential information, trade secrets or proprietary assets.

Names and addresses in the LISTS or database are defined herein as confidential.

These restrictions and obligations shall not apply to the disclosure of any confidential information to employees or agents of the acting party, to the extent that (i) such disclosure is necessary for the party to perform its obligations hereunder and (ii) such employee / agent agrees in writing to maintain said information as confidential; and (iii) any information is or becomes public knowledge without fault of the acting party or it's agents or employees. Upon termination of this Agreement, each party shall surrender all of the other's confidential information, trade secrets or proprietary assets.

These restriction and obligations shall not apply to the disclosure of coding data that is regularly included on list media that is delivered to letter shops, end users and service bureaus.

Each of the parties hereto agrees that all ad copy, solicitations and other communications used in connection with MANAGER's lists and the E-TECH data may credit and acknowledge each other. MANAGER may publish E-TECH promotional data, available selections, and benefits within its promotional materials. **Manager shall approve all advertising copy and materials issued by ET concerning the LISTS**

The provisions of this paragraph shall survive the termination of this Agreement. Both parties acknowledge and agree that irreparable damage can result in the event of breach of any of the provisions set forth in this paragraph and agree that upon failure to remedy any such breach after written notice thereof, the injured party shall be entitled to apply for and receive appropriate injunctive relief in the court of equity.

12.   INDEPENDENT CONTRACTORS:

MANAGER and ET agree that each is an independent contractor of the other and neither party shall represent to third parties that it is the agent or representative of the other, except as specifically provided in this Agreement.

13. **NOTICES:**

All notices required or permitted to be given under this Agreement shall be in writing and personally delivered or sent by certified or registered mail, return receipt requested, with postage fully prepaid to the parties at the addresses specified below, and shall be effective when received, if personally delivered, or when deposited properly addressed and postage prepaid in the U.S. Mail. Each party may change such address by written notice in accordance with this section.

| | |
|---|---|
| To MANAGER: | Edith Roman Associates, Inc.<br>Attn: Steven Roberts, President<br>1 Blue Hill Plaza<br>Pearl River, NY 10965-8556 |
| To ET: | Ethnic Technologies, LLC.<br>Attn: G Nelson or TJ Lindsay<br>600 Huyler Street<br>South Hackensack, NJ 07606 |
| With a copy to: | O. Gene Hurst, Esq.<br>1088 Raritan Road<br>Clark, NJ 07066 |
| With a copy to: | Ken Furry<br>Parker Chapin Jenkins<br>405 Lexington Avenue<br>New York, New York 10174 |

14. **TERMS AND TERMINATION:**

-9 The Initial Term of this Agreement shall commence on the execution of this Agreement (hereinafter the "COMMENCEMENT DATE") and shall continue for one (1) year. Thereafter, this Agreement shall automatically renew itself for successive one (1) year periods beginning on the anniversary of the COMMENCEMENT DATE; **provided, however, that this agreement will sooner terminate immediately in the event that MANAGER'S agreement with the list's owner terminates or is not renewed.**

B. Either party may terminate this Agreement at the end of the Initial Term or any Renewal Term subsequent thereto by providing the other party written notice thereof at least 60 days prior to the end of the Initial Term or then current Renewal Term, as applicable.

C. Not withstanding the term outlined in 14A., MANAGER may terminate this Agreement at anytime, on a list-by-list basis, as it applies to MANAGER's Agreements with the owner's of the LISTS.

D. **Upon Termination of this Agreement, MANAGER agrees to remove all encoding or segmentation from the LISTS that were derived from E-TECH and agrees to return to ET or destroy all materials, records, programs, tapes and copies of E-TECH's data.**

E. Upon Termination of this Agreement, ET agrees to return to MANAGER or it's authorized representatives or erase all materials, records, tapes and copies of the LISTS and the LISTS data.

6

F.   Upon Termination of this Agreement, MANAGER agrees to pay ET all sums, if any, owed in accordance with section six (6) of this Agreement.

G.   Upon Termination of this Agreement, ET agrees to pay MANAGER all sums, if any, owed in accordance with section six (6) of this Agreement

## 15.   GENERAL:

A.   No waiver of any breach of any provision of this Agreement shall constitute a waiver of a prior, concurrent or subsequent breach of the same or any other provisions hereof, and no waiver shall be effective unless made in writing and signed by an authorized representative of the affected party.

B.   Section headings are for convenience only and shall not be constructed as part of this Agreement.

C.   This Agreement shall be governed by and constructed in accordance with the laws of the State of New York, as applied to contracts made fully performed in New York.  Service hereby agrees to venue in a federal district court in the city of New York, in the state of New York, in any action suit or proceeding.  The parties hereto waive trial by jury.

D.   This Agreement contains the entire Agreement between the parties, may not be amended except in writing signed by the parties and failure to insist on full and timely performance of any provision shall not be deemed a waiver of such obligation or of any other provisions.  No statement in writing subsequent to the date hereof purporting to modify or add to the terms and conditions hereof shall be binding unless consented to in a document signed by duly authorized representatives of both ET and MANAGER which makes reference to this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized officers, all as of this 25th day of September 2001.


ETHNIC TECHNOLOGIES, LLC.

By: _Peter D. Braunstein_
Authorized Officer


EDITH ROMAN ASSOCIATES, INC.

_[signature]_
Authorized Officer

7

ET 30Ɔ∂        ᘶᘿ96ᘿ6ᘿ1ᔭ                                         ᘑᔅ:ᘿ1 ᘿᘿᘿᔅ ᔅ1 ᘑᘿᔕ

page 1 WellsFargoCCG / ET Statement of Work

## Exhibit A

STATEMENT OF WORK ("SOW")
TO THE SOFTWARE LICENSE AGREEMENT
BETWEEN ETHNIC TECHNOLOGIES ("ET")  AND WELLS FARGO BANK, N.A.

This Statement of Work, ("SOW") dated November 14th, 2002 is  entered into pursuant to the Software License Agreement dated November 11th. 2002,  by and between  Wells Fargo Bank, N.A. ("Wells Fargo") and E-Tech ("E-Tech"), all of the terms of which are hereby incorporated by reference and applied.

**I.     Basic System to be Licensed to Wells Fargo:**

E-Tech consists of a set of both proprietary computer programs and data files as follows:

* unique first name files, by ethnicity
* surname files, by ethnicity
* non unique first name files
* unique middle name files, by ethnicity
* a series of two (2) to six (6) character prefix rule files, by ethnicity
* a series of three (3) to six (6) character suffix rule files, by ethnicity
* a series of codes to attach to a name record and classify its ethnic, minority and language preference status, among other fields
* geocentric reference tables
* a series of computer programs that apply the above mentioned data groups to lists and databases, which can be supplied on magnetic media, and in respect of which ET owns all rights, including copyrights.

**II.     Service and Maintenance (first year included with License Fee, second year and thereafter $15,000 / year:**

1.     On-site initial training session
2.     On-site visits, user group conferences, or ET-sponsored seminars thereafter
3.     Technical support via telephone and e-mail between the hours of 8:30 am Eastern Standard Time and 5:30 p.m. Eastern Standard Time from Monday through Friday excluding Holidays.
4.     Product corrections, enhancements and updates at no additional cost, once per year, guaranteed.

**ET Contact Name and Address:**
Attention:  T. Lindsey / CFO, Director of Research or G Nelson / CEO
Ethnic Technologies, LLC
600 Huyler Street, P.O. Box 2145
South Hackensack, NJ  07606
E-mail:  j@ethnictechnologies.com or gnelson@ethnictechnologies.com
(201) 440-8923  (phone)
(201) 440-2168  (fax)

**Wells Fargo Contact Name  and Address:**
Attention:  Will Tangalos
Vice President, Marketing Database Manager
Wells Fargo Bank / Consumer Credit Group
550 California Street, 9th Floor
San Francisco, CA  94101
E-mail:  tangalwa@wellsfargo.com
Phone Number:  (415) 396-0652



page 2 WellsFargoCCG / ET Statement of Work

### III. Project Name and Synopsis:  E-Tech Project

The Consumer Credit Group ("CCG") of Wells Fargo is licensing the E-Tech software to gain business and marketing insight into its customer and prospect portfolio to better understand and serve various ethnic communities.  Additionally, the software will allow Wells Fargo to evaluate the effectiveness of its existing and future marketing programs by determining its impact on various user bases.  The end user will be the marketing and sales organization of CCG.

