# Exhibit 15

SUPERIOR COURT OF NEW JERSEY
CHANCERY DIV. GENERAL EQ. PART
BERGEN COUNTY
DOCKET NO. C-179-15
A.D. # _____

TAP SYSTEMS, INC.,            )
                             )
          Plaintiff,         )       TRANSCRIPT
                             )          OF
     vs.                     )        MOTION
                             )
CONSUMERS MARKETING          )
RESEARCH,                    )
                             )
          Defendant.         )

                    Place: Bergen County Justice Center
                           10 Main Street
                           Hackensack, New Jersey 07601

                    Date: April 22, 2016

BEFORE:

     HONORABLE ROBERT P. CONTILLO, P.J.Ch.

TRANSCRIPT ORDERED BY:

     TIMOTHY FORD, ESQ. (Einhorn, Harris, Ascher,
     Barbarito & Frost, PC)

APPEARANCES:

     TIMOTHY J. FORD, ESQ. (Einhorn, Harris, Ascher,
     Barbarito & Frost, PC)
     Attorneys for Plaintiff and Third-Party Defendants

     JAY R. McDANIEL, ESQ. (McDaniel Law, PC)
     Attorneys for Defendant Bonnie Nelson and Noslen,
     LLC)

     FRANK HOLAHAN, ESQ. (Rivker Radler, LLP)
     Attorney for Defendant Estate of Ginger Nelson

                    Transcriber: Patricia Wtulich
                    Phoenix Transcription, LLC
                    796 Macopin Rd.
                    West Milford, NJ  07480
                    (862) 248-0670

                    Audio Recorded
                    Recording Opr: Augie LaSala

2

I N D E X

PAGE

Colloquy re: Housekeeping...................3,11,16,25

MOTION TO DISQUALIFY McDANIEL LAW FIRM:      PAGE

ARGUMENTS:

BY:   MR. Ford.............................5,15

BY:   MR. McDaniel.........................8,14,18

THE COURT:

Decision...................................25

3

1          (Proceeding commenced at 2:33:47 p.m.)

2          THE COURT: Tap Systems, Inc. versus Consumers

3     Marketing Research, C-179-15, appearances, please.

4          MR. FORD:  Good afternoon, Your Honor,

5     Timothy Ford, Law Firm of Einhorn, Harris, on behalf of

6     the Plaintiff and the Third-Party Defendants.

7          MR. McDANIEL:  Good afternoon, Judge. Jay

8     McDaniel from McDaniel, PC, on behalf of Bonnie Nelson

9     and Noslen, LLC.

10          MR. HOLAHAN:  Good afternoon, Your Honor.  On

11     behalf of the Estate of Ginger Nelson, Frank Holahan;

12     Rivker Radler.

13          THE COURT:  All right, welcome, please be

14     seated.  This matter is before the Court upon an

15     application for the disqualification of the McDaniel's

16     Firm who has entered an appearance on behalf of Bonnie

17     Nelson and Noslen, LLC.

18          So I've received a series of submissions from

19     the parties.  I'm prepared to hear the oral argument.

20     I just want to make sure I know the status of

21     representation of Ethnic Technologies, LLC, in my case.

22     Does anyone represent that entity in my case?

23          MR. FORD:  No, Your Honor.

24          THE COURT:  Is it anticipated that there will

25     be a default entered against them in this case?

4

1          MR. HOLAHAN:  I believe, Your Honor, the

2     Court had maybe administratively defaulted.  There was

3     a notice that I think probably was sent quite a number

4     of months ago by the Court.

5          MR. FORD:  You would have received that I

6     would think.  Ethnic Technologies, from my perspective,

7     and I think the way that we might all look at it is

8     really a stakeholder.  It's typical in a shareholder

9     oppression case that the Court is very familiar with

10    where the entity becomes the object of the dueling

11    owners.  And so no appearance has been made in its

12    behalf.  Perhaps the administrative notion is you may

13    have received a notice from the court that the

14    complaint as to Ethnic might be dismissed because no

15    action was taken.  And I think Ethnic is really a

16    stakeholder with no need, as I see it, for separate

17    independent representation.  But someone may have a

18    different view.

19          MR. McDANIEL:  Having -- having had the

20    opportunity recently to review the file.  There is --

21    there is a dismissal for like a prosecution, and Your

22    Honor signed that -- signed an order to that effect.

23          THE COURT:  All right, so we're not going to

24    be going to final judgment against Ethnic Technologies,

25    here; right?

1    MR. FORD:  No.

2                 (Pause in hearing)

3    THE COURT:  What are the claims of the

4    plaintiff against Bonnie Nelson in this case?

5    MR. FORD:  Against Bonnie, Your Honor?  Your

6    Honor, Bonnie Nelson is an owner of Consumers Marketing

7    Research along with Noslen, LLC, which she is the sole

8    shareholder of.  Bonnie Nelson is also the 50 percent

9    beneficiary of the Estate of Gabrielle Nelson.