CCG currently does not have an effective methodology to segment its database for better promotion of products to its diverse customer base.  The E-Tech solution provides more detailed business and marketing intelligence that currently does not exist.  Upon installation on CCG's Business and Marketing database which is managed by Choice Point Precision Marketing (CPPM), the E-Tech software will be able to segment most of the households by ethnic and language group and other field preferences.

### IV. Performance Period for Software Installation and Testing:

Performance Period shall consist of two (2) full business days for installation and four (4) full weeks for testing. Installation will occur expeditiously within a mutually agreeable time frame..

ET will install the E-Tech software system and data at the CPPM facilities, located below, upon CPPM's signing of a confidentiality Agreement protecting the E-TECH system and it's Data.  A scored copy of the Hemisphere data file has been created by ET and will be shipped to CPPM as soon as the Confidential Agreement and Statement of Work are signed.

### V. Installation and Testing Location at CPPM Facilities:

Business Contact at CPPM Facilities:

Tim Smith
Vice President of Account Management
3 Riverside Drive
Suite 203
Andover, MA  1810
415.725.5253 (cell)
tsmith@mtidata.com

### VI. License Fees and Manner of Payments

Wells Fargo shall pay ET a license fee of one hundred fifty thousand dollars ($150,000.00) to use the E-Tech Software for an Initial Term of three (3) years and for a renewal term of two (2) years for a total term of up to five (5) years.  This license fee will include all expenses incurred by ET to install E-Tech on Wells Fargo's designated service bureau site, plus it will include all expenses incurred by ET during training of Wells Fargo's personnel in the uses and applications of E-Tech.  The license fee will also include maintenance in the first year.

The License Fee is payable in one (1) installment which will be paid in January 2003.

### Total Costs, Payment Terms, and Invoicing:

An initial three-year term with automatic renewals for an additional two-year period will cost a licensing fee of $150,000 which includes the first year's maintenance.  The fee will be broken up into two payments of $75,000 each with the first payment due upon signing the Statement of Work and the second payment due four (4) months after the Statement of Work start date.  A $15,000 / year maintenance fee for the second and subsequent years is due on the anniversary date of the Statement of Work

page 3 WellsFargoCCG / ET Statement of Work

**Invoice Address:** (Please reference AU# 11417 on all invoices to ensure timely payments)
    Attention: Will Tangalos
    Vice President, Marketing Database Manager
    Wells Fargo Bank / Consumer Credit Group
    550 California Street, 9th Floor
    San Francisco, CA 94101
    E-mail: tangalwa@wellsfargo.com
    Phone Number: (415) 396-0652
    AU# 11417

## VII. Acceptance Criteria:

Wells Fargo will put the E-Tech software through 4 weeks of acceptance testing to determine if the software is compliant in all material respects and without Errors, in the manner it will allow for the majority of Hemisphere records to be coded with an appropriate ethnic code. A benchmark comparison will be made with the initial coded records that were coded by ET to determine that similar results are achieved with the software installed on Hemisphere. Upon Wells Fargo's successful testing, Wells Fargo will provide written notice of its acceptance to ET.

### Service Level Expectations for Response Times:

Environment is Compaq Alpha GS140 Server with 8 processors and 8GB RAM running TRU64 UNIX. The E-Tech software will handle more than one hundred eighteen (118) million individuals in Hemisphere. It shall be functional 99.5 percent of the time.

Should there be a coding error that would result in data corruption, General Protection Fault Errors, or other situations that would cause an agency significant down time. Whether or not the error is generally experienced by many licensees, or just one licensee, the error receives top priority due to the potentiality for causing adverse results. Response time will be within twenty four (24) hours.

### Person to Call from E-Tech:

Peter Brownstein
Title: CIO, Chief Information Officer
E-mail: peter@ethnictechnologies.com
Phone Number: (201) 440-8923

### Contact from Wells Fargo:

Will Tangalos
Title: Vice President, Marketing Database Manager
E-mail: tangalwa@wellsfargo.com
Phone Number: (415) 396-0652

### Contact from CPPM:

Tim Smith
Title: Vice President of Account Management
phone: 415.725.5253 (cell)

### ENHANCEMENT REQUESTS (if applicable)

Recommendations or requests for additional features or enhanced functionality of the software are recorded in the Enhancement Database as a request. Although not an error condition, these enhancement requests are coordinated with efforts expended in response to other entries. Enhancements are part of new version releases.

9T 'ƎƆＢＦ        ⱯＥＳ9∠99Ｚ9ＬＦ                                         0S:ƐT Ｚ00Ｚ ƐT ＨＢＡ

page 4 WellsFargoCCG / ET Statement of Work

**Person to Call from E-Tech:**
Candace Kennedy
Title:  National Sales Manager
E-mail: candace@ethnictechnologies.com
Phone Number: (201) 440-8923

**Contact from Choice Point:**
Tim Smith
Title:  Vice President of Account Management
E-mail: tsmith@mitidata.com
Phone:  415.725.5253 (cell)

**Wells Fargo Project Manager Name and Address:**
Ken Gibson
Marketing Database Analyst
2200 John Glen Drive
Concord, CA  94520
(925) 603-2145

**Vendor Project Manager Name and Address:**
Tim Smith
Choice Point Precision Marketing
E-mail:  tsmith@mitidata.com
Phone:  415.725.5253 (cell)

**WARRANTY AND POST PROJECT SUPPORT:**
The software will be warranted throughout the term of Statement of Work

By the signatures of their duly authorized representatives below, ET and Wells Fargo, intending to be legally bound, agree to all of the provisions of this Statement of Work.

AGREED TO AND ACKNOWLEDGED BY:

By: *Peter H. Brownstein* (ET)

Name: Peter Brownstein
Title:  CFO

Date:  November 14, 2002

By: *Sylvia L Reynolds* (Wells Fargo)

Name: (Print)

Title  EVP

Date:  November 14, 2002

Ｄ    ｰ    ΤＧＶ 'Ｏｐ            ＡＬＴＣ0 ＢＡＯｰ ＴＮＩＯＬ ＡＮ 00ᵷ∀ｰ ＥＴＴＥｰ        ＡＨＥＥ Ｌ, Ｚ00Ｚ Ｅ, SＥ∀

AGREEMENT made this 11th day of December, 2002 between Ethnic Technologies, LLC ("ET") a New Jersey Limited Liability Company having an address at 600 Huyler Street, South Hackensack, New Jersey 07606 and Penn Media, (hereinafter "PM") a Illinois corporation having an address at 19001 Old Lagrange Road Mokena, Illinois 60448

WITNESSETH:

WHEREAS, ET has by means of extensive research and the expenditure of substantial sums of money developed know-how and skills relating to means of ascertaining the ethnic, religious, minority and language preference backgrounds of individuals by reference to their first, middle, and last names and their addresses, and has developed the ability to recognize and to produce lists of such names sorted by ethnic, religious, minority and language preference background, which lists are of great value, inter alia, in the direct mail field; and

WHEREAS, these skills and know how are embodied in the computer process called E-TECH, which consists of a set of both computer programs and data files as follows:

* unique first name files, by ethnicity
* surname files, by ethnicity
* non unique first name files
* middle names by ethnicity
* a series of two (2) to five (6) character prefix rule files, by ethnicity
* a series of three (3) to five (6) character suffix rule files, by ethnicity
* a series of codes to attach to a name record and classify it's ethnic, religious, minority and language preference status
* geocentric reference tables
* a series of computer programs that apply the above mentioned data groups to lists and databases, which can be supplied on magnetic media, and to which ET owns all rights, including copyrights; and

WHEREAS, PM wishes ET to apply E-TECH to PM's Lists (hereinafter the "LISTS") in order to sort and output these LISTS by ethnic, religious, minority and language preference criteria enabling PM to use the encoded LISTS in providing direct marketing products and services to its customers; and

WHEREAS, PM acknowledges that ET's methods, criteria, knowledge and information as embodied in E-TECH are confidential, secret and the exclusive property of ET; and

WHEREAS, ET acknowledges that the LISTS are confidential, secret and the exclusive property of PM.