10            So with respect to the claims of Bonnie, Your

11   Honor, it's in her capacity as a shareholder of

12   Consumers Marketing Research and Noslen, both of which

13   own CMR.

14            THE COURT:  Well, we don't typically sue the

15   shareholders of companies that we're suing; right?

16            MR. FORD:  Your Honor, I think the other

17   distinction here is she's not only a shareholder, but

18   she's a 50 percent beneficiary.  So, she, in large part

19   is CMR.  She will, at least, receive the benefit of the

20   sale of CMR or as -- as Consumers Marketing Research,

21   and the Estate has taken the position, which we, of

22   course disagree, the sale potentially of Ethnic

23   Technologies.

24            THE COURT:  Well, what sort of relief do you

25   want against Bonnie Nelson?

6

1          MR. FORD:  Your Honor, I think that the

2     relief is similar to the relief that's sought against

3     CMR.  And quite frankly, Your Honor --

4          THE COURT:  Tell me.

5          MR. FORD:  -- discovery is premature, at this

6     point.

7          THE COURT:  Well, it's not premature to tell

8     me what relief you want against Bonnie Nelson.

9          MR. FORD:  Dissolution, Your Honor.

10    Dissolution of an entity with which she has an

11    ownership interest.  They're disputing the dissolution

12    of that entity.  Certainly, for at least discovery

13    purposes, we believe that Bonnie Nelson and Noslen, LLC

14    are -- are necessary parties to the litigation.

15          They have an interest in CMR, which our

16    position is pursuant to the operating agreement that

17    they're not going to purchase or bought out by Tap.

18    Pursuant to the operating agreement, the 2000 operating

19    agreement the assets and liabilities of Ethnic

20    Technologies, the joint LLC are to be split.

21          So with that regard, Your Honor, I certainly

22    think that it's something that is not only for

23    discovery purposes relevant to have those two parties

24    in the matter.  But she's inextricably intertwined in

25    all of this.  You know, there is another matter pending

7

1    before Judge Toskos.

2         THE COURT:  If she didn't file a responsive

3    pleading, and you've entered a default, and then you

4    want a default judgment against Bonnie Nelson.  What --

5    what would I be ordering Bonnie Nelson to do?

6         MR. FORD:  I think, Your Honor, you'd be

7    ordering a dissolution.

8         THE COURT:  Oh.

9         MR. FORD:  But I don't -- we would be

10   proceeding for judgment by default until trial in this

11   matter.  I don't think that, for example, if there's no

12   appearance made on her behalf, you know, that we would

13   default her, of course.  But we wouldn't proceed to

14   final judgment.  I think that would need to be

15   determined at the time of trial.  A proof hearing would

16   not be sufficient.

17        And I think also to, you know, foreclose her

18   rights to Ethnic Technologies, it's certainly important

19   for her to be a party.

20        Your Honor, there's issues that are pled in

21   the complaint.  Bonnie Nelson was a -- it was a

22   purported sister, but apparently a cousin of Ginger

23   Nelson.  Bonnie Nelson has had some level of

24   involvement.  She's certainly -- there was an *inter*

25   *vivos* transfer of the interest of CMR.

8

1          There's also issues that go back to 6 to 12

2    months ago, Your Honor, where Bonnie Nelson was looking

3    to sell, you know, she was marketing CMR and/or Ethnic

4    Technologies.  She had inappropriately shared the

5    general ledger.  Judge Toskos had entered an order

6    precluding her from doing so, requiring her to return

7    it and destroying any copies of the general ledger.

8          So I think the position taken by Mr. McDaniel

9    that Bonnie Nelson and Noslen are -- they're

10   inappropriate parties in this litigation, I think is

11   disingenuous.  And I don't think that that's the case.

12          THE COURT:  Okay.

13          MR. McDANIEL:  May I, Your Honor, on that

14   issue?

15          THE COURT:  Mmm-hmm.

16          MR. McDANIEL:  With all due respect to my

17   adversary, he didn't answer your question.  You

18   couldn't enter an order against her today, because the

19   relief sought is entirely speculative.

20          We understand the principles of corporate

21   governance.  The corporate governance is that Bonnie

22   Nelson is a shareholder.  She doesn't have any inherent

23   right to participate in litigation involving a company

24   in which -- a limited liability company in which she

25   happens to be a nominal shareholder of one of members.

9

1          She's not involved in management.  She's not

2     an officer.  She's not a director; she's not a member

3     of the litigation control.  She doesn't have any role

4     in management of the company.

5          She received this stock of *inter vivos*

6     transfer.  And the fact of the matter is, is it really

7     demonstrates what, I would respectfully suggest that

8     our litigation tactics are beyond the pale of what's

9     normally found.

10          You're right, you don't sue the shareholders,

11     and you don't sue beneficiaries of an estate just

12     because they might some day get some money.  There's

13     all kinds -- there's law on the book about that.  If

14     there was a distribution made to -- and that's the only

15     -- that's the only possible claim that I can see, is

16     that there seems to an assertion that if there was a

17     distribution, and it was this carved back provision

18     some day was actually effective and she may have gotten

19     money that she wouldn't have otherwise been entitled

20     to.