NOW, THEREFORE, in consideration of the foregoing premises and the covenants and agreements hereinafter set forth, the parties agree as follows:

1. PURPOSES:
   The purpose of this Agreement between PM and ET is to append the E-TECH Ethnic, Religious, Minority and Language Preference targeting system's data (hereinafter ET data) onto the LISTS for use as selection criteria, so that the LISTS may be rented to PM's customers for direct marketing purposes. The E-TECH overlay will enable those who rent the LISTS to select names and addresses based on probable Religion, Ethnic Group, Minority Group and/or Language Preference.



page two  ET Penn Media, Inc. Agreement

2. DELIVERY AND INSTALLATION:

A. Following the execution of the Agreement, PM shall provide ET with a copy of the LISTS containing first name, last name, zip code and sequence number. ET shall overlay the ET Data to the LISTS and shall return the enhanced LISTS to PM within ten (10) business days of receipt of the LISTS from PM.

B. ET acknowledges that at all times the LISTS remain the property of and PM its list owners. ET further acknowledges that it shall process, copy or otherwise use the LISTS only as necessary for the application.

C. PM shall furnish to ET updates of the LISTS as they become available.

D. PM shall perform acceptance tests on the application of the Lists. If E-Tech does not pass such tests, PM shall give ET notice thereof and ET shall perform all necessary services to correct any deficiency. If ET fails to perform as represented within 30 days of the date of PM's notice to ET, PM shall have the right to terminate this Agreement and in such event, PM shall have no obligation to pay ET any sum hereunder.

3. PROTECTIONS AND PROHIBITIONS:

A. PM guarantees that it is not in the business of ethnic, religious, minority and language preference coding or segmentation of lists except in connection with providing direct marketing services to its clients as specifically stated in this Agreement, and agrees not to enter the business of ethnic or religious coding or segmentation for a period of twenty four (24) months after the expiration of this Agreement or any renewals thereof, written or oral.

B. ET acknowledges that at all times the LISTS are and shall at all times remain the sole property of PM and agrees not to use the LISTS in any way other than contemplated by this Agreement. ET shall not copy, reproduce, duplicate or in any way attempt to recreate or analyze the LISTS or otherwise use the LISTS in any way other than as required to apply ET Data to the LISTS. Nothing contained in this Agreement shall be construed to grant to ET any right, title or interest in the LISTS nor shall ET have any right to use, license, sell, resell or otherwise deal with the LISTS on its own behalf or on the behalf of any third parties.

C. PM recognizes that E-TECH is protected under the copyright laws of the United States and agrees that it will not utilize any materials supplied to it by ET hereunder for any purposes not specifically herein authorized and, without limitation, will not transfer, duplicate, copy or in any way whole or in part reproduce or attempt to recreate or analyze the E-TECH system.

4. PRICES AND COMPENSATION:

A. ROYALTIES

ET shall receive from PM a royalty of $10.00 per thousand names from all list rental sales or uses utilizing the E-TECH ethnic, religious, minority or language preference selection criteria even though other selection criteria may have been run in conjunction with the ethnic, religious, minority or language preference selections.

page three - PT - Penn Media, Inc. Agreement

B. All payments due to ET will be paid on the thirtieth (30th) day of each month, accompanied by both a current payment report and a detailed monthly usage report, for the previous month, showing quantity, user ID, the per thousand rate due, and the amount due.

5. DATA / SERVICES WARRANTY:

A. Each party warrants to the other that it has all rights to perform the services and deliver E-TECH and the LISTS as contemplated by this Agreement.

B. ET hereby warrants and represents that the application of the ET Data to the LISTS shall not in any way impact the integrity of the LISTS and shall not alter, add to, delete from, reorder, reorganize or otherwise affect the LISTS other than to allow PM to sort the LISTS according to the ET Data.

C. ET shall perform all services hereunder in accordance with the highest professional standards. In no event shall ET alter any of PM 's data. In no event shall ET copy in whole or in part any of the LISTS.

D. PM shall at all times act in accordance with the highest professional standards. In no event shall PM alter any of ET's software or attempt to analyze or back engineer E-TECH or the applied ET Data.

E. ET warrants and represents that (a) its collection and use of personally identifiable information or profiling data of individuals used pursuant to the Agreement (collectively "Personal Data") shall comply with all United States privacy laws, regulations, rules, opinions or other governmental and/or self regulatory group requirements or statements currently existing or enacted during the term of this Agreement; (b) it has secured all necessary consents, authorizations and waivers for the use of E-TECH and the contents thereof; (c) E-TECH and the use thereof in the manner permitted by this Agreement will not infringe upon the copyrights, trademark, patent or other intellectual property rights of any party or constitute defamation, invasion of privacy or the violation of any right of publicity of any party; and (d) the use of E-TECH in the manner contemplated by this Agreement complies with all federal, state and local laws and regulations.

F. ET shall indemnify and hold  PM , its parents, subsidiaries and affiliates and their officers, directors, shareholders, employees and agents (collectively " PM Manager Parties"} from and against any and all claims, liabilities, losses, expenses (including without limitation fines, forfeitures, reasonable attorney's fees, disbursements and administrative or court costs) penalties and damages (collectively, the "Liabilities") arising from a breach of ET's representations and warranties pursuant to this Agreement.

G. PM shall indemnify and hold ET, its parents, subsidiaries and affiliates and their officers, directors, shareholders, employees and agents (collectively "ET Manager Parties"} from and against any and all claims, liabilities, losses, expenses (including without limitation fines, forfeitures, reasonable attorney's fees, disbursements and administrative or court costs) penalties and damages (collectively, the "Liabilities") arising from a breach of PM's representations and warranties pursuant to this Agreement.

page four - ET 'Penn Media. Inc Agreement

H.    ET acknowledges the breach of the covenants and agreements contained in this Agreement may lead to irreparable harm to the PM Manager Parties that would be inadequately compensated by monetary damages.

I.    Accordingly, ET agrees that, in addition to any legal remedies that may be available, temporary and permanent injunctive and equitable relief against the threatened breach or breach of the undertakings contained in this Agreement shall be available without the necessity of proving that monetary damages are inadequate.

J.    PM acknowledges the breach of the covenants and agreements contained in this Agreement may lead to irreparable harm to ET that would be inadequately compensated by monetary damages.

K.    Accordingly, PM agrees that, in addition to any legal remedies that may be available, temporary and permanent injunctive and equitable relief against the threatened breach or breach of the undertakings contained in this Agreement shall be available without the necessity of proving that monetary damages are inadequate.

L.    ET warrants and represents that E-TECH does not infringe upon the rights of any other party and that there are no conflicting claims related to the rights granted by ET hereunder. Accordingly, ET will indemnify PM Manager Parties from and against any and all Liabilities arising out of the use of E-TECH by PM.

M.  PM warrants and represents that the LISTS do not infringe upon the rights of any other party and that there are no conflicting claims related to the LISTS hereunder. Accordingly, PM will indemnify ET from and against any and all Liabilities arising out of the use of the LISTS by ET.