21          We don't do that with shareholders.  There's

22     the law that says that, you know, if you make a

23     distribution to shareholders and you're insolvent at

24     the time, or it would make you insolvent, than you can

25     get it.  But there's all kinds of remedies about that.

10

1          When -- what -- and I will suggest to the

2     Court, you may not have had the benefit of looking at

3     the discovery in this case, but it's -- I got a hundred

4     interrogatories of which maybe five, ten have something

5     to do with the case.  The rest of it, what did you do

6     with cars, and what did you get, and what did the other

7     shareholders get.  It just -- it doesn't make any

8     sense.

9          And my -- my position on this as it relates

10     to her, she doesn't belong in the case.  If she is in

11     the case, she's a bit player.  If she has tried to

12     assert her rights in some respect with regard to the

13     dissolution of the company, she would have no grounds

14     to do that.  And they have -- the Estate has a lawyer,

15     a very competent lawyer, that represents the interest

16     of the company.

17          She has an unliquidated contingent interest

18     in whatever the proceeds may be under -- under a

19     document that was -- that was settled in another case.

20     There was an issue with some documents that she

21     received.  There was an action that was filed.  I

22     actually had occasion to look at that.  There was a

23     consent to return the documents.  It never went to a

24     hearing -- I don't even think it got to the return

25     date.  She gave back the stuff.  She signed an order

11

1   that she won't give it to anybody.

2         You know, I'll talk about the other issues

3   about, you know, whether or not there's actually any

4   body in this case that I have duty to.  But I just want

5   to be clear about this that I think that the first

6   fundamental issue here is why is this woman being

7   tortured in this way?  She's got to pay her own legal

8   fees. She doesn't have the benefit of the Estate, she

9   doesn't have anybody else.  You know she's out-of-

10  pocket a lot of money, and she does not -- nothing that

11  happens with her will effect the outcome of the case.

12        THE COURT:  If she's not in the case, or if

13  she wasn't in the case, is she privy to the Estate

14  documents that are made up, or is she privy tot he

15  documents that are made available to the Estate?

16        MR. McDANIEL:  No.

17        THE COURT:  Why not?

18        MR. McDANIEL:  I mean she's -- she's a

19  beneficiary under the Estate.

20        THE COURT:  How much?

21        MR. McDANIEL:  Well, she gets 50 -- she gets

22  the cars.  Ms. Nelson left a number of personality and

23  then there's the company.

24        THE COURT:  Half of the Estate she gets?

25        MR. McDANIEL:  Well, it's a little bit more

12

1   complicated than that.  There was some personality, and

2   an apartment, other things that got divided up.  And

3   then the deal was we'll sell CMR.  And when we sell

4   CMR, you'll get the distributions, you'll get that

5   distributed.  So she has that, but I mean --

6           THE COURT:  But why would a beneficiary be

7   immune from or be precluded from knowing information

8   that was made available to the Estate of which she is a

9   50 percent beneficiary?  How could you not share that

10  with her, if she wanted to see it?

11          MR. McDANIEL:  I think she's entitled to -- I

12  don't do Estate Administration, so I can't really

13  answer that completely.  I can tell you that to date

14  she's received her own accountings.  She is not privy

15  to the litigation discussions.  There was a

16  stakeholders meeting that was awarded in this case.

17  She wasn't invited to it.

18          You know, I think that my experience has been

19  that there are some general discussions about where is

20  the Estate now.  I don't think that she's entitled to

21  -- I don't think there's -- frankly, others would know

22  better than me.  I did examine the issue.  As a

23  beneficiary you're entitled to -- beneficiary for cash,

24  because it's important to recognize, at least at this

25  juncture, she's -- there's been no distribution of

1    stock.

2           Is a beneficiary of cash entitled to know

3    privileged information about the company that's in the

4    Estate, if that's in litigation?  I -- I --

5           THE COURT:  Well, there seems, what I'm

6    trying to get to is the concern that was raised first

7    by Mr. Bartner (phonetic), then reiterated by Mr. Ford

8    with respect to the sharing of confidential

9    information, that she would otherwise not have

10   available to her.

11          MR. McDANIEL:  I don't think she's -- I

12   really don't think she's got a right to it.  I

13   certainly --

14          THE COURT:  Well, she doesn't have a right

15   under the -- as a nominal shareholder.

16          MR. McDANIEL:  No, absolutely not.  The

17   question of whether she has a right as a -- as a

18   beneficiary of the Estate --

19          THE COURT:  I presume she has that right

20   whether she's in the case or out of the case.

21          MR. McDANIEL:  That's true, if she's got it.

22   I mean --

23          MR. FORD:  Yeah, one thought, we -- Your

24   Honor did enter very recently a confidentiality order

25   and stipulation.  That it does address whether or not

14

1   information, confidential information can be provided

2   and to who.  And there is a preclusion on providing

3   information to the beneficiaries of the Estate.