N.  ET warrants and represents that the ET Data provided by ET shall be accurate to the best of its ability.

6.   DEFAULT:
     A.    In the event PM: (i) breaches any term, covenant or representation in this Agreement with cause; or (ii) becomes insolvent, makes an assignment for the benefit of creditors, suspends business or commences or has commenced against any case or proceeding under any provision of the Bankruptcy Code; then in addition to ET's rights and remedies provided by law and subject to the liability limitations set forth herein, ET may immediately terminate this Agreement.

     B.    In the event ET: (i) breaches any term, covenant or representation in this Agreement with cause; or (ii) becomes insolvent, makes an assignment for the benefit of creditors, suspends business or commences or has commenced against any case or proceeding under any provision of the Bankruptcy Code; then in addition to PM's rights and remedies provided by law and subject to the liability limitations set forth herein, PM may immediately terminate this Agreement.

     C.    Both parties remedy of law for breach, with cause, of this Agreement may be inadequate and ET and PM shall in addition to all other remedies available at law or in equity, may be entitled to injunctive relief. Injunctive relief can never exclude ET from conducting its regular business which is the sale of, encoding and managing of Ethnic, Religious, Minority and Language Preference lists not derived from PM's LISTS data. Injunctive relief can never exclude PM from conducting its regular business but may preclude any use of ET's data and coding derived from E-TECH.

page five - ET 'Penn Media, Inc. Agreement

7   ASSIGNMENT:

A.   PM may not assign its rights or obligations hereunder without approval of ET. The change of beneficial or record owners of 50% or more of any class of outstanding capital stock, or the merger, consolidation or reorganization of PM hereto shall not be considered as constituting an improper assignment hereof, however it shall give ET the option of terminating this Agreement.

B.   ET may not assign its rights or obligations hereunder without approval of PM. The change of beneficial or record owners of 50% or more of any class of outstanding capital stock, or the merger, consolidation or reorganization of ET hereto shall not be considered as constituting an improper assignment hereof, however it shall give PM the option of terminating this Agreement.

8.   SALES PROMOTION FOR THE ENCODED LISTS AND LICENSES:

PM may, at its option, develop promotional materials and advertising to promote the uses of the targeted LISTS and the E-TECH targeting system. Both ET and PM reserve the right of approval for all promotional materials mentioning the other's properties.

9.   CONFIDENTIALITY:

Each of the parties hereto agree and acknowledge that in the performance of their services pursuant to this Agreement, they will or may be provided access to certain confidential information of the other party, including, without limitation, codes, code sources, data bases, sales and marketing information, Lists and other confidential or proprietary information or trade secrets either in existence as of the date of this Agreement or subsequently created. Each party, one to the other, acknowledges that the control and maintenance of the confidential information and restriction on each other's use of such information is essential to protecting the value of each of these assets. Each party therefore agrees it will not at any time divulge any confidential information to any person, entity or party, directly or indirectly, or utilize the information for their benefit, without the prior written consent of the party having rights to said confidential information, trade secrets or proprietary assets.

This restriction and obligation shall not apply to the disclosure of any confidential information to employees or agents of the acting party, to the extent that (i) such disclosure is necessary for the party to perform its obligations hereunder and (ii) such employee / agent agrees in writing to maintain said information as confidential; and (iii) any information is or becomes public knowledge without fault of the acting party or it's agents or employees. Upon termination of this Agreement, each party shall surrender all of the other's confidential information, trade secrets or proprietary assets.

The provisions of this paragraph shall survive the termination of this Agreement. After written notice thereof, the injured party shall be entitled to apply for and receive appropriate injunctive relief in the court of equity.

page six - ET  Penn Media, Inc. Agreement

10. INDEPENDENT CONTRACTORS:PM and ET agree that each is an independent contractor of the other and neither party shall represent to third parties that it is the agent or representative of the other, except as specifically provided in this Agreement.

11. NOTICES: All notices required or permitted to be given under this Agreement shall be in writing and personally delivered or sent by certified or registered mail, return receipt requested, with postage fully prepaid to the parties at the addresses specified below, and shall be effective when received, if personally delivered, or when deposited properly addressed and postage prepaid in the U.S. Mail. Each party may change such address by written notice in accordance with this section.

<div style="margin-left:3em">

To Penn Media Inc.:  Penn Media Inc.
Attn: Jaffer Ali
19001 Old Lagrange Road
Mokena, Illinois 60448

To ET:  Ethnic Technologies, LLC.
Attn: G Nelson or TJ Lindsay
600 Huyler Street
South Hackensack, NJ 07606

With a copy to:  O. Gene Hurst, Esq.
1088 Raritan Road
Clark, NJ 07066

</div>

12. TERM AND TERMINATION:
A.  The Initial Term of this Agreement shall commence on the execution of this Agreement (hereinafter the "COMMENCEMENT DATE") and shall continue for three (3) years. Thereafter, this Agreement shall automatically renew itself for successive two (2) year periods beginning on the third anniversary of the COMMENCEMENT DATE.

B.  Either party may terminate this Agreement at the end of the Initial Term or any Renewal Term subsequent thereto by providing the other party written notice thereof at least 90 days prior to the end of the Initial Term or then current Renewal Term, as applicable.

C.  Upon Termination of this Agreement, PM agrees to remove all encoding or segmentation from the LISTS which were derived from E-TECH and agrees to return all materials, records, programs, tapes and copies of E-TECH and its data to ET.

D.  Upon Termination of this Agreement, ET agrees to return all materials, records, tapes and copies of the LISTS and the LISTS data to PM or it's authorized representatives.

E.  Upon Termination of this Agreement, PM agrees to pay ET all sums, if any, owed in accordance with section four (4) of this Agreement

page seven - ET /Penn Media, Inc. Agreement

13.  GENERAL:

A.    No waiver of any breach of any provision of this Agreement shall constitute a waiver of a prior, concurrent or subsequent breach of the same or any other provisions hereof, and no waiver shall be effective unless made in writing and signed by an authorized representative of the affected party.

B.    Section headings are for convenience only and shall not be constructed as part of this Agreement.

C.    This Agreement shall be governed by and constructed in accordance with the laws of the State of New Jersey.

D.    This Agreement contains the entire Agreement between the parties, may not be amended except in writing signed by the parties and failure to insist on full and timely performance of any provision shall not be deemed a waiver of such obligation or of any other provisions.  No statement in writing subsequent to the date hereof purporting to modify or add to the terms and conditions hereof shall be binding unless consented to in a document signed by duly authorized representatives of both ET and PM which makes reference to this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized officers , all as of this 11th day of December, 2002.

ETHNIC TECHNOLOGIES, LLC.

By: _Peter H. Brownstein_
    Authorized Officer

Penn Media Inc.

By: _____
    Authorized Officer

Page one - ET / Merkle Agreement

AGREEMENT made this 2 7 day of May, 2003 between Ethnic Technologies, LLC (hereinafter "ET") a New Jersey Limited Liability Company having an address at 600 Huyler Street, South Hackensack, New Jersey 07606 and Merkle Data Technologies, Inc. (hereinafter LICENSEE) a Maryland Corporation having an address at 8400 Corporate Drive, Lenham, Maryland 20785.