4                MR. McDANIEL:  I -- I --

5                MR. FORD:  And then I believe, I don't know

6   if Mr. McDaniel signed that order or not, but you were

7   here.

8                MR. McDANIEL:  When was it entered?

9                MR. FORD:  When it was -- when it was --

10                MR. McDANIEL:  I had no opposition to it.

11                MR. FORD:  Okay, yeah.  Your Honor called it

12   about two weeks ago, and entered it.

13                MR. McDANIEL:  Judge, let me be clear.  This

14   -- I have no interest in trying to give access to

15   another attorney.  I'm not -- I don't practice that

16   way.  This is not about my trying to get access to

17   privileged information or whatever.  She has none now.

18   I don't see that, if there was any given in the future,

19   it would be voluntary.  It wouldn't be because --

20   because there's some compulsion on it.  And I mean

21   counsel for the Estate can address the issue of whether

22   or not she's received anything.

23                I mean Tom Howard who put in the

24   certification in this case.  I've litigated with him

25   for a decade now.  He's a very competent lawyer.  He's

15

1    not going to be compelled to turn over his files to me,

2    without a Court Order.   And I'm not -- that's not what

3    this is about.

4              I mean the goal here, at least for my client,

5    is to get in an appearance, make my motion to get out

6    of the case, and then go on my way.  She engaged me

7    because of the background that I have with some of the

8    parties.  I think that if you look at -- you know, I

9    wouldn't have any problem at all entering into some of

10   sort of an agreement, or having the Court fashion an

11   order that would preclude her from getting access to

12   privileged information.  I think that's only fair.

13   That's not what this is about.

14             THE COURT:   All right, we've gone afar

15   afield of my initial question to plaintiff's counsel.

16   So let me hear from plaintiff's counsel, if he wants to

17   supplement his argument.

18             MR. FORD:   Your Honor, I don't really want to

19   take up much more of the Court's time.   I mean that I

20   know that the parties have certainly briefed this and

21   lettered this sufficiently for Your Honor.

22             Your Honor, I think in this circumstance

23   there's a clear concurrent conflict of interest.   Not

24   only for one reason.   Not only because Mr. McDaniel

25   represents Peter Brownstein in the Federal Court

16

1      Litigation.  But because of Peter Brownstein

2      though Mr. McDaniel the representation in various other

3      facets.

4            Your Honor, going back to 2008 or 2009 Mr.

5      McDaniel was purportedly representing Tap.  Certainly,

6      preparing resolutions for Tap.

7            THE COURT:  What was he representing --

8      you're talking in the lawsuit?

9            MR. FORD:  No, Your Honor, even prior to

10     that.  Pursuant to --

11           THE COURT:  But the lawsuit was a derivative

12     action; right.

13           MR. FORD:  The lawsuit, yes, Your Honor.

14     Prior to that there was meetings with Mr. McDaniel,

15     Tina Lindsay, as is set forth in her certification, and

16     Peter Brownstein.  He prepared resolutions for Tap.  He

17     called meetings for Tap.  And then after that, he filed

18     litigation that clearly states for Peter Brownstein

19     individually and on behalf of Tap.

20           Ultimately, there's no dispute that Tap and

21     Mr. Wilhoit, or is that Tina Lindsay, at that point,

22     said, no, through Mr. Howard.  You don't represent Tap

23     here.  And -- and ultimately there was a further

24     distinction that was drawn.

25           Well, Your Honor in that matter, Mr. McDaniel

17

1   had filed a lawsuit against Zack Wilhoit, Tina Lindsay,

2   Ginger Nelson (Bonnie Nelson's cousin or purported

3   sister, whatever she may be).  In addition, Your Honor,

4   that matter proceeded, they were adverse.  There was no

5   dispute as the adversity as is set forth in Tom

6   Howard's certification.

7           And now, Mr. McDaniel is representing Peter

8   Brownstein in a Federal Court litigation.  He is suing

9   Ethnic Technologies and Tina Lindsay.  As the Court

10  knows Ethnic Technologies is owned by Tap, by CMR, and

11  we know, or at least it's purported that two of the

12  benefi -- or excuse me, or two of the shareholders of

13  CMR, Your Honor, are Bonnie Nelson and Noslen, LLC.

14          Pursuant to RPC 1.7, Your Honor, it doesn't

15  get more clear.

16          THE COURT:  If he gets a recovery in the

17  Federal action, and let's say Tina Lindsay is bankrupt.

18  Who is he collecting as?

19          MR. FORD:  If he gets a recovery, I mean I

20  would presume in the Federal litigation he's suing not

21  only Tina Lindsay, but it's Ethnic Technologies.

22          THE COURT:  Those are the two defendants that

23  I saw.

24          MR. FORD:  So if Tina Lindsay were bankrupt,

25  I presume that he's going after Ethnic Technologies.

18

1          THE COURT:  And who owns Ethnic Technologies?

2          MR. FORD:  Tap, CMR, and CMR's two

3     shareholders are Bonnie Nelson and Noslen, represented

4     by Mr. McDaniel.