WITNESSETH:

WHEREAS, ET has by means of extensive research and the expenditure of substantial sums of money developed know-how and skills relating to means of ascertaining the ethnic origin, probable religion, minority group and language preference of individuals by reference to their first, middle and last names and their addresses, and has developed the ability to recognize and to produce lists of such names sorted by ethnic, religious, minority and language preference, which lists are of great value, inter alia, in the direct mail field; and

WHEREAS, these skills and know how are embodied in the computer process called "E-TECH", which analyzes both an individual's first, middle and last name and also applies ethnolinguistic and geocentric rules to those names; and

WHEREAS, E-TECH consists of a set of both proprietary computer programs and data files as follows:
    * unique first name files, by ethnicity
    * surname files, by ethnicity
    * non unique first name files
    * unique middle name files, by ethnicity
    * a series of two (2) to six (6) character prefix rule files, by ethnicity
    * a series of three (3) to six (6) character suffix rule files, by ethnicity
    * a series of codes to attach to a name record and classify it's ethnic, religious, minority and language preference status
    * geocentric reference tables
    * a series of computer programs that apply the above mentioned data groups to lists and databases, which can be supplied on magnetic media, and to which ET owns all rights, including copyrights; and

WHEREAS, LICENSEE wishes ET to provide to LICENSEE, E-TECH, in order to allow LICENSEE to sort and code its files and its customer's files (hereinafter "LISTS") by E-TECH's criteria using ET's computerized know-how and information so that LICENSEE and its customers may utilize their lists so coded for internal marketing purposes and so that LICENSEE may rent its lists and its customer's lists so coded; and

WHEREAS, LICENSEE wishes E-TECH to be supplied to it on magnetic media in such manner that LICENSEE could, if it wished, extrapolate from that media, material information about ET's know-how and selection parameters and thus gain knowledge as to the confidential methods and criteria used by ET for such coding; and

WHEREAS, LICENSEE acknowledges that ET's methods, criteria, knowledge and information as embodied in E-TECH and its data output and data codes are confidential, secret and the exclusive property of ET and at all times rights, title and interest in E-TECH and its data and data codes remain as the property of ET; and



DEFENDANT'S
EXHIBIT
12

Page two - ET / Merkle Agreement

NOW, THEREFORE, in consideration of the foregoing premises and the covenants and agreements hereinafter set forth, the parties agree as follows:

1.  PURPOSE:

The purpose of this Agreement between LICENSEE and ET is to supply the E-TECH Ethnic, Religion, Minority and Language Preference targeting system to LICENSEE for its use, so that it may apply E-TECH's data onto the LISTS for use as selection criteria, so that the LISTS may be used by LICENSEE's list and data file owners for their own marketing purposes and so that the LISTS may be rented to LICENSEE's customers for direct marketing purposes. ET will be considered a value added reseller of LICENSEE's LISTS and will not be charged for use of its own data. Coding the LISTS using E-TECH will enable those who use the LISTS to select or deselect names and addresses based on Ethnic Group. Minority Group, Probable Religion and Language Preference.

2.  DELIVERY AND INSTALLATION

ET will supply to LICENSEE magnetic media containing E-TECH and install E-TECH at a single site, in a manner suitable for LICENSEE's intended use only as herein provided. ET represents and warrants that it has the legal right to possess and transfer E-TECH to LICENSEE..

3.  DISCLOSURE

A.  LICENSEE acknowledges that E-TECH is a trade secret of ET and that LICENSEE shall not process, sell, copy or otherwise use E-TECH except in a manner specifically contemplated by this Agreement. LICENSEE further acknowledges that E-TECH is protected by the copyright laws of the United States and, without limitation will not transfer, duplicate, copy, or in any way, in whole or in part, reproduce, or attempt to recreate or analyze the data files or computer process used within E-TECH.

B.  LICENSEE further acknowledges that E-TECH constitutes trade secrets of great value to ET and therefore will not disclose to any other party the content of E-TECH or permit any other party or itself to reproduce E-TECH or any part thereof. LICENSEE will take all reasonable steps to safeguard the integrity of E-TECH and to prevent any unauthorized use thereof.

4.  PERMITTED USES OF E-TECH

A.  LIST ENHANCEMENT FOR LICENSEE'S CUSTOMER'S IN HOUSE USE
LICENSEE may use E-TECH to match and encode its customer's LISTS for it's customer's own direct marketing programs and modeling projects. Royalties will be paid to ET for all records enhanced by E-TECH and outputted to the customer as per paragraph six (6) of this Agreement.

B.  ENCODING OF LICENSEE'S OR ITS CUSTOMER'S LISTS FOR LIST RENTAL
LICENSEE may use E-TECH or E-TECH's data to match and encode its and its customer's LISTS for outside list rentals. Royalties will be paid to ET for all names selected and rented as per paragraph six (6) of this Agreement.

C.  SCREENING LISTS
LICENSEE may use E-TECH to do both positive screens and negative screens for it's clients. A "positive screen" is the process whereby E-TECH is used to select names from lists. A "negative screen" is the process whereby E-TECH is used to eliminate names from lists. Royalties will be paid to ET for all names selected or deleted during screening, as per paragraph six (6) of this Agreement.

Page three - ET / Merkle Agreement

5.  MAINTENANCE AND USERS GROUP
    A. E-TECH is continually being updated, enhanced and corrected. Updates will be provided at least once per year. New Versions will be provided as they become available.

    B. A "USER GROUP" consisting of E-TECH licensees has been created. LICENSEE agrees to assign up to two of it's personnel to represent itself within the User's Group. The User's Group provides feed back directing necessary research and further development of E-TECH.

6.  FEES, ROYALTIES AND PAYMENT REPORTS
    A. LICENSE FEE
    Upon execution of this License Agreement, ET shall waive the usual LICENSE fee. LICENSEE shall pay ET an installation and training fee of Twenty Thousand Dollars ($20,000.00). This fee will cover expenses incurred by ET to install E-TECH on LICENSEE's site, plus expenses incurred by ET during training of LICENSEE's personnel in the uses and applications of E-TECH.

    B. ROYALTIES
    1. For encoding of LICENSEE's customer's not for rent outside lists using the "E-TECH" system data for in house direct marketing programs and modeling projects, royalties will be a minimum of Four Dollars ($4.00) per thousand records enhanced by E-TECH and outputted to customer. Discounts are available for orders based upon size and competitive pricing. No discounts may be given without ET's prior approval. approval will not to be unreasonably withheld.

    2. For Data Installations using the "E-TECH" system data, a royalty will be paid to ET. Data installations can be of varying types, purposes and sizes. Therefore each data installation is treated as a unique entity and pricing will be based upon the specifics pertaining to each individual installation.

    3. For screens using the "E-TECH" system data, royalties will be Four Dollars ($4.00) per thousand records selected or deleted.

    4. For names rented using the "E-TECH" system data, royalties will be a minimum of Four Dollars ($4.00) per thousand records mailed.

    5. It is understood that sometimes, to be competitive, LICENSEE must adjust it's pricing within the marketplace. In such cases, ET will consider adjustments to the royalties described above on a case by case basis. These adjustments will not to be unreasonably withheld.

    C. MAINTENANCE FEE
    Maintenance will be FifteenThousand Dollars ($15,000.00) per year. Maintenance fees will become due on the first anniversary of this Agreement and each subsequent anniversary. Maintenance will include new releases of E-TECH, training, support help line and User Group membership.

    D. PAYMENTS AND REPORTS
    1. Upon collection for list rentals, encoding or screening work, all collected royalties due ET will be paid by the end of each calendar month. Service bureau work, such as encoding or screening, is billable immediately.

Page four - ET - Merkle Agreement

2. LICENSEE shall provide to ET two monthly reports: 1) a current payment report; and 2) a detailed monthly usage report, for the previous month showing all E-TECH related sales, collections and moneys due to ET.

E. ET shall have the right at least once per calendar year, upon 10 days written notice to LICENSEE and during it's regular business hours, to examine all books and records to the extent relating to the use of E-TECH.

7. TERM AND TERMINATION:

A. The Initial Term of this Agreement shall commence on the execution of this Agreement (hereinafter the "COMMENCEMENT DATE") and shall continue for three (3) years. Thereafter, this Agreement shall automatically renew itself for one two (2) year period beginning on the third anniversary of the COMMENCEMENT DATE.

B. Either party may terminate this Agreement at the end of the Initial Term or any Renewal Term subsequent thereto by providing the other party written notice thereof at least 90 days prior to the end of the Initial Term or then current Renewal Term, as applicable.

C. Upon Termination of this Agreement, LICENSEE agrees to return all materials, records, programs and copies of E-TECH and E-TECH output data to ET.