5          THE COURT:  I mean that's where I see

6     potential conflict, actually.

7          MR. FORD:  And Your Honor, I don't see that

8     -- there's no way to waive it,  the fact that there in

9     different tribunals doesn't matter.  Because RPC 1.7b

10    provides for if you're in a tribunal, if there is a --

11         THE COURT:  He's suing to recover as against

12    an entity in which the party that he now wants to

13    represent in my case, is a shareholder.

14         MR. FORD:  Yes, Your Honor.

15         THE COURT:  So that's --

16         MR. McDANIEL:  If I may?  Here's -- here's

17    the issue that comes up, and you know maybe --

18         THE COURT:  Do you want to waive any recovery

19    against --

20         MR. McDANIEL:  I don't think I got a legal

21    right to it.  I mean, are they going to estopped when I

22    come back, and when we come back for an accounting, and

23    I say I want to recover against Ethnic Technologies,

24    they'll scream bloody murder.

25         THE COURT:  But if you get a recovery in

19

1   Federal Court and Tina Lindsay goes bankrupt; where are

2   you going to get your recovery?

3            MR. McDANIEL:  I take -- I take the

4   copyright.

5            THE COURT:  You're not going to get a

6   recovery against Ethnic Technologies?

7            MR. McDANIEL:  I don't see how?

8            THE COURT:  Why -- they're a defendant in the

9   case.

10            MR. McDANIEL:  They were -- they were named

11   as a defendant initially.  The case was somewhat

12   different when it was filed.  And there was an issue

13   with some other registrations, and it's been up to the

14   Third Circuit, and the Third Circuit's kind of defined

15   it.

16            I mean --

17            THE COURT:  So --

18            MR. McDANIEL:  -- I hear what you're saying,

19   but --

20            THE COURT:  -- I haven't study, I actually

21   did reviewed it, but I haven't studied the pleadings.

22   You're suing in Federal Court a company that is co-

23   owned by entities in which the people you now seek to

24   represent have interest.  Admittedly not big interest,

25   but interest.  That doesn't seem -- on its face doesn't

20

1   seem right.

2          MR. McDANIEL:  The issue -- the issue is

3   copyrights like a joint tenancy in an apartment

4   building.

5          THE COURT:  Copyrights like UCC, every time I

6   hear it, my eyes glaze over.  Meaning I don't

7   understand it.

8          MR. McDANIEL:  Well, let me take a shot, if I

9   could for just a second.

10          THE COURT:  Mmm-hmm.

11          MR. McDANIEL:  All right?  It's -- copywrites

12   is properties, personal property, and the co-authors --

13   this is a co-authorship.  Co-authors have an undivided

14   interest in the whole.

15          THE COURT:  I've read -- I've read your

16   papers.

17          MR. McDANIEL:  Okay.  So -- so, but the point

18   is that --

19          THE COURT:  Me, my comment was simply I don't

20   know in terms of the relief you're seeking.  What is --

21   you get a default judgment in the Federal case, what's

22   the relief you get?

23          MR. McDANIEL:  I get an order that Tina

24   Lindsay has to pay me half of everything that she's

25   received.

21

```
 1              THE COURT:  Assume she's bankrupt?
 2              MR. McDANIEL:  Then I get to pursue, she owns
 3    stock.  I have my regular creditors running these.  I
 4    take her stock in Tap, or I get an order from Chancery
 5    Judge compelling a receiver to conduct an auction of
 6    her -- of the copywrite and to pay me the balance.
 7              THE COURT:  So your waiving any right to
 8    collect anything against Ethnic Technologies, LLC in
 9    the Federal action?
10              MR. McDANIEL:  Ethnic could be on the hook
11    for attorneys fees, and I mean, and honestly --
12              THE COURT:  Where -- who's going to pay
13    those?
14              MR. McDANIEL:  Well, that's an issue of --
15    that they're litigating.  Here's one of the problems
16    that I have with this.
17              THE COURT:  That's the end of it.  Isn't that
18    the end of it there?
19              MR. McDANIEL:  I don't think so, because the
20    -- if you have to --
21              THE COURT:  Well, it trickles down to the
22    shareholders if their company is going to be on the
23    hook for the attorneys fees in that case.
24              MR. McDANIEL:  I have a couple of points that
25    I would just like to make.
```

22

1            THE COURT:  So you'll be getting the

2    attorneys fees both ways.  From the minority

3    shareholders that you're representing, and also you'll

4    be getting them to pay your attorneys fees in the

5    Federal action.

6            MR. McDANIEL:  Well, there's -- one of the

7    issues in this case.  The first thing I would say is

8    that, you know, this notion of who represents Ethnic

9    and -- and you know, if we're going to use the idea

10   that derivative plaintiffs represent the company that

11   they're bringing a derivative claim on them, then the

12   Einhorn Harris case --

13           THE COURT:  I'm passed that -- I'm passed

14   that issue.