D. Upon Termination of this Agreement, LICENSEE agrees to pay ET all sums, if any, owed in accordance with section Six (6) of this Agreement.

8. DEFAULT:

A. In the event LICENSEE: (i) breaches any term, covenant or representation in this Agreement with cause; or (ii) becomes insolvent, makes an assignment for the benefit of creditors, calls a meeting of its creditors to obtain any greater financial accommodation, suspends business or commences or has commenced against any case or proceeding under any provision of the Bankruptcy Code; then in addition to ET's rights and remedies provided by law and subject to the liability limitations set forth herein, ET may immediately terminate this Agreement.

B. In the event ET: (i) breaches any term, covenant or representation in this Agreement with cause; or (ii) becomes insolvent, makes an assignment for the benefit of creditors, calls a meeting of its creditors to obtain any greater financial accommodation, suspends business or commences or has commenced against

any case or proceeding under any provision of the Bankruptcy Code; then in addition to LICENSEE's rights and remedies provided by law and subject to the liability limitations set forth herein, LICENSEE may immediately terminate this Agreement.

C. Both parties remedy of law for breach, with cause, of this Agreement may be inadequate and ET and LICENSEE, shall in addition to all other remedies available at law or in equity, may be entitled to injunctive relief. Injunctive relief can never exclude ET from conducting its regular business which is the sale of, encoding and managing of ethnic, religion, minority and language preference. Injunctive relief can never exclude LICENSEE from conducting its regular business but may preclude any use of ET's data and any coding or selections derived from E-TECH.

Page five - ET / Merkle Agreement

D.   For purposes of this section, "with cause" means (i) a breach of any condition or representation by either party to this Agreement, (ii) notice to the breaching party in writing by the non-breaching party and (iii) the failure to correct the default within sixty (60) days of written notice from the other party specifying the nature of the default.

9.   DATA / SERVICES WARRANTY
ET warrants to LICENSEE that it has all rights to perform the services and deliver E-TECH as contemplated by this Agreement.

10.  ASSIGNMENT:
A.  LICENSEE may not assign its rights or obligations hereunder without approval of ET.  The change of beneficial or record owners of 50% or more of any class of outstanding  capital stock, or the merger, consolidation or reorganization of LICENSEE hereto shall be considered as constituting an improper assignment hereof and shall give ET the option of terminating this Agreement.

B.   ET may not assign its rights or obligations hereunder without approval of  LICENSEE.  The change of beneficial or record owners of 50% or more of any class of outstanding capital stock, or the merger, consolidation or reorganization of ET hereto shall be  considered as constituting an improper assignment hereof and shall give LICENSEE the option of terminating this Agreement.

11.  CONFIDENTIALITY:
Each of the parties hereto agree and acknowledge that in the performance of their services pursuant to this Agreement, they will or may be provided access to certain confidential information of the other party, including, without limitation, codes, code sources, data bases, sales and marketing information, and other confidential or proprietary information or trade secrets either in existence as of the date of this Agreement or subsequently created.  Each party, one to the other, acknowledges that the control and maintenance of the confidential information and restriction on each other's use of such information is essential to protecting the value of each of these assets.  Each party therefore agrees it will not at any time divulge any confidential information to any person, entity or party, directly or indirectly, or utilize the information for their benefit, without the prior written consent of the party having rights to said confidential information, trade secrets or proprietary assets.

This restriction and obligation shall not apply to the disclosure of any confidential information to employees or agents of the acting party, to the extent that (i) such disclosure is necessary for the party to perform its obligations hereunder and (ii) such employee / agent agrees in writing to maintain said information as confidential; and (iii) any information is or becomes public knowledge without fault of the acting party or it's agents or employees.  Upon termination of this Agreement, each party shall surrender all of the other's confidential information, trade secrets or proprietary assets.

The provisions of this section shall survive the termination of this Agreement.  Both parties acknowledge and agree that irreparable damage can result in the event of breach of any of the provisions set forth in this paragraph and agree that upon failure to remedy any such breach after written notice thereof, the injured party shall be entitled to apply for and receive appropriate injunctive relief in the court of equity.

Page six - ET / Merkle Agreement

### 12. INDEPENDENT CONTRACTORS

ET and LICENSEE agree that each is an independent contractor of the other and neither party shall represent to third parties that it is the agent or representative of the other, except as specifically provided in this Agreement.

### 13. NOTICES

All notices required or permitted to be given under this Agreement shall be in writing and personally delivered or sent by certified or registered mail, return receipt requested, with postage fully prepaid to the parties at the addresses specified below, and shall be effective when received, if personally delivered, or when deposited properly addressed and postage prepaid in the U.S. Mail. Each party may change such address by written notice in accordance with this section.

To ET      Ethnic Technologies, LLC
Attn: Ginger Nelson or Attn: Tina Lindsay
600 Huyler Street
PO Box 2145
South Hackensack, NJ 07606

To LICENSEE

Merkle Data Technologies, Inc.
Attn: _____
8400 Corporate Drive
Lanham, MD 20785

With a copy to:    O. Gene Hurst, Esq.
1088 Raritan Road
Clark, NJ 07066

### 14. SALES PROMOTION FOR THE ENCODED LISTS:

LICENSEE may, at its option, develop promotional materials and advertising to promote the uses of the targeted LISTS and the E-TECH targeting system. ET may, at its option, develop promotional materials and advertising to promote the uses of LICENSEE's targeted LISTS. Both parties reserve the right of prior approval of such advertising, such approval shall not be unreasonably withheld.

### 15. GENERAL

A.    No waiver of any breach of any provision of this Agreement shall constitute a waiver of a prior, concurrent or subsequent breach of the same or any other provisions hereof, and no waiver shall be effective unless made in writing and signed by an authorized representative of the affected party.

B.    Section headings are for convenience only and shall not be constructed as part of this Agreement.

C.    This Agreement shall be governed by and constructed in accordance with the laws of the State of MD.

D.    This Agreement contains the entire Agreement between the parties, may not be amended except in writing signed by the parties and failure to insist on full and timely performance of any provision shall not be deemed a waiver of such obligation or of any other provisions. No statement in writing subsequent to

Page seven - ET / Merkle Agreement

the date hereof purporting to modify or add to the terms and conditions hereof shall be binding unless consented to in a document signed by duly authorized representatives of both ET and LICENSEE which makes reference to this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized officers, all as of this ___2 7___ day of ___M a y___, 2003.

ETHNIC TECHNOLOGIES, LLC

By: *Peter H. Braunstein*
Authorized Officer

MERKLE DATA TECHNOLOGIES, INC

by: _____
Authorized Officer

Page 1 ET CAS Agreement

AGREEMENT made this 10th day of March, 2005 between Ethnic Technologies, LLC (hereinafter "ET") a New Jersey Limited Liability Company having an address at 600 Huyler Street, South Hackensack, New Jersey 07606 and Central Address Systems, Inc. (hereinafter LICENSEE) having an address at 10303 Crown Point Avenue, Omaha, NE 68134.