15           MR. McDANIEL:  Okay.

16           THE COURT:  I'm here with you suing and

17   seeking recovery in the Federal action against the

18   company in which your present would be clients have an

19   interest.  You can't do that.

20           MR. McDANIEL:  So if I represent -- let's say

21   I had a client who owned shares in PSE&G; right?  And

22   --

23           THE COURT:  And you were suing to bring PSE&G

24   to its knees, break it up in a million pieces.  Have it

25   divest --

23

1          MR. McDANIEL:  And my client owns 100 shares.

2          THE COURT:  Right.

3          MR. McDANIEL:  I'm out?

4          THE COURT:  You're trying to diminish your

5     clients shares.  Yes, you're out, yeah.

6          But that's not this case.

7          MR. McDANIEL:  So in any amount?

8          THE COURT:  I think so, I'm afraid.

9          MR. McDANIEL:  I'm just, you know, if I'm

10    out, then the one thing I would say is that I think

11    they're pushing me out on the idea that -- of my

12    recovery, and you know.  If I'm out, I think Tom Howard

13    is also out of the case.

14         THE COURT:  I don't know.  I'm not here to

15    say that.  And I'm not trying --

16         MR. McDANIEL:  But I mean -- there's --

17    there's going to be -- There's a lot of problem.

18         THE COURT:  I'm not trying to be -- I'm not

19    trying to deprive anybody the right to make a living or

20    anything else.

21         MR. McDANIEL:  Yeah.

22         THE COURT:  You know, it's a substantial

23    application.  But you're suing in Federal Court and

24    among the relief you are seeking against this, against

25    Ethnic Technologies in which there are two owners, one

24

1    of which your client has an interest in.  It's not --

2    it's not so attenuated that -- just don't --

3            MR. McDANIEL:  It's a 3 percent interest on a

4    claim that would be -- and right now it's about

5    $250,000, so you're talking about six grand, right,

6    seven, eight grand.  And its, you know, if it exists,

7    it's a very nominal interest.  And I did cite some

8    cases that said there's a kind of a threshold.

9            THE COURT:  Well, you may be -- there may be

10   all kinds of relief you may want against Ethnic

11   Technologies beside just a money award.  You may want

12   -- you may want to seize assets that Ethnic

13   Technologies has an interest in to satisfy Mr.

14   Brownstein.

15           MR. McDANIEL:  I don't think I -- I just

16   don't see how I could.  I would -- I would --

17           THE COURT:  It's too incestuous.  I mean on

18   its face it just doesn't --

19           MR. McDANIEL:  I mean I would waive, you

20   know, and I'll be -- well, I'm not here to try, I'm

21   very straightforward on these things.  The -- the

22   attorneys fees in the only thing that there's a

23   potential claim for.

24           Part of the issue is that it's a very -- it

25   is a relatively remote occurrence a conflict would

25

1    arise in the future.  Is it waivable, is the other

2    thing.

3            THE COURT:  It's concurrent, I don't think

4    you can a waive a concurrent interest.

5            MR. McDANIEL:  You don't think it's waivable.

6            THE COURT:  Don't know.  I was tempted to

7    say, file your motion, just to get that issue tested as

8    to whether they even belong in the case.  And then if

9    you were out of the case, the issue would be moot.  And

10   if you were in the case, then I would have to address

11   the conflict.

12           But on the surface of it, on the face of it,

13   there's an actual concurrent dispute.  Your interest

14   are adverse to the interest that your client has in

15   Ethnic Technologies.  Your Federal Court interest is

16   adverse, it's live, it's unwavering.  That's my ruling.

17           MR. McDANIEL:  All right, I respectively

18   accept the Court's ruling.  Obviously, I disagree, but

19   I understand.

20           THE COURT:  You can --

21           MR. McDANIEL:  Thank you, Judge.

22           THE COURT:  -- that's why we have the

23   Appellate Division.

24           MR. McDANIEL:  Yes.

25           THE COURT:  Among other reasons.

26

1          MR. FORD:  Your Honor, there are several

2    other matters that are of pressing need.  Several of

3    which were raised in correspondence back and forth to

4    the Court with respect to a couple of issues.

5          THE COURT:  Well, don't argue them, just

6    itemize them.

7          MR. FORD:  Your Honor, the items are CMR and

8    the Estates responses to discovery.  I sent a letter on

9    March --

10          THE COURT:  All right, we have that issue,

11    and we have the discovery issue here.

12          MR. FORD:  We have the sanctions issue, Your

13    Honor.  There is an issue where Mr. Holahan we filed

14    our -- excuse me, we served a Third Party with the

15    subpoena.  Mr. Holahan has requested leave to file a

16    motion to quash the subpoena.

17          THE COURT:  Did I give that leave?

18          MR. HOLAHAN:  You have not.  You have not

19    addressed it, Your Honor.