WITNESSETH:

WHEREAS, ET has by means of extensive research and the expenditure of substantial sums of money developed know-how and skills relating to means of ascertaining the Ethnic, Religious, Minority, Hispanic country of origin, and Language Preference backgrounds of individuals by reference to their first, middle, and last names and their addresses, and has developed the ability to recognize and to produce lists of such names sorted by ethnic, religious, minority, hispanic country of origin, and language preference, which lists are of great value, inter alia, in the direct mail field; and

WHEREAS, these skills and know how are embodied in the computer process called "E-TECH", which analyzes an individual's first, middle, and last name, and also applies ethnolinguistic and geocentric rules to those names; and

WHEREAS, E-TECH consists of a set of both proprietary computer programs and data files as follows:
* unique first name files, by ethnicity
* surname files by ethnicity
* non unique first name files
* unique middle name files, by ethnicity
* a series of two (2) to six (6) character prefix rule files, by ethnicity
* a series of three (3) to six (6) character suffix rule files, by ethnicity
* a series of codes to attach to a name record and classify it's ethnic, religious, minority, and language preference status
* geocentric reference tables
* a series of computer programs that apply the above mentioned data groups to lists and databases, which can be supplied on magnetic media, and to which ET owns all rights, including copyrights; and

WHEREAS, LICENSEE wishes ET to supply E-TECH to LICENSEE so that LICENSEE may code its Lists, and its Customers Lists, and Databases (hereinafter the "LISTS") which are currently maintained at LICENSEE's own Computer Site and are owned by LICENSEE and LICENSEE's Customers, in order to sort and code these LISTS by ethnic, religion, minority, hispanic country of origin, and language preference criteria enabling LICENSEE to use the codes applied to the LISTS in providing modeling and direct marketing products and services to itself and its customers; and

WHEREAS, LICENSEE wishes E-TECH to be transmitted to it on magnetic media in such manner that LICENSEE could, if it wished, extrapolate from that media, material information about ET's know-how and selection parameters and thus gain knowledge as to the confidential methods and criteria used by ET; and

WHEREAS, LICENSEE acknowledges that ET's methods, criteria, knowledge and information as embodied in E-TECH and its data output and data codes are confidential, secret and the exclusive property of ET and at all times rights, title and interest in E-TECH and its data and data codes remain as the property of ET.

WHEREAS, ET acknowledges that the LISTS are confidential, secret and the exclusive property of LICENSEE and at all times, rights title and interest in the LISTS remain as the property of LICENSEE.



DEFENDANT'S EXHIBIT

13

Page 2 ET-CAS Agreement

NOW, THEREFORE, in consideration of the foregoing premises and the covenants and agreements hereinafter set forth, the parties agree as follows:

1. PURPOSES:
   The purpose of this Agreement between LICENSEE and ET is to supply E-TECH to LICENSEE so that LICENSEE may code the LISTS, which are currently maintained at LICENSEE's own Computer Site, in order to sort and code these LISTS by ethnic, religion, minority, hispanic country of origin, and language preference criteria, enabling LICENSEE to use the codes applied to the LISTS in providing modeling and direct marketing products and services to itself and its customers, so that the LISTS may be used by LICENSEE and LICENSEE's customers for their own direct marketing and modeling purposes, and so that the LISTS may be rented to LICENSEE's customers for direct marketing purposes. The E-TECH data and transmitted codes will enable the LISTS to be selected based on Ethnic Group, Minority Group, Probable Religion, Hispanic Country of Origin, and Language Preference.

2. DELIVERY AND INSTALLATION
   A. ET will supply to LICENSEE magnetic media containing E-TECH and install E-TECH at LICENSEE's single site, in a manner suitable for LICENSEE's intended use only as herein provided. ET represents and warrants that it has the legal right to possess and transfer E-TECH to LICENSEE.

   B. LICENSEE acknowledges that at all times E-TECH remains the property of ET. LICENSEE further acknowledges that it shall process copy or otherwise use the LISTS only in a manner specifically contemplated by this Agreement.

   C. ET shall provide training at LICENSEE's facilities to selected sales and marketing personnel in the new technology, new abilities and new opportunities provided by E-TECH.

3. PERMITTED USES OF E-TECH
   A. LIST ENHANCEMENT FOR LICENSEE's CUSTOMERS' IN-HOUSE USE
   LICENSEE may use E-TECH to match and encode the LISTS for its and its customer's own direct marketing programs and modeling projects only. Royalties will be paid to ET for all names input as per paragraph five (5) of this Agreement.

   B. ENCODING OF LICENSEE's OR ITS CUSTOMERS' LISTS FOR LIST RENTAL
   LICENSEE may use E-TECH to match and encode its, and its customer's LISTS for outside list rentals. Customers Lists may not be resold using E-TECH data or data codes, unless Customer's Lists reside at LICENCEE's on site facility and all usages are controlled and tabulated by LICENSEE for E-TECH Royalty collection. Royalties will be paid to ET for all names rented as per paragraph five (5) of this Agreement.

   C. SCREENING LISTS
   LICENSEE may use E-TECH to do both positive screens and negative screens for its clients. A "positive screen" is the process whereby E-TECH is used to select names from lists. A "negative screen" is the process whereby E-TECH is used to eliminate names from lists. Royalties will be paid to ET for all names selected or deleted during screening, as per paragraph five (5) of this Agreement.

Page 4 ET CAN Agreement

**D. MODELING**

LICENSEE may use E-TECH to add the E-TECH data and data codes to its and its customer LISTS for modeling purposes only.  Royalties will be paid to ET for all names input as per paragraph five (5) of this Agreement.

**4   PROTECTIONS AND PROHIBITIONS:**

A.  LICENSEE guarantees that it is not in the business of ethnic, religious, minority, hispanic country of origin, and language preference coding or segmentation of lists, except as specifically stated in this Agreement, and agrees not to enter the business of ethnic or religious coding or segmentation for a period of five years (5) after the expiration of this Agreement or any renewals thereof, written or oral.

B.  LICENSEE recognizes that E-TECH is protected under the copyright laws of the United States and agrees that it will not utilize any of the materials supplied to it by ET hereunder for any purposes not specifically herein authorized and, without limitation, will not transfer, duplicate, copy or in any way in whole or in part reproduce, or attempt to recreate, back engineer or analyze the E-TECH system.

C.  LICENSEE agrees that at all times it shall maintain current, accurate and complete books and records relating to its usage of the E-TECH output Data and any payments due ET derived therefrom and agrees that ET, or any designee of ET, shall have the right at any time following the date of this Agreement to examine, inspect, audit, review and copy or make extracts from all such books, records and any source documents used in the preparation thereof, during normal business hours, upon written notice to LICENSEE at least ten (10) business days prior to the commencement of any such examination, inspection, review or audit

D.  LICENSEE agrees that it may not sell E-TECH output or provide E-TECH data or data codes as selection criteria in any form or manner to direct competitors of ET, including but not limited to Geoscape Freedax USA, List Service Direct Inc. Marketing Services Group Inc., and Septech Data Management. The list of direct competitors will be updated from time to time.

**5.   PRICES AND COMPENSATION**

A.  LICENSE FEE

LICENSEE will pay ET a License Fee of Ten Thousand Dollars ($10,000.00) to use the E-Tech targeting system for an initial Term of three (3) years and for a renewal term of two (2) years for a total term of up to five (5) years.  This license fee will include all expenses incurred by ET to install E-Tech on LICENSEE's computer site, plus it will include all expenses incurred by ET during training LICENSEE's personnel in the uses and applications of E-Tech. The license fee will also include maintenance in the first year

B.  MAINTENANCE FEE

LICENSEE will pay ET a Five Thousand Dollar ($5,000.00) annual Maintenance Fee, for the second, and subsequent years of this Agreement.

C.  LIST RENTALS

ET shall receive from LICENSEE a royalty of Three Dollars ($3.00) per thousand names, from all list rental sales or uses utilizing ethnic, religion, minority, language preference, and hispanic country of origin selection criteria, even though other selection criteria may have been run in conjunction with the ethnic, religion, minority, or language preference selections

Page 4 ET / CAS Agreement

**D. ENCODING OF CUSTOMER'S LISTS FOR MODELING AND INTERNAL MARKETING USES**
When LICENSEE encodes its customer's files, for its customer's own internal marketing and modeling uses, ET shall receive a Royalty Fee of Three Dollars ($3.00) per thousand records input.

**E. SCREENING**
ET shall receive from LICENSEE a royalty of Three Dollars ($3.00) per thousand names, for all names selected or deleted during screening using E-TECH, its data, or its data codes.

**F. PAYMENTS**
All payments due to ET will be paid on the 20th (20) day of each month, accompanied by both a current payment report and a detailed monthly usage report, for the previous month, showing quantity, user or user ID, and the amount due.