20          MR. FORD:  There is an issue, Your Honor,

21    with respect to -- and I assume counsel can work this

22    out, we had noticed Peggy Mead (phonetic) the

23    administrator CTA, her deposition.  Counsel for the

24    Estate was unwilling to produce her.

25          So there are several issues that every time

27

1    we try to make progress, Your Honor, we get bogged

2    down.  We send a subpoena for a deposition, for

3    documents.  A Motion to Quash.

4         THE COURT:  Well, they're allowed to file a

5    Motion to Quash, or they will be.  But do you want me

6    to address these matters today, right now, with

7    counsel?

8         MR. FORD:  Yes, Your Honor.

9         MR. McDANIEL:  Actually, I should, I suppose

10   I'm excused, at this point?

11        THE COURT:  I haven't signed the order yet.

12        MR. McDANIEL:  Okay.

13        THE COURT:  You can be thought, if you want

14   to be?

15        MR. McDANIEL:  I don't want to hear anything

16   that's --

17        THE COURT:  All right, let me talk about the

18   fee -- on the fee thing.  Until I get my hands on

19   whether or not there's been a good faith response to

20   the discovery demands, I can't decide whether or not,

21   or when, or what to do about the sanctions that are

22   being imposed.

23        So if in fact there's been a good faith

24   effort to provide the discovery that's available by Ms.

25   Nelson, you know, I'm going scale back the penalties, I

28

1    mean certainly to the day that they were produced and

2    maybe even before that.  So I can't really resolve that

3    question today.  I can't have a debate about whether

4    they were adequate or inadequate.  If they are

5    inadequate, then I'll -- we're going to have to deal

6    with that.  We're going to have to deal with that.

7            MR. FORD:  Your Honor, I would submit that

8    this issue has been pending before the Court for a

9    substantial amount of time.  The briefs, most recently,

10   while she was represented by counsel, did address this

11   issue.

12           The position of the plaintiff and third-party

13   defendants is this is just another opportunity to kick

14   the can down the road, to delay the matter.  This

15   matter, Your Honor, is scheduled for trial in

16   September.  Now we all know that we can't even get off

17   the ground, despite our best efforts to move this case.

18   Because every try to take one step forward, another

19   issue is interjected.  And we'll never, discovery will

20   never end in this case, Your Honor.

21           THE COURT:  I've never had such a case in my

22   life.  I've never had a case go a day after the

23   discovery end date, as a matter of fact.

24           MR. FORD:  Your Honor, we're past the

25   discovery end date in this matter.

29

1        THE COURT:  Well, there you go.  So I'm not

2   going to do anything with respect to the now

3   lawyerless, noncompliant, self represented party.  I'll

4   give you leave to file whatever application you want,

5   vis-a-vis, Bonnie Nelson and Noslen, Inc, on the

6   question of the noncompliance with the discovery

7   obligation.

8        MR. HOLAHAN:  Okay.

9        THE COURT:  Next?

10       MR. FORD:  The discovery responses by CMR and

11   the Estate.

12       THE COURT:  Have you given them a deficiency

13   letter?

14       MR. FORD:  We sent it March 14th and March

15   16th, Your Honor.

16       THE COURT:  And have you got a response?

17       MR. FORD:  Mr. Holahan hinted that he would

18   not respond.  He took the position that they deemed

19   their responses to be sufficient.  Mr. Oliver has not

20   responded on behalf of CMR.

21       THE COURT:  What do you want me to do?

22       MR. FORD:  Your Honor, I would -- I would

23   like -- I mean, obviously, I'm not going to -- the

24   Court is not going to enter draconian relief of

25   striking their answer and counterclaim.  But I think a

30

1    reasonable measure, Your Honor, is to provide a

2    deadline, a hard and fast deadline to, at least to

3    start by giving a good faith response to our letter,

4    which I think is something that we're entitled to.

5            THE COURT:  Have I appointed a Discovery

6    Master in this case?

7            MR. FORD:  No, Your Honor.

8            MR. HOLAHAN:  No.  We welcomed it, Your

9    Honor.  But your Court -- but the Court has not done

10   so.

11           THE COURT:  Should I?

12           MR. FORD:  Your Honor, given --

13           THE COURT:  Because otherwise I'm going to do

14   what I don't do, which is allow a discovery -- a Motion

15   to Dismiss their pleadings for inadequate discovery,

16   let them respond, and you reply.  And then I'll come in

17   and see whether or not they've met their obligations to

18   provide responses to discovery.

19           MR. FORD:  We have no objection to a

20   Discovery Master, Your Honor.

21           THE COURT:  Joe Castiglia. Do you know him?

22           MR. FORD:  Joe Castiglia?

23           MR. HOLAHAN:  Yes, I think he would be --

24           THE COURT:  He's a local fellow, he's quite

25   good.  Do a due diligence Joseph Castiglia, C-A-S-T-I-

31

1      G-L-I-A.  He's across the street here.  I think -- I

2      mean I don't do Discovery Masters, now I've done two in

3      one week, so I must be getting old.  But he's quite

4      good.