**G. PRICING ADJUSTMENTS**
Due to the nature of the marketplace, it is recognized that occasionally special pricing arrangements will need to be created on a customer by customer basis. These arrangements must have ET's prior approval, such approval shall not be unreasonably withheld.

6. MAINTENANCE AND USERS GROUP
A. E-TECH is continually being updated, enhanced, and corrected. Updates will be provided at least once per year. New Versions will be provided as they become available.

B. A USER GROUP of regular users of E-TECH licensees has been created. LICENSEE agrees to nominate to two of its personnel to participate within the Users Group. The Users Group provides feedback directing necessary research and further development of E-TECH. This is to provide designated individuals within LICENSEE's organization to help direct the development of E-TECH so that it continues to address the ongoing needs of LICENSEE.

7. DATA / SERVICES WARRANTY. ET warrants to LICENSEE that it has all rights to perform the services and deliver E-TECH as contemplated by this Agreement.

8. DEFAULT.
A. In the event LICENSEE (i) breaches any term, covenant or representation in this Agreement, cause, or (ii) becomes insolvent, makes an assignment for the benefit of creditors, calls a meeting of its creditors to obtain any greater financial accommodation, suspends business or commences or has commenced against any case or proceeding under any provision of the Bankruptcy Code; then in addition to ET's rights and remedies provided by law and subject to the liability limitations set forth herein, ET may immediately terminate this Agreement.

B. In the event ET (i) breaches any term, covenant or representation in this Agreement with cause, or (ii) becomes insolvent, makes an assignment for the benefit of creditors, calls a meeting of its creditors to obtain any greater financial accommodation, suspends business or commences or has commenced against any case or proceeding under any provision of the Bankruptcy Code; then in addition to LICENSEE's rights and remedies provided by law and subject to the liability limitations set forth herein, LICENSEE may immediately terminate this Agreement.

Page 5 ET/CAS Agreement

C.  Both parties remedy of law for breach, with cause, of this Agreement may be inadequate and ET and LICENSEE, shall in addition to all other remedies available at law or in equity, may be entitled to injunctive relief.  Injunctive relief can never exclude ET from conducting its regular business which is the sale of, encoding and managing of ethnic, religion, minority and language preference lists not derived from the LISTS. Injunctive relief can never exclude LICENSEE from conducting its regular business but may preclude any use of ET's data and any coding or selections derived from E-TECH.

D.  For purposes of this section, "with cause" means (i) a breach of any condition or representation by either party to this Agreement, (ii) notice to the breaching party in writing by the non-breaching party and (iii) the failure to cure said breach within 30 days of notice.

9.   ASSIGNMENT:

A.   LICENSEE may not assign its rights or obligations hereunder without approval of ET.  The change of beneficial or record owners of 50% or more of any class of outstanding capital stock, or the merger, consolidation or reorganization of LICENSEE hereto shall be considered as constituting an improper assignment hereof and shall give ET the option of terminating this Agreement.

B.   ET may not assign its rights or obligations hereunder without approval of LICENSEE.  The change of beneficial or record owners of 50% or more of any class of outstanding capital stock, or the merger, consolidation or reorganization of ET hereto shall be considered as constituting an improper assignment hereof and shall give LICENSEE the option of terminating this Agreement.

10.  CONFIDENTIALITY:

Each of the parties hereto agree and acknowledge that in the performance of their services pursuant to this Agreement, they will or may be provided access to certain confidential information of the other party, including, without limitation, codes, code sources, data bases, sales and marketing information, and other confidential or proprietary information or trade secrets either in existence as of the date of this Agreement or subsequently created.  Each party, one to the other, acknowledges that the control and maintenance of the confidential information and restriction on each other's use of such information is essential to protecting the value of each of these assets.  Each party therefore agrees it will not at any time divulge any confidential information to any person, entity or party, directly or indirectly, or utilize the information for their benefit, without the prior written consent of the party having rights to said confidential information, trade secrets or proprietary assets.

This restriction and obligation shall not apply to the disclosure of any confidential information to employees or agents of the acting party, to the extent that (i) such disclosure is necessary for the party to perform its obligations hereunder and (ii) such employee/agent agrees in writing to maintain said information as confidential, and (iii) any information is or becomes public knowledge without fault of the acting party or it's agents or employees.  Upon termination of this Agreement, each party shall surrender all of the other's confidential information, trade secrets or proprietary assets.

The provisions of this section shall survive the termination of this Agreement.  Both parties acknowledge and agree that irreparable damage can result in the event of breach of any of the provisions set forth in this paragraph and agree that upon failure to remedy any such breach after written notice thereof, the injured party shall be entitled to apply for and receive appropriate injunctive relief in the court of equity.

Park E-TEC CAS Agreement

11. INDEPENDENT CONTRACTORS  LICENSEE and FT agree that each is an independent contractor of the other and neither party shall represent to third parties that it is the agent or representative of the other except as specifically provided in this Agreement

12. NOTICES:  All notices required or permitted to be given under this Agreement shall be in writing and personally delivered or sent by certified or registered mail, return receipt requested, with postage fully prepaid to the parties at the addresses specified below, and shall be effective when received, if personally delivered, or when deposited properly addressed and postage prepaid in the U.S. Mail.  Each party may change such address by written notice in accordance with this section.

　　　　　To LICENSEE:　　　Central Address Systems, Inc.
　　　　　　　　　　　　　　　Attn: Mike Garrean
　　　　　　　　　　　　　　　10303 Crown Point Avenue
　　　　　　　　　　　　　　　Omaha, NE 68134

　　　　　To FT:　　　　　　 Ethnic Technologies, LLC
　　　　　　　　　　　　　　　Attn. Ginger Nelson or JJ Lindsay
　　　　　　　　　　　　　　　600 Huyler Street
　　　　　　　　　　　　　　　South Hackensack, NJ 07606

　　　　　With a copy to:　　 C. [illegible] Duffy, Esq.
　　　　　　　　　　　　　　　1058 Raritan Road
　　　　　　　　　　　　　　　Clark, NJ [illegible]

13. TERM AND TERMINATION

A.  The Initial Term of this Agreement shall commence on the execution of this Agreement (herein after the "COMMENCEMENT DATE") and shall continue for three (3) years.  Thereafter, this Agreement shall automatically renew itself for one two (2) year period beginning on the third anniversary of the COMMENCEMENT DATE.

B.  Either party may terminate this Agreement at the end of the Initial Term or any Renewal Term subsequent thereto by providing the other party written notice thereof at least 90 days prior to the end of the Initial Term or then current Renewal Term, as applicable.

C.  Upon Termination of this Agreement LICENSEE agrees to return all materials, records, programs and copies of E-TECH and E-TECH output data to FT

D.  Upon Termination of this Agreement, LICENSEE agrees to pay FT all sums, if any, owed in accordance with section five (5) of this Agreement.

14. GENERAL

A.  No waiver of any breach of any provision of this Agreement shall constitute a waiver of a prior, concurrent or subsequent breach of the same or any other provisions hereof, and no waiver shall be effective unless made in writing and signed by an authorized representative of the affected party

B.  Section headings are for convenience only and shall not be constructed as part of this Agreement

Page 2 FT / CAS Agreement

C.  This Agreement shall be governed by and constructed in accordance with the laws of the State of New Jersey

D.  This Agreement contains the entire Agreement between the parties, may not be amended except in writing signed by the parties and failure to insist on full and timely performance of any provision shall not be deemed a waiver of such obligation or of any other provisions.  No statement in writing subsequent to the date hereof purporting to modify or add to the terms and conditions hereof shall be binding unless consented to in a document signed by duly authorized representatives of both FT and LICENSEE which makes reference to this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized officers this 10th day of March, 2005.

ETHNIC TECHNOLOGIES, LLC.

By _Peter H. Braunstein_
      Authorized Officer
Date: _March 16, 2005_

NAME OF COMPANY

By _____
      Authorized Officer
Date _____