5              So I'll, you submit an order Discovery Master

6      -- No, I'll tell you what, I'll do my own order.  Do I

7      need the consent of the party that's not here?

8              MR. HOLAHAN:  I'm sure, I don't -- I can

9      speak for CMR, Your Honor, the Estate, I'm sure that

10     CMR would consent.

11             THE COURT:  Okay.  So that will get done

12     immediately.

13             MR. FORD:  Thank you, Your Honor.

14             THE COURT:  Do you want file a -- I'm sorry,

15     you're done or not done?

16             MR. FORD:  Your Honor, I guess the Discovery

17     Master will handle the issue with respect to the

18     depositions, the subpoena of Richard Lane.

19             Just give me one second, Your Honor, I want

20     to be sure.

21             MR. McDANIEL:  Will the Master handle the

22     issue of my client as well, or my former client, or

23     soon to be former client?

24             THE COURT:  Well, I think she's in a little

25     different position.  Right now she's under the gun of

32

1    the Court's Order, so she's going to have to get before

2    me proof that she's provided good discovery.  I haven't

3    seen it, so.

4            MR. McDANIEL:  Would Your Honor like to see

5    it?

6            THE COURT:  Would I like to see it?

7            MR. McDANIEL:  I'll send it in.  It's 900

8    pages?

9            THE COURT:  Do you want to submit that issue

10   to the Discovery Master, whether she's responded in

11   good faith in her discovery demands?

12           MR. FORD:  Your Honor, would I be able to

13   give that some thought over the weekend?

14           THE COURT:  No, not that weekend.  It's only

15   five after three.  Really --

16           MR. FORD:  Your Honor, I have no problem with

17   the Discovery Master.

18           THE COURT:  Let's do it that way, all of it.

19   Good, done.

20           MR. FORD:  It's fine.  Your Honor, there's

21   just one other issue, I believe, in our application we

22   requested that the Court require that counsel for CMR

23   and the Estate sign certifications, much like was done

24   with Judge Toskos in the matter of the general ledger.

25   To determine what, if any, confidential or privileged

33

1      information has been shared with Mr. McDaniel or his

2      clients.

3                  THE COURT:  Well, I'm assuming they're going

4      to say none.  Why do we think that there was some?

5                  MR. FORD:  Your Honor, we believe that in the

6      general ledger that was shared either with Bonnie

7      Nelson or the general ledger that was provided on a

8      thumb drive to the Estate and CMR, at the stakeholders

9      meeting in early March.  There's information that Mr.

10     McDaniel used in his application with respect to the

11     compensation of an employee at Ethnic Technologies.

12                 The only way they would have had access to

13     this information is through the general ledger.

14     There's no other way.  Any other ways would have been

15     wholly unlawful.

16                 So our position is CMR and the Estate did not

17     object in their application to signing a certification.

18     And there is a real concern considering -- Judge Toskos

19     already entered an order, it was not a consent order,

20     with respect to Bonnie Nelson compelling her to return

21     the general order.  Now we have another instance where

22     Bonnie Nelson either used the information from the

23     general ledger she received last year, or when we

24     produced the general ledger to --

25                 THE COURT:  I'm not going to order a

34

1    certification.  You can do discovery on that issue.

2    I'm not ordering a certification.

3          MR. FORD:  Okay.

4          THE COURT:  I'm not ordering the

5    certification.

6          MR. McDANIEL:  Are we on the record?

7          THE COURT:  Yes.

8          MR. McDANIEL:  I received no confidential

9    information from my client, Judge.  If I did, I would

10   tear it up and send it back in pieces, I don't practice

11   that way.

12         THE COURT:  Motion to Quash, what do you want

13   to quash?

14         MR. HOLAHAN:  A subpoena served on Richard

15   Lane and that is, I thought we just decided was going

16   to be determined by or addressed by Mr. Castiglia.

17         THE COURT:  Has, so you didn't get leave of

18   court from me to file a motion?

19         MR. HOLAHAN:  No, I wrote --

20         THE COURT:  Perfect, don't file it.

21         MR. HOLAHAN:  That's what I thought.

22         THE COURT:  Thank you, fellows.

23         MR. FORD:  Thank you, Your Honor.

24         MR. HOLAHAN:  Thank you.

25         MR. McDANIEL:  Thank you, Judge, have a nice

35

1   weekend.

2          (Proceeding concluded at 3:08:33 p.m.)

3                    CERTIFICATION

4

5      I, Patricia Wtulich, the assigned transcriber, do

6   hereby certify the foregoing transcript of proceedings

7   on CourtSmart, Index No. from 2:33:47 to 3:08:33, is

8   prepared to the best of my ability and in full

9   compliance with the current Transcript Format for

10  Judicial Proceedings and is a true and accurate non-

11  compressed transcript of the proceedings, as recorded.

12

13     /s/ Patricia Wtulich                    AD/T 621
14       Patricia Wtulich                     AOC Number
15
16
17     Phoenix Transcription LLC              05/17/16
18        Agency Name                            Date
